# EXHIBIT A

NHTSA Campaign Number: 15V-568



**Hyundai Motor America**
10550 Talbert Avenue
P.O. Box 20839
Fountain Valley, CA 92728-9937

# IMPORTANT SAFETY RECALL

This notice applies to your vehicle, VIN: XXXXXXXX**XXXXXXXX**

Dear Hyundai Sonata Owner:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act. Hyundai has decided that a defect which relates to motor vehicle safety exists in certain model year 2011 through 2012 Hyundai Sonata vehicles equipped with 2.4 liter and turbocharged 2.0 liter gasoline direct injection engines.

**What is the problem?**
- An investigation by Hyundai has determined that excess metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft. This debris can be forced into the connecting rod oiling passages, restricting oil flow to the bearings and increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine RPM increases. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion, increasing the risk of a crash.

**What will Hyundai do?**
- Your Hyundai dealer will inspect your vehicle for indications of a worn connecting rod bearing and if necessary, repair your vehicle. This procedure will be performed at no charge to you. The actual time required to perform the inspection procedure will take approximately 1 hour, however your vehicle may be needed longer depending on the dealer's schedule; therefore, we recommend scheduling a service appointment to minimize inconvenience. Additional time will be required if it is necessary to perform a repair procedure on your vehicle.

  Additionally, the warranty coverage for the engine's "short block "assembly (consisting of the engine block, crankshaft and bearings, connecting rods and bearings, and pistons) on 2011-2012 Sonatas manufactured at Hyundai Motor Manufacturing Alabama has been extended to 10 years from the date of original delivery or the date of first use, or 120,000 miles, whichever occurs first.

**What should you do?**

- For more information regarding this Recall Campaign, including a link to make a service appointment, please visit:

www.HyundaiUSA.com/Campaign132

- Input your 17 digit Vehicle Identification Number to verify that your vehicle qualifies for this Recall Campaign.  Input your zip code and a list of the five closest dealers will appear.  Click on "Schedule Service" for your preferred dealer.

1. Click on "Choose Individual Service and Repairs"
2. Select the "Recommended" tab.
3. When the campaign is displayed, click on the campaign and select "Add to Cart"
4. Click "Next" to complete scheduling your service appointment.

If your preferred dealer does not have a link to schedule service online or you are unable to make an appointment online, call your Hyundai dealer to schedule an appointment.

**What if you have other questions?**

- If you require further assistance, you may contact the Hyundai Customer Care Center at 1-855-671-3059.  If you are not satisfied that we have remedied this situation without charge, and within a reasonable amount of time, you may wish to write to the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE, Washington, D.C. 20590, or call their toll-free Vehicle Safety Hotline at 1-888-327-4236 (TTY: 1-800-424-9153), or go to http://www.safercar.gov.

**Reimbursement Notification**

- Hyundai has a program for reimbursing owners of Model Year model year 2011 through 2012 Hyundai Sonata vehicles equipped with 2.4 liter and turbocharged 2.0 liter gasoline direct injection engines who paid to have the their engine repaired as a result of a worn or damage connecting rod bearing prior to receiving this recall notification letter.  To obtain information about reimbursement from Hyundai, and submit your request for reimbursement electronically, please visit:

www.HyundaiUSA.com/Campaign132

If you are a vehicle lessor, Federal law requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

We urge your prompt attention to this important safety matter.

Hyundai Motor America

# EXHIBIT B

**HYUNDAI**
NEW THINKING.
NEW POSSIBILITIES.

**Hyundai Motor America**
10550 Talbert Avenue
P.O. Box 20839
Fountain Valley, CA 92728-9937

# IMPORTANT SAFETY RECALL

This notice applies to your vehicle, VIN: XXXXXXXXX**XXXXXXXX**

Dear Hyundai Sonata owner:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act. Hyundai has decided that a defect which relates to motor vehicle safety exists in certain Model Year 2013 through 2014 Sonata vehicles produced beginning on March 21, 2012 through May 29, 2014.   Our records indicate that you own or lease the vehicle identified by the VIN on this notice.

**What is the problem?**
- An investigation by Hyundai has determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine.  This debris may restrict oil flow to the bearings and increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine RPM increases.  If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion, increasing the risk of a crash.

**What will Hyundai do?**
- Your Hyundai dealer will inspect your vehicle for indications of a worn connecting rod bearing and if necessary, repair your vehicle.   This procedure will be performed at no charge to you.  The actual time required to perform the inspection procedure will take approximately 1 hour, however your vehicle may be needed longer; therefore, we recommend scheduling a service appointment to minimize inconvenience.  A minimum of one day will be required if it is necessary to perform a repair procedure on your vehicle.

---

**What should you do?**

This is an important Safety Recall
- Schedule a service appointment at your local Hyundai dealer.

- For more information regarding this Recall Campaign, including a link to make a service appointment, please visit:

  www.HyundaiUSA.com/Campaign162

---

**What if you have other questions?**
- If you require further assistance, you may contact the Hyundai Customer Care Center at 1-855-371-9460.  If you are not satisfied that we have remedied this situation without charge, and within a reasonable amount of time, you may wish to write to the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE, Washington, D.C. 20590, or call their toll-free Vehicle Safety Hotline at 1-888-327-4236 (TTY: 1-800-424-9153), or go to http://www.safercar.gov.

**Reimbursement Notification**
- Hyundai has a program for reimbursing owners of Model Year model year 2013 through 2014 Hyundai Sonata vehicles equipped with 2.4 liter and turbocharged 2.0 liter gasoline direct injection engines who paid to have the their engine repaired as a result of a worn or damage connecting rod bearing prior to receiving this recall notification letter.  To obtain information about reimbursement from Hyundai, and submit your request for reimbursement electronically, please visit:

www.HyundaiUSA.com/Campaign162

If you are a vehicle lessor, Federal law requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

We urge your prompt attention to this important safety matter.

Hyundai Motor America

# EXHIBIT C

 **HYUNDAI**

Hyundai Motor America
P.O. Box 20839
Fountain Valley, CA 92728-9937

NHTSA Campaign Number: 17V-226

# IMPORTANT SAFETY RECALL

This notice applies to your vehicle, VIN: XXXXXXXXXXXXXXXX

Dear Hyundai Santa Fe Sport owner:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act. Hyundai has decided that a defect which relates to motor vehicle safety exists in certain Model Year 2013 through 2014 Santa Fe Sport vehicles manufactured through September 12, 2014. Our records indicate that you own or lease the vehicle identified by the VIN on this notice.

## What is the problem?
An investigation by Hyundai has determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine. This debris may restrict oil flow to the bearings and increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine RPM increases. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion, increasing the risk of a crash.

## What will Hyundai do?
Your Hyundai dealer will inspect your vehicle for indications of a worn connecting rod bearing and if necessary, repair your vehicle. This procedure will be performed at **NO CHARGE** to you. The actual time required to perform the inspection procedure will take approximately 1 hour, however your vehicle may be needed longer; therefore, we recommend scheduling a service appointment to minimize inconvenience. A minimum of one day will be required if it is necessary to perform a repair procedure on your vehicle.

## What should you do?

> **This is an important Safety Recall**
> - Schedule a service appointment at your local Hyundai dealer.
> - For more information regarding this Recall Campaign, including a link to make a service appointment, please visit:
>   **www.HyundaiUSA.com/Campaign162**

## What if you have other questions?
If you require further assistance, you may contact the Hyundai Customer Care Center at 1-855-371-9460. If you are not satisfied that we have remedied this situation without charge, and within a reasonable amount of time, you may wish to write to the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE, Washington, D.C. 20590, or call their toll-free Vehicle Safety Hotline at 1-888-327-4236 (TTY: 1-800-424-9153), or go to http://www.safercar.gov.

## Reimbursement Notification
Hyundai has a program for reimbursing owners of Model Year model year 2013 through 2014 Hyundai Santa Fe Sport vehicles equipped with 2.4 liter and turbocharged 2.0 liter gasoline direct injection engines who paid to have the their engine repaired as a result of a worn or damage connecting rod bearing prior to receiving this recall notification letter. To obtain information about reimbursement from Hyundai, and submit your request for reimbursement electronically, please visit:
**www.HyundaiUSA.com/Campaign162**

If you are a vehicle lessor, Federal law requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

We urge your prompt attention to this important safety matter.

Hyundai Motor America

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

If you have changes to the information below, please remove and submit this form by inserting into the postage-paid envelope enclosed.



# Information Change Card

Name and address has changed (print new information below)

LAST NAME                          FIRST NAME                          M.I.

MAILING ADDRESS          STREET                          APT. NO.

CITY                          STATE      ZIP

TELEPHONE NUMBER

VEHICLE ▶
IDENTIFICATION
NUMBER

I no longer own this automobile as of  __ /__ /____
                                              DATE
It was:
☐ SOLD   (Print name and address of new owner above, if known).

☐ EXPORTED          ☐ STOLEN

☐ DESTROYED          ☐ I have NEVER owned this Hyundai

☐ The Vehicle Identification Number on this card is incorrect.
   The VIN of my Hyundai is

E-MAIL ADDRESS



Hyundai Motor America
P.O. Box 20839
Fountain Valley, CA 92728-9937

Número de campaña NHTSA: 17V-226

# IMPORTANTE RETIRO DEL MERCADO POR MOTIVOS DE SEGURIDAD

Esta notificación aplica a su vehículo, VIN: XXXXXXXXXXXXXXXX

Estimado(a) propietario(a) del vehículo Hyundai Santa Fe Sport:

Se le envía este aviso de acuerdo con los requisitos de la Ley Nacional de Seguridad de Tráfico y Vehículos Motorizados (National Traffic and Motor Vehicle Safety Act). Hyundai ha detectado un defecto relacionado con la seguridad del vehículo motorizado en determinados vehículos Santa Fe Sport, de años modelo 2013 hasta 2014, fabricados hasta el 12 de septiembre de 2014. Nuestros registros indican que usted posee o arrienda el vehículo identificado por el VIN en este aviso.

### ¿Cuál es el problema?
Una investigación realizada por Hyundai ha determinado que un exceso de residuos metálicos puede haberse generado de las operaciones de mecanizado fábrica, como parte de la fabricación del motor. Estos residuos pueden restringir el flujo de combustible a los cojinetes y aumentar potencialmente el desgaste prematuro de los mismos. Un cojinete de biela desgastado producirá un ruido de golpe metálico cíclico del motor que aumentará la frecuencia a medida que las RPM del motor aumenten. Si se sigue conduciendo el vehículo con un rodamiento de biela gastado, el rodamiento puede fallar y el vehículo puede calarse aún en movimiento, lo que aumenta el riesgo de una colisión.

### ¿Qué hará Hyundai?
Su concesionario Hyundai inspeccionará el vehículo en busca de indicios de un rodamiento de biela gastado y, si es necesario, lo reparará. Este procedimiento se realiza **SIN COSTO** alguno para usted. El tiempo real necesario para realizar el procedimiento de inspección será de aproximadamente una hora. Sin embargo, es posible que le soliciten que su vehículo permanezca más tiempo; por lo tanto, le recomendamos que programe una cita de servicio para minimizar los inconvenientes. Se requerirá un día, como mínimo, en caso de que sea necesario realizar un procedimiento de reparación en el vehículo.

### ¿Qué debe hacer usted?

> **Este es un importante retiro del mercado por motivos de seguridad**
> - Programe una cita de servicio en su concesionario local de Hyundai.
> - Para obtener más información sobre esta campaña de retiro del mercado, incluido el enlace para programar una cita de servicio, visite:
>   **www.HyundaiUSA.com/Campaign162/espanol**

### ¿Qué sucede si tiene usted otras preguntas?
Si necesita más ayuda, puede comunicarse con el Centro de Atención al Cliente de Hyundai al 1-800-633-5151. Si no queda satisfecho una vez que hayamos solucionado este problema sin cargo, y dentro de un tiempo razonable, puede dirigirse por escrito al Administrador, Administración Nacional para la Seguridad del Tránsito en las Carreteras, 1200 New Jersey Avenue, SE, Washington, D.C. 20590, o llame al número gratuito de la Línea de Seguridad de Vehículos 1-888-327-4236 (TTY: 1-800-424-9153), o visite http://www.safercar.gov.

### Notificación de reembolso
Hyundai tiene un programa para reembolsar a los propietarios de los vehículos Hyundai Santa Fe Sport de años modelo 2013 a 2014 equipados con motores de inyección directa de combustible de 2,4 litros y de 2,0 litros turboalimentados que pagaron una reparación del motor como resultado de un rodamiento de biela gastado o dañado antes de recibir esta carta de retirada de producto. Para obtener información sobre el reembolso que otorga Hyundai y enviar su solicitud de reembolso en forma electrónica, visite:
**www.HyundaiUSA.com/Campaign162/espanol**

En caso de que sea arrendador del vehículo, la legislación federal exige a todos los arrendadores de vehículos que reciben este aviso de retiro del mercado que reenvíen una copia de este aviso al arrendatario en un plazo de diez días.

Le solicitamos que preste inmediata atención a esta importante cuestión de seguridad.

Hyundai Motor América

---

Si tiene algún cambio en la información que aparece a continuación,
por favor retire y envíe este formulario mediante la inserción en el sobre adjunto con franqueo pagado.

## Tarjeta de modificación de información

Si el nombre o la dirección ha cambiado, escribir la nueva información a continuación

| APELLIDO | NOMBRE | INICIAL DEL SEGUNDO NOMBRE |
|---|---|---|

DIRECCIÓN POSTAL          CALLE                    APARTAMENTO NO.

CIUDAD                    ESTADO    CÓDIGO POSTAL

NÚMERO DE TELÉFONO

EL NÚMERO DE IDENTIFICACIÓN DEL VEHÍCULO (VIN) ▶

No soy propietario de este automóvil desde el __ /__ /_____
                                              FECHA

Ha sido:
☐ VENDIDO (imprimir nombre y dirección del nuevo propietario, si lo conoce)

☐ EXPORTADO        ☐ ROBADO

☐ DESTRUIDO        ☐ NUNCA he sido propietario de este Hyundai

☐ El Número de Identificación del Vehículo (VIN) de esta tarjeta es incorrecto. El VIN de mi Hyundai es

CORREO ELECTRÓNICO

# EXHIBIT D

Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
Jae (Eddie) K. Kim, State Bar No. 236805
jkk@mccunewright.com
**McCuneWright LLP**
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Joseph G. Sauder, PA State Bar No.82467*
JGS@chimicles.com
Matthew D. Schelkopf, PA State Bar No. 89143*
MDS@chimicles.com
**Chimicles & Tikellis LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
*_Pro Hac Vice_ applications to be submitted

Attorneys for Plaintiff and Putative Class

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MENDOZA, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>HYUNDAI MOTOR COMPANY, LTD, HYUNDAI MOTOR AMERICA, INC., and DOES 1 through 10, Inclusive,<br><br>        Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, _et seq._);<br>2. Violation of California Unfair Competition Laws (Cal. Bus. & Prof. Code § 17200);<br>3. Violation of California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, _et seq._);<br>4. Breach of Express Warranty;<br>5. Breach of Implied Warranty;<br>6. Breach of Written Warranty Under the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, _et seq._);<br>7. Common Law Fraud;<br>8. Breach of the Duty of Good Faith and Fair Dealing;<br>9. Violation of the Song-Beverly Act – Breach of Implied Warranty (Cal. Civ. Code §§ 1792, 1791.1, _et seq._)<br><br>**DEMAND FOR JURY TRIAL** |

-1-

## PLAINTIFF'S CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Elizabeth Mendoza brings this action against Defendants Hyundai Motor Company, Hyundai Motor America, and Does 1 through 10 (collectively "Defendants"), by and through her attorneys, individually and on behalf of all others similarly situated, and alleges as follows:

## INTRODUCTION

1.  This is a class action lawsuit brought by Plaintiff on behalf of herself and a class of current and former owners and lessees with Theta II 2.4 liter (a/k/a "G4KC") gasoline direct injection engines (the "Theta II Engine") installed in model years ("MY") 2011 and 2012 Hyundai Sonata vehicles (the "Class Vehicles").[1]

2.  This action arises from Defendants' failure, despite their longstanding knowledge of a material design defect, to disclose to Plaintiff and similarly situated consumers that the engines in the Class Vehicles contain, *inter alia*, defective connecting rod bearings and insufficient channels of engine lubrication. As explained below, when the connecting rod bearings begin to fail, metal debris from the defective rod bearings is transported throughout the Class Vehicles' engines via contaminated engine oil. This defect – which typically manifests itself during and shortly after the limited warranty period has expired – will inevitably cause the Class Vehicles to experience catastrophic engine failure. Further, due to insufficient channels of lubrication in the Class Vehicles' engines, the time it takes the Class Vehicles to experience catastrophic engine failure is accelerated.

3.  Significantly, the presence of defective connecting rod bearings and insufficient lubrication channels poses a safety risk to the operator and passengers of the Class Vehicles. The failure of the connecting rod bearings can cause complete and catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speeds, and the insufficient lubrication channels accelerates the time it takes the Class Vehicles to experience catastrophic engine failure. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death. As discussed further herein, numerous

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

-2-

CLASS ACTION COMPLAINT
CASE NO.:

owners and lessees of the Class Vehicles have experienced engine damage and catastrophic failure while operating the Class Vehicles, thus placing themselves and those around them in immediate danger.

4. Not only did Defendants actively conceal the fact that particular components within the Class Vehicles' engines are defective, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5. Hyundai has long been aware of the defect described above. Yet, notwithstanding its longstanding knowledge of this design defect, Hyundai has routinely refused to repair the Class Vehicles without charge when the defect manifests. Indeed, in many cases Hyundai even has refused to disclose the existence of the defect when Class Vehicles displaying symptoms consistent with the defect are brought in for service, instead choosing to ignore the defect until they have caused significant mechanical problems necessitating costly repairs.

6. Many other owners and lessees of the Class Vehicles have communicated with Defendants and/or Defendants' agents to request that they remedy and/or address the defect and/or resultant damage at no expense. Defendants have routinely failed to do so.

7. Hyundai has also refused to take any action to correct this concealed design defect when it manifests in the Class Vehicles outside of the warranty period. Since the defect can manifest shortly outside of the warranty period for the Class Vehicles – and given Defendants' knowledge of this concealed, safety related design defect – Hyundai's attempt to limit the warranty with respect to the engine defect is unconscionable and unenforceable here.

8. Despite notice and knowledge of the defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records, including durability testing, Hyundai has not recalled the Class Vehicles to repair the engine defect, offered its customers suitable repairs or replacements free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses to repair the defect.

9. As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money

CLASS ACTION COMPLAINT
CASE NO.:

and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

10. Had Plaintiff and other Class Members known of the defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

11. Plaintiff is also informed and believes, and on that basis alleges, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

12. As a result of the defect and the monetary costs associated with attempting to repair the defect, Plaintiff and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

13. Accordingly, Plaintiff brings this action to redress Defendants' violations of California's consumer fraud statutes, and also seeks recovery for Defendants' breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and common law fraud.

## JURISDICTION

14. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15. This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of California and throughout the United States.

## VENUE

16. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, there are one or more authorized Hyundai dealers within this district and Defendants have advertised in this district and have received substantial revenue

-4-

and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## PARTIES

**Plaintiff Elizabeth Mendoza**

17.     Plaintiff Elizabeth Mendoza ("Plaintiff") is a citizen of the State of California, and currently resides in Marina, California.

18.     On or about February 11, 2012, Plaintiff purchased a 2011 Hyundai Sonata with approximately 30,000 miles on the odometer.

19.     On or about October 27, 2014, with approximately 85,000 miles on the odometer, Plaintiff was driving when she heard a loud "knocking" noise emanating from the engine of her vehicle.

20.     Plaintiff then brought her vehicle into her local Hyundai dealer.  The dealer informed Plaintiff that one of the pistons in her engine had blown out.  Plaintiff then requested that the dealership repair her vehicle under warranty.  The dealer refused to make such repairs, informed Plaintiff that the repairs were not covered under her warranty, and instead offered to replace the engine in Plaintiff's vehicle for approximately $4,500.  Plaintiff declined the repairs.

21.     Plaintiff subsequently contacted a local mechanic to perform the repairs.  Plaintiff's vehicle necessitated an engine replacement at an out-of-pocket cost to her of $3,000.

22.     At all times relevant herein, Plaintiff adhered to Hyundai's recommended maintenance intervals.

23.     Plaintiff has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect and repairs and diminished value of her vehicle.

24.     None of the Defendants, or any of their agents, dealers, or other representatives informed Plaintiff of the existence of the defect prior to, or any time after, her purchase.

**The Defendants**

25.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop,

-5-

CLASS ACTION COMPLAINT
CASE NO.:

manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

26. Defendant Hyundai Motor Company, Ltd. ("HMC") is a South Korean corporation. HMC is the parent corporation of Hyundai Motor America, Inc. HMC, through its various entities, designs, manufactures, markets, distributes and sells Hyundai automobiles in California and multiple other locations in the United States.

27. Defendant Hyundai Motor America, Inc. ("HMA") is incorporated and headquartered in the State of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708. HMA is HMC's U.S. sales and marketing division, which oversees sales and other operations across the United States. HMA distributes Hyundai vehicles and sells these vehicles through its network of dealers. Money received from the purchase of a Hyundai vehicle from a dealership flows from the dealer to HMA.

28. HMA and HMC sell Hyundai vehicles through a network of dealerships that are the agents of HMA and HMC.

29. There exists, and at all times herein existed, a unity of ownership between HMC, HMA and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

30. Upon information and belief, Defendant HMC communicates with Defendant HMA concerning virtually all aspects of the Hyundai products it distributes within the United States.

31. Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Theta II Engine as it relates to the engine defect within the Class Vehicles were performed exclusively by Defendants HMA and HMC.

32. Upon information and belief, Defendants HMA and HMC developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

33. HMA and HMC are collectively referred to in this complaint as "Hyundai" or "Defendants" unless identified separately.

34. Hyundai engages in continuous and substantial business in California.

-6-

CLASS ACTION COMPLAINT
CASE No.:

35. The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such defendants by such fictitious names. Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as DOES when such identities become known.

36. Based upon information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## CALIFORNIA LAW APPLIES

37. It is appropriate to apply California law to the nationwide claims because California's interest in this litigation exceeds that of any other state.

38. As discussed above, Defendant HMA is located in Fountain Valley, California and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting Hyundai vehicles.

39. Hyundai's customer relations, engineering, marketing, and warranty departments are all located in HMA's Fountain Valley campus. Hyundai's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to Hyundai or third-party websites. Hyundai's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from Hyundai's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.

40. Based on the foregoing, such policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, Defendants' headquarters in Fountain Valley, California. As detailed below, Hyundai also came to know, or should have come to know, of the engine defect through the activities of Hyundai divisions and affiliated entities located within California.

-7-

Accordingly, the State of California has the most significant relationship to this litigation and its law should govern.

**TOLLING OF STATUTES OF LIMITATIONS**

41.     Any applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiff and the members of the Class could not have reasonably discovered the true, latent nature of the engine defect until shortly before this class action litigation was commenced.

42.     In addition, even after Plaintiff and Class Members contacted Defendants and/or their authorized dealers for vehicle repairs concerning the engine defect, they were routinely told by Defendants and/or through its dealers that the Class Vehicles were not defective.  As described below, the true cause of the premature and catastrophic failure is a defective connecting rod bearing and insufficient channels for engine oil lubrication.

43.     Defendants were and remain under a continuing duty to disclose to Plaintiff and the Members of the Class the true character, quality and nature of the Class Vehicles, that the connecting rod bearing and lubrication systems are based on poor designs, that they will require costly repairs, pose a safety concerns, and diminish the resale value of the Class Vehicles.  As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**FACTUAL ALLEGATIONS**

**A.     The Defective Engine Components within the Class Vehicles**

44.     Hyundai is a multinational corporation with over 75,000 employees worldwide.  Hyundai is currently the fourth largest automobile manufacturer in the world.

45.     The Theta II Engine (G4KC), which HMC used in the Class Vehicles, is a 2.4 liter engine that was manufactured by Hyundai Motor Manufacturing Alabama, LLC at its manufacturing plant in Montgomery, Alabama.

46.     The Theta II Engine is a 2.4 liter gasoline direct-injection ("GDI") fuel delivery system.  Hyundai states that "[t]his shorter, more direct path of fuel delivery, allows for greater control of the fuel mixture at the optimum moment, thus improving efficiency.  The fuel is injected by a camshaft-driven,

-8-

high pressure pump that operates at pressures up to 2,175 psi.  Direct injection also utilizes a higher than normal 11.3:1 compression ratio for increased power.  The pistons are 'dished' to increase combustion efficiency in the cylinder.  This powerplant delivers best-in-class fuel economy, best-in-class four-cylinder horsepower and best-in-class torque."

47.     As background, the Theta II Engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion.  Gasoline is mixed with air in the combustion chambers of the engine.  To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle").  First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber.  Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber.  Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft.  And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder.  The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself.   A diagram of Combustion Cycle is below:



48.     The pistons are connected to the crankshaft via the connecting rod.  As the connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately

CLASS ACTION COMPLAINT
CASE NO.:

resulting in power to the drive wheels of the vehicle. During this cycle, the crankshaft rotates many thousands of times per minute within each connecting rod. In order to reduce friction and prolong longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces. As a result, the connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle. An exemplar diagram of the piston, connecting rod, connecting rod bearing and crankshaft are shown below:



Figure 3-70.—Connecting rod bearings.

49.     When the Class Vehicles are in operation, engine oil is used to lubricate the piston, cylinder wall, connecting rod bearings and other rotating and moving components as the piston moves up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the oil filter. Oil is pumped and pressurized throughout the engine by the oil pump. The oil pump draws oil from the oil pan, located underneath the piston and crankshaft. The oil pump forces engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction in internal moving engine components. The oil then returns to the oil pan through small drainage holes

CLASS ACTION COMPLAINT
CASE NO.:

located throughout the engine where it will be recirculated by the oil pump. Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:



**Engine Lubrication (Overhead Cam Shown)**

50.     The connecting rod bearings are also lubricated with engine oil in order to allow the crankshaft to rotate within the connecting rods. A close up picture of functional connecting rod bearing is below:



CLASS ACTION COMPLAINT
CASE NO.:

51. When the defect inherent in the connecting rod bearings manifests itself, the bearings begin to fracture. As a result, large amounts of metal debris begin to accumulate in the engine oil. As a result, the oil becomes so contaminated that the oil filter can no longer remove the plethora of metal debris. This contaminated oil is recirculated throughout the engine by the oil pump, causing damage to the various engine components and eventually leading to catastrophic engine failure.

52. Additionally, as the connecting rod bearings continue to fracture, the acceptable tolerances between the bearings, the connecting rod, and the crankshaft begin to rapidly deteriorate. Eventually, the Class Vehicles begin producing a "knocking" sound originating from the engine as a result of the deteriorating bearings. The defective connecting rod bearings may eventually cause the piston to break through the engine block due to the deterioration – this space is referred to in the automobile industry as "play."

53. A photograph of a defective connecting rod bearing removed from one of the Class Vehicles is included below. As shown in the photograph, the bearing is has fractured and worn away to the point of laying flush along the inside of the connecting rod. A large fracture is also plainly visible along the bottom left side of the bearing.



CLASS ACTION COMPLAINT
CASE NO.:

54.     After the connecting rod bearings fail and metal debris is circulated throughout the engine via the engine oil, damage is caused to other key engine components. As pictured below, the main cap – which fastens the crankshaft to the engine – can also be damaged by the metal debris in the engine oil. After the main cap is damaged, play between the main cap and engine develops, which also leads to catastrophic engine failure.



55.     The Class Vehicles were manufactured with defective connecting rod bearings, materials and components. This defect renders the Class Vehicles prone to costly repairs and premature and catastrophic engine failure.

56.     In addition to the defective connecting rod bearings, the Class Vehicles suffer from inadequate engine oil lubrication channels. As explained above, engines are designed to have oil distributed throughout the engine through lubrication channels. When operating properly, the engine oil is distributed throughout the engine through the oil pump and then flows back to the oil pan where it is redistributed throughout the engine.

57.     In the Class Vehicles, the lubrication channels are defective and clog under normal use and proper maintenance. When the lubrication channels clog, engine oil is unable to be both pumped

CLASS ACTION COMPLAINT
CASE NO.:

throughout the engine (through the oil pump) and is also unable to adequately return to the oil pan, causing a condition known as oil starvation. This results in insufficient lubrication throughout the Class Vehicles' engine, which causes premature wear of the engine components and catastrophic engine failure.

58. The engine defect poses serious safety and security issues for operators and occupants of the Class Vehicles. By way of example, the California Department of Motor Vehicles asserts that stalled engines pose a significant safety risk and, as part of its safety curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of injury.[2]

59. NHTSA takes a similar view of engine failure during vehicle operation. For instance, according to *Forbes*, in 2011 the NHTSA recalled certain Chrysler and Dodge vehicles due to "engine seizure because of connecting rod bearing failure . . . Engine seizure could increase the risk of a crash."[3]

60. Defendants failed to adequately research, design, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

**B.    Hyundai's Knowledge of the Engine defect**

61. Plaintiff's experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same engine defect within the Class Vehicles. Upon information and belief, Defendants, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal durability testing, and (6) other various sources, were well aware of the engine defect but failed to notify consumers of the nature and extent of the problems with the Class Vehicles' Theta II Engines or provide any adequate remedy.

---

[2]  https://www.dmv.ca.gov/portal/wcm/connect/ada60d78-9cfa-4250-bd2b-f616ef9dbe43/unit_8.pdf?MOD=AJPERES, at 08.F.07 (last visited Apr. 9, 2015).

[3]  http://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/ (last visited Mar. 29, 2015).

-14-

CLASS ACTION COMPLAINT
CASE NO.:

62.     Hyundai routinely monitors the internet for complaints similar in substance to those quoted below.  Hyundai's customer relations department routinely monitors the internet for customer complaints, and Hyundai has retained the services of third-parties to do the same.  Further, the customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects.  Through these sources, Defendants were made aware of the engine defect.  The complaints also indicate Hyundai's knowledge of the defect and its potential danger.

63.     Hyundai is experienced in the design and manufacture of consumer vehicles.  As experienced manufacturers, Hyundai likely conducts testing on incoming batches of components, including the Theta II Engine, to verify that the parts are free from defects and comply with Hyundai's specifications.  Accordingly, Hyundai knew or should have known that the engine used in the Class Vehicles is defective and likely to fail prematurely, costing Plaintiff and Class Members thousands of dollars in repairs.

64.     Moreover, Defendants also should have known of the connecting rod bearing defect and insufficient lubrication channels due to the sheer number of reports of engine problems relating to the connecting rod bearings and/or lubrication channels.  For instance, Defendants' customer relations department, which interacts with Hyundai-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings and lubrication channels.  Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

65.     Defendants' warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles.  Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair.  For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants

-15-

CLASS ACTION COMPLAINT
CASE NO.:

because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

66. Defendants knew or should have known about the engine defect because of the high number of replacement parts likely ordered from Hyundai. All Hyundai service centers are required to order replacement parts, including engines, piston assemblies and connecting rod bearings directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. Defendants routinely monitor part sales reports, and are responsible for actually shipping parts requested by dealerships and technicians. Thus, Defendants have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The sudden increase in orders for Theta II Engines and engine components used in the Class Vehicles was known to Defendants, and should have alerted them to the scope and severity of the engine defect.

67. In September 2012, Defendants issued a technical service bulletin ("TSB") to their authorized dealerships regarding a knocking noise in the engine. TSBs are documents used by automotive manufacturers to inform dealership technicians about new information, including vehicle problems, new repair procedures, and improved parts. In TSB No. 12-EM-006, Defendants acknowledged that the Class Vehicles are defective and experience a "knocking noise." As a result, Hyundai directed dealers to blame the engine defect on the use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter with a genuine Hyundai oil filter. The TSB also explained that this "repair" is not covered under warranty. Hyundai has failed to provide any post-sale notification to owners and lessees regarding the use of only genuine Hyundai oil filters in the Class Vehicles. Instead, Hyundai attempts to circumvent warranty obligation related to the engine defect by faulting customers for use of an aftermarket oil filter. The defective connecting rod bearings and oil lubrication channels are not, however, caused by the use of an aftermarket engine oil filter. Despite Defendants' knowledge of this fact, Defendants have not informed Plaintiff of the true cause of the defective connecting rod bearings and insufficient oil lubrication channels.

//

//

//

CLASS ACTION COMPLAINT
CASE NO.:

**C.      Complaints by Other Class Members**

68.      Representatives examples of complaints on the NHTSA website regarding the Class Vehicles are included below (with emphasis supplied in capitalized bold, underlined letters)[4]:

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 1/21/2015
Component(s): ENGINE
Date of Incident: 01/19/2015
NHTSA ID Number: 10678152
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEC4ACBH0...
      SUMMARY:
      I WAS DRIVING DOWN THE HIGHWAY, THE ENGINE STARTED MAKING A KNOCKING NOISE. NO LESS THAN 30 SECONDS LATER DID THE CAR'S ENGINE MAKE A LARGE BAG NOISE AND I RAN OVER WHAT FELT LIKE PARTS. I COASTED A WHILE DOWN THE ROAD AND FINALLY PULLED THE CAR OVER TO THE SIDE OF THE ROAD. UPON OPENING THE HOOD I DISCOVERED OIL ALL OVER THE INTAKE AND EXHAUST MANIFOLDS AS WELL AS THE RADIATOR. I CALLED HYUNDAI ROADSIDE ASSISTANCE AND HAD THE CAR TOWED TO FAULKNER HYUNDAI IN HARRISBURG PA ON 1/19/14. THEY PROVIDED A SERVICE LOANER AND SAID THEY WOULD GET BACK TO ME WITH AN UPDATE ON THE CAR. I WAITED UNTIL WEDNESDAY THE 21ST BEFORE CALLING THEM, ONLY TO FIND OUT THAT THE ENGINE HAD SEIZED AND THEY HAD ALREADY TAKEN PICTURES OF THE DAMAGE AND SENT THEM TO THE HYUNDAI PEOPLE TO SEEK WARRANTEE COVERAGE. THEY ALSO ASKED ME FOR MAINTENANCE RECORDS ON THE CAR. I CHANGE THE OIL MYSELF AND ALWAYS PUT IN FULL SYNTHETIC, SO THEY HAD ME SUBMIT RECEIPTS FROM THE AUTO PARTS STORE PROVING I BOUGHT OIL AND FILTERS OR THE SONATA. I AM NOW AWAITING RESOLUTION FROM HYUNDAI. WILL UPDATE ONCE I HAVE AN ANSWER FROM HYUNDAI. THIS IS A PRETTY SERIOUS SAFETY CONCERN, **THE ENGINE LET GO AT 60+MPH WITHOUT WARNING, WHEN IT LET GO IT BLEW OIL ALL OVER THE ENGINE COMPARTMENT AND I'M SURE ON THE ROAD AS WELL. LUCKY I WAS DRIVING EARLY IN THE MORNING AND THEIR WAS VERY LITTLE TRAFFIC.**

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 1/06/2015
Component(s): ENGINE
Date of Incident: 01/06/2015
NHTSA ID Number: 10670454
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEB4AC4BH…
      SUMMARY:
      **I WAS TRAVELING DOWN A HIGHWAY WHEN MY ENGINE STARTED TO MAKE A KNOCKING SOUND**. THE CHECK ENGINE LIGHT CAME ON, AND WITHIN 10 SECONDS MY CAR STOPPED RUNNING. I WAS STILL MOVING WHEN THIS HAPPENED. I WAS FORTUNATE TO BE ABLE TO COAST TO A CLOSE BY SIDE ROAD. I AM GRAVELY CONCERNED THAT THIS COULD HAVE HAPPENED ON THE INTERSTATE AT HIGHER SPEEDS, AND THE POTENTIAL CONSEQUENCES OF SUCH. **I HAD THE CAR TOWED TO A DEALER, AND THEY TELL ME THE ENGINE IS SHOT**. I CONTACTED HYUNDAI CUSTOMER CARE, AND THEIR RESPONSE WAS

---

[4] The foregoing complaints are reproduced as they appear on the NHTSA website.  Any typographical errors are attributable to the original author of the complaint.

CLASS ACTION COMPLAINT
CASE NO.:

"WHAT DO YOU WANT ME TO DO ABOUT IT." AFTER MORE RESEARCH, I HAVE FOUND NUMEROUS OTHER INSTANCES OF THIS ENGINE FAILURE. IF THIS IS AN ONGOING PROBLEM, I FEEL HYUNDAI SHOULD DO SOMETHING BEFORE SOMEONE GETS KILLED WHEN THIS HAPPENS. PLEASE NOTE I AM THE SECOND OWNER OF THIS CAR. THE MILEAGE AT JUST OVER 85,000 IS MAINLY HIGHWAY MILES, AND THE CAR IS SERVICED REGULARLY.

Vehicle: 2011 Hyundai Sonata
Date Complaint Filed: 10/26/2014
Component(s): ENGINE
Date of Incident: 10/01/2014
NHTSA ID Number: 10650011
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEB4AC0BH...
SUMMARY:
10/1/2014 @ 7:30PM EST - **WHILE DRIVING HOME, WAS AT A RED LIGHT WHEN THE CAR STALLED OUT. THEN A LOUD KNOCKING SOUND HAPPENED. *NO ENGINE LIGHT WAS ON*** IT IS VERY UNSAFE FOR THE ENGINE TO STALL OR JUST RANDOMLY SHUTOFF WHILE IN TRAFFIC. THERE WERE NO SIGNS OR WARNINGS, THE VEHICLE JUST STALLED. VEHICLE WAS NOT SAFE TO OPERATE. I HAD THE VEHICLE TOWED TO NORTHTOWNE HYUNDAI DEALER ON SHERIDAN DRIVE, BUFFALO NY.10/3/2014 @ 2:47PM EST - **NORTHTOWNE HYUNDAI DEALER CALLED ME SAID THAT I NEED TO REPLACE MY ENGINE BECAUSE THE PISTON POPPED**. I SAID WELL, MY CAR IS WELL WITHIN THE WARRANTY, ISN'T THIS COVERED? NORTHTOWNE HYUNDAI DEALER SAID THAT WE CAN'T SUBMIT YOUR WARRANTY CLAIM WITH OUT RECEIPTS OF YOUR MAINTENANCE FROM 5K MILES TO PRESENT. 10/3 - 10/13/2014 - CONTACTED OUR 3 LOCAL PLACES WE LIKE TO SEND OUR VEHICLES TO FOR COPIES OF OUR RECEIPTS. WITH NO PROBLEM WE WERE ABLE TO OBTAIN COPIES OF OUR LAST 7 OIL CHANGES AND GENERAL MAINTENANCE RECEIPTS. 10/14/2014 @ 2:00PM EST - MY HUSBAND GAVE NORTHTOWNE HYUNDAI DEALER OUR RECEIPTS AND HE STATED THAT HE WILL SUBMIT OUR CLAIM TO HYUNDAI. 10/24/2014 @ 8:59AM EST - "REGIONAL" / "CORPORATE" CALLED ME AND STATED "THE DISTRICT MANAGER WHO WOULD HAVE AUTHORIZED THE REPAIR, HAD THE DEALERSHIP PARTIALLY DISASSEMBLE THE ENGINE; TAKE OFF THE COVER FOR INSPECTION, AND THERE'S A CONDITION OF SLUDGE WHICH IS INDICATIVE OF EITHER THE MAINTENANCE INTERVALS NOT BEING FOLLOWED; OIL CHANGE NOT FREQUENTLY ENOUGH OR POSSIBLY THE QUALITY OR GRADE OF THE OIL USED. IN EITHER CASE THESE IS NOT A MANUFACTURE DEFECT, SO HE HAS DENIED WARRANTY COVERAGE." I'VE ALSO ADDED MY COMPLAINT TO THE FOLLOWING:[ HTTP://WWW.CHIMICLES.COM/2011-HYUNDAI-SONATA-ENGINE-FAILURE-CLASS-ACTION-LAWSUIT ] ** **OUR LAST OIL CHANGE WAS 8/2/2014 AT 43K MILES ** WE HAD A CLEAN BILL OF HEALTH, NO ISSUES WERE REPORTED OR MAINTENANCE RECOMMENDED AT THAT TIME**.

Vehicle: 2012 Hyundai Sonata
Date Complaint Filed: 1/02/2015
Component(s): ENGINE
Date of Incident: 12/27/2013
NHTSA ID Number: 10669708
Manufacturer: Hyundai Motor America
Vehicle Identification No. (VIN): 5NPEB4AC0CH…
SUMMARY:
**WAS DRIVING 35 MPH MAKING A TURN WHEN I HEARD A KNOCKING NOISE.** WAS SUBTLE AT FIRST. CHECKED OIL AND WAS LOW. ADDED 1 QRT OF OIL. DROVE HOME ABOUT 2 MILES AND KNOCKING BECAME EXTREMELY LOUD.

-18-

CLASS ACTION COMPLAINT
CASE NO.:

**TOOK IT TO LEN STOLER HYUNDAI DEALERSHIP AND THEY STATED THAT EXHAUST MANIFOLD, DRIVE BELT, PISTONS, AND VALVES NEED TO BE REPLACED.** BASICALLY, $6300.00 WORTH OF WORK. CAR IS UP TO DATE ON ALL MAINTENANCE. NO OTHER ISSUES WITH CAR. WARRANTY DOES NOT COVER ENGINE DAMAGE AND NO HELP WAS GIVEN. I HAVE SEEN MANY OTHER COMPLAINTS ABOUT THE SAME ENGINE ISSUES. HYUNDAI SHOULD REPLACE!

69. Upon information and belief, Hyundai regularly monitors these NHSTA databases as part of its ongoing obligation to identify potential defects in its vehicles. NHTSA complaints establish that Hyundai knew, or should have known, of the engine defect *at least* as early as December 27, 2013. Upon information and belief, Defendants' became aware of the engine defect earlier than December 2013 through: (1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) durability testing, and (6) other various sources.

**D.     Hyundai's Warranty-Related Practices**

70. Hyundai issued two relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty."

71. Under the basic New Vehicle Limited Warranty, Hyundai agreed to repair defects reported within the earlier of 5 years or 60,000 miles.

72. Under the Powertrain Warranty, Hyundai agreed to repair defects affecting various powertrain components through 10 years and 100,000 miles. According to the Owner's Handbook and Warranty Information Book, Powertrain Coverage Components include:

**ENGINE**
Cylinder block/head and all internal parts, manifolds, timing gears, timing chain, timing cover, gaskets and seals, oil pump, water pump, fly-wheel, oil pan assembly, rocker cover and engine mounts, and turbocharger.

**TRANSMISSION/TRANSAXLE**
Case and all internal parts, axle shafts (front/rear), constant velocity joints, front/rear hub bearings, propeller shafts, seals and gaskets, torque converter and converter housing and clutch cover and housing, transfer case for Santa Fe, Tucson and Veracruz . . . .

73. Hyundai instructs vehicle owners and lessees to bring their vehicles to a Hyundai dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Hyundai dealerships with complaints related to the engine defect.

-19-

74. Hyundai has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defect is the owner's neglect to properly maintain the engine oil and/or engine oil level. This representation, however, is false as the engine is inherently defective and will inevitably fail.

75. In addition, Hyundai has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a Hyundai dealership, before determining whether to make the necessary repairs under warranty. Hyundai, however, knows that the defect in the Class Vehicles' engines manifests even if the owner or lessee has followed Hyundai's oil change guidelines. Even if consumers produce their vehicles' maintenance history, Hyundai blames the defect and engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges as much as $10,000 to repair the engine.

76. Hyundai also advertises that it offers "America's Best Warranty." With respect to the powertrain warranty, however, Hyundai publicizes the existence of 10 year/100,000 mile powertrain warranty but fails to mention that subsequent owners only receive powertrain warranty coverage for 5 years/60,000 miles. As such, subsequent owners are left to discover the limited warranty coverage after purchasing their vehicle. Hyundai's failure to cover repairs under the powertrain warranty between 5 years/60,000 miles and 10 years/100,000 miles is therefore unconscionable and unenforceable. A typical Hyundai advertisement touting "America's Best Warranty" is pictured below:



AMERICA'S BEST WARRANTY
- 10-year/100,000-mile Powertrain Limited Warranty
- Lifetime Hybrid Battery Warranty

77. In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the defect, despite such defect having been contained in the Class Vehicles when

CLASS ACTION COMPLAINT
CASE NO.:

manufactured by Defendants, repair and replacement of the Theta II Engine and the unnecessary and premature replacement of the connecting rod, crank shaft, oil pump, and other engine components.

78. Furthermore, a number of Class Members, who presented their Class Vehicles to Hyundai dealerships due to issues related to the defective connecting rod bearings and insufficient engine oil lubrication channels, were denied warranty repairs and instead informed that was nothing wrong with their vehicles. As a result, after expiration of the warranty period, Class Members are forced to pay costly repairs to correct the defect.

## CLASS ALLEGATIONS

79. Plaintiff brings this action on her own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle.

80. In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P. 23(c)(5), Plaintiff seeks to represent the following state class only in the event that the Court declines to certify the Nationwide Class above. Specifically, the state class consists of the following:

**California Class:**

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

81. Together, the California Class and the Nationwide Class shall be collectively referred to herein as the "Class." Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

82. <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that hundreds

-21-

of thousands of Class Vehicles have been sold and leased in each of the States that are the subject of the Class.

83.    Existence and Predominance of Common Questions of Fact and Law:  Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class Members.  These common legal and factual questions include, but are not limited to, whether:

   a.    The Class Vehicles were sold with a defect;

   b.    Hyundai knew of the defect but failed to disclose the problem and its consequences to its customers;

   c.    A reasonable consumer would consider the defect or its consequences to be material;

   d.    Hyundai has failed to provide free repairs as required by its New Vehicle Limited Warranty and/or Powertrain Warranty;

   e.    Hyundai should be required to disclose the existence of the defect; and

   f.    Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein.

84.    Typicality:  All of Plaintiff's claims are typical of the claims of the Class since Plaintiff purchased a Class Vehicle with the engine defect, defective vehicle design, and defective engine, as did each member of the Class.  Furthermore, Plaintiff and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all absent Class Members.

85.    Adequacy:  Plaintiff is an adequate representative because her interests do not conflict with the interests of the Class that she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and she intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

86.    Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually

-22-

impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

87. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")

### (Cal. Civ. Code § 1750, *et seq*.)

### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

88. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

89. Plaintiff brings this claim on behalf of herself and on behalf of the Members of the Class against all Defendants.

90. Defendants are "persons" as that term is defined in California Civil Code § 1761(c).

91. Plaintiff and the Class are "consumers" as that term is defined in California Civil Code §1761(d).

92. Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class Members that the Class Vehicles suffer from a design defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

-23-

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

93. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

94. Defendants knew that their Class Vehicles and their engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

95. Defendants were under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles and the defective nature of the connecting rod bearings and insufficient engine oil lubrication channels because:

    a. Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

    b. Plaintiff and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

    c. Defendants knew that Plaintiff and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

    d. Defendants actively concealed the safety and security defect and the associated repair costs by asserting to Plaintiff and Class Members that the cause of their engine problems was due to Plaintiff and the Class Members' inability to maintain the proper engine oil levels despite knowing the repairs needed to correct the defect.

96. In failing to disclose the engine defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

97. The facts concealed or not disclosed by Defendants to Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff and the Class

-24-

known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

98.  Plaintiff has provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).

99.  Plaintiff's and the other Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

100.  Therefore, Plaintiff and the other Class Members are entitled to equitable and monetary relief under the CLRA.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE

### (Cal. Bus. & Prof. Code § 17200)

### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

101.  Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

102.  Plaintiff brings this claim on behalf of herself and on behalf of the Members of the Class against all Defendants.

103.  The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

104.  Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Class Members that the Class Vehicles suffer from a design defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to the design defect, and Plaintiff and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

105.  The defective connecting rod bearings and insufficient engine oil lubrication channels constitute a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

-25-

106.     These acts and practices have deceived Plaintiff and are likely to deceive the public.  In failing to disclose the design defect and suppressing other material facts from Plaintiff and the Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff and the Class Members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff and the Class Members, as it would have been to all reasonable consumers.

107.     The injuries suffered by Plaintiff and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class Members should have reasonably avoided.

108.     Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

109.     Plaintiff seeks to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## THIRD CAUSE OF ACTION

## VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW

### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)

### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

110.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

111.     Plaintiff brings this claim on behalf of herself and on behalf of the Members of the Class against all Defendants.

112.     California Business & Professions Code § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any

-26-

statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

113.    Hyundai caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Hyundai, to be untrue and misleading to consumers, including Plaintiff and the other Class Members.

114.    Hyundai has violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

115.    Plaintiff and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Hyundai's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the misrepresentations and/or omissions of Hyundai with respect to the safety and reliability of the Class Vehicles.  Hyundai's representations were untrue because the Class Vehicles are distributed with defective connecting rod bearings and insufficient engine oil lubrication channels.  Had Plaintiff and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiff and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

116.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Hyundai's business.  Hyundai's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

117.    Plaintiff, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Hyundai from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other Class Members any money Hyundai acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

//

//

-27-

## FOURTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

118.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

119.    Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.  Accordingly, Defendants' warranties are express warranties under state law.

120.    The parts affected by the defect, including the rotating assembly and engine block, were manufactured and distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

121.    Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

122.    Plaintiff notified Defendants of the breach within a reasonable time, and/or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile.  Defendants also know of the defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

123.    As a direct and proximate cause of Defendants' breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the defective connecting rod bearings and insufficient engine oil lubrication channels.

124.    Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

-28-

CLASS ACTION COMPLAINT
CASE NO.:

125. The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Hyundai and the Class Members, and Hyundai knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

126. Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

127. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

128. Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

129. Defendants provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their engines suffered from defective connecting rod bearings and insufficient engine oil lubrication channels at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

130. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were

-29-

safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

131.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

132.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## SIXTH CAUSE OF ACTION

### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. § 2301, *et seq.*)

### (On behalf of the Nationwide Class or, Alternatively, the California Class)

133.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

134.    Plaintiff brings this action on behalf of herself and on behalf of the Class against Defendant Hyundai Motor America ("HMA"), only.

135.    Plaintiff and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

136.    Defendant HMA  is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

137.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

138.    Defendant HMA's New Vehicle Limited 5 years/60,000 miles Basic Warranty and 10 years/100,000 miles and Powertrain Warranty are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

139.    Defendant HMA breached the express warranties by:

  i.    Providing a 5 year/60,000 miles Basic Warranty and a 10 year/100,000 miles Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

ii. Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

iii. Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the defective connecting rod bearings and insufficient engine oil lubrication channels.

140. Plaintiff and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

141. Defendant HMA's breach of the express warranties has deprived the Plaintiff and the other Class Members of the benefit of their bargain.

142. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

143. Defendant HMA has been afforded a reasonable opportunity to cure its breach of the written warranties and/or Plaintiff and the other Class Members were not required to do so because affording Defendant HMA a reasonable opportunity to cure its breach of written warranties would have been futile. Defendant HMA was also on notice of the alleged defect from the complaints and service requests it received from Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

144. As a direct and proximate cause of Defendant HMA's breach of the written warranties, Plaintiff and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendant HMA's conduct damaged Plaintiff and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## SEVENTH CAUSE OF ACTION

## COMMON LAW FRAUD

### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

145. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

-31-

CLASS ACTION COMPLAINT
CASE NO.:

146.    Defendants made material omissions concerning a presently existing or past fact.  For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the Theta II Engine, which was not readily discoverable until years later, often after the New Vehicle Limited Warranty or the Powertrain Warranty has expired.  As a result, Plaintiff and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said design defect and all of the resultant problems.

147.    These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and the Class Members rely on them.

148.    Plaintiff and the Class Members reasonably relied on these omissions, and suffered damages as a result.

## EIGHTH CAUSE OF ACTION

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

#### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

149.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

150.    Every contract in California contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

151.    Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiff and Class Members of the defective connecting rod bearings and insufficient engine oil lubrication channels in the Class Vehicles, and failing to fully and properly repair this defect.

152.    Defendants acted in bad faith and/or with a malicious motive to deny Plaintiff and the Class Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

//
//
//
//

-32-

**NINTH CAUSE OF ACTION**

**VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY**

**(Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

153.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.    At all relevant times hereto, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles.  Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

155.    Defendants provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold.  The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure.

156.    The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

157.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Hyundai were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

158.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose.  Instead, the Class Vehicles are defective, including, but not limited to, the defective design and/or manufacture of the Theta II Engines.

159.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and members of the Class, respectfully requests that this Court:

A.  determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.  appoint Plaintiff as the representative of the Class and their counsel as Class counsel;

C.  award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled (though such damages are not currently sought under the CLRA claim);

D.  award pre-judgment and post-judgment interest on such monetary relief;

E.  grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the design defect(s);

F.  award reasonable attorneys' fees and costs; and

G.  grant such further relief that this Court deems appropriate.

Dated:  April 14, 2015.                      Respectfully submitted,

                                             MCCUNEWRIGHT LLP

                                             By:    /s/ Richard D. McCune
                                                    Richard D. McCune
                                                    Attorneys for Plaintiff and Putative Class

-34-

CLASS ACTION COMPLAINT
CASE NO.:

**JURY DEMAND**

Plaintiff, on behalf of herself and the putative Class, demands a trial by jury on all issues so triable.

MCCUNEWRIGHT LLP

By: _____/s/ Richard D. McCune_____

Richard D. McCune
Attorneys for Plaintiff and Putative Class

CLASS ACTION COMPLAINT
CASE NO.:

# EXHIBIT E

Eric H. Gibbs (SBN 178658)
Dylan Hughes (SBN 209113)
Steve Lopez (SBN 300540)
**GIBBS LAW GROUP LLP**
One Kaiser Plaza, Suite 1125
Oakland, California 94612
Telephone:      (510) 350-9700
Facsimile:      (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
sal@classlawgroup.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETH GRAHAM, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>HYUNDAI MOTOR AMERICA, INC.,<br><br>                    Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## NATURE OF THE CASE

1. Plaintiff and the class members she proposes to represent are owners or lessees of 2011-2015 Hyundai Sonatas that were manufactured with an undisclosed defect in the engine's rotating assembly. The rotating assembly cannot withstand the long-term stress generated within the Sonata's combustion chambers and fails within the useful life of the engine (most failures occur between 60,000 to 90,000 miles). When the rotating assembly fails, it does so without warning and causes the engine to seize suddenly—leaving Sonata drivers without power and struggling to maneuver the vehicle to safety.

2. Rather than addressing this safety problem by warning drivers and recalling its dangerous vehicles, Hyundai has concealed the problem from consumers and implemented a concerted practice of denying warranty coverage for failed engines. Hyundai tells Sonata owners that they must submit a complete record of the vehicle's maintenance history before making a warranty claim—even though it knows that Sonata engines fail regardless of owner maintenance and that the faulty rotating assembly is responsible. For those warranty claims that are submitted, Hyundai's practice is to deny them based on inadequate maintenance records or improper maintenance. Hyundai denies that engine failures are widespread in Sonata vehicles and blames its customers for the problem—forcing them to pay as much as $10,000 for an engine replacement.

3. Plaintiff now brings this proposed class action against Hyundai for violating California's consumer protection laws. Among other things, Plaintiff seeks an order requiring Hyundai to immediately disclose the existence of the rotating assembly defect and its associated risks to all existing and prospective customers, to repair the defect and all resulting damage in Sonata vehicles free of charge, and to cease selling Sonatas through its dealerships until the defect is repaired.

## PARTIES

4. Plaintiff Beth Graham is a citizen and resident of Pingree Grove, located in Kane County, Illinois.

5. Defendant Hyundai Motor America ("Hyundai") is headquartered in Fountain Valley, California. Hyundai is a wholly-owned American subsidiary of Hyundai Motor Company of Korea, for which it serves as a general manager and exclusive distributor of Hyundai vehicles within the United States.

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Hyundai, on the other, are citizens of different states.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Hyundai resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**INTRADISTRICT ASSIGNMENT**

8.      Assignment is proper to the San Jose division of this District under Local Rule 3-2(c)-(e), as a substantial part of the events or omissions which give rise to the claim occurred in San Jose County.

**SUBSTANTIVE ALLEGATIONS**

9.      Defendant Hyundai is the manufacturer, distributor, and warrantor of all 2011-2015 Hyundai Sonata vehicles sold within the United States—referred to hereafter as "Class Vehicles."

10.      Class Vehicles are sold with a 5-year / 60,000-mile New Vehicle Warranty and a 10-year /100,000-mile Powertrain Warranty.  The New Vehicle Warranty covers original components found to be defective in material or workmanship under normal use and maintenance.  The Powertrain Warranty covers powertrain components—including the engine block and all internal parts—found to be defective in material or workmanship under normal use and maintenance.  The Powertrain Warranty applies only to the original purchaser and to purchasers of certified pre-owned vehicles, and commences upon the expiration of the New Vehicle Warranty.

11.      Unbeknownst to Hyundai's consumers, Class Vehicles are also sold with defective rotating assemblies that cause sudden and catastrophic engine failure.  The rotating assembly is the part of the engine responsible for converting linear motion into rotational motion.  It is supposed to take the power generated within the combustion chambers and transfer it from the pistons and through the crankshaft.  The entire rotating assembly, as it is called, consists of a crankshaft, pistons, piston

CLASS ACTION COMPLAINT

assembly, connecting rods, bearings, as well as the lubrication passages needed to keep the assembly properly lubricated.

12. The rotating assembly in Class Vehicles is not properly manufactured to withstand the combustion forces over the life of the engine. It eventually succumbs to the long-term stress and stops converting the piston's linear motion to the rotational motion of the crankshaft. There are no warning signs that the rotating assembly is about to fail, but when it does, it causes the engine to abruptly seize—leaving Sonata drivers stranded and in need of a new engine block.

13. Sudden Sonata engine seizures have become widespread as a result of the rotating assembly defect. Over a hundred reports have been posted online—including on the National Highway Traffic Safety Administration (NHTSA) website and on Hyundai owner forums—and likely thousands more have experienced the same thing but not taken the time to post about their experience. The issue has become so common that when one Sonata owner suffered an engine seizure and had her car towed to the local Hyundai dealership, she found that four *other* Sonatas were already at the dealership for the same issue.

14. The cost of replacing a Sonata engine that has failed because of the defect runs between $5,000 and $10,000—depending on labor costs and whether the replacement engine is new or used.

15. But it is not only the high cost of engine failures that has Sonata owners so concerned. When the engines fail, they do so with no warning and expose drivers, passengers, and others on the road to significant risk. Sonata owners have been driving at 70 miles per hour or in the middle of rush-hour traffic when their engines suddenly froze, leaving their vehicles without power, without power steering, and without power brakes. Making matters worse, smoke can billow from the engine and obscure drivers' vision as they attempt to maneuver the vehicle to safety. On rare occasions, the abrupt loss of lubrication has even started a fire in the engine compartment. The experience of a sudden engine failure is often a harrowing affair for Sonata owners—several of whom have reported near accidents and called on Hyundai to conduct a safety recall.

16. Hyundai is, of course, currently aware that Sonata engines are seizing in record numbers. It provides Hyundai dealerships with replacement engines and carefully tracks both part sales and the

CLASS ACTION COMPLAINT

type of repairs conducted by its dealerships. In addition, many Sonata owners have complained to their dealership and to Hyundai's corporate office—to no avail.

17. The strong likelihood is that Hyundai knew of the rotating assembly defect much earlier, likely before Class Vehicles were ever released to the public. Discovery and review of Hyundai's internal records will be necessary to know for certain, but the rotating assembly defect is one that would typically be discovered during standard pre-release testing. Hyundai, like all automakers, subjects its rotating assemblies to material stress tests and accelerated testing designed to ensure that the assembly will withstand typical engine forces for at least 10 years and 150,000 miles. The severe and widespread nature of this particular defect is unlikely to escape pre-release testing. More likely, Hyundai did not know how to fix the issue quickly and was unwilling to incur the expense and delay associated with re-manufacturing the Sonata's rotating assembly.

18. The prepared and concerted way in which Hyundai has responded as Sonata owners have suffered from seized engines, strongly supports Plaintiff's allegation that Hyundai has long known about the rotating assembly defect. If Hyundai had learned only recently that its Sonatas are suffering from an extremely high number of engine failures, one would acknowledge the issue and repair the vehicles under warranty or pursuant to a safety recall. Instead, Hyundai is continuing to deny that anything is wrong with the Sonata's rotating assembly, actively concealing the widespread nature of the problem, and systematically blaming its customers to minimize its warranty costs.

19. Hyundai has never disclosed the rotating assembly defect to consumers—through its dealerships or otherwise. It has not even stopped selling Sonata vehicles with defective rotating assemblies; it continues to sell them—without including any warning—as both new vehicles and used vehicles.

20. Most engine failures occur within the 10-year /100,000-mile Powertrain Warranty that Hyundai provides with its new and certified pre-owned vehicles, but Hyundai employs a concerted practice to avoid paying for engine replacements. Even though Hyundai knows that the rotating assembly defect—and not driver maintenance—is responsible for Sonata engine failures, it instructs its dealers to blame them failures on poor maintenance and to tell Sonata owners that they must a complete maintenance history (including all receipts) before they can make a warranty claim. For those Sonata

owners who are not discouraged and do make a warranty claim, Hyundai's practice is to deny warranty coverage based on inadequate maintenance records or improper maintenance. And if a customer calls to complain, Hyundai's practice is to blame the problem on improper maintenance and deny that engine failures are widespread in Sonatas and the result of a systemic defect.

21.    The safety hazard posed by the Sonata's rotating assembly defect, along with the exorbitant repair costs Hyundai is shifting to its consumers by systematically denying warranty coverage, will only worsen if nothing is done soon. The Sonata rotating assembly defect typically takes around 60,000 to 95,000 miles before it manifests itself in catastrophic engine failure—so the problem will only get worse as more Sonata owners reach this mileage. To date, the vast majority of reported engine failures have occurred in 2011 Sonatas. But 2012 Sonatas are following a similar pattern, with complaints of engine seizures now beginning to accrue (just as they did about a year ago with 2011 Sonatas). And 2013-2015 Sonatas will likely follow the same pattern as well since Hyundai has yet to fix the defect and continues to use the same defective rotating assembly in those vehicles as well.

### PLAINTIFF'S EXPERIENCE

22.    Last year, Plaintiff Beth Graham purchased a used 2011 Hyundai Sonata with 65,000 miles from Elgin Hyundai in Elgin, Illinois.

23.    In January 2015, Ms. Graham's husband was driving the Sonata on the highway during rush hour when the engine suddenly seized and the engine turned off. Fortunately, Mr. Graham was able to coast to the side of the highway and call a tow truck.

24.    At the time the engine seized, the Grahams had owned the car for about seven months and put an additional 14,000 miles on the vehicle—for about 79,000 miles in all. Hyundai refused to cover the full cost of the repair. After several calls to Hyundai's regional office, Hyundai agreed to pay a portion of the cost as a "goodwill gesture." Ms. Graham was still required to pay $2,000 for the engine repair, about $800 for a rental car while her Sonata was being repaired, and about $150 for towing and an initial diagnosis.

25.    At no time before or after Ms. Graham purchased her Sonata did Hyundai or its dealership inform her of the car's rotating assembly defect or the defect's implications for the engine and her safety. Had she been told, Ms. Graham would not have purchased the 2011 Sonata.

## **CLASS ACTION ALLEGATIONS**

26. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and a proposed class initially defined as:

> All persons who purchased or leased a 2011-2015 Hyundai Sonata within the United States.

27. Excluded from the proposed class is Hyundai; any affiliate, parent, or subsidiary of Hyundai; any entity in which Hyundai has a controlling interest; any officer, director, or employee of Hyundai; any successor or assign of Hyundai; and any judge to whom this case is assigned and any member of his or her immediate family.

28. <u>Numerosity</u>. Hyundai has sold hundreds of thousands of Class Vehicles, such that there are far too many class members to be practically joined in a single action. Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

29. <u>Existence and predominance of common questions</u>. Common questions of law and fact exist as to all members of the proposed class and predominate over questions affecting only individual class members. These common questions include:

    a. Whether the rotating assembly in Class Vehicles is defective;

    b. Whether the defect causes sudden engine failure and poses a safety hazard to consumers;

    c. Whether Hyundai had a duty to disclose the defect and its consequences to its customers;

    d. Whether the defect and its consequences would be considered material by an objectively reasonable person; and

    e. Whether it is unfair under the UCL for Hyundai to sell or fail to recall dangerous vehicles.

30. <u>Typicality</u>. Plaintiff's claims are typical of the claims of the proposed classes. Plaintiff and the class members or she proposes to represent purchased a Class Vehicle that contains the same defective rotating assembly, giving rise to substantially the same claims.

CLASS ACTION COMPLAINT

31. <u>Adequacy</u>. Plaintiff is an adequate representative of the proposed classes because her interests do not conflict with the interests of the class members she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

32. <u>Superiority</u>. The action may be certified under Rule 23(b)(3) because common questions predominate as described above and because a class action is the best available method for the fair and efficient adjudication of this controversy. This litigation involves technical issues that will require expert testimony and targeted discovery of a sophisticated defendant, and could not practically be taken on by individual litigants. In addition, individual litigation of class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results. A class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

33. In the alternative to class certification under Rule 23(b)(3), the proposed class may be certified under Rule 23(b)(2) because Hyundai has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the class as a whole.

## CHOICE OF LAW ALLEGATIONS

34. The State of California has sufficient contacts to the conduct alleged herein such that California law may be uniformly applied to the claims of the proposed nationwide class. Hyundai does substantial business in California, its principal offices are located in California, and it maintains over 50 authorized dealerships in California—more than any other state.

35. The conduct that forms the basis for each and every class members' claims against Hyundai emanated from Hyundai's headquarters in Fountain Valley, California. Hyundai's marketing department, warranty department, customer affairs department, and engineering and design analysis groups are all located in Fountain Valley, California, and it is those departments who were responsible for the decision to conceal the rotating assembly defect from Hyundai's customers and to systematically deny warranty coverage for resulting engine failures based on improper maintenance and inadequate maintenance records.

CLASS ACTION COMPLAINT

36.     The State of California also has the greatest interest in applying its law to class members' claims.  Its governmental interests include not only an interest in compensating resident consumers under its consumer protection laws, but also what the State has characterized as a "compelling" interest in using its laws to regulate a resident corporation and preserve a business climate free of fraud and deceptive practices.  *Diamond Multimedia Sys. v. Sup. Ct.*, 19 Cal. 4th 1036, 1064 (1999).

37.     Were other states' laws applied to class members' claims, California's interest in discouraging resident corporations from engaging in the sort of unfair and deceptive practices alleged in this complaint would be significantly impaired.  California could not effectively regulate a corporate citizen like Hyundai, who does business throughout the United States, if it can only ensure that consumers from one of the fifty states affected by conduct that runs afoul of its laws are compensated.

### FIRST CAUSE OF ACTION
**For Violation of the Consumers Legal Remedies Act,**
**Cal. Civil Code §§ 1750, *et seq.***

38.     Plaintiff re-alleges, as if fully set forth, each and every allegation herein.

39.     Hyundai has violated the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1770(a)(5), (7), (14), and (16), by engaging in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions—namely, the sale of Class Vehicles to Plaintiff and class members—that are intended to result and have resulted in the sale and lease of goods to consumers.

40.     In connection with the sale of Class Vehicles to Plaintiff and class members, Hyundai omitted material information about those vehicles which it was legally obligated to disclose.  Hyundai has never informed Plaintiff or class members—at the point of sale or otherwise—that the rotating assembly in Class Vehicles is defective and can cause sudden engine failure.

41.     The Class Vehicle's faulty rotating assembly poses an unreasonable safety risk to consumers and other members of the public with whom they share the road. Hyundai had exclusive knowledge of the defect and has actively concealed it from consumers.

42.     As a result of Hyundai's violations of the CLRA, Plaintiff and Class members have suffered damages.  Plaintiff and class members would not have purchased Class Vehicles had the defect and associated risks been disclosed to them.  In addition, Plaintiff and other class members have

incurred significant repair costs, including expensive engine replacements, diagnostic expenses, towing costs, and rental car expenses as a result of the defect. They are left with vehicles of diminished value and utility because of the defect, which continues to pose a safety risk.

43. Plaintiff seeks an order requiring Hyundai to immediately disclose the existence of the rotating assembly defect and associated risks to all existing and prospective customers, to repair the defect and all resulting damage in Class Vehicles free of charge, and to cease selling new or certified pre-owned Class Vehicles through its dealerships until the defect is remedied. In addition, Plaintiff will serve Hyundai with a notice letter to provide Hyundai with the opportunity to correct its business practices pursuant to Civil Code § 1782. If Hyundai does not thereafter correct its business practices, Plaintiff will amend this action to add claims for monetary relief, including restitution and actual damages under the CLRA.

## SECOND CAUSE OF ACTION
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

44. Plaintiff re-alleges, as if fully set forth, each and every allegation herein.

45. Hyundai has violated and continues to violate California's Unfair Competition Law (UCL), which prohibits unlawful, unfair, or fraudulent acts and practices.

46. Hyundai's conduct, as alleged in this complaint, constitutes an unlawful practice under the UCL in that it violates the Consumers Legal Remedies Act.

47. Hyundai's failure to disclose material facts to class members—namely, the rotating assembly defect and its implications for the vehicles' engines and class members' safety—constitutes a fraudulent business practice under the UCL, as it is likely to deceive an objectively reasonable consumer.

48. Hyundai's sale of defective vehicles and failure to recall those vehicles are each unfair business practices under the UCL. The practices are unethical, unscrupulous, or substantially injurious to consumers; any legitimate utility of the practices are outweighed by the harm to consumers; the injury is not one that consumer reasonably could have avoid; and/or the practice run afoul of the public safety policies underlying the Highway Safety Act, the National Traffic and Motor Vehicle Safety Act, and California's Secret Warranty Law, among others, as well as the consumer protection policies underlying

the CLRA.

49.     As a result of Hyundai's violations of the UCL, Plaintiff has suffered injury in fact and lost money or property.  Ms. Graham purchased a vehicle she would not otherwise have purchased, suffered a catastrophic engine failure and incurred significant expense to replace the engine, and is left with a vehicle of diminished value.

50.     Plaintiff and class members seek equitable relief under the UCL, including restitution of all revenue accruing to Hyundai or its dealerships as a result of Hyundai's violations, declaratory relief, a permanent injunction prohibiting Hyundai from continuing to violate the UCL, and an award of attorney fees and costs.

## TOLLING

51.     Any applicable statute of limitations that might otherwise bar any class member's claims is tolled by Hyundai's knowing and active concealment of the Class Vehicle's defective rotating assemblies.  Hyundai kept Plaintiff and the members of the class ignorant of vital information essential to the pursuit of their claims.  Class members could not reasonably have discovered that their rotating assemblies were defective until their engines suddenly seized.  Even then, Hyundai continued to actively conceal that the rotating assembly defect by denying the existence of a widespread problem and blaming engine failures on poor maintenance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.     For an order certifying the proposed class and appointing Plaintiff and her counsel to represent the class;

b.     For an order requiring Hyundai to immediately disclose the existence of the rotating assembly defect and associated risks to all existing and prospective customers, to repair the rotating assembly defect and all resulting damage in Class Vehicles free of charge, and to cease selling Class Vehicles through its dealerships until the rotating assembly defect is repaired;

CLASS ACTION COMPLAINT

c. For an order awarding Plaintiff and class members actual, statutory, punitive or any other form of damages provided by statute, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

d. For an order awarding Plaintiff and class members restitution, disgorgement or other equitable relief provided by statute or as the Court deems proper, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

e. For an order awarding Plaintiff and the members of the classes pre-judgment and post-judgment interest;

f. For an order awarding Plaintiff and the members of the classes reasonable attorney fees and costs of suit, including expert witness fees; and

g. For an order awarding such other and further relief as this Court may deem just and proper.

DATED: May 7, 2015                    Respectfully submitted,

                                      **GIBBS LAW GROUP LLP**

                                      By:    */s/* Eric H. Gibbs

                                      Dylan Hughes
                                      Steve Lopez
                                      One Kaiser Plaza, Suite 1125
                                      Oakland, California 94612
                                      Telephone:    (510) 350-9700
                                      Facsimile:    (510) 350-9701
                                      ehg@classlawgroup.com
                                      dsh@classlawgroup.com
                                      sal@classlawgroup.com

                                      *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED: May 7, 2015        Respectfully submitted,

**GIBBS LAW GROUP LLP**

By: ___/s/ Eric H. Gibbs_____

Dylan Hughes
Steve Lopez
One Kaiser Plaza, Suite 1125
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dsh@classlawgroup.com
sal@classlawgroup.com

*Attorneys for Plaintiff*

# EXHIBIT F

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ELIZABETH MENDOZA, et al., | Case No. 15-cv-01685-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING IN PART MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARD** |
| HYUNDAI MOTOR COMPANY, LTD, et al., | |
| Defendants. | |

[Re: ECF 73, 74]

Alleging that their 2011–2014 Hyundai Sonatas were sold with defective engines, Plaintiffs Elizabeth Mendoza and Beth Graham (collectively, "Plaintiffs") sued Hyundai Motor Co. The parties now jointly appear before the Court in support of final approval of their class action settlement.

Two motions are pending in this putative class action for violations of California's consumer protection statutes, the Magnuson-Moss Warranty Act, and the Song-Beverly Act, as well as for breach of express and implied warranty, common law fraud, and breach of the duty of good faith and fair dealing. *See generally* Compl., *Mendoza v. Hyundai Motor Am., Inc.*, No. 15-cv-1685, ECF 1 (filed Apr. 14, 2015) (hereinafter, "Mendoza Compl."); Compl., *Graham v. Hyundai Motor Am., Inc.*, No. 15-2071, ECF 1 (filed May 7, 2015) (hereinafter, "Graham Compl."). First, Plaintiffs move for an order granting final approval to the parties' settlement agreement. Mot. for Final Settlement Approval, ECF 73, (hereinafter, "Final Approval Mot."). Second, Plaintiffs move for an award of attorneys' fees, litigation costs, and a service award to the class representatives. Mot. for Att'y Fees, Costs, & Service Awards, ECF 74 (hereinafter, "Mot. for Att'y Fees"). The Court held a final fairness hearing on December 15, 2016. For the reasons set forth below, the Court GRANTS the motion for final approval and GRANTS IN PART the

1  motion for attorneys' fees, costs, and service award.

2  **I.  BACKGROUND**

3  **A.  The Parties and Claims**

4  Plaintiffs bring this class action against Hyundai Motor America ("Hyundai"), alleging that

5  the 2011–2014 model year Hyundai Sonatas were sold with defective engines.  Plaintiffs bring

6  these claims on behalf of "[a]ll owners and lessees of a Class Vehicle[1] who purchased or leased

7  the Class Vehicle in the United States, excluding the territories, or abroad while on active military

8  duty."  Final Approval Mot. 5 (footnote added).

9  Plaintiff Mendoza filed her suit on April 14, 2015.  *See generally* Mendoza Compl.

10  Mendoza alleges that her 2011 Hyundai Sonata began to exhibit a loud knocking noise in the

11  engine, and that her Hyundai dealership told her one of the pistons had blown out.  *Id.* ¶ 19.  The

12  dealership refused to cover the necessary repairs under warranty, leaving Mendoza to pay a local

13  mechanic $3,000 to replace her engine.  *Id.* ¶¶ 20–21.  Plaintiff Graham, whose 2011 Sonata also

14  suffered an engine failure, filed suit on May 7, 2015.  *See generally* Graham Compl.  Graham

15  alleges that the engine in her Sonata seized and turned off while her husband was driving in rush-

16  hour traffic.  *Id.* ¶ 23.  Mr. Graham was able to coast to the side of the highway and call a tow

17  truck.  *Id.* ¶ 24.  Hyundai agreed to pay for part of the required engine repair, purportedly as a

18  "goodwill gesture," but the Grahams spent $2,000 to repair the engine, $800 for a rental car while

19  the car was being repaired, and $150 for towing and the initial diagnosis.  *Id.*

20  Plaintiffs allege that a common defect in the vehicles' rotating assembly—specifically, in

21  the lubrication channels within the connecting rods and other parts of the assembly—was

22  responsible for the various symptoms and eventual engine failures experienced by Sonata owners.

23  Mendoza Compl. ¶ 49–57; Graham Compl. ¶¶ 11–15.  Plaintiffs further allege that to remedy the

24  defect, the "short block" engine must be replaced, along with potentially other components of the

25  vehicle, such as its battery, starter, or "long block" engine.  Gibbs Decl. ISO Preliminary Approval

26

27  _____

[1] The term "Class Vehicles" refers to "all 2011, 2012, 2013, and 2014 model year Hyundai Sonata
28  vehicles factory equipped with a Theta II 2.0-liter or 2.4-liter gasoline direct injection engine[.]"
*See* Ex. 1 to Gibbs Decl. § I.F, ECF 57-2 (hereinafter, "Settlement Agreement").

2

United States District Court
Northern District of California

of Class Settlement ("Gibbs Decl.") ¶ 4, ECF 57-1. Plaintiffs contend that by selling Sonata vehicles without disclosing that the engines were defective, Hyundai violated California's consumer protection statutes and common law. Mendoza Compl. ¶¶ 88–159; Graham Compl. ¶¶ 38-50. Plaintiffs also aver that Hyundai breached its warranty obligations by blaming owners for causing the engine failures, accusing them of not properly maintaining or servicing their vehicles. Mendoza Compl. ¶¶ 68, 88–159; Graham Compl. ¶¶ 38–50.

The Court consolidated the two cases on June 24, 2015. ECF 27. The parties were able to reach a preliminary settlement before Plaintiffs filed a consolidated complaint. The Court granted preliminary approval to the parties' proposed settlement agreement and conditionally certified the putative class for settlement purposes only on July 8, 2016. ECF 67. In its order granting Plaintiff's motion for preliminary approval, the Court also (1) appointed the law firm of Gibbs Law Group LLP and McCune Wright LLP, as counsel for the settlement class; (2) approved the parties' proposed notice; (3) set the deadline for filing objections and requests for exclusion by November 28, 2016; and (4) set the date of the fairness hearing to December 15, 2016. *See* ECF 67.

Plaintiffs have now filed a motion for final approval of the class action settlement and a motion for attorney fees, costs, and service award. ECF 73, 74. The Court held a fairness hearing on December 15, 2016.

### B. Terms of the Agreement

Under the terms of the preliminarily approved settlement agreement, Hyundai has agreed to (1) warn drivers about the problem; (2) extend its Powertrain Warranty for free inspections and repairs; (3) reimburse Class Members for past vehicle repairs, rental cars, and towing services; and (5) compensate Class Members for trade-ins and sales. *See* Settlement Agreement; Final Approval Mot. 6–9. At the fairness hearing, Class Counsel clarified that it would be "very difficult" to put a dollar value on the settlement because not every Class Vehicle suffers from the defect. Hr'g Tr. 6:18–21. As of December 15, 2016, Hyundai had paid about $8.5 million to 2,883 Class Members in connection with this settlement. *Id.* 4:20.

The Court discusses each aspect of the agreement below.

United States District Court
Northern District of California

3

### i.  Warning Drivers about Stalling

Hyundai will be responsible for ensuring Class Members are adequately warned about possible engine failure through the following mechanisms:

- *Recall Notices*:  Owners and lessees of the 2011–2012 Class Vehicles have been sent notices by mail pursuant to the recall initiated in September 2015.

- *Class Notice by Direct Mail*:  Hyundai has disseminated a long form notice warning about potential engine stalling and encouraging Class Members to schedule the free inspection provided by the settlement.

- *Class Notice by Email*:  Hyundai has emailed the class notice to all Class Members for whom it possesses email addresses.

- *Color Pamphlet to be Kept with Owner's Manual*:  Hyundai has mailed and emailed Class Members a color pamphlet designed to be kept with the owner's manual.  The pamphlet warns of the risks of the defect, encourages drivers to obtain inspections and repairs as needed, and reminds them of various settlement benefits to which they are entitled.  The pamphlets will also be distributed at dealerships.

- *Website and Phone*:  Hyundai will maintain a dedicated settlement website and toll-free telephone number to provide additional information and answer questions about the settlement.

Settlement Agreement §§ IV.C.1–4, IV.C.6–8

### ii.  Warranty Extension for Free Inspections and Repairs

Under the settlement, all current owners and lessees of Class Vehicles can receive a free engine inspection and, if necessary, a short block engine repair.  *Id.* §§ IIA.1–11.  This benefit will come in two forms.  First, Hyundai will extend its Powertrain Warranty to cover short block engines for a 10-year/120,000-mile period, whichever comes first.  *Id.* §§ I.J, II.A.1.  The full duration of the extended warranties negotiated for original and subsequent owners are transferable to subsequent owners.  *Id.* § II.A.3.  Second, all Class Members were permitted to bring their vehicles to a Hyundai retailer for free inspections between September 28, 2016 and December 27, 2016.  *Id.* § II.A.I.  Any vehicle determined to need a short block repair based on that inspection received free repairs under the extended warranty, regardless of mileage or current length of ownership.

Under the settlement, extended warranty inspections and repairs may not be denied for

failure of the owner to properly maintain or service those vehicles except in "limited exceptional neglect circumstances." *Id.* § II.A.6. All such denials must be reported to Class Counsel. Additionally, Hyundai will cover all costs associated with repairs, including replacement parts, labor, diagnoses, and loaner vehicles.[2] *Id.* §§ II.A.2, II.A.5. Finally, the settlement contains a BBB dispute resolution process, through which Class Members can contest a dealership's warranty decision. *Id.* § III.6. All fees and expenses aside from attorneys' fees associated with this dispute resolution process will be borne by Hyundai.

### iii. Reimbursements for Past Vehicle Repairs, Rental Cars and Towing Services

The settlement also reimburses Class Members in full for repairs due to the alleged defect, including short block engine repairs, provided certain conditions are met. Primarily, the repair must have been performed within the period covered by the extended settlement warranty, *i.e.*, within the earlier of 10 years of the Class Vehicle's original sale or lease or 120,000 miles. *Id.* § II.C.1. Additionally, Hyundai will reimburse Class Members who incurred rental car or towing expenses reasonably related to a reimbursable repair.

To obtain a refund, Class Members must complete a brief Claim Form that can be submitted by mail, email, or through the settlement website. *See* Claim Form, Ex. B to Settlement Agreement, ECF 57-2. Class Members seeking reimbursements must provide few or no supporting documents to verify their expenses. Settlement Agreement § II.C.2.

### iv. Compensation for Trade-Ins and Sales

Class Members who sold or traded in the Class Vehicles for reduced value rather than paying for the necessary repairs will be able to seek compensation from Hyundai. *Id.* § II.D.3. Those Class Members must submit a Claim Form with documentation demonstrating that their Class Vehicle was diagnosed with an engine failure prior to receiving notice of the settlement or recall, and that they sold or traded-in the Class Vehicle without first obtaining the recommended engine-block repair. *Id.* Hyundai will evaluate the transaction and propose compensation for any effect on the fair market value of the Class Vehicle at the trade-in or sale. *Id.* Any unsatisfied

---

[2] Alternatively, Hyundai will reimburse rental car costs.

United States District Court
Northern District of California

1 | Class Member has the right to avail himself or herself of the BBB dispute resolution process

2 | outlined above.

3 |           **v.    Mutual Release**

4 |     As part of the settlement, Class Members agree to release Hyundai and its related entities

5 | from all known and unknown claims related to the engine defect alleged or that could have been

6 | alleged in the litigation.  Settlement Agreement §§ I.N, VI.  Hyundai will also release Plaintiffs

7 | and Class Counsel from any claims related to this litigation or settlement.  *Id.* §§ I.O, VI.  Claims

8 | for death, personal injury, damages to tangible property other than a Class Vehicle, and/or

9 | subrogation, are not covered by the settlement.  *Id.* § VI.

10 | **II.    FINAL APPROVAL OF SETTLEMENT AGREEMENT**

11 |     In line with its previous order granting preliminary approval, the Court now concludes that

12 | the proposed settlement is fair, adequate, and reasonable.

13 |     **A.    Legal Standard**

14 |     "The claims, issues, or defenses of a certified class may be settled . . . only with the court's

15 | approval."  Fed. R. Civ. P. 23(e).  "Adequate notice is critical to court approval of a class

16 | settlement under Rule 23(e)."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).  In

17 | addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is

18 | fundamentally fair, adequate, and reasonable."  *Id.* at 1026.  In order to assess a settlement

19 | proposal, the district court must balance a number of factors:

20 |         (1) the strength of the plaintiffs' case; (2) the risk, expense,

21 |         complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount

22 |         offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel;

23 |         (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

24 | *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

25 |     Settlements that occur before formal class certification also require a higher standard of

26 | fairness.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  In reviewing such

27 | settlements, in addition to considering the above factors, the court also must ensure that "the

28 | settlement is not the product of collusion among the negotiating parties."  *In re Bluetooth Headset*

*Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011).

## B. Rule 23(a) and (b) Requirements

A class action is maintainable only if it meets the four Rule 23(a) prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In a settlement-only certification context, the "specifications of the Rule . . . designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc.*, 521 U.S. at 614. Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "pertinent" matters to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*

The Court previously found the putative class satisfied the requirements for numerosity,

7

1    commonality, typicality, and adequacy of representation under Rule 23(a).  Order Granting

2    Preliminary Approval of Class Settlement ¶ 2, ECF 67 (hereinafter, "Preliminary Approval

3    Order").  The Court is unaware of any changes that would alter its analysis, and thus sees no

4    reason to revisit the analysis of Rule 23.  *See G.F. v. Contra Costa Cty.*, No. 16-3667, 2015 WL

5    4606078, at *11 (N.D. Cal. July 30, 2015).

6        **C.    Adequacy of Notice**

7        "The class must be notified of a proposed settlement in a manner that does not

8    systematically leave any group without notice."  *Officers for Justice v. Civil Serv. Comm'n of City

9    & Cty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

10        The Court has previously approved the parties' proposed notice procedures for the class.

11    Preliminary Approval Order 3.  In the motion for final approval, Plaintiffs state that the parties

12    have carried out this notice plan.  Final Approval Mot. 2.   Hyundai mailed the long form class

13    notice via first class mail to 1.3 million Class Members between August 15, 2016 and September

14    28, 2016.  *Id.*; Reply ISO Final Approval Mot. 2, ECF 76.  Hyundai also sent the email version of

15    the class notice to those Class Members for whom Hyundai had an email address.  Zielomski

16    Decl. ¶ 5, ECF 76-4.  Hyundai sent this email version to over 1.4 million email addresses, which

17    included multiple email addresses per Class Member.  The notice informed Class Members about

18    all key aspects of the settlement, the date, time, and place of the fairness hearing, and the process

19    for objection and opt-out.

20        Of the 1,310,640 long form class notices sent via mail, 8,755 were returned as

21    undeliverable.  Zielomski Decl. ¶ 4.  Of the 1,413,087 emails sent, 269,984 were returned as

22    undeliverable.  *Id.* ¶ 5.  For the mailed notices returned as undeliverable, Hyundai used its best

23    efforts to conduct an advanced address search using its customer database, and was able to identify

24    35 alternative addresses.  *Id.*  Hyundai mailed a long form class notice to those alternative

25    addresses.

26        In light of these actions and the Court's prior order granting preliminary approval, the

27    Court finds the parties have sufficiently provided notice to the settlement Class Members.  *See

28    Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (holding that notice must

United States District Court
Northern District of California

8

"apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Lundell v. Dell, Inc.*, No. C05-3970, 2006 WL 3507938, at *1 (N.D. Cal. Dec. 5, 2006) (holding that notice sent via email and first class mail constituted the "best practicable notice" and satisfied due process requirements).

### D. Fairness, Adequacy and Reasonableness

#### i. Strength of Plaintiffs' Case and Risk of Continuing Litigation

Approval of a class settlement is appropriate when "there are significant barriers plaintiffs must overcome in making their case." *Chun–Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010). Similarly, difficulties and risks in litigating weigh in favor of approving a class settlement. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).

Here, Plaintiffs acknowledge that despite the strength of their case, were the case to continue, it could fail on liability or be whittled down in terms of overall liability. Final Approval Mot. 12. For example, Plaintiffs assert that Hyundai might have a colorable defense because it did not discover the problem until after it sold many of the Class Vehicles or that the majority of repairs not covered under warranty or through goodwill were fairly denied given the owner's failure to properly maintain the vehicle. *Id.* Moreover, Plaintiffs recognize the impact a delay on any damage award could have on Class Members: "Any damage award would need to be distributed to class members based on vehicle ownership records that would then be several years older; class members would also likely need to locate receipts for repairs that would be equally old, significantly reducing the overall recovery." *Id.*; *id.* at 13 ("The passage of time would [ ] pose a risk to class members because of the potential for engine seizure or stalling, which they will now be notified about and able to address through free inspections and repairs."). Additionally, Plaintiffs admit that they would face risk at the class certification stage, given the highly discretionary nature of class certification proceedings. *Id.* at 3.

The Court finds that these factors weigh in favor of settlement.

#### ii. Settlement Amount

"In assessing the consideration obtained by the class members in a class action settlement, 'it is the complete package taken as a whole, rather than the individual component parts, that must

United States District Court
Northern District of California

9

be examined for overall fairness.'" *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (quoting *Officers for Justice*, 688 F.2d at 628). "In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

Although Class Counsel stated that it would be "very difficult" to put a dollar value on the settlement because not every Class Vehicle suffers from the defect, Hr'g Tr. 6:18–21, the proposed settlement provides Class Members with virtually all relief requested in Plaintiffs' complaints. As detailed above, Hyundai is warning drivers potentially affected by this defect of the defect and is extending the warranty at its expense. Settlement Agreement § II.A.I. Hyundai is also reimbursing Class Members for past repair expenses in full, with only minimal documentation requirements and a streamlined claims process. *Id.* § II.C.2. And, any Class Members who sold or traded in their vehicles to avoid the expense of repairing the engine will be entitled to a compensation process. *Id.* § II.D.3. Under these circumstances, this factor weighs in favor of approval.

### iii. Extent of Discovery

"In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp.*, 213 F.3d at 459 (citation omitted).

Here, Plaintiffs' counsel have reviewed publicly available sources of technical information, interviews of drivers, and consultations with automotive experts; retained an automotive expert to conduct a tear down and analysis of a failed Sonata engine; reviewed raw data and analysis relating to potentially relevant warranty claims, customer complaints, goodwill payments, and field service reports; reviewed materials prepared internally to brief Hyundai executives about the alleged engine defect and root cause analysis; and conducted a full interview of the Hyundai engineer most familiar with the data and analysis. Final Approval Mot. 14. These actions put Class Counsel in a strong position to evaluate their case and conclude that settlement was the best way forward. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2007)

United States District Court
Northern District of California

10

(finding the parties were sufficiently informed about the case prior to settling because they engaged in discovery, took depositions, briefed motions, and participated in mediation). This factor therefore weighs in favor of approval.

### iv. Counsel's Experience

Plaintiffs' counsel have recommended approval of the settlement. Final Approval Mot. 15. "The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision*, 559 F. Supp. 2d at 1043 (citation omitted); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each parties' expected outcome in litigation."). Here, Class Counsel has substantial experience litigating consumer class actions against automotive companies. Final Approval Mot. 15. In light of Class Counsel's considerable experience and their belief that the settlement provides more than adequate benefits to Class Members, this factor weighs in favor of approval.

### v. Presence of a Governmental Participant

Because there is no governmental entity involved in this litigation, this factor is inapplicable.

### vi. Reaction of the Class

There are approximately 1.3 million Class Members. Reply ISO Final Approval Mot. 2. The deadline for Class Members to submit objections to the settlement or the fees and expenses motion, or to request exclusion from the Settlement Class was November 7, 2016. Final Approval Mot. 2. Since notice of the settlement was disseminated, over 800 Class Members have contacted Class Counsel and Hyundai has paid approximately $8.58 million in compensation to 2,883 Class Members. Reply ISO Final Approval Mot. 2; Hr'g Tr. 4:20–21. Moreover, as of December 15, 2016, out of 885,000 current owners, 338,054 (about 38%) had availed themselves of the option to receive a free inspection and, if necessary, a repair. Reply ISO Final Approval Mot. 2. Class Counsel expects this number to rise, as Class Members will remain eligible for free repairs throughout the 10-year/120,000-mile extended warranty period. *Id.*

In contrast, only 247 Class Members (approximately 0.017%) have opted out. Hr'g Tr.

United States District Court
Northern District of California

10:8–9; Reply ISO Final Approval Mot. 2. A list of Class Members who have opted out of the settlement can be found in Exhibit A to this order. Forty-one Class Members, some of whom have also opted out of the settlement, have timely objected. Reply ISO Final Approval Mot. 3.

Given the high claim rate and the low opt-out and objection rates, this factor strongly favors final approval. *See Churchill Vill.*, 361 F.3d at 577 (finding no abuse of discretion where district court, among other things, reviewed list of 500 opt-outs in a class of 90,000 Class Members); *Cruz v. Sky Chefs, Inc.*, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it."); *Chun-Hoon*, 716 F. Supp. 2d at 852 (granting final approval of settlement where 16 out of 329 class members (4.86%) requested exclusion). That nearly 40 percent of Class Members have availed themselves of the option to receive a free inspection and, if necessary, a repair, also supports final approval. *See In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1006 (N.D. Cal. 2015) (approving class action settlement with claim rate of approximately 25–30%); *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823, 2013 WL 4610764, at *8 (N.D. Cal. Aug. 28, 2013) (approving class action settlement with 3% claim rate).

Nonetheless, the Court recognizes that not all—albeit a small percentage—of Class Members are entirely satisfied with the settlement. "[I]t is the nature of a settlement, as a highly negotiated compromise . . . that it may be unavoidable that some class members will always be happier with a given result than others." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (internal quotation marks omitted). The Court addresses those objections below.

### a. Timing and Mileage Limitations of the Extended Warranty

The most common objection is that the settlement does not cover repairs far enough into the future.[3] One objector expresses concerns that future repairs will not be covered at all, while the remainder contend that the extended warranty is insufficient. For example, Vincent Preston

---

[3] Objections from or on behalf of David Bourne, Michael Canceliere, Robert & Lorelei Chaplin, Don Clarke, Louis Curcio, James Dirago, John Dragone, Robert & Donna Farr, Christina & Keith Floyd, Greg Geisert, Jeff Klotz, Arnold Levey, Roger Love, Velma Inez Miles, Dennis Miller, Robert Neeley, Mitchell Pitkoff, Vincent Preston, Rachel Ray, Hilda Rudder, Greg Shaw, and Philip Storace. *See* Objections, ECF 78-1.

United States District Court
Northern District of California

writes:

> The warranty extension is insufficient.  The 10 years is no extension for new car owners, like myself, since the car was warranted for 10 years when purchased.  The mileage extension is only 20,000 miles to 120,000 miles which is ridiculous for a car that could be serviceable for 200,000 miles or more.  Thus, if this design flaw causes a failure at 121,000 miles, the owner is liable for all repair costs which are quite high.

Objections 71.  Class Counsel responds, however, that the settlement does offer protections for these consumers.  Reply ISO Final Approval Mot. 3.  Under the settlement, regardless of the current mileage count of the Class Vehicle, Class Members are entitled to receive a free inspection.  Settlement Agreement § II.A.I.  If any engine is found to suffer from the defect at issue in the case, that Class Member will receive a free repair.  Accordingly, the extended warranty is not the primary mechanism for ensuring that consumers are not required to pay to repair their engines; it is merely an added remedy—if a Class Member does not elect to participate in the inspection program and later suffers engine failure, he or she may avail himself or herself of the extended warranty.  Reply ISO Final Approval Mot. 3–4.

Moreover, in addition to extending the length of the warranty for engine repairs, the settlement improves the scope of warranty coverage:  Under the settlement, warranty repairs can no longer be denied on improper maintenance grounds, with the only exception being cases of "exceptional neglect."  Settlement Agreement § II.A.6.  And, any past repair expenses denied on improper maintenance grounds can be recouped through the settlement.  *Id.* § II.C.4.

Finally, at the hearing, Class Counsel explained that the underlying data in the case shows that the engine failures at issue most commonly occur before 100,000 miles.  Hr'g Tr. 12:8–17.

In sum, although the settlement extends the warranty to 10 years or 120,000 miles, whichever comes first, the Court agrees that holding off on settlement in the hopes of receiving a longer extended warranty would not be in the best interests of the class as a whole.  Accordingly, the Court OVERRULES these objections.

### b.  Continued Safety Concerns

Another common concern is that Sonata vehicles may still suffer from dangerous engine

seizures.[4]  For example, Louis Curcio writes:

> This settlement provides me no satisfaction that my car engine won't one day just seize, while I am driving on the highway at 75 mph.  This could easily end in death or serious, debilitating injury. . . .  I am now afraid to drive my car, have my wife or son drive my car, or have anyone as passengers in my car.  I am even afraid to trade it in on a new lease for fear that someone who purchases the vehicle in the future may become victim to this faulty engine.

Objections 19.  Despite this concern, the recall and free-inspection program addresses any potential safety issues by taking defective engines off the road before they can fail.  According to Class Counsel, the National Highway Traffic Safety Administration ("NHTSA") has approved the inspection protocol.  Moreover, there is no evidence to suggest that the inspection protocol will be ineffective.  *See Nguyen v. BMW of N. Am. LLC*, No. C 10-02257, 2012 WL 1677054, at *2 (N.D. Cal. Apr. 20, 2012) (overruling objections to settlement where "[t]he objectors point[ed] to no evidence that . . . indicate[d] ongoing defects").

In light of the proactive inspection program, NHTSA's approval of the inspection protocol, and the lack of evidence demonstrating that the inspection protocol is insufficient, the Court OVERRULES these objections.

### c.  Lost Resale Value

A third complaint raised by several of the objectors is that they are not receiving a cash payment for loss of resale value.[5]  For example, James Robinson writes:

> All Hyundai owners should be given a cash settlement or a buyback. . . .  My car has now been tainted and will always be known as a "suspect car" because of the unreliable engine.  . . .  When I go to trade it for another car, all automotive sales people will know that this car's engine can fail.  I will then be given a lesser amount for my car because of this fact.

Objections 87.

---

[4] Objections from or on behalf of Richard Bartha, Melvin Bultman, Louis Curcio, Christina & Keith Floyd, Randy Hernandez, Addie Marie Jenkins, Doreen Jodoin, Paralee Massie-Armstrong, Velma Miles,  Robert Neeley, Mitchell Pitkoff, Vincent Preston, Stephanie Roberts, Hilda Rudder, and Mark Sullivan.  *See* Objections, ECF 78-1.

[5] Objections from or on behalf of Melvin Bultman, Louis Curcio, James Dirago, Randy Hernandez, Addie Marie Jenkins, Arnold Levey, Paralee Massie-Armstrong, Mitchell Pitkoff, Vincent Preston, Craig Rabinowitz, James Robinson, Karen Starr-Brady, and James Ventura.

United States District Court
Northern District of California

The settlement considers these concerns in two ways.  First, if a Sonata owner suffered an engine failure, could not afford to repair the car, and sold it at a loss, he or she can seek reimbursement for the loss in fair-market value caused by the engine defect.[6]  Settlement Agreement § II.D.3.  Second, Class Members who have never suffered an engine failure are now receiving free inspections and there is no evidence that they will suffer a loss in value when and if they later resell their vehicles.  Accordingly, the Court finds that as currently constructed, it is in the Class's best interests to accept the offer, and thus OVERRULES these objections.

### d.  Additional Compensation

Other class members object to the settlement because although it offers reimbursement for prior repairs, rental car expenses, and towing expenses, it does not go far enough in reimbursing related expenses and costs, such as the cost of previously purchased extended warranties, aggravation, lost wages, and the cost associated with buying a new car.[7]

With respect to reimbursing the cost of previously purchased extended warranties, which several objectors raise, Class Counsel explained at the fairness hearing that the negotiated warranty under the settlement focuses on a very specific thing and provides the aforementioned appeals process.  Hr'g Tr. 16:4–11.  Thus, the previously purchased extended warranties are far broader than the extended warranty negotiated under the settlement and thus, there is still significant value in the purchased extended warranties.  *Id.* 16:17–20.  Accordingly, the Court OVERRULES the objections on this ground.

As to the remainder of the objectors requesting additional compensation, the Court finds that a class settlement is not capable of resolving every possible consequential damages claim a Class Member might wish to pursue.  It would not be fair to the class as a whole to set aside an

---

[6] To qualify under this provision, a Class Member must have sold or traded in their un-repaired Class Vehicle before the recall was announced for 2011–2012 models or before the settlement was announced for 2013–2014 models.  Three Class Members—Katherine Boutin, Paralee Massie-Armstrong, and Richard Prigge—object to the time limitation.  *See* Objections 5–6, 49; Prigge Objection, ECF 78-2.  However, once the recall or settlement was announced, there is no reason to discount the estimated fair-market value of the vehicle because the Class Member could either obtain a free engine repair prior to selling it or sell the vehicle with the assurance that a free engine repair was available.  Therefore, the Court OVERRULES these objections.

[7] Objections from or on behalf of Yolanda Ashley, Michele Brown, Doreen Jodoin, Paralee Massie-Armstrong, Samantha Raffield, and James Ventura.

United States District Court
Northern District of California

otherwise fair settlement because it does not address unique and difficult to prove hardships suffered by only a few members of the class. *See Hendricks v. Starkist Co.*, No. 13-cv-00729, 2016 WL 5462423, at *6 (N.D. Cal. Sept. 29, 2016) ("That a more favorable result for some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement."). Accordingly, the Court OVERRULES these objections as well.

### e. Other Objections

Other objections raised by only one Class Member are addressed below.

Mark Farrell objects because he believes his 2011 Santa Fe vehicle suffered from the same defect and should therefore be included in the settlement along with Hyundai Sonatas. Objections 26–27. However, because the settlement will not release any claims Mr. Farrell may have regarding this vehicle, Mr. Farrell lacks standing to raise this objection. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig.*, No. MDL 2672, 2016 WL 6248426, at *22 (N.D. Cal. Oct. 25, 2016) (citation omitted) (finding owners lacked standing to object based on the settlement's failure to include certain vehicles in the class). Accordingly, the Court OVERRULES Mr. Farrell's objection.

Dmitriy Pavlov objects because he believes the settlement should include 2011–2014 Hyundai Sonata with rebuilt salvage titles, except where the engine was damaged in an accident. Objections 59. Mr. Pavlov's objection appears to be based on a misunderstanding, as those vehicles do fall within the definition of "Class Vehicles" and are eligible for free inspections and repairs (as needed), as well as for reimbursements for qualifying repairs. Settlement Agreement §§ II.A.1, II.C.1. Accordingly, the Court OVERRULES Mr. Pavlov's objection.

Jason Pence objects on the belief that his claim was incorrectly denied. Objections 60–68. Mr. Pence states that he has appealed Hyundai's initial determination as required by the settlement, but objects to preserve his rights. Class Counsel believes that Mr. Pence's claim was wrongly denied, and expects that this wrong will be remedied once Mr. Pence avails himself of the process provided for challenging claim determinations. Final Approval Mot. 7. Class Counsel further states that Mr. Pence's experience does not appear to be typical. Because it appears that Mr. Pence's objection can be resolved pursuant to the settlement and is not typical of the class, the

United States District Court
Northern District of California

Court OVERRULES his objection.

Finally, Arnold Levey objects on three grounds. First, Mr. Levey argues that the recall is "past consideration," and that the class gains nothing from the settlement. Objections 44. He analogizes to an objection filed by Judge Kozinski and his wife in *Klee v. Nissan North America, Inc.*, No. CV1208238AWTPJWX, 2015 WL 4538426 (C.D. Cal. July 7, 2015). However, here, unlike in *Klee*, the settlement includes substantial relief that Hyundai will not be obligated to provide if the Court denies settlement approval. *Cf. id.* (objecting because the initial settlement consisted solely of relief Nissan had agreed to provide regardless of whether the settlement was approved). Accordingly, the Court finds this objection meritless and thus OVERRULES it.

Second, Mr. Levey objects to the form of the class notice. He claims that the class notice "was defective and did not provide sufficient information for enough of the class members to realize how little they would receive as a result of the settlement." Objections 45. However, for the reasons described above, in Part II.C., the Court finds the notice adequate and OVERRULES this objection.

Third, Mr. Levey objects to the requested attorneys' fees, stating that the amount of fees requested are "clearly excessive and unwarranted." Objections 43. As explained below in III.B., the Court finds the attorneys' fees reasonable, and thus OVERRULES Mr. Levey's third objection.

### E. The *Bluetooth* Factors

Although the *Churchill* factors favor settlement, consideration of those factors alone is insufficient. *See In re Bluetooth*, 654 F.3d at 946. Where, as here, the parties reach a settlement prior to class certification, courts must examine the settlement with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Id.* (citations omitted). "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Signs of subtle collusion include:

United States District Court
Northern District of California

United States District Court
Northern District of California

(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotations marks and citations omitted).

Here, neither the process used by the parties to negotiate the settlement nor the settlement's terms indicate a collusive deal. The first factor is not present—while the Class receives all of the recovery Plaintiffs requested, attorneys' fees will not exceed $795,000 for both fees and expenses. Mot. for Att'y Fees 2. This amount represents less than 10 percent of the value of the settlement at present. *See* Hr'g Tr. 4:20–21 (Hyundai has paid approximately $8.58 million in compensation to 2,883 Class Members); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) (finding that the Ninth Circuit sets a "benchmark" fee award at 25% of the recovery obtained).

As to the second factor, the settlement agreement contains a clear sailing provision. The agreement states Defendants will not "oppose, undermine, or solicit others to oppose or undermine an award of attorneys' fees and costs up to, but not to exceed, the total combined sum of $795,000.00." Settlement Agreement § V.2 "Although clear sailing provisions are not prohibited, they 'by [their] nature deprive . . . the court of the advantages of the adversary process' in resolving fee determinations and are therefore disfavored." *In re Bluetooth*, 654 F.2d at 949 (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)). When "confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefits to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.* at 948 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).

However, the award represents the amount of time and expense counsel actually devoted to

18

United States District Court
Northern District of California

1   the litigation.  Gibbs Decl. ¶ 11.  And, had the fee amount been litigated rather than negotiated, a

2   multiplier could have been awarded and the fees substantially higher.  *See, e.g.*, *MacDonald v.*

3   *Ford Motor Co.*, No. 13-cv-2988, 2016 WL 3055643, at *9–10 (N.D. Cal. May 31, 2016)

4   (awarding fee multiplier of 2.0).  The parties' fee agreement thus represents a legitimate

5   compromise and not a collusive agreement to pay Class Counsel more in exchange for paying the

6   class less.  *See Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 687 (N.D. Cal. 2016)

7   (clear-sailing provision does not signal collusion when the agreed-upon fees are reasonable and

8   the relief negotiated for the class is favorable).

9            As to the third factor, there is no kicker arrangement whereby "unpaid attorneys' fees"

10  would revert to the defendant.  *In re Bluetooth*, 654 F.3d at 949.

11           Two additional facts suggest that the settlement was not a result of collusion.  First, the

12  settlement was negotiated by counsel with extensive experience litigating automotive class actions

13  and was aided by the presence of a mediator, Hon. James P. Kleinberg (Ret.).  Gibbs Decl. ¶¶ 7,

14  10–11; *see G.F. v. Contra Costa Cty.*, 2015 WL 4606078, at *13 ("[T]he assistance of an

15  experienced mediator in the settlement process confirms that the settlement is non-collusive."

16  (citation and internal quotation marks omitted)).  Second, under the settlement, Plaintiffs are

17  receiving all of their requested relief, which strongly suggests that the settlement is non-collusive.

18  *See Tadepalli v. Uber Techs., Inc.*, No. 15-cv-4348, 2016 WL 1622881, at *9 (N.D. Cal. Apr. 25,

19  2016) ("[T]he fact that the class is receiving 100% [recovery] reduces the likelihood that the

20  parties colluded to confer benefits on each other at the expense of class members.").

21           Similarly, the $2,500 service awards that Hyundai has agreed to award Plaintiffs Mendoza

22  and Graham are not indicative of a collusive deal, as they are lower than "typical incentive awards

23  in the Ninth Circuit, where $5,000 is presumptively reasonable."  *Smith v. Am. Greetings Corp.*,

24  No. 14-cv-2577, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016).

25           Accordingly, the Court concludes that the settlement does not raise an inference of

26  collusion that warrants invalidation of the class settlement as a whole.

27

28

### III. ATTORNEYS' FEES AND COSTS

#### A. Legal Standard

##### i. Attorneys' Fees

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. "Where a settlement produces a common fund for the benefit of the entire class," as here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to determine the reasonableness of attorneys' fees. *Id.* at 942. "Because the benefit to the class is easily quantified in common-fund settlements," the Ninth Circuit permits district courts "to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* "Applying this calculation method, courts [in the Ninth Circuit] typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *Id.* (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). However, the benchmark should be adjusted when the percentage recovery would be "either too small or too large in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers*, 904 F.2d at 1311. "[W]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth*, 654 F.3d at 942.

##### ii. Costs

An attorney is also entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotations and citation omitted). To support an expense award, Plaintiffs should file an itemized list of their expenses by category, listing the total amount advanced for each category, listing the total amount advanced for each category, allowing the Court to assess whether the expenses are reasonable. *Wren v. RGIS Inventory Specialists*, No. 06-

United States District Court
Northern District of California

1  cv-5778, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011), supplemented, No. 06-cv-5778,

2  2011 WL 1838562 (N.D. Cal. May 13, 2011).

3      **B.    Analysis**

4          **i.    Attorneys' Fees**

5          Class Counsel moves the Court for $761,415.67 in attorneys' fees, representing less than

6  10 percent of the settlement amount as of December 15, 2016.  Mot. for Att'y Fees 2.  Class

7  Counsel argues that this award is reasonable because they have spent 1,962 hours over the past

8  year and a half working on behalf of the class, which, at the current hourly billing rates, amounts

9  to a lodestar value of $882,201.  *Id.*  Thus, the fee Hyundai has agreed to pay includes an effective

10 multiplier of 0.86.  *Id.*  Moreover, this multiplier will decrease further as Class Counsel continues

11 to fulfil their post-settlement obligations to the class.  *Id.*  Finally, Class Counsel argues that in

12 light of the contingency risk they undertook and the positive results they achieved, the amount of

13 attorneys' fees and expenses is reasonable.  *Id.*

14         After careful review of Class Counsel's declarations and filings, the Court concludes that

15 awarding $761,415.67 in attorneys' fees and costs to Class Counsel is reasonable.  First, the award

16 requested is far less than the 25 percent "benchmark" for a reasonable fee award in the Ninth

17 Circuit.  *See In re Bluetooth*, 654 F.3d at 942.  Such a fee award is "presumptively reasonable."

18 *Ching v. Siemens Indus., Inc.*, No. 11-cv-4838, 2014 WL 2926210, at *7 (N.D. Cal. June 27,

19 2014) (citing *In re Bluetooth*, 654 F.3d at 942).  Although one class member has objected to the

20 proposed fee award, the Court finds the use of a fractional multiplier to be reasonable.

21         The Court has also crosschecked this award against the lodestar recovery.  Class Counsel

22 calculated the anticipated lodestar as $882,201,[8] which, as previously stated, would result in a

23 multiplier of approximately 0.86.  This amount is less than the range of multipliers routinely

24 awarded by courts.  *See In re Omnivision*, 559 F. Supp. 2d at 1048 (noting that courts have

25 approved multipliers raging between 1 and 4); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d

26 _____

27 [8] This figure is supported by the declarations of Eric Gibbs, Benjamin F. Johns, and Richard D.
   McCune.  Gibbs. Decl. ISO Mot. for Att'y Fees ("Gibbs Decl. II"), ECF 74-1; Johns Decl. ISO

28 Mot. for Att'y Fees ("Johns Decl."), ECF 74-3; McCune Decl. ISO Mot. for Att'y Fees ("McCune
   Decl."), ECF 74-5.

United States District Court
Northern District of California

1043, 1051 n.6 (noting that the majority of class action settlements approved had fee multipliers that ranged between 1.5 and 3). Additionally, the number of hours expended falls below the range of hours previously found by courts to be reasonable in similar cases. *See, e.g.*, *Sadowska v. Volkswagen Grp. Of Am.*, No. CV 11-665, 2013 WL 9600948, at *9 (C.D. Cal. Sept. 25, 2013) (approving attorneys' fees based on 3,115 hours over 23 months of litigation).

Finally, Class Counsel is entitled to an award of attorneys' fees under two California fee-shifting statutes, the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1780(e), and California's codification of the private attorney general doctrine, Cal. Civ. Proc. Code § 1021.5. CLRA provides for an award of attorneys' fees to a prevailing plaintiff in an action like this brought pursuant to the CLRA. Cal. Civ. Code § 1780(e). Similarly, section 1021.5 of the California Code of Civil Procedure provides for attorneys' fees to a successful party who confers a significant benefit on the general public of a large class of persons. Under this section, it does not matter that Plaintiffs succeeded through a settlement rather than through a judgment following trial, it only matters that they succeeded. *See Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 566 (2004) ("In determining whether a plaintiff is a successful party for purposes of section 1021.5, the critical fact is the impact of the action, not the manner of the resolution." (citation and internal quotation marks omitted)).

Accordingly, Class Counsel's motion for $761,415.67 in attorneys' fees is GRANTED.

### ii. Costs

Plaintiffs are also seeking reimbursement of $33,584.33 in costs. Gibbs Decl. II ¶ 18; Johns Decl. ¶ 10; McCune Decl. ¶ 37. Class Counsel has provided itemized lists of the costs and expenses separated by category. Gibbs Decl. II ¶ 18; Johns Decl. ¶ 10; McCune Decl. ¶ 37. Most of the expenses resulted from expert consultants, litigation support and professional services, and travel. *Id.* Upon review, the expenses are reasonable with the exception of the $8,343 classified as "other" by Chimicles & Tikellis LLP. *See* Johns Decl. ¶ 10. Because Mr. Johns has not provided sufficient information for the Court to assess whether these expenses are reasonable, the Court declines to award those costs. Accordingly, Class Counsel's motion for $33,584.33 in costs is GRANTED IN PART. The Court awards Class Counsel $25,241.33 in costs.

United States District Court
Northern District of California

United States District Court
Northern District of California

## IV.     SERVICE AWARD

### A.     Legal Standard

Service awards "are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (internal citation omitted).  Courts evaluate service awards individually, "using relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation and reasonable fears of workplace retaliation." *Staton*, 327 F.3d at 977 (citation and internal quotations and alterations omitted).  Indeed, "courts must be vigilant in scrutinizing all inventive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

### B.     Analysis

Plaintiffs request a service award of $2,500 each for Lead Plaintiffs Mendoza and Graham. Mot. for Att'y Fees 2.  Plaintiffs believe this award is reasonable in light of the contributions that Plaintiffs have made on behalf of similarly-situated Sonata owners.  *Id.*  Specifically, Mendoza and Graham worked with counsel to present their individual experiences on behalf of the class, searched for and provided documentation to support their claims, reviewed the complaint prior to filing, consulted with Class Counsel regarding potential settlement remedies, and reviewed the settlement agreement on behalf of the class.  *Id.*; Gibbs Decl. II ¶ 19.  No one has objected to the proposed service award.

To determine the reasonableness of a service award, courts consider the proportionality between the service award and the range of class members' settlement awards.  *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal. 2014).  In this Circuit, an award of $5,000 is presumptively reasonable.  *See Harris v. Vector Marketing Corp.*, No. C-08-5198, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases).  Thus, in light of Lead Plaintiffs' service to the class, the Court finds that a service award of $2,500 each is reasonable.

23

**V.    ORDER**

For the foregoing reasons, the Court hereby ORDERS as follows:

1.    The Court certifies the class for settlement purposes only.

2.    The Court grants final approval to the parties' proposed settlement, which is fair, adequate, and reasonable.

3.    The Court approves a service award of $2,500 Plaintiff Elizabeth Mendoza and Beth Graham ($5,000 collectively).

4.    The Court approves an award to class counsel of $ 761,415.67 in attorneys' fees and $25,241.33 in expenses.

5.    The 247 class members who requested to opt out of the settlement class are excluded from the class.

The Court further ORDERS the parties to submit a revised proposed final judgment consistent with this order **on or before January 30, 2017**.

**IT IS SO ORDERED.**

Dated: January 23, 2017

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

[Cite as *Mason v. Mercedes-Benz, L.L.C.*, 2005-Ohio-4296.]

COURT OF APPEALS OF OHIO, EIGHTH DISTRICT

COUNTY OF CUYAHOGA

NO. 85031

RECEIVED
ATTORNEY GENERAL OF OHIO

AUG 2 6 2005

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

| | | |
|---|---|---|
| MONICA MASON | : | |
| | : | JOURNAL ENTRY |
| Plaintiff-Appellee | : | |
| | : | and |
| -vs- | : | |
| | : | OPINION |
| MERCEDES-BENZ USA, LLC | : | |
| | : | |
| Defendant-Appellant | : | |
| | : | |

DATE OF ANNOUNCEMENT                    AUGUST 18, 2005
OF DECISION:

CHARACTER OF PROCEEDING:         Civil appeal from
                                 Common Pleas Court
                                 Case No. CV-491499

JUDGMENT:                        Affirmed.

DATE OF JOURNALIZATION:

APPEARANCE:

For Plaintiff-Appellee:          J. DANIEL SCHARVILLE
                                 Kahn & Associates, L.L.C.
                                 55 Public Square, Suite 650
                                 Cleveland, Ohio 44113


For Defendant-Appellant:         STEPHANIE E. NIEHAUS
                                 RICHARD GURBST
                                 SARAH K. RATHKE
                                 Squire, Sanders & Dempsey
                                 4900 Key Tower
                                 127 Public Square
                                 Cleveland, Ohio 44114-1304

−2−

PATRICIA ANN BLACKMON, A.J.:

{¶ 1} Appellant Mercedes-Benz USA, LLC ("Mercedes") appeals from the jury's award of damages in the amount of $27,500 in favor of appellee Monica Mason, and the court's award of treble damages. Mercedes assigns six errors for our review.[1]

{¶ 2} Having reviewed the record and pertinent law, we affirm the decision of the trial court.  The apposite facts follow.

### MANY CAR REPAIRS IN A SHORT PERIOD OF TIME

{¶ 3} On May 24, 2001, Monica Mason leased a 2001 Mercedes-Benz C320 from Motorcars Infiniti/Mercedes Benz located in Bedford, Ohio.  The lease was through Mercedes Benz Credit Corporation and was for a term of 39 months with a monthly payment of $768.41.  In connection with the lease, Mercedes issued a four-year/50,000 mile warranty on the vehicle.  Mason also purchased an additional warranty for $1,080, which extended the warranty coverage to 100,000 miles.

{¶ 4} Mason leased the C320 because Mercedes represented it as one of the "safest, most reliable, maintenance free cars."[2]  She needed a reliable car because she traveled frequently.

—————————

[1]See Appendix.

[2]Tr. at 136.

—3—

{¶ 5}  The day after taking possession of the car, Mason was driving on the freeway with a coworker, when the steering on the car became difficult.  The coworker testified that it was obvious Mason was having difficulty steering because Mason had to use two hands in order to turn the wheel to exit the freeway.  The car was towed to the dealership.  The mechanic found no obvious problem with the power steering, but as a precaution he replaced the power steering pump.  Mason's expert, Mark Sargent, testified that a dealership would not replace an $800 part without a reason.

{¶ 6}  Over the next two years, Mason took the car in for repairs over twenty times for the following problems: driver's side seat belt release was stuck, gear shift light was not working, rear window would not express up, faulty thermostat, windshield wiper sensors inoperable, head light sensors failed, turn signal bulbs repeatedly burning out, climate control on the passenger side failed, remote key access intermittently not working, loud squeaking noises, key would not release from the ignition, brake lights not working, and lateral acceleration sensors malfunctioned.  Most of the problems were corrected; however, some repairs required several visits before being resolved.

{¶ 7}  Finally, the driver's seat motor failed, which prevented Mason from being able to adjust the seat, and her Global Position System ("GPS") also failed.  According to Mason, Mercedes refused to repair the driver's seat or GPS without her paying for it; therefore, she did not have these problems repaired.  Mercedes

—4—

denied it refused to repair the vehicle at no cost.  At this point, Mason had driven the car approximately 60,000 miles; however, her extended 100,000 mile warranty was still valid.

{¶ 8} Mercedes offered to lease another vehicle to Mason. However, the vehicle offered to her did not have the upgrades she had paid for, and Mercedes required that she pay at least $3,600 to break her lease.  Mason refused the offer.

{¶ 9} Mason eventually stopped driving the Mercedes because she lost confidence in the car and no longer felt safe.  Although Mason was still paying for the lease on the Mercedes,  she purchased a 1992 Buick Century from her grandmother that she used for her driving needs.

{¶ 10} Mason's expert, Mark Sargent of Motor Vehicle Forensic Services, stated that he had never heard of a car needing so many repairs in so short a time.  He claimed the number of repairs was not typical, especially for a Mercedes.  In his opinion, the car was not fit for its ordinary purpose because it was not reliable.  He conceded that malfunctioning head lights, windshield wipers, and turn signals seem minor, but stressed that they become safety issues when not working properly.

{¶ 11} The jury awarded Mason $20,000 for breach of implied warranty of merchantability and $7,500 for her Consumer Sales Practices Act claim.  After conducting a hearing, the trial court awarded Mason treble damages on her Consumer Sales Practices Act

—5—

claim, but denied her motion for attorney fees.   Mercedes now appeals and Mason cross-appeals.

## INTERROGATORIES

{¶ 12} In its first assigned error, Mercedes claims the trial court erred by refusing to submit requested interrogatories to the jury.

{¶ 13} Civ. R. 49(B) states:

"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

{¶ 14} Civ.R. 49(B) does not require the trial judge to act as a "'mere conduit who must submit all interrogatories counsel may propose.'"[3] The court retains limited discretion to reject proposed interrogatories where they are ambiguous, confusing, redundant, or otherwise legally objectionable.[4]

{¶ 15} In the instant case, the trial court's reason for not submitting the interrogatories was because it had "never done it."[5]

---

[3]*Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 107, quoting *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161, 165.

[4]Id.

[5]Tr. at 530.

—6—

Thus, the trial court did not reject the interrogatories because they were improper. Rather, the trial court refused because it had "never done it before." This clearly is an erroneous basis for refusing to submit interrogatories. The trial court may refuse to submit interrogatories only if they are "ambiguous, confusing, redundant, or legally objectionable."[6]

{¶ 16} Nevertheless, we conclude the trial court's refusal to submit the interrogatories was not prejudicial. The Ohio Supreme Court in *Freeman v. Norfolk & Western Ry. Co.*[7] held:

> "The purpose of an interrogatory is to 'test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict.' *Riley v. Cincinnati* (1976), 46 Ohio St.2d 287, 298, 75 O.O.2d 331, 338, 348 N.E.2d 135, 142. Although interrogatories may be addressed to issues of mixed law and fact or issues of fact only, the issues must be ultimate and determinative in character. *Ragone,* supra, 42 Ohio St.2d at 169, 71 O.O.2d at 168, 327 N.E.2d at 651. This court has defined proper interrogatories as those that will lead to 'findings of such a character as will test the correctness of the

---

[6]*UZ Engineered Prods. Co. v. Midwest Motor Supply Co.,* 147 Ohio App.3d 382, 399, 2001 Ohio 8779, citing *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 15.

[7](1994), 69 Ohio St.3d 611.

−7−

general verdict returned and enable the court to determine as a matter of law whether such verdict shall stand.' *Bradley v. Mansfield Rapid Transit, Inc.* (1950), 154 Ohio St. 154, 160, 42 O.O. 221, 224, 93 N.E.2d 672, 676-677. A properly drafted interrogatory will elicit a statement of facts from which a conclusion of negligence or no negligence may be drawn. Id. at 161, 42 O.O. at 224, 93 N.E.2d at 677. An interrogatory that is merely probative or evidentiary in nature, and does not touch on an ultimate issue, is improper. Id."[8]

{¶ 17} In the instant case, Mercedes proposed sixteen interrogatories. Interrogatories six through twelve dealt with the implied warranty of a particular purpose, which Mason voluntarily dismissed, and, therefore, were properly not submitted.

{¶ 18} Interrogatories one and two asked the jury to identify how Mason's vehicle was not fit for its ordinary purpose and whether the defects were reported to the dealer. Those interrogatories were improper because Mason alleged only one claim of implied breach of warranty based on the totality of circumstances that the vehicle was not fit for its ordinary purpose. Mason claimed it was the multitude of problems with the vehicle that made it unfit for its ordinary purpose. Therefore, because there was only one claim for breach of implied warranty of merchantability, we conclude the submission of

---

[8]Id. at 613-614.

−8−

interrogatories one and two was not necessary because they were not determinative of an ultimate issue. Rather, the interrogatories were merely probative.

{¶ 19} Interrogatories three, four, five and sixteen concerned damages. However, the measure of damages was contrary to the trial court's instructions on damages, and, therefore, properly rejected.

{¶ 20} Interrogatories thirteen, fourteen, and fifteen were properly rejected because Mercedes requested the jury to write a narrative regarding what they found to be unfair, deceptive, or unconscionable. Civ.R. 49(B) does not require submission of an interrogatory which is "'merely of a probative or evidentiary nature.'"[9] Where the determinative issues and the issues submitted to the jury for its verdict are identical, there is no function for an interrogatory.[10] The jury could not have found in favor of Mason on her Consumer Sales Practices Act claim without finding Mercedes committed an unfair, unconscionable, or deceptive act. The two interrogatories would have required the jury to state the specific evidentiary basis for its finding Mercedes violated the Ohio Consumer Sales Practices Act. Thus, the two proposed interrogatories did not address determinative issues.[11]

---

[9] *Ragone*, supra, 42 Ohio St.2d at 169.

[10] *Richley v. Liechty* (1975), 44 Ohio App.2d 359, 363.

[11] *Costa v. Hardee's Food Sys.* (Jan. 20, 1998), 12th Dist. No. A97-03-022.

–9–

{¶ 21} Mercedes argues this case is analogous to this court's opinion in *Rich v. McDonald*,[12] requiring us to reverse the matter for a new trial. However, we conclude *Rich* is distinguishable from the instant case.

{¶ 22} Although the trial court in *Rich* had arbitrarily refused to issue the interrogatories, in that case prejudice arose because the trial court had erred in instructing the jury on a crucial issue in the case. The requested interrogatories would have indicated if the erroneous instruction influenced the jury. Moreover, our review of the interrogatories in *Rich* indicated that they were not legally objectionable.

{¶ 23} In the instant case, the trial court correctly instructed the jury and we have determined that the interrogatories were legally objectionable. Under the circumstances, we cannot say that the trial court's refusal to submit the proposed interrogatories resulted in prejudicial error, unlike in the *Rich* case. Accordingly, we overrule Merecedes' first assigned error.

### TREBLE DAMAGES

{¶ 24} In its second assigned error, Mercedes claims the trial court erred by awarding treble damages because there was no evidence that Merecedes committed a deceptive or unconscionable act. Mercedes further contends that because its interrogatories were not

---

[12]155 Ohio App.3d 1.

—10—

submitted to the jury, the trial court would have to speculate what constituted the basis of the jury's finding the Ohio Consumer Sales Practices Act was violated.

{¶ 25} R.C. 1345.09(B) provides for the following damages:

"(B) Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) or section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02 or 1345.03 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code, the consumer may *** recover, *** three times the amount of his actual damages or two hundred dollars, whichever is greater ***."

{¶ 26} Mercedes claims that without an interrogatory, the trial court could not determine whether the conduct giving rise to the violation of the Ohio Consumer Sales Practices Act was deceptive, or unconscionable. We disagree.

{¶ 27} Whether treble damages should be awarded is a legal issue for the trial court.[13] The evidence indicated the reason Mason purchased a Mercedes was because Mercedes represented its vehicles

---

[13]*Bierlein v. Alex's Continental Inn, Inc.*, (1984), 16 Ohio App.3d 294, 301.

−11−

as being the most reliable, safest cars on the market. The car purchased by Mason, however, was neither safe nor reliable, as it was beset with a multitude of problems, some of which affected the safety of the vehicle.

{¶ 28} In fact, the jury found that Mercedes breached its implied warranty of merchantability; therefore, the trial court did not have to speculate whether the jury found Mercedes to have committed a deceptive act.  Pursuant to R.C. 1345.02(B)(1) (10), the failure to honor an implied warranty of merchantability is a deceptive act. R.C. 1345.02(B)(1) provides:

> "(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:
>
> "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;"
>
> "***
>
> "(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false."

{¶ 29} Therefore, because the breach of an implied warranty of merchantability has previously been declared a deceptive act, treble damages were appropriately awarded in the instant case. Accordingly, Mercedes' second assigned error is overruled.

## IMPLIED WARRANTY OF MERCHANTABILITY

−12−

{¶ 30} In its third assigned error, Mercedes claims the evidence was

{¶ 31} insufficient to support the jury's finding that Mercedes violated an implied warranty of merchantability. Mercedes argues that because Mason drove the car approximately 60,000 miles there was no evidence that Mason's car was unfit for its ordinary purpose.

{¶ 32} R.C. 1302.27(A) implies a warranty that goods sold shall be merchantable. In order for goods to be merchantable, they must be, "fit for the ordinary purposes for which such goods are used[.]"[14]

{¶ 33} Although Mercedes cites to various cases for the proposition that continued use of the car undermines the claim of breach of implied warranty of merchantability, those cases are distinguish-able.[15] They dealt with a singular or several repairs, but not the multitude of different problems that afflicted Mason's vehicle, which required her to have the car in for repairs twenty times over a two-year time period.

---

[14] R.C. 1302.27(B)(3).

[15] *Labonte v. Ford Motor Co.* (Oct. 7, 1999), Cuyahoga App. No. 74855 (plaintiff's vehicle returned eight times for a "check engine" warning light malfunction); *Filipovic v. Fairchild Chevrolet* (Sept. 27, 2001), Cuyahoga App. No. 78673 ( used car returned three times for repairs); *Miller v. Daimler Chrysler Motors Corp.* (May 31, 2001), Cuyahoga App. No. 78300 (only problem was noise and vibration); *Reyant v. Daimler-Benz* (Dec. 29, 1978), 9th Dist. No. 8972 (vehicle returned once for repair of broken crankshaft); *Sharkus v. Daimler Chrysler Corp.* (Oct. 17, 2002), Cuyahoga App. No. 79218 (vehicle repaired on six occasions, with noise and vibration an unrepairable problem).

−13−

{¶ 34} Mason testified that her faith in the vehicle was so undermined by its constant problems that, although she was still paying for the Mercedes' lease, she had to purchase another vehicle. The value to the buyer of an automobile is substantially impaired when its nonconformities undermine the buyer's faith in the integrity and reliability of the vehicle.[16] Therefore, given the fact she no longer drove the Mercedes even though she still owed on the lease, supports her allegation that the car was unfit for its ordinary purpose. She no longer felt safe driving the car. Accordingly, Mercedes' third assigned error is overruled.

## OHIO CONSUMER SALES PRACTICES ACT

{¶ 35} In its fourth assigned error, Mercedes claims the jury's finding that Mercedes violated the Consumer Sales Practices Act was not supported by sufficient evidence because there was no evidence that Mercedes committed an unfair, deceptive, or unconscionable act. Mercedes also argues there was no evidence that Mason suffered any damages as a result of any alleged violation because all the repairs were made at no cost to her.

{¶ 36} As we stated in addressing Mercedes' second and third assigned errors, the evidence supported the jury's finding that Mercedes breached its implied warranty of merchantability. This also supports the jury's finding that Mercedes violated the Ohio

---

[16] *McCullough v. Bill Swad Chrysler-Plymouth* (1983), 5 Ohio St.3d 181, paragraph four of the syllabus.

−14−

Consumer Sales Practices Act.  We will address the damages portion of this assigned error in the fifth assigned error.  Accordingly, Mercedes' fourth assigned error is overruled.

### EXCESSIVE DAMAGE AWARD

{¶ 37} In its fifth assigned error, Mercedes claims the damage award was grossly excessive because it exceeded Mason's actual damages.

{¶ 38} In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive.[17]  In the instant case, the record is devoid of any evidence that the jury was wrongfully influenced in returning a large award, and the amount of the award itself is not so manifestly excessive to warrant our interference with the province of the jury. The jury awarded Mason $20,000 for her breach of implied warranty claim and $7,500 for her consumer sales practices claim.  We cannot say this amount was excessive because it was less than the $29,967.99 for which Mason was obligated under her lease.

{¶ 39} In addition, the trial court was in the best position to determine whether the award  was manifestly excessive or influenced

---

[17]See *Moskovitz v. Mt. Sinai Medical Ctr.*, 69 Ohio St.3d 638, 1994 Ohio 324; *Toledo, Columbus & Ohio River RR. Co. v. Miller* (1923), 108 Ohio St. 388, 402-403.

—15—

by passion and prejudice.[18] The trial judge refused to set the verdict aside and denied the motion for a new trial. That determination is entitled to deference.[19]

{¶ 40} Also, as we have stated above, the trial court did not err by awarding treble damages. Mercedes breached its implied warranty of merchantability, which constitutes a deceptive act under the Ohio Consumer Sales Practices Act. Accordingly, Mercedes' fifth assigned error is overruled.

## REMITTITUR

{¶ 41} In its sixth assigned error, Mercedes claims the court erred

{¶ 42} by denying its motion for remittitur due to the excessive damage award. Because we found in the fifth assigned error that the damage award was not excessive, the trial court did not err by denying Mercedes' motion for remittitur. Accordingly, Mercedes' sixth assigned error is overruled.[20]

Judgment is affirmed.

---

[18]See, generally, *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40; *Larrissey v. Norwalk Truck Lines, Inc.* (1951), 155 Ohio St. 207, 219; *Moskovitz,* supra.

[19]*Moskovitz,* supra.

[20]Mason untimely filed a cross-appeal raising three assigned errors. This court issued a ruling stating we would only consider those errors pursuant to R.C. 2505.22 if we reverse the judgment. Therefore, because we are affirming, we will not address the errors raised by Mason.

—16—

It is ordered that appellee recover of appellant her costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., J., and

KENNETH A. ROCCO, J., CONCUR.

PATRICIA ANN BLACKMON
ADMINISTRATIVE JUDGE

N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).

[Cite as *Mason v. Mercedes-Benz, L.L.C.*, 2005-Ohio-4296.]

## APPENDIX

### ASSIGNMENTS OF ERROR

"I.  The trial court erred to the prejudice of MBUSA in refusing to submit proper written interrogatories to the jury to test the jury's general verdict."

"II.  The court erred in awarding treble damages on appellee's Consumer Sales Practices Act claim because the jury did not find that MBUSA committed an act or practice declared by rule or judicial decision to be a violation of the Consumer Sales Practices Act."

"III.  The jury's verdict was not supported by the evidence and was contrary to law, as appellee failed to demonstrate that the vehicle was not fit for its ordinary purpose of personal transportation."

"IV.  The jury's verdict was not supported by the evidence and was contrary to law, as appellee failed to demonstrate that MBUSA acted unfairly, deceptively, or unconscionably in dealing with appellee's complaints."

"V.  The combined jury award was excessive as a matter of law in light of appellee's substantial use of the vehicle, appellee's limited interest in the vehicle, and MBUSA's responsiveness in attempting to resolve appellee's concerns with the vehicle."

"VI.  The trial court erred in denying MBUSA's motion for remittitur, because the jury's damages award was excessive and did not reflect the actual damages shown by the evidence."

# EXHIBIT H

| PIF Number: | 10002123 |
|---|---|
| Case Name: | STATE EX REL. MONTGOMERY V. FORD MOTOR COMPANY |
| Case Number: | 02CVH1214233 |

Case 8:17-cv-00838-JLS-JDE   Document 89-3   Filed 09/04/18   Page 105 of 162   Page ID #:1697

**RECEIVED**
ATTORNEY GENERAL OF OHIO

DEC 2 0 2002

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

**IN THE COURT OF COMMON PLEAS**
**FRANKLIN COUNTY, OHIO**

TERMINATION NO. 7
BY GAE 12/20/02

| | | |
|---|---|---|
| STATE OF OHIO, *ex rel.* | ) | CASE NO. 02CVH12 14233 |
| BETTY D. MONTGOMERY | ) | |
| ATTORNEY GENERAL OF OHIO | ) | |
| | ) | JUDGE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AGREED ENTRY AND** |
| | ) | **FINAL JUDGMENT ORDER** |
| FORD MOTOR COMPANY | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

The parties to this action and Agreed Entry And Final Judgment Order ("Agreed Judgement") ("the Parties") are Plaintiff, the State of Ohio, by and through Betty D. Montgomery, the Attorney General of Ohio, and Defendant, Ford Motor Company, a Delaware corporation with its principal place of business in Dearborn, Michigan ("Ford"). As evidenced by their signatures below, the Parties consent to the entry of this Agreed Judgment and its provisions without trial or adjudication of any issue of fact or law, and without any admission of any liability or wrongdoing of any kind. The Parties consent to entry of this Agreed Judgment to avoid the expenses and uncertainty associated with further investigation or litigation.

Ford hereby accepts and expressly waives any defect in connection with service of process issued on the Defendant by the State. Defendant hereby consents to entry of this Judgment without further notice. This is an Agreed Judgment for which execution may issue. The Parties consent to entry of this Agreed Judgment without further notice.

1

By signature of their respective counsel below, and except as otherwise set forth herein, the Parties waive any right to appeal, petition for certiorari, or move to reargue or be heard, in connection with any judicial proceeding upon this Agreed Judgment in the form originally signed and submitted to the Court by the Parties.  Each of the Parties retains any right afforded by law to notice of, and to oppose, brief, and be heard on, any motion or other proceeding for modification, enforcement, or execution of this Agreed Judgment, and the right to appeal any subsequent order of any court relating to this Agreed Judgment.

This Agreed Judgment shall bind the Parties and shall be binding on any and all future purchasers, merged parties, inheritors, or other successors in interest of Ford.

IT IS HEREBY AGREED AND ADJUDGED AS FOLLOWS:

## 1. JURISDICTION

Jurisdiction of this Court over the subject matter and over the Parties for the purpose of entering this Agreed Judgment is admitted by the Parties.  The Court retains jurisdiction for the purpose of enabling the Parties to apply to this Court at any time for such further orders and relief as may be necessary or appropriate for the construction, modification, enforcement, execution, or satisfaction of this Agreed Judgment.

## 2. VENUE

Venue as to all matters between the parties hereto relating or arising out of this Agreed Judgment shall lie exclusively in the Court of Common Pleas, Franklin County, Ohio.

## 3. PARTIES

3.1     Plaintiff is the State of Ohio.

3.2     Defendant is Ford Motor Company.

2

3.3     Defendant waives service of process of the underlying Complaint and its

summons.

IT IS HEREBY AGREED AND ADJUDGED AS FOLLOWS:

## 4. DEFINITIONS

As used in this Agreed Judgment, the following words or terms shall have the following

meanings:

4.1     "Advertise," "Advertisement," or "Advertising" shall mean any written, oral, or

electronic statement, illustration, or depiction that is designed to create interest in the purchasing

of, impart information about the attributes of, publicize the availability of, or effect the sale or

use of, goods or services, whether the statement appears in a brochure, newspaper, magazine,

free-standing insert, marketing kit, leaflet, circular, mailer, book insert, letter, catalogue, poster,

chart, billboard, public-transit card, point-of-purchase display, package insert, package label,

product instructions, electronic mail, website, homepage, film, slide, radio, television, cable

television, program-length commercial or "infomercial," or any other medium.  Advertising does

not include statements, illustrations, or depictions that are not designed to create interest in the

purchasing of, impart information about the attributes of, publicize the availability of, or effect

the sale or use of, goods or services, such as internal design and strategy documents, and

Representations made by Ford to Ford dealers that are not reasonably anticipated to be

communicated or publicized to any Consumer.

4.2     "Agreed Judgment" shall refer to this document entitled Agreed Entry and Final

Judgment Order in the matter of State of Ohio v. Ford Motor Company, a Delaware corporation

with its principal place of business in Dearborn, Michigan.

3

4.3     "Attorney General" shall refer to the Attorney General of the state of Ohio and the Office of the Ohio Attorney General.

4.4     "Clear and Conspicuous" or "Clearly and Conspicuously" shall mean a statement that, regardless of the medium in which it is made, is readily understandable and presented in such size, color, contrast, duration, location, and audibility, compared to the other information with which it is presented, that it is readily apparent to the person to whom it is disclosed. If a statement modifies, explains, or clarifies other information with which it is presented, it must be presented in proximity to the information it modifies, in a manner that is readily apparent and understandable.

4.5     "Competent and Reliable Scientific or Engineering Evidence" shall mean tests, analyses, research, studies, or other evidence conducted and evaluated in an objective manner by persons qualified to do so, and using procedures or methodologies generally accepted by the relevant professional, scientific, or engineering community to yield accurate and reliable results. For purposes of this Agreed Judgment, Competent and Reliable Scientific or Engineering Evidence does not exclude new tests, analyses, procedures, or methodologies, provided that they either (a) are based in relevant part on scientific or engineering principles generally accepted by the relevant professional, scientific, or engineering community, or (b) have yielded, or are reasonably expected to yield, accurate, reliable, and repeatable scientific or engineering results. Nothing in this Agreed Judgment shall require tests, analyses, research, studies, procedures, methodologies, or other evidence to be endorsed in a peer-reviewed publication before constituting or yielding Competent and Reliable Scientific or Engineering Evidence. Except as otherwise expressly set forth herein, or as otherwise provided by law, nothing in this Agreed Judgment shall be interpreted to require Ford, in order to subsequently demonstrate that any test,

4

analysis, procedure, or methodology constituted Competent and Reliable Scientific or Engineering Evidence, to take any action that would impair any of Ford's rights under any law governing patents or trade secrets. Provided, however, that nothing herein shall be interpreted as allowing Ford to withhold production of documents based on a claim of patent or trade secret where reasonable confidentiality protections have been provided.

4.6  "Consumer" shall mean any person, a natural person, individual, governmental agency or entity, partnership, corporation, limited liability company or corporation, trust, estate, incorporated or unincorporated association, or any other legal or commercial entity, however organized.

4.7  "Consumer Act" or "Consumer Sales Practices Act" shall refer to the Ohio Consumer Sales Practices Act and related statutes and administrative rules found at R. C. §1345.01 *et seq.*

4.8  "Defined Tires" shall refer to Firestone Radial ATX and Wilderness AT tires

4.9  This section is reserved.

4.10  "Early Warning System" shall mean a program meeting all the legal requirements of 49 U.S.C. § 30166, and regulations promulgated pursuant thereto, as they may be modified or amended.

4.11  "Effective Date" shall mean the date this Agreed Judgment is filed and in no event later than 30 days after the entry of the Florida Agreed Final Judgment.

4.12  "Explorer" shall refer to all Ford Explorer, Ford Explorer Sport, and Ford Explorer Sport Trac models and trim lines, including 4 x 2, 4 x 4, and All Wheel Drive versions.

4.13  "Fantasy Advertising" shall refer to Advertising depicting the Motor Vehicle in a manner that so deviates from reality, or real life portrayal, such as driving underwater or on a

5

vertical cliff face, that no reasonable Consumer could interpret the Advertisement as portraying an actual capability or appropriate use of the vehicle.

    4.14    "Florida Order" or "Florida Agreed Final Judgment" shall refer to the Agreed Final Judgment entered in the Second Judicial Circuit in and for Leon County between the State of Florida and Ford Motor Company on December 20, 2002.

    4.15    "Ford" shall refer to Ford Motor Company and any and all of its successors and assigns.

    4.16    "Motor Vehicle" shall refer to a vehicle driven or drawn by mechanical power and manufactured primarily for public streets, roads or highways but does not include a vehicle operated on a rail line.

    4.17    "Multi-State Executive Committee" ("MSEC") shall refer to a committee comprising representatives from the States of Connecticut, Florida, Georgia, Illinois, Tennessee, Texas, Iowa, and Washington.

    4.18    "Multi-State Working Group" ("MSWG") or "States" shall refer to all 50 States of the United States of America, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico, collectively.

    4.19    "National Highway Traffic Safety Administration" ("NHTSA") shall refer to the federal National Highway Traffic Safety Administration.  If any of the obligations, duties, or jurisdiction of the NHTSA should at any time be transferred, consolidated, or merged with the obligations, duties, or jurisdiction of any other governmental agency, all references to "National Highway Traffic Safety Administration" or "NHTSA" herein shall specifically include and reference that other governmental agency or entity.

6

4.20    "Payload Capacity" shall refer to the combined, maximum recommended weight

of cargo, occupants, and optional equipment that the Motor Vehicle is designed to carry.  Payload

Capacity is equal to Gross Vehicle Weight Rating minus the base curb weight of the Motor

Vehicle.

4.21    "Plaintiff," "State of Ohio" or "State" shall refer to the Ohio Attorney General and

the office of the Ohio Attorney General.

4.22    "Point-of-Sale Checklist" shall refer to the document that Ford provides to its

dealers for their use in providing to Consumers who purchase or lease new Ford SUVs, prior to

or contemporaneously with such deliveries, information about features, characteristics, and use of

the SUVs.

4.23    "Recall" or "Recalls" shall refer to any program undertaken by a Motor Vehicle

manufacturer or Motor Vehicle component manufacturer, whether voluntarily or pursuant to an

order by NHTSA, to withdraw, repair, replace, or remove from trade or commerce any vehicle or

vehicle component that poses an unreasonable risk to Motor Vehicle safety.

4.24    "Represent" means to state or imply through claims, statements, questions,

conduct, graphics, symbols, lettering, formats, devices, language, documents, messages, or any

other manner or means by which meaning might be conveyed.  This definition applies to other

forms of the word "Represent," including without limitation "representation," "misrepresent," and

"misrepresentation."

4.25    "Sport Utility Vehicle" or "SUV" refers to a Motor Vehicle that is designed to

carry eight or fewer persons and is constructed on a truck chassis (i.e., a body-on-frame pick-up

truck platform) with special features for occasional off-road operation, including, but not limited

to, all models of the Ford Excursion (notwithstanding that the Excursion is designed to carry nine

persons), the Ford Expedition, the Ford Explorer, the Ford Explorer Sport, the Ford Explorer Sport Trac, the Mercury Mountaineer, and the Lincoln Navigator. Specifically excluded from this definition are trucks designed primarily for carrying cargo, vans, and minivans.

4.26    "States" or "Multi-State Working Group" ("MSWG") shall refer to all 50 States of the United States of America, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico, collectively.

4.27    "SUV Safety Awareness Topics" refers to the following issues relating to the safe use and maintenance of SUVs irrespective of the manufacturer of any particular SUV:

(a)    the concept of Payload Capacity and the risks of exceeding that capacity in an SUV;

(b)    how a Consumer should determine whether an SUV is overloaded;

(c)    how weight should be distributed in an SUV and the risks of improper weight distribution;

(d)    how to drive an SUV off-road and any limitations on the safe use of SUVs off-road, including the limitations of any particular vehicle component;

(e)    the Payload Capacity, base curb weight, and gross vehicle weight rating of any particular SUV;

(f)    the importance of maintaining SUV tires properly and the risks of failing to do so;

(g)    the maximum inflation pressure for the tires on an SUV and the difference between that pressure and the recommended inflation pressure;

(h)    the recommended inflation pressure for the tires on an SUV and recommended practices for maintaining that inflation pressure;

8

(i)     the load capacity of roof racks and recommended practices for safe loading of roof racks on SUVs;

(j)     the differences in handling between SUVs and passenger cars, including the increased rollover risk associated with abrupt maneuvers and excessive speed;

(k)     the difference between Payload Capacity and the volume of the cargo area of SUVs;

(l)     that important safety information is included in the Owner Guide for the SUV, and other information sources; and

(m)     any other topic that may be of relevance in instructing Consumers on safe driving or ownership of SUVs.

4.28    "SUV Tire" or "SUV Tires" shall refer to any and all tires installed as original equipment on SUVs manufactured, leased, or sold by Ford, or recommended or sold by Ford for use as replacements for original equipment on a Ford SUV.

## 5. INJUNCTIVE RELIEF

Except as otherwise specifically set forth in this Agreed Judgment, pursuant to R. C. §1345.07, Ford shall be permanently enjoined and restrained from directly or indirectly engaging in any of the following in the States, or from failing to engage in the following in the States, as appropriate:

5.1    Ford shall disclose to purchasing Consumers of SUVs the Payload Capacity of the SUV and the risks of exceeding that capacity by the following:

(a)     including in the SUV Owner Guide a discussion of the SUV's Payload Capacity, the risks of exceeding that capacity, and the location in the vehicle of the placard stating the Payload Capacity; and

9

(b)     including on its Point-of-Sale checklists an item to direct the attention of

Consumers to the Payload Capacity placard in the SUV and to the Owner Guide

for information regarding Payload Capacity and safe loading practices.

5.2     In any of Ford's Advertising of SUVs, Ford shall not Represent by spoken or

written words that an SUV is "best in class," or term or phrase of similar meaning, unless it

Clearly and Conspicuously discloses the specific class and the SUV to which the claim applies.

5.3     In any of Ford's Advertising of SUVs, Ford shall not Represent by spoken  or

written words, that an SUV is "safest," "safer," or term or phrase of similar comparative or

superlative meaning regarding safety, unless such Representation is supported by Competent and

Reliable Scientific or Engineering Evidence and Ford Clearly and Conspicuously discloses the

information necessary to place the Representation in an accurate context, including:

(a)     the SUV for which the claim is made;

(b)     the design, feature, or aspect of performance for which the claim is

made; and

(c)     the test results or data source on which the claim is based.

5.4     In any of Ford's Advertising of SUVs,  Ford shall not Advertise that an entire line

of vehicles possesses a particular quality, characteristic, feature, or attribute unless all vehicles

within that line have the same quality, characteristic, feature, or attribute.  Notwithstanding the

foregoing, Ford may Advertise any quality, characteristic, feature, or attribute of a subset of a line

of vehicles, provided that such Advertisement is truthful, fair, and not misleading.

5.5     Ford shall not Represent:

(a)     that a particular make and model tire is identical to the tire originally installed on

a particular Motor Vehicle, when new, if such is not the case;

10

(b)     that a particular make and model tire was originally installed on a particular Motor Vehicle, when new, if such is not the case;

(c)     that an aftermarket or replacement tire is designed, engineered, built, or tested to meet ride, quality, handling, safety or other performance characteristics that a Motor Vehicle's original equipment tire is designed to meet, including, but not limited to, uniformity specifications, absent a written statement from the tire manufacturer that such is the case; or

(d)     that the size, load rating, speed rating, temperature grade, traction grade, tread wear grade, or tread type of an aftermarket or replacement tire is the same as that of a Motor Vehicle's original equipment tire, unless such a Representation is consistent with Representations made by the tire manufacturer.

5.6     When Ford directs Consumers to take their SUVs to a Ford dealer for inspection or repair, Ford shall not Misrepresent the purpose for the inspection or repair.  Nothing herein shall prevent Ford from conducting customer-satisfaction campaigns, making goodwill adjustments, harvesting components or data for analysis, or performing service pursuant to safety, emissions, or customer-satisfaction programs, provided that any Representations made therewith are truthful, accurate, and not misleading.

5.7     Within 180 days after the Effective Date, in any State in which Ford Advertises any SUV in the Spanish language, Ford shall, upon request by any Consumer purchasing any new Ford SUV so Advertised, and at no charge to the Consumer, provide to the Consumer a copy of the SUV's Owner's Guide in the Spanish language for the SUV so Advertised.

11

## 6. OTHER INJUNCTIVE RELIEF

Except as otherwise specifically set forth in this Agreed Judgment, pursuant to R. C.
§1345.07, Ford shall be enjoined and restrained from directly or indirectly engaging in any of the
following in the States, or from failing to engage in the following in the States, as appropriate:

6.1     (a)     In any of Ford's Advertising of SUVs in which Ford by spoken or  written
words makes Representations regarding the Payload Capacity of an SUV in terms of volume, or
in which a feature of the Advertisement, verbal or otherwise, is the volume of an SUV's cargo
area, Ford must Clearly and Conspicuously disclose that Payload Capacity is limited by weight
and weight distribution.  For  purposes of this provision, mere picture(s) portraying an SUV's
cargo  area--without cargo or with only small light objects in it--shall not be  interpreted as being
a "feature" of an Advertisement.

(b)     In any of Ford's Advertising of SUVs in which Ford Represents by spoken  or
written words that an SUV's cargo area is "spacious" or "roomy," or a term or  phrase of similar
import, Ford must Clearly and Conspicuously disclose that  Payload Capacity is limited by
weight and weight  distribution.

(c)     In written, televised, or graphic Advertising, the requirements of this Section 6.1
will be satisfied if in any Clear and Conspicuous manner in the Advertisement, Ford disclaims
"Cargo and load capacity limited by weight and distribution" or a substantially equivalent
disclaimer.

6.2     In any of Ford's Advertising of SUVs, Ford shall not Represent by spoken or
written words that an SUV's "handling" or "steering," or term or phrase of similar meaning, is
"car-like," or term or phrase of similar meaning.  In interpreting this Section 6.2, terms that relate
to the comfort of an SUV, such as "ride" or "comfort," do not have meaning similar to

12

"handling" or "steering," unless the terms are used in such a way as to be a Representation

relating to "steering" or "handling."

6.3     Sections 6.1 and 6.2 shall expire on December 31, 2006, provided that Ford has

not been adjudged by the Court, as designated in Section 2 of this Agreed Judgment, in any

MSWG state to have violated sections 6.1 or 6.2 of any MSWG Agreed Judgment.  However, if

prior to January 1, 2007, Ford is adjudged by the Court in any MSWG state to have violated

section 6.1 or 6.2, Ford shall continue to be subject to the section  which it has been held to have

violated until December 31, 2008 in all MSWG state Agreed Judgments, provided that Ford is

not further adjudged by the Court in any MSWG state in a ruling issued between December 31,

2006 and December 31, 2008 to have violated the same provision, in which event that provision

shall not expire, unless that ruling is reversed by the highest appellate court that addresses the

matter. This paragraph is in addition to all other remedies available to the State in law and equity.

## 7. SETTLEMENT FUND

7.1     Within fifteen days of the entry of the Florida Order,  Ford shall pay the amount of

Fifty-one  Million Five Hundred Thousand Dollars, $51,500,000.00 ("the Settlement Fund") to

the States.  Such payment shall be made by electronic funds transfer, or certified or cashier's

check, made payable to the "Legal Affairs Revolving Escrow Trust Fund" and shall be tendered

to the State of Florida to be distributed to the States and used for the purposes delineated in

Sections 7 and 8, pursuant to the terms of this Agreed Judgment.

7.2     Upon payment of the Settlement Fund in the manner prescribed in Section 7.1 of

this Agreed Judgment, Ford shall (a) be fully divested of any interest in, or ownership of, the

monies paid and all interest in the monies, and any subsequent interest or income derived

therefrom shall inure entirely to the benefit of the MSWG pursuant to the terms of this Agreed

13

Judgment; (b) have no further obligation to make any payment to the State, or to the States, pursuant to this Agreed Judgment, except as otherwise provided herein; (c) have no control over, responsibility for or input as to the disbursal of any funds or designation of any funds; and (d) have no further obligation to the State, or to the States, pursuant to Section 7.1 of this Agreed Judgment.

7.3     Upon receipt of the Settlement Fund, the State of Florida shall deposit it into an interest-bearing account (the "Settlement Account") and be deemed custodian of the funds in the Settlement Account on behalf of the States, and shall remain custodian of such funds until distributed. Payments to individual States will be made within 45 days of entry of the individual State's Agreed Judgment or of receipt of the funds by Florida, whichever is later.

7.4     The State of Florida, acting through the Florida Attorney General, shall be the sole authorized agent on behalf of the States with power to open, disburse, and close the Settlement Account. The entity holding the Settlement Account shall be paid solely from the interest generated by the Settlement Account. Any additional interest shall be used for public service announcements pursuant to Section 8.1 of this Agreed Judgment.

7.5     Ford waives and relinquishes any right to challenge any action or inaction by any of the States with regard to the receipt, retention, disbursement, or other payment of funds made or received from or to the Settlement Account. Nothing herein shall limit or otherwise affect any right Ford may have to seek enforcement of the terms of this Agreed Judgment.

## 8. DISBURSEMENT OF PAYMENTS

8.1     Thirty Million dollars and 00/100 dollars ($30,000,000.00) shall be paid from the Settlement Account for use by the MSWG to produce, publish, and broadcast, in a manner designed to reach Consumers throughout the United States, consumer education and awareness

14

public service announcements regarding SUV Safety Awareness Topics ("the consumer

education and awareness program").

8.2     The MSEC shall retain a vendor or vendors to design and implement the

consumer education and awareness program for the MSWG.  Each of the consumer education

materials published, broadcast, or otherwise disseminated pursuant to the consumer education

and awareness program shall address one or more of the SUV Safety Awareness Topics

generally.

8.3     No individual State shall have any claim to the funds for the consumer education

and awareness program, and funds for the consumer education and awareness program may only

be expended by Florida upon a majority vote of the MSWG.  Any portion of the Thirty Million

dollars ($30,000,000.00) provided for in Section 8.1 of this Agreed Judgment not to be expended

pursuant to Sections 8.1 and 8.2 may be distributed among the States at the sole discretion of the

MSWG.

8.4     Three Hundred Thousand and 00/100 Dollars ($300,000.00) from the Settlement

Fund shall be disbursed to each State ~~as a monetary payment for~~ *in Settlement of* the Attorney General's Claims

set forth in the States' lawsuits.

8.5     The State of Ohio's portion of the monetary payment of  Three Hundred

Thousand and 00/100 Dollars ($300,000.00) shall be paid in a check made payable to the Ohio

Attorney General and shall be used as payment for Ohio's attorney's fees and costs.  Said

payment shall be used by the Plaintiff as and for attorney's fees and other costs of investigation

and litigation, or to be palced in, or applied to, the consumer protection enforcement fund, a

consumer education, litigation or local consumer aid fund or revolving fund, or used to defray the

costs of the inquiry leading hereto, in each case as permitted by the laws of the State of Ohio, at

15

the sole discretion of the Attorney General.  Said payment shall be made from the Settlement

Fund in accordance with the terms of the Florida Order.

      8.6     This section is reserved.

      8.7     This section is reserved.

      8.8     Upon execution and entry of this Agreed Judgment, the State of Ohio shall be

entitled to receive from the Settlement Account any monies to which it is entitled under this

Agreed Judgment.  However, in no event shall any disbursement from the Settlement Account be

made to any State prior to sixteen days after the entry of the Florida Order, or as soon as

practicable thereafter.

## 9. GENERAL PROVISIONS

      9.1     This Agreed Judgment is entered into by the Parties as their own free and

voluntary act and with full knowledge and understanding of the nature of the proceedings and the

obligations and duties imposed by this Agreed Judgment.

      9.2     Nothing in this Agreed Judgment constitutes any agreement by the Parties

concerning the characterization of the amounts paid pursuant to this Agreed Judgment for

purposes of the Internal Revenue Code or any state tax laws.

      9.3     This Agreed Judgment may be enforced by, or provide any basis for any action by

or for any award of relief to, only the Parties hereto and no other person or entity.  In entering this

Agreed Judgment with this provision and other limiting provisions, this Court specifically refers

to and invokes the Full Faith and Credit Clause of the United States Constitution and the doctrine

of comity and requests that any other court reviewing, construing, or applying this Agreed

Judgment implement and enforce each such limiting provision.  Neither the State nor the

Attorney General grants permission to or cedes, and this Agreed Judgment does not grant or

16

otherwise provide, to any person or entity any power or authority to act as a "private attorney general" with respect to any matter covered by or arising out of this Agreed Judgment or otherwise to assert standing on behalf of the State or the public at large or to assert any claim seeking declaratory or equitable relief for alleged public or State injury with respect to any matter covered by this Agreed Judgment.

9.4    Titles or captions in this Agreed Judgment are inserted as a matter of convenience and for reference only and in no way define, limit, extend, or describe the scope of this Agreed Judgment or any provision hereof.  The Parties have negotiated, jointly drafted, and fully reviewed the terms of this Agreed Judgment, and the rule that uncertainty or ambiguity is to be construed against the drafter shall not apply to the construction or interpretation of this Agreed Judgment.  As used in this Agreed Judgment, the plural shall include the singular and the singular shall include the plural.

9.5    Except as otherwise explicitly provided in this Agreed Judgment, nothing in this Agreed Judgment shall be construed to limit or expand the authority of the Attorney General or the State to protect the interests of the State or the people of the State.  In addition, except as otherwise explicitly provided in this Agreed Judgment, this Agreed Judgment shall not bar the State, the Federal Trade Commission, the National Highway Traffic Safety Administration, or any other governmental entity from enforcing laws, regulations, or rules against Ford, or limit or modify in any way any defense Ford may have to, or any procedural or substantive right Ford may have in, any action or proceeding to enforce any such law, regulation, or rule.

9.6    This Agreed Judgment may be amended either by an order of this Court entered pursuant to a written agreement between Plaintiff and Ford or for good cause shown to this Court upon a motion by Ford, and the Court retains jurisdiction for the purpose of ruling on requests for

17

amendments.  Before moving for an order amending this Agreed Judgment, Ford may send to the Attorney General of the State a written request pursuant to Section 16.  If Ford elects to contact the Attorney General prior to moving for an order and more than one of the States is involved in the motion, Ford shall also send a copy of the request to the MSEC representatives, who shall use their best efforts to coordinate the States' position with respect to the requested amendment.  The Attorney General for each of the States that objects to the requested amendment shall provide a written objection to Ford and, if more than one of the States is involved in the request, a representative of the Attorney General of each of the States constituting the MSEC.  No State shall so object unless the Attorney General for the objecting State believes that the requested amendment is not in the public interest and articulates in the written objection the reasons for that belief.  Each written objection must be sent pursuant to Section 16 within ninety days of the objecting States' receipt of the request.  If a State does not provide notice of its objection to the written request within the ninety-day period, that State shall be deemed conclusively not to object to the requested amendment and to have waived any objection to a motion for the requested amendment.  A motion for amendment may be served in accordance with Section 16 of this Agreed Judgment.

9.7     If any portion of this Agreed Judgment is held invalid by operation of law, the remaining terms of this Agreed Judgment shall not be affected.

9.8     This Agreed Judgment shall be binding upon the Parties and their successors.  In no event shall assignment of any right, power, or authority under this Agreed Judgment avoid compliance with this Agreed Judgment.

18

9.9    Ford shall use good-faith and reasonable efforts to notify its employees responsible for carrying out and effecting the terms of this Agreed Judgment of the obligations, duties, and responsibilities imposed on Ford by this Agreed Judgment.

9.10    Time shall be of the essence with respect to each provision of this Agreed Judgment that requires action to be taken by either party within a stated time period or upon a specified date.

9.11    This Agreed Judgment, together with a letter dated December 20, 2002 from the MSEC to Dennis Ross, General Counsel of Ford Motor Company, concerning the Public Service Announcements that are the subject of Sections 8.1 and 8.2 above, sets forth the entire agreement between the Parties, and there are no representations, arrangements, or understandings, oral or written, between the Parties relating to the subject matter of this Agreed Judgment that are not fully expressed herein or attached hereto.

9.12    The footnotes to this Agreed Judgment are and shall be considered a part of the Agreed Judgment.

9.13    Nothing in this Agreed Judgment shall be construed to waive, limit, or expand any claim of sovereign immunity the State may have in any action or proceeding.

9.14    This Agreed Judgment is agreed to by the Parties and entered by the Court for settlement purposes only. Neither the fact of, nor any provision contained in, this Agreed Judgment nor any action taken hereunder shall constitute, or be construed as, any admission of the validity of any claim or any factual allegation that was or could have been made by the State or the Attorney General, or of any admission of wrongdoing, fault, violation of law, or liability of any kind on the part of Ford, or any admission by Ford of any claim or allegation made in any action or proceeding against Ford. This Agreed Judgment is not intended, and shall not be

19

deemed, to constitute evidence or precedent of any kind except (a) in any action or proceeding by one of the Parties to enforce, rescind, or otherwise implement or affirm any or all of the terms of this Agreed Judgment, or (b) in any action involving a Released Claim, to support a defense of res judicata, collateral estoppel, release, or other theory of claim preclusion, issue preclusion, or similar defense.

9.15    Unless otherwise prohibited by law, any signatures by the Parties required for entry of this Agreed Judgment may be executed in counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreed Judgment.

9.16    Any failure by one of the Parties to this Agreed Judgment to insist upon the strict performance by the other party of any of the provisions of this Agreed Judgment shall not be deemed a waiver of any of the provisions of this Agreed Judgment, and each of the Parties, notwithstanding any such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreed Judgment and the imposition of any penalties provided for by the laws of the State of Ohio.

9.17    No right, power, or authority granted by this Agreed Judgment shall be assignable without the express written consent of the non-assigning party. Any purported assignment in violation of the preceding sentence shall be void.

9.18    In any action or proceeding in which it is alleged or claimed that any Advertising by Ford is false, misleading, or unfair, nothing in this Agreed Judgment shall in any way limit or expand, or be construed or deemed to limit or expand, the defense or doctrine of "puffing" or "puffery" or its doctrinal equivalent.

20

## 10. REPRESENTATIONS AND WARRANTIES

10.1    Ford warrants and represents that it manufactured, sold, and distributed Ford

Explorer vehicles equipped with the Defined Tires.  Ford further acknowledges that it is a proper

party to this Agreed Judgment and that Ford Motor Company is the true legal name of the entity

other than the State agreeing to this Agreed Judgment.

10.2    Each of the non-Court signatories to this Agreed Judgment represents and

warrants that he or she has authority to agree to this Agreed Judgment on behalf of one of the

Parties.

10.3    Each of the Parties represents and warrants that it negotiated the terms of this

Agreed Judgment in good faith.

10.4    Ford acknowledges and agrees that Plaintiff has relied on all of the representations

and warranties set forth in this Agreed Judgment and that, if any representation is proved false,

unfair, deceptive, misleading, or inaccurate in any material respect, Plaintiff has the right to seek

any relief or remedy afforded by law or equity in the State.

10.5    Ford represents and warrants that its responses to the civil investigative demands

of the MSWG were prepared pursuant to good-faith investigations for documents and

information responsive to those portions of the demands that were adequately designated and not

otherwise subject to a good faith objection or to a good faith claim of privilege or work-product

immunity.

10.6    Ford represents and warrants that it has acted in good faith in conducting and

completing the tire replacement program initiated by Ford on May 22, 2001, including tire

replacements and refunds.

21

## 11. UNDERTAKINGS AND ACKNOWLEDGMENTS BY FORD

11.1    Ford's Advertising of SUVs will be truthful, fair, and not misleading with respect

to safety and depictions of vehicle use, including Representations regarding steering and

handling.  When determining whether a particular Advertisement complies with this provision,

the entire Advertisement shall be considered, including the context of the particular depiction at

issue, any limitations, warnings, or disclaimers contained in the Advertisement, and any

limitations or warnings set forth in the Owner Guide materials for that SUV.  Nothing herein

shall preclude Ford from (a) demonstrating the ordinary use of vehicle components, systems or

features, or (b) demonstrating the performance of safety features such as airbags, safety canopies,

stability control/enhancement systems, four-wheel or all-wheel drive system and antilock brakes,

in potentially dangerous situations, (c) depicting, in its Advertisements, an SUV being driven by

a professional driver on a closed course, provided that any necessary and appropriate disclaimers

are Clearly and Conspicuously disclosed in the Advertisement, or (d) using "Fantasy"

Advertising.

11.2    When depicting an SUV being driven by a professional driver on a closed course

to demonstrate the full range of capabilities of an SUV, Ford shall Clearly and Conspicuously

disclose the use of a professional driver or closed course and warn against attempting the

depicted driving (e.g. "Professional Driver.  Closed Course. Do Not Attempt." or a substantially

similar disclaimer).

11.3    The total weight of the occupants and cargo depicted in any of Ford's

Advertisements of SUVs shall not exceed the Payload Capacity for that SUV and Ford shall (i)

weigh all occupants and cargo depicted in an Advertisement and document its efforts to ensure

22

that the depicted vehicle is not overloaded, and (ii) depict the cargo being distributed in a manner consistent with the instructions in the Owner Guide for that SUV.

11.4    Prior to or contemporaneous with making any Representation regarding the safety, performance, or durability of any specific SUV, or any SUV component or system, Ford shall possess Competent and Reliable Scientific or Engineering Evidence that reasonably substantiates each specific claim.

11.5    Ford acknowledges that the following state and federal laws apply to SUVs it manufactures and sells, and Ford affirms its commitment to comply with those laws:

(a)    Motor Vehicle Safety Act, 49 U.S.C. § 30101, et seq. and all regulations promulgated thereunder by the National Highway Traffic and Safety Administration, where applicable, including, but not limited to,  the Transportation Recall Enhancement, Accountability and Documentation (TREAD) Act, and the Uniform Tire Quality Grading System standards.

(b)    Rollover Warning Requirements.  49 C.F.R. § 575.105 requiring all manufacturers of certain utility vehicles with a wheelbase under 110 inches to alert the drivers that these vehicles have a higher possibility of rollover than other vehicle types and advise them of steps they can take to reduce the potential for rollover or rollover-related injuries.

(c)    Tire Pressure, Cargo Loading and Related Consumer Information Requirements. Federal regulations promulgated pursuant to § 11 of the federal Transportation Recall Enhancement, Accountability and Documentation Act (the "TREAD Act") mandating industry-wide labels and owner's guide content to address tire pressure recommendations, cargo loading information and recommended practices.

23

(d)     Foreign Recall Reporting.  Federal regulations promulgated pursuant to TREAD

Act § 3(a) requiring vehicle manufacturers to report safety recalls and other safety

campaigns worldwide on vehicles that are substantially similar to those sold in the

United States.

(e)     Early Warning Reporting Requirements. Federal regulations promulgated

pursuant to TREAD Act § 3(b) requiring automobile manufacturers to provide a

report to NHTSA quarterly of certain field performance information specified by

NHTSA.

(f)     Record Retention Requirements.  49 C.F.R § 576 mandating a record retention

period for certain records NHTSA has determined are "needed for the proper

investigation, and adjudication or other disposition, of possible defects related to

motor vehicle safety and instances of nonconformity to the vehicle safety

standards and associated regulations."

(g)     Recall Determination and Notification.  The Safety Act (49 U.S.C. §§ 30101,

30118-30121) and NHTSA regulations (49 C.F.R. § 573) specifying requirements

governing the process used to notify NHTSA and affected customers about

potential safety-related defects or noncompliance issues.

(h)     Vehicle Safety Certification.  The Safety Act stating that automobile

manufacturers may not manufacture for sale, sell, offer for sale, introduce or

deliver for introduction into interstate commerce, or import into the United States

any vehicle that does not comply with applicable Federal Motor Vehicle Safety

Standards.  49 U.S.C. § 30112.

24

(i)     State and Federal Consumer Protection Laws.  The Federal Trade Commission

Act and state Consumer Acts prohibiting falsely advertising the quality,

characteristics or attributes of products and engaging in trade practices that are

unfair or deceptive, including silent or secret warranties.

(j)     State common law requiring manufacturers of products to give appropriate

priority to safety considerations when designing products, including a duty, when

choosing among alternative available designs, to use reasonable efforts to choose

designs that will not pose unreasonable risks to Motor Vehicle safety.

The summary descriptions of the foregoing laws are not intended to limit, expand, modify, or

construe any such law, each of which is to be construed and applied in accordance with its terms

and construction by appropriate courts and authorities.  The Parties agree that by this

acknowledgment and affirmation of its commitment, Ford does not, and shall not be deemed to,

in any way expand, limit, or otherwise modify any power, authority, right, or jurisdiction of any

federal, state, or local governmental entity, including, but not limited to, the State and the

Attorney General, or of any person or entity not a party to this action, to enforce, or seek or

obtain relief under, any statute, regulation, or other law of any jurisdiction, including, but not

limited to, any law listed in this Section 11.5, or under any other provision of this Agreed

Judgment.  Nor does anything in this Section 11.5 in any way diminish, expand, or otherwise

modify any State's sovereignty or sovereign right to enforce, or seek or obtain relief under, any

statute, regulation, or other law of any jurisdiction.

11.6    (a) Within 180 days after the Effective Date, upon request of any Consumer

who owns, or is a current lessee, of a 2003 Model Year Ford SUV, Ford shall provide the Consumer with a copy of the Owner Guide for that SUV written in the Spanish language. There shall be no charge to the Consumer for this service.

(b)     Within 180 days after the Effective Date, upon request of any Consumer who owns, or is a current lessee, of a Ford SUV, Ford shall provide the Consumer with a then-current copy of the Owner Guide supplement (historically entitled "4-Wheeling with Ford" and currently entitled "Driving Your Truck or SUV") written in the Spanish language. There shall be no charge to the Consumer for this service.

(c)     Within 180 days after the Effective Date, Ford shall use best efforts to inform Consumers, by reference in its Spanish language Advertising to a toll-free telephone number and its website www.ford.com, that the information referenced in Sections 11.6(a) and (b), is available in Spanish.

11.7     Ford represents and warrants that, within one year of the Effective Date of this Agreed Judgment, it will launch, at its own expense, the following Consumer education initiatives:

(a)     SUV Owner Guide Supplement. Ford will retain and work with a communications expert to revise the content of its SUV Owner Guide Supplement (historically entitled "4-Wheeling with Ford" and currently entitled "Driving Your Truck or SUV") to expand truthful and accurate references to the SUV Safety Awareness Topics (a) through (l). Ford also will take reasonable steps to ensure that every purchaser of a new Ford SUV is provided with a copy of the booklet and will provide Ford dealers with additional copies to make available to owners of Ford vehicles at Ford dealerships. Ford will also publish the booklet on the

26

Internet.  Ford also will request its dealers to provide the booklet to buyers of used

SUVs.  Ford will waive intellectual property rights to the SUV safety sections of

the booklet so that the states and the attorneys general may encourage other

manufacturers and sellers of SUVs to publish and distribute similar material.

(b)     SUV Quick Reference Guides.  Ford will include SUV safety information in

"Quick Reference Guides" to accompany its SUV Owner Guide materials for the

2003 model year for Ford and Lincoln-Mercury SUVs (Expedition, Explorer,

Explorer Sport, Explorer Sport Trac, Mountaineer, Navigator, and Aviator). Quick

Reference Guides are intended to serve as educational pamphlets with basic

information about various vehicle features and options.  The Quick Reference

Guides will remind owners that SUVs handle differently from passenger cars, and

refer to the Owner Guide and SUV Owner Guide Supplement for further

educational material on the SUV Safety Awareness Topics (a) through (l).  Ford

will take reasonable steps to ensure that every purchaser of a new Ford SUV is

provided with a copy of the Quick Reference Guide.

(c)     SUV CD-ROM.  In consultation with a communications expert, Ford will

evaluate the use of CD-ROMs for possible inclusion in the Owner Guide package

for SUVs.  Ford will evaluate the possible benefits of CD-ROMs that provide

educational information on vehicle features and content and that include audio

and visual content concerning the SUV Safety Awareness Topics (a) through (l).

The CD-ROMs to be evaluated will be multimedia adaptable, with (a) numbered

audio tracks that allow customers to immediately access relevant feature content,

and (b) PC-compatible programs that provide more in-depth multimedia

educational material.  During the evaluation, Ford will include the CD-ROMs
with a representative cross-section of its SUV lineup for the 2003 model year.
Through customer feedback and market research studies, Ford will evaluate the
appropriateness of the CD-ROMs as part of the overall future Owner Guide
package.

(d)     Point-of-Sale Checklists.  Ford will add to its dealer Point-of-Sale Checklist an
item to direct the attention of buyers of new and used SUVs to the SUV Owner
Guide Supplement and to recommend that the customer review the content of the
booklet prior to their operation of any new SUV.

(e)     SUV Visor Warning Labels.  Unless and until the National Highway Traffic
Safety Administration promulgates a regulation requiring such a label elsewhere
on new SUVs sold in the United States, Ford will continue to include on all of its
SUVs, not just those with a wheelbase less than 110 inches as specified by 49
C.F.R. § 575.105, a sunvisor label to warn Consumers that SUVs handle
differently from passenger cars.

(f)     SUV Fuel Fill Area Tire Pressure Labels.  Unless and until the National Highway
Traffic Safety Administration promulgates a regulation requiring such a label
elsewhere on new SUVs sold in the United States, Ford will continue to provide
in the fuel filler door area on all new SUVs a label indicating the proper tire
inflation pressure for the original equipment tires provided with the vehicle.

(g)     Updates to Owner Guides.  In accordance with, and to the extent consistent with,
anticipated NHTSA regulations, Ford will update the information and warnings
on tire safety in its SUV Owner Guides to inform Consumers of the difference

28

between the vehicle manufacturer's recommended tire inflation pressure and the maximum tire inflation pressure marked on the sidewall of the tire.

11.8    Ford agrees to take or to initiate the following actions to enhance the ability of all Motor Vehicle manufacturers to prevent, identify and correct potential safety concerns:

(a)    Ford Early Warning System.  Upon request by another Motor Vehicle manufacturer or NHTSA, Ford will discuss and demonstrate on an informal basis its Early Warning System, provided, however, that Ford will not be required to breach existing commercial agreements and Ford will not share or disclose intellectual property or confidential information of suppliers or other third parties.

(b)    Increase Safety Belt Usage.  Ford will waive all licensing and royalty rights under the BeltMinder® patent in order to allow other companies to increase safety by providing this technology in all vehicles.

11.9    When making recommendations to Consumers regarding tire pressure, Ford will consider the range of environmental factors to which Tires may be exposed, the patterns of Consumer use that are known or reasonably foreseeable to Ford, adequate safety margins for reductions in air pressure, loading and load distribution, and other factors relevant to safe operation of an SUV.

11.10   Within 120 days of the Effective Date, Ford will communicate to each of its dealers presently participating in the "Around the Wheel" program general information about the differences between original equipment tires and replacement tires.  Ford's pricing guides and tire catalogs for 2003, when published in the ordinary course, will comply with Section 5.6.

## 12. RELEASE

12.1    In consideration of the injunctive relief, payments, undertakings, and acknowledgments provided for in this Agreed Judgment, and conditioned on Ford's making full payment of the Settlement Fund in the manner specified in Section 7.1, and subject to the limitations and exceptions set forth in Section 12.2, the State and the Attorney General (collectively, the "Releasors") to the fullest extent permitted by law release and forever discharge to Ford and its past and present officers, directors, shareholders, employees, partners, affiliates, subsidiaries, successors, attorneys, insurers, and assigns (collectively, the "Releasees") of and from any and all causes of action, claims, administrative claims, demands, debts, damages, costs, attorney's fees, obligations, judgments, expenses, compensation, or liabilities, in law or in equity, contingent or absolute, that Releasors now have, or in the absence of this Agreed Judgment may in the future have had, against the Releasees by reason of any conduct, omission, harm, matter, cause, or thing whatsoever that has occurred at any time up to and including the Effective Date of this Agreed Judgment relating to the following (collectively, the "Released Claims"):

(a)    the Advertising, sale, marketing, or servicing of Ford Explorers or Mercury Mountaineers (including all of their components) and Representations concerning Ford Explorers or Mercury Mountaineers, including the adequacy and timing of disclosures of information concerning recalls and potential safety risks with respect to 1990 through 2001 Ford Explorer and Mercury Mountaineer model years;

(b)    the Defined Tires, including the design, manufacture, Advertising, sale, marketing, purchasing, or servicing (including recalls and replacement programs and any alleged failure or delay in conducting such programs) of the Defined Tires

30

and Representations about the Defined Tires including the adequacy and timing of

disclosures of information concerning recalls and potential safety risks;

(c)     the Advertising, marketing, or sale of aftermarket or replacement tires and

Representations about replacement tires to the extent that such claims are based

upon laws relating to consumer protection, unfair or deceptive trade practices or

civil RICO statutes providing for enforcement by the State or remedies to the

State;

(d)     the failure to publish and make available in the Spanish language Owner Guides

for Ford SUVs to the extent that such claims are based upon laws relating to

consumer protection, unfair or deceptive trade practices, or civil RICO statutes

providing for enforcement by the State or remedies to the State;

(e)     the allegations set forth in the Complaint filed in this action; and

(f)     the Advertising, marketing, and sale of SUVs, and Representations concerning

SUVs, insofar as they relate to the following:

     i.     Representations concerning cargo- or load-carrying capacity, spaciousness,

        or roominess, or the disclosure of Payload Capacity of SUVs;

     ii.     Representations concerning the steering or handling of SUV's, including

        Representations that an SUV's "steering," or "handling" or term or phrase

        of similar import, is "car-like," or words of similar import;

     iii.     Representations that an SUV or an attribute of an SUV is "best-in-class,"

        or words of similar import;

     iv.     Representations that any of Ford's SUVs are "safer" or "safest," or term of

        comparative or superlative import regarding safety;

31

v.  Representations that an entire line of SUVs possesses a quality, characteristic, feature, or attribute that only a subset of the SUV line possesses;

vi.  practices with respect to the specification, testing, and purchasing of SUV Tires, recommending inflation pressure for SUV Tires, and disclosing to Consumers information about SUV Tire safety and the risks associated with the failure to follow safety disclosures, warnings or instructions about SUV Tire safety to the extent that such claims are based upon laws relating to consumer protection, unfair or deceptive trade practices, or civil RICO statutes providing for enforcement by the State or remedies to the State;

1.  Representations made to Consumers regarding the purpose for any inspection or repair of SUVs to the extent that such claims are based upon laws relating to consumer protection, unfair or deceptive trade practices, or civil RICO statutes providing for enforcement by the State or remedies to the State; and

2.  Representations, or the adequacy of Representations, made in Ford's SUV Owner Guides, Owner Guide supplements (historically entitled "4-Wheeling with Ford" and currently entitled "Driving Your Truck or SUV"), and made by Ford on or within Ford's SUVs themselves, insofar as they relate to SUV tires, SUV stability, SUV steering and handling, payload capacity, towing, and off-road use;

32

12.2    Notwithstanding the release set forth in Section 12.1 above, the following are excluded and reserved from the scope and terms of the release, and shall not be considered Released Claims under 12.1 above:

(a)    private rights of action by Consumers, provided, however, that this Agreed Judgment does not create or give rise to any such private right of action of any kind;

(b)    claims for indemnification or contribution by the State based on claims identified in Section 12.2(a);

(c)    claims of environmental or tax liability;

(d)    criminal liability;

(e)    claims for breach of, or enforcement of, warranty or contract, including claims arising under the Motor Vehicle lemon law statutes of any state;

(f)    claims for property damage; and

(g)    claims to enforce the terms and conditions of this Agreed Judgment.

## 13. MONITORING FOR COMPLIANCE

13.1    For the purposes of resolving disputes with respect to compliance with Sections 5, 6 and 11 of this Agreed Judgment, duly authorized representatives of the State shall for legally sufficient cause (which shall include, at a minimum, a reasonable basis to believe that Ford has violated a provision of Sections 5, 6 or 11 of this Agreed Judgment) be permitted the following:

(a)    reasonable access to inspect and copy all relevant, non-privileged, non-work-product records and documents in the possession, custody or control of Ford that relate to Ford's compliance with each provision of Sections 5, 6 or 11 of this Agreed Judgment as to which legally sufficient cause has been shown; and

33

(b)     reasonable access to take depositions of Ford's employees with relevant

knowledge, each of whom may have counsel present, relating to Ford's

compliance with each provision of Sections 5, 6 or 11 of this Agreed Judgment as

to which legally sufficient cause has been shown.

13.2    Within thirty days of entry of the Florida Order, Ford shall appoint an employee to

act as a direct contact for State Attorneys General (or other state or territorial agencies

responsible for Consumer complaint handling and mediation) for resolution of Consumer

complaints that are covered by the scope of the Investigation.  Ford shall notify each State

Attorney General of the name, address, telephone and facsimile number of the designated

employee no later than thirty days following entry of the Florida Order.

## 14. PENALTIES FOR FAILURE TO COMPLY

14.1    Violations of the provisions of Sections 5 and 6 of this Agreed Judgment shall be

punishable in accordance with the applicable laws of the State.

14.2    The State may assert any claim that Ford has violated this Agreed Judgment in a

motion to enforce this Agreed Judgment or, subject to Section 12.1, in a separate civil action, or

seek any other relief afforded by law.  In any such action or proceeding, relevant evidence of

conduct that occurred before the Effective Date shall be admissible on any material issue,

including alleged willfulness, intent, knowledge, contempt or breach, provided, however, that in

any such action the State shall not seek or be awarded damages, restitution, disgorgement, civil

penalties or other monetary relief for any conduct that occurred before the Effective Date and

relates to Released Claims.

## 15. COMPLIANCE WITH ALL LAWS

15.1    Except as expressly provided in this Agreed Judgment, nothing in this Agreed Judgment shall be construed as:

(a)    relieving Ford of its obligation to comply with all state and federal laws, regulations or rules, or granting permission to engage in any acts or practices prohibited by such law, regulation or rule; or

(b)    limiting or expanding in any way any right the State or the Attorney General may otherwise have to obtain information, documents or testimony from Ford pursuant to any state or federal law, regulation or rule, or any right Ford may otherwise have to oppose any subpoena, civil investigative demand, motion, or other procedure issued, served, filed, or otherwise employed by the State or the Attorney General pursuant to any such state or federal law, regulation, or rule.

## 16. NOTICES UNDER THIS AGREED JUDGMENT

16.1    Any notices required to be sent to the State or to Ford by this Agreed Judgment shall be sent by United States mail or certified mail return receipt requested.  The documents shall be sent to the following addresses:

For the State of Ohio:
Sandra L. Lynskey:
**Assistant Attorney General**
Office of the Ohio Attorney General
Consumer Protection Section
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

For the MSEC:
Division Director
Economic Crimes Litigation Unit
Office of the Attorney General
The Capitol
Tallahassee, Florida 32399-1050

For Ford Motor Company:
General Counsel
Ford Motor Company
One American Road
Dearborn, Michigan 48126

## 17. PAYMENT OF FILING FEES

17.1    All filing fees associated with commencing this action and obtaining the Court's

approval and entry of this Agreed Judgment shall be borne by Ford.

IT IS SO ORDERED, JUDGED AND DECREED.

_____        _____
JUDGE                                                            DATE

36

JOINTLY APPROVED AND SUBMITTED FOR ENTRY:


FOR THE PLAINTIFF STATE OF OHIO

BETTY D. MONTGOMERY
ATTORNEY GENERAL



Sandra L. Lynskey (0067618)
Assistant Attorney General
Consumer Protection Section
30 East Broad Street – 14th floor
Columbus, Ohio 43215
(614) 644-9618



Michael Ziegler (0042206)
Assistant Attorney General
Consumer Protection Section
30 East Broad Street – 14th floor
Columbus, Ohio 43215
(614) 644-9618

FOR THE DEFENDANT FORD MOTOR COMPANY

JOHN F. MELLEN
ASSOCIATE GENERAL COUNSEL

Michael N. Beekhuizen (0065722)
Thompson Hine LLP
10 West Broad St.
Columbus, OH 43215
(614) 469-3200
fax: (614) 469-3361

38

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, *ex rel.* | ) | **02CVH12 14233** |
| BETTY D. MONTGOMERY | ) | CASE NO. |
| ATTORNEY GENERAL | ) | |
| 30 East Broad Street | ) | |
| State Office Tower – 25th Floor | ) | JUDGE |
| Columbus, Ohio 43215-3428 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT FOR** |
| FORD MOTOR COMPANY | ) | **DECLARATORY JUDGMENT,** |
| a Delaware corporation with its principal | ) | **RESTITUTION, INJUNCTIVE** |
| place of business at | ) | **RELIEF AND COSTS** |
| One American Road | ) | |
| Dearborn, Michigan 48126 | ) | |
| | ) | |
| Defendant. | ) | |

This civil action is brought in the name of the State of Ohio, by and through the Attorney General ("Attorney General"), pursuant to Ohio Revised Code (R.C.) 1345.07 of the Consumer Sales practices Act. The State of Ohio has reason to believe that the Defendant named herein has violated the Consumer Sales Practices Act, R.C. §1345.01 *et seq.*

The Attorney General brings this civil action regarding the acts and practices of Ford Motor Company (hereinafter "Ford") concerning (1) the marketing, advertising and sale of Ford Explorers, Mercury Mountaineers, and certain other specified sport utility vehicles ("SUVs"), all of which were manufactured during model years 1990 through 2001; and, (2) the advertising and marketing of certain specified tires that were sold through Ford dealers as replacement tires for tires placed as original equipment on certain motor vehicles manufactured by Ford.

In summary, and as further set forth herein, the Attorney General alleges that Ford (1) failed to disclose to consumers a known safety risk associated with driving the Ford

Explorer equipped with certain Firestone tires, viz, the Firestone ATX and Wilderness AT tires; (2) deceptively advertised certain aftermarket tires as the same as those originally placed on Ford motor vehicles, when in fact they were not; and, (3) deceptively advertised its SUVs as having certain characteristics and capabilities that, in fact, they do not have. The Attorney General contends that these practices by Ford were unfair and deceptive, and therefore unlawful, pursuant to the Consumer Sales Practices Act, R.C. §1345.01 *et seq*.

The Attorney General is the chief civil law enforcement officer in the State. She has the unique responsibility to protect the public interest of Ohio's consumers from misrepresentations, omissions of facts and other safety hazards that impact Ohio. She also has a unique enforcement role over those who do business within the State of Ohio, or that operate or manufacture goods for distribution and use throughout the country from this state. It is in this critical role that the Attorney General commences this lawsuit against Ford Motor Company.

## I. JURISDICTION

1. Plaintiff, State of Ohio, by and through the Attorney General of Ohio, Betty D. Montgomery, having reasonable cause to believe that violations of Ohio's consumer laws have occurred, brings this action in the public interest and on behalf of the State of Ohio under the authority vested in her pursuant to R.C. 1345.07 of the Consumer Sales practices Act.

2. The actions of Defendant, hereinafter described, have occurred in the State of Ohio, County of Franklin and various other counties, and as set forth below, are in violation of the Consumer Sales Practices Act, R.C. §1345.01 *et seq*.

3. Defendant, as described below, is a "supplier" as that term is defined in R.C.

2

§1345.01(C) as Defendant was, at all times relevant herein, engaged in the business of effecting "consumer transactions" by producing, manufacturing, distributing, selling, and advertising certain tires to individuals in Ohio for purposes that were primarily personal, family or household within the meaning specified in R.C. §1345.01(A) and (D).

4.    Jurisdiction over the subject matter of this action lies with this Court pursuant to R.C. §1345.04 of the Ohio Consumer Sales Practices Act.

5.    This Court has venue to hear this case pursuant to Ohio Civ. R. 3(B)(1)-(3), in that some of the transactions complained of herein and out of which this action arose, occurred in Franklin County.

## II.  NATURE OF DEFENDANT'S BUSINESS

6.    The Defendant, Ford is and/or was engaged in the business of producing, manufacturing, distributing, selling and advertising automobiles and trucks.

7.    The Defendant, Ford. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.

## III.  COMPLAINT

## FACTUAL ALLEGATIONS

The State of Ohio alleges as follows:

## A.  Ford's Failure to Disclose Known Safety Risk

8.    Beginning no later than 1990, and continuing through the 2001 model year, Ford Motor Company manufactured and sold SUVs and, in particular, the Ford Explorer in the United States and throughout the world.  Throughout this period, Ford  devoted hundreds of millions of dollars to advertise SUVs and, in particular, the Ford Explorer to consumers.

3

9.     On information and belief, Ford has manufactured, advertised, and sold over five

(5) million Explorers to consumers in the United States.

10.    Beginning no later than 1990, and continuing until in or about May 2001, Ford

placed – as original equipment on new Explorers tires manufactured by

Bridgestone/Firestone and branded as Firestone ATX ("ATX") or Firestone

Wilderness AT ("Wilderness AT").

11.    Beginning in approximately 1993, Ford knew or should have known that

Explorers equipped with ATX or Wilderness AT tires were experiencing

increased levels of tire failures due to tread separations.  Ford knew or should

have known that the failures were occurring more frequently in warmer climates.

12.    Beginning as early as 1993, and no later than 1997, Ford knew or should have

known that, as a result of these tire failures, Ford Explorers equipped with ATX or

Wilderness AT tires were experiencing increased levels of rollovers.  Ford knew

or should have known of these tire failures and/or rollovers through a variety of

sources, including but not limited to:  (1) warranty/complaint data collected by

Ford and its dealers; (2) consumer complaints; (3) lawsuits against Ford Motor

Company for personal injuries sustained in Ford Explorer rollovers; (4) data

collected by insurance groups; (5) data collected by the National Highway Traffic

and Safety Administration; and (6) reports received by Ford of problems in other

countries involving the same tires and the same vehicle, especially in countries

with warmer climates.

13.    Beginning in approximately 1997, Ford executives in the U.S. were notified by

Ford of Venezuela that Explorers equipped with ATX and Wilderness AT tires

were experiencing elevated levels of tire failures and were rolling over in

Venezuela.

14.    Beginning in approximately 1998, Ford executives in the U.S. were notified by

Ford dealers in Saudi Arabia that Explorers equipped with ATX and Wilderness

4

AT tires were experiencing elevated levels of tire failures and were rolling over in Saudi Arabia. Ford continued to get reports of Explorer tire failures resulting in rollovers, injuries and deaths in warm weather Gulf Coast countries for the next two years.

15. Beginning in approximately 1999, Ford executives in the U.S. were notified by Ford dealers in Malaysia and Thailand that Explorers equipped with ATX and Wilderness AT tires were experiencing elevated levels of tire failure and were rolling over in Malaysia and Thailand.

16. In or about August 1999, Ford issued a "silent recall" to Explorer owners in Venezuela. Through this program, Ford contacted Explorer owners and provided misleading information suggesting that Ford wished them to bring their Explorers to Ford Dealers for a "Special Promotion" offering "free tire rotation and free inspection services." In truth and in fact, the true purpose of the program was to inspect the tires for signs of tire failure and, where discovered, to replace the tires. However, Ford did not disclose the true purpose of this program to U.S. regulators, U.S. dealers or U.S. consumers

17. In February 2000, Ford approved an "owner's notification program" in Malaysia and Thailand, the purpose of which was to recall the ATX Wilderness or AT tires on Ford Explorers in those countries without adequately notifying consumers of the reasons underlying the notification program. Ford did not disclose this recall to U.S. regulators, U.S. dealers or U.S. consumers.

**B. Ford's Deceptive Advertising**

18. Beginning in approximately 1989, and continuing through 2001, Ford marketed and advertised the performance, use and safety of the Ford Explorers in a manner which misled consumers in several material ways.

5

**Deceptively advertising the Explorer's Handling and Steering as "Carlike"**

19.     Despite the fact that the Explorer was a "truck", built on a truck chassis, Ford

        marketed and advertised the Explorer as being engineered to have "carlike"

        steering and handling, thus blurring critical distinctions between Explorer and

        passenger cars.

20.     In truth and in fact, the Explorer's steering and handling were not carlike in

        material ways.

21.     Post-sale disclosures given to consumers only after the sale contradicted Ford's

        advertisements and warned Explorer owners that the Explorer was not a passenger

        car, and that its handling and steering were materially different than cars.  Such

        post-sale disclosures warned that if the Explorer was handled or steered like a car

        in certain circumstances, the vehicle had a higher safety risk associated with it,

        such as the higher risk of rollover.  These safety risks associated with handling

        and steering the Explorer like a car were not disclosed in Ford's advertisements of

        the Explorer.

**Deceptively advertising the cargo and loading capacity of the Explorer**

22.     Ford advertised the Explorer as having "best in class" cargo capacity.

23.     Ford stated or implied in its advertising that the cargo-carrying capacity of the

        Explorer was limited by volume.  In truth, the cargo carrying capacity of the

        Explorer was limited by weight and weight distribution, not volume.

24.     Nevertheless, Ford stated or implied in its advertising that consumers could safely

        load the Explorer up to its cargo volume capacity without regard to any weight

        limitation.  Among other representations, Ford claimed "pack all the gear you

        need, and then some."

25.     In fact, the weight limitation – or Gross Vehicle Weight Rating (GVWR) for

        many models of the Explorer was less than that of competitors.  In fact, for some

        models, if a consumer loaded the Explorer with popular options, and with a

6

person in each seat (as advertised by Ford), the Explorer's GVWR would be exceeded, leaving <u>zero</u> capacity to safely carry any cargo.

26. In contrast to Ford's advertising, post-sale disclosures warned consumers that cargo capacity was limited by weight, not volume, and that safety risks, such as the increased risk of tire failure and rollover, were associated with exceeding the GVWR. Ford failed to disclose in its advertisements the safety risks associated with loading the Explorer to its volume capacity.

**Ford's Deceptive Aftermarket Tire Sales**

27. In or about 1998, Ford developed a program entitled "Around the Wheel" to better facilitate the sale of Ford-approved component parts through its dealers.

28. As part of its "Around the Wheel" program Ford advertised Ford-approved replacement tires – including Firestone tires – for sale through its dealerships.

29. In its "Around the Wheel" advertising, Ford touted its dealers as "experts" in the component parts, such as tires, to be used as replacements on Ford vehicles.

30. Ford advertised its replacement tires – including Firestone tires – as "the same tires" as those placed as Original Equipment (OE) on the vehicles it manufactured. Ford encouraged consumers to buy these "same tires" in order to "experience" the same feeling they had when they first drove their Ford vehicles.

31. In fact, the tires that Ford sold through its "Around the Wheel" program, while having the same appearance of like size Original Equipment tires, were not the same tires as the tires used as OE on its vehicles. These aftermarket tires were often made with different specifications, different uniformity standards, and using different compounds.

32. Ford knew or should have known that the tires sold by Ford in its "Around the Wheel" program were not the same as the tires that were placed as Original Equipment on the vehicles it manufactured. Ford knew or should have known

7

that it had not tested the tires internally and that the tires were made to different specifications than OE tires.

## IV. CAUSES OF ACTION

33.     The State of Ohio re-alleges all preceding paragraphs of this Complaint, and incorporates them herein.

34.     Defendant Ford Motor Company engaged in unfair and deceptive acts and practices as defined in (state code cite(s)) and therefore engaged in unlawful practices in violations of (state code site) by:

    (A)    Deceptively advertising the Ford Explorer as having "car-like" steering and handling;

    (B)    Deceptively advertising the Explorer as being capable of carrying more cargo and/or passengers than it could safely carry pursuant to the vehicle's weight limitations;

        1.    Deceptively advertising that certain aftermarket tires sold through the "Around the Wheel" program were the same tires as those that were originally placed on the vehicle by Ford when in fact they were not.

        2.    Failing to disclose a known safety risk associated with Ford Explorers equipped with ATX and Wilderness AT tires.

## V. RELIEF

### REQUEST FOR RELIEF

The State respectfully requests that the Court order relief against Defendant as follows:

    (1)    That the Court, pursuant to the Consumer Sales Practices Act, R.C. §1345.01 *et seq.*, permanently enjoin Defendant from advertising, offering or selling merchandise in a manner which does not comply with the Consumer Sales Practices Act, R.C. §1345.01 *et seq.*

8

(2)    That the Court, in its discretion, order Defendant to pay a civil penalty to the State in an amount up to $25,000.00 per violation pursuant to R.C. §1345.07(D).

(3)    That the Court order Defendant to pay the State's costs, including but not limited to reasonable attorney fees and investigative costs incurred in this action pursuant to Consumer Sales Practices Act, R.C. §1345.01 *et seq.*

(4)    That the Court order Defendant to pay all court costs.

(5)    That the Court grant any further relief as the Court deems just and equitable.


Respectfully submitted,

BETTY D. MONTGOMERY
Attorney General


MICHAEL S. ZIEGLER
Ohio Sup. Ct. Atty. No. 0042206
Assistant Attorney General
Consumer Protection Section
30 East Broad Street – 25th floor
Columbus, Ohio 43215-3428
(614) 644-9618
(614) 466-8898 (FAX)


SANDRA L. LYNSKEY
Ohio Sup. Ct. Atty. No. 0067618
Assistant Attorney General
Consumer Protection Section
30 East Broad Street – 25th floor
Columbus, Ohio 43215-3428
(614) 644-9618
(614) 466-8898 (FAX)

Counsel for Plaintiff

9

# EXHIBIT I

PIF Number:      10002025

Case Name:      STATE EX REL. MONTGOMERY V. BRIDGESTONE/FIRESTONE INC.

Case Number:     01CVH1111036

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

TERMINATION NO. 1
BY KM 11/8/01

STATE OF OHIO, *ex rel.*          )
BETTY D. MONTGOMERY              )
ATTORNEY GENERAL OF OHIO         )
                                 )       **01 CVH11  1 1036**
           Plaintiff,            )
                                 )       CASE NO.
                                 )
       v.                        )       JUDGE: O'Neill
                                 )
BRIDGESTONE/FIRESTONE INC.       )
                                 )       **AGREED ENTRY AND**
           Defendant.            )       **FINAL JUDGMENT ORDER**
                                 )

## AGREED ENTRY AND FINAL JUDGMENT ORDER

Plaintiff, the State of Ohio, by and through Betty D. Montgomery, Attorney

General of Ohio (hereinafter referred to as "State"), and Bridgestone/Firestone, Inc., an

Ohio corporation with its principal place of business in Nashville, Tennessee (hereinafter

referred to as "Defendant"), as evidenced by their signatures, do consent to the entry of

this Judgment and its provisions without trial or adjudication of any issue of fact or law,

and without an admission of any liability.

This is an Agreed Entry and Final Judgment Order ("Judgment" or "Order") for

which execution may issue.  Defendant hereby accepts and expressly waives any defect

in connection with service of process issued on the Defendant by the State.  Defendant

consents to entry of this Judgment without further notice.

RECEIVED
ATTORNEY GENERAL OF OHIO

NOV 0 9 2001

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

Defendant has, by signature of its counsel hereto, waived any right to appeal, petition for certiorari, move to reargue or rehear or be heard in connection with any judicial proceedings upon this Judgment and Order, as originally submitted to the Court.[1]

This Agreed Entry and Final Judgment Order shall bind Defendant and shall be binding on any and all future purchasers, merged parties, inheritors, or other successors in interest of Defendant.

## 1. ATTORNEY GENERAL'S ALLEGATIONS

The Attorney General's allegations are set forth in the State's Complaint, which is filed under separate cover contemporaneously with this Agreed Entry and Final Judgment Order.

## 2. DEFENDANT'S POSITION

2.1     On August 9, 2000, Defendant voluntarily recalled its P235/75R15 Radial ATX and ATX II tires manufactured in North America, including Mexico, and its Radial P235/75R15 Wilderness AT Tires manufactured in Decatur, Illinois. Of the estimated 14.4 million such tires produced, 6.5 million were then estimated to be in service.

2.2     On August 15, 2000, in connection with the August 9, 2000 recall, and because of the scope of the recall and the resulting shortage of replacement tires made by Defendant, Defendant announced its Voluntary Safety Tire Recall Reimbursement Program detailing a plan to reimburse consumers who incurred costs related to replacement of tires included in the August 9, 2000 recall with tires made by Defendant's competitors.

---

[1]This paragraph does not restrict Defendant's rights under paragraph 14.13 or in connection with any actions commenced to enforce this Order.

2.3    Under its Voluntary Safety Tire Recall Reimbursement Program, Defendant offered to reimburse all consumers up to $100.00 per tire, including applicable mounting and balancing charges and taxes, for each competitor's tire purchased by owners of P235/75R15 ATX, ATX II and Decatur-manufactured Wilderness AT Tires as replacement tires on or after August 9, 2000. Defendant also offered to reimburse consumers who exchanged Recalled Tires between January 1, 2000 and August 8, 2000 at a company owned Firestone Tire Service Center or authorized Bridgestone/Firestone retailer on a pro-rated basis.

2.4    Defendant voluntarily implemented a bounty program to buy back from used tire and other dealers used tires that were within the scope of the recall and illegal to sell, at a price of $10.00 per tire.

2.5    On September 1, 2000, the National Highway Traffic Safety Administration issued a Consumer Advisory relating to 1.4 million additional tires, 357,000 of which were then estimated to still be in service, manufactured by Defendant which were not subject to the August 9, 2000 recall. On September 12, 2000, Defendant announced its Customer Satisfaction Program addressed to the Consumer Advisory tires. Under this program, Defendant agreed to conduct free inspections of tires on the Consumer Advisory, and offered to replace such tires with which a consumer was concerned with Defendant's tires or reimburse the customer up to $140.00 per tire, including applicable mounting and balancing charges and taxes, for each competitor's tire purchased on or after September 1, 2000 by consumers as replacements for Consumer Advisory tires.

2.6    In August 2000, the various Attorneys General, acting through a Multi-state Working Group, commenced an investigation of Bridgestone/Firestone, Inc.

2.7    Contemporaneous with the filing of this Agreed Entry and Final Judgment Order, the various Attorneys General initiated lawsuits against Defendant in their respective state courts across the country, in the District of Columbia, and in the territories of the Virgin Islands and Puerto Rico.

2.8    Defendant denies the allegations in the various Attorneys' General Complaints.

2.9    Defendant has ceased, directly or indirectly, producing, manufacturing, distributing, or selling any of the Recalled Tires and instituted a program to withdraw all of such tires from trade or commerce.

2.10   Defendant has provided consumers substantial safety warnings concerning tires both before and after the August 9, 2000 recall, including but not limited to the nationwide distribution of its "Inflate, Rotate and Evaluate" Safety Manual and development of a web-based consumer outreach program.

2.11   Defendant has informed the Attorneys General that it intends to fully comply with the respective states' consumer protection acts and not to engage in any false, misleading, deceptive or unfair advertising.

2.12   The States do not necessarily agree with the statements set forth in the "Defendant's Position" section of this Order.

IT IS HEREBY AGREED, ORDERED, AND ADJUDGED THAT:

### 3. <u>JURISDICTION</u>

3.1    Jurisdiction of this Court over the subject matter and over the parties for
the purpose of entering into and enforcing this Order is admitted.  Jurisdiction is retained
by this Court for the purpose of enabling the parties to apply to this Court at any time for
such further orders and directions as may be necessary or appropriate for the
construction, modification or execution of this Order, and the enforcement of this Order
and punishment of violations thereof.  Defendant agrees to pay all court costs, expenses
and reasonable attorneys' fees and costs associated with this Court granting any petitions
to enforce any provision of this Order against Defendant.

### 4. <u>VENUE</u>

4.1    Venue as to all matters between the parties relating hereto or arising out of
this Order lies in the Court of Common Pleas, Franklin County, Ohio.

### 5. <u>PARTIES</u>

5.1    Defendant warrants and represents that it manufactured, sold and
distributed Defined Tires.  Defendant further acknowledges that it is a proper party to this
Order and Bridgestone/Firestone, Inc. is the true legal name of the entity entering into
this Order.  Defendant further acknowledges that it understands that the State expressly
relies upon this representation and warranty, and that if it is false, unfair, deceptive,
misleading or inaccurate, the State has the right to move to vacate or set aside this Order,
or request that Defendant be held in contempt, if the State so elects.

5.2    Plaintiff is the State of Ohio.

## 6. DEFINITIONS

As used in this Agreed Entry and Final Judgment Order, the following words or

terms shall have the following meanings:

6.1   "Agreed Entry and Final Judgment Order", "Judgment" or "Order" shall
refer to this document entitled Agreed Entry and Final Judgment Order in
the matter of *State of Ohio ex rel. Betty D. Montgomery, Attorney General
of Ohio v. Bridgestone/Firestone, Inc., an Ohio corporation with its
principal place of business in Nashville, Tennessee.*

6.2   "Authorized Retailer" or "Authorized Dealer" shall refer to any retail
stores owned by Defendant or authorized by a dealer agreement to sell
Defendant's tires, respectively.

6.3   "Bounty Program" shall refer to the voluntary program announced by
Defendant on September 21, 2000 offering payment for the return of used
Recalled Tires.

6.4   "Clear and Conspicuous" or "Clearly and Conspicuously": A statement is
"Clear and Conspicuous" or "Clearly and Conspicuously" disclosed if, by
whatever medium, it is readily understandable and presented in such size,
color, contrast, location and audibility, compared to the other information
with which it is presented, that it is readily apparent to the person to whom
it is disclosed.  If such statement is necessary as a modification,
explanation or clarification to other information with which it is presented,
it must be presented in close proximity to the information it modifies, in a
manner which is readily noticeable and understandable.  Further, a
disclosure of information is not clear and conspicuous if, among other
things, it is obscured by the background against which it appears or there
are other distracting elements.  Warnings, safety disclosures or statements
of limitation must be set out in close conjunction with the benefits
described, or with appropriate captions, of such prominence, that
warnings, safety disclosures or statements of limitation are not minimized,
rendered obscure, presented in an ambiguous fashion, or intermingled with
the context of the statement so as to be confusing or misleading. If a
federal law or regulation specifically requires a disclosure in a particular
format or manner, conformity with that law or regulation shall be deemed
to be compliance with this definition.

6.5   "Competent and Reliable Scientific Evidence" shall mean tests, analyses,
research, studies, or other evidence conducted and evaluated in an
objective manner by persons qualified to do so, and using procedures or

6

methodologies generally accepted by the relevant professional or scientific community to yield accurate and reliable results. This definition shall not prevent the use of new scientific methods that yield accurate and reliable results. Nothing contained herein shall require such tests, analyses, research, studies or other evidence to be peer reviewed prior to their implementation or use.

6.6     "Consumer" means a person who engages in a consumer transaction with a supplier.

6.7     "Consumer Act" or "Consumer Sales Practices Act" shall refer to the Ohio Consumer Sales Practices Act and related statutes and administrative rules found at R.C. §1345.01 *et seq.*

6.8     "Consumer Advisory Tires" shall refer to any Tire included in the NHTSA Consumer Advisory dated September 1, 2000. Attached as Exhibit 1 is a list of the Consumer Advisory tires.

6.9     "Customer Satisfaction Program" shall refer to the program announced on September 12, 2000 by the Defendant to replace Consumer Advisory Tires as promoted to consumers.

6.10    "Defendant" shall refer to Bridgestone/Firestone, Inc.

6.11    "Defined Tires" shall refer to:
        (A)  all Firestone Radial ATX and Radial ATX II tires in size P235/75R15;

        (B)  all Wilderness AT tires in size P235/75R15 produced at the Decatur, Illinois plant; and

        (C)  all Wilderness AT tires in size P235/75R15 and P255/70R16 produced before May 1998 which were fitted as O.E. Tires on Ford Explorers and Mercury Mountaineers for model years 1995-1998 or were purchased in the replacement market for Ford, Mercury and other sport utility vehicles.

6.12    "House Brands" shall refer to brands other than Firestone or Bridgestone, the trademarks for which are owned by Defendant.

6.13    "Multi-state Compliance Committee" shall refer to representatives from the States of Florida, Georgia and Tennessee.

6.14    "Multi-state Executive Committee" shall refer to representatives from the States of Connecticut, Florida, Georgia, Illinois, Tennessee, Texas and Wisconsin.

7

6.15   "National Highway Traffic and Safety Administration" or "NHTSA" shall
refer to the federal National Highway Traffic and Safety Administration.
If any of the obligations, duties or jurisdiction of the NHTSA should at
any time be transferred, consolidated, or merged with the obligations,
duties or jurisdiction of any other governmental agency, all references to
"National Highway Traffic and Safety Administration" or "NHTSA"
included herein shall specifically include and reference that other
governmental agency or entity.

6.16   "Nylon Cap Plies" or "Nylon Cap Strips" shall refer respectively to one or
more plies or strips of nylon cord, which, in essence, circumferentially
cover the width of the second belt ply from shoulder to shoulder or
overlap an edge region of the second belt ply, and which have the effect of
reinforcing and stabilizing the tread belt edge region of the tire, by
restricting the expansion of the footprint of the tire.

6.17   "Plaintiff", "State of Ohio", "State" or "Attorney General" shall refer to
the Ohio  Attorney General and the Office of the Ohio Attorney General.

6.18   "O.E. Tire" shall refer to a Tire sold by Defendant to an original
equipment vehicle manufacturer.

6.19   "Private Label Tire" shall refer to any Tire which is made by Defendant or
for which it contracts for manufacture with a third-party, but which bears a
brand name or trademarks owned by an entity other than the manufacturer.

6.20   "Recalled Tires" shall refer to any Tire included in the
Bridgestone/Firestone, Inc. voluntary recall announced on August 9, 2000.

6.21   "Recall" shall refer to any program initiated or enacted by Defendant,
whether voluntary or pursuant to any Order by NHTSA, to withdraw or
remove any Tires manufactured, designed, or sold by Defendant from
trade or commerce.

6.22   "Silent Warranty", "Secret Warranty" or "Silent Recall" shall refer to any
policy however distributed or known by Defendant (not distributed
publicly) to pay or reimburse for repairs or replacements related to certain
problems or defects which Defendant knew to be associated with a
particular good or service, after the warranty period has expired.  Nothing
in this definition shall be construed to restrict Defendant in any way from
offering general customer satisfaction programs designed to satisfy
customer complaints.

6.23   "Tennessee Order" or "Tennessee Agreed Final Judgment" shall refer to
the Agreed Final Judgment entered in Davidson County Circuit Court

between the State of Tennessee and Bridgestone/Firestone, Inc. on
November 8, 2001.

6.24    "Tire" shall refer to any and all tires manufactured by Defendant and
identified as Passenger or Light Truck tires in the Tire and Rim
Association, Inc. Yearbook.

6.25    "Tread Pattern" shall refer to a series or combination of grooves, ribs,
slots, pockets, sipes and ridges or the like on the exterior crown surface of
a tire.

6.26    "UTQG" shall refer to the Uniform Tire Quality Grading System outlined
in 49 C.F.R. § 575.104 and any new, amended or successor Federal
provision or requirement as amended or modified from time to time.

6.27    "Warranty" shall refer to:

(A) any affirmation of fact, or any promise or representation made, in
connection with the sale of a Tire to a consumer which relates to the
nature of the material or workmanship of the Tire and affirms or promises
that such material or workmanship is defect free or will meet a specified
level of performance over a specified period of time or number of miles,
or

(B) any undertaking in a writing or an advertisement, in connection with
the sale of a Tire to a consumer, to refund, repair, replace, or take other
remedial action with respect to such Tire, in the event that such Tire fails
to meet the conditions set forth in the undertaking.

## 7. PERMANENT INJUNCTION AND REHABILITATION

Accordingly, it is hereby agreed by the Defendant that immediately upon the

entry of this Order, pursuant to R.C. §1345.07, Defendant, and anyone in active concert

with it, shall be permanently enjoined and restrained, or as otherwise set forth in this

Order, from directly or indirectly engaging in any of the following or permanently

required to directly or indirectly engage in any of the following, as appropriate:

**Tire Safety.**

7.1    Defendant shall not offer for sale or otherwise provide or deliver any Tire

which it knows or reasonably should know is unsafe or contains a safety-related defect.

9