**EXHIBIT 3**



STATE ATTORNEYS GENERAL MULTISTATE WORKING GROUP
ATTN: BRIDGESTONE/FIRESTONE SETTLEMENT
POST OFFICE BOX
CITY, STATE ZIP

POSTMASTER:
ADDRESS CORRECTION REQUESTED.
Important information about your rights
Attorneys General Settlement
with Bridgestone/Firestone

EXHIBIT
3

**EXHIBIT 4**

STATE OF TENNESSEE

# Office of the Attorney General



**PAUL G. SUMMERS**
ATTORNEY GENERAL AND REPORTER

**ANDY D. BENNETT**
CHIEF DEPUTY ATTORNEY GENERAL

**LUCY HONEY HAYNES**
ASSOCIATE CHIEF DEPUTY
ATTORNEY GENERAL

(Date)

**MICHAEL E. MOORE**
SOLICITOR GENERAL

425 FIFTH AVENUE NORTH
NASHVILLE, TN 37243-0485

TELEPHONE (615) 741-3491
FACSIMILE (615) 741-2009

RE:   Attorneys General Settlement with Bridgestone/Firestone, Inc.

Dear Consumer:

Some time ago, under the Attorneys General settlement with Bridgestone/Firestone, Inc., you requested that Bridgestone/Firestone, Inc. reconsider your request for a refund under the Voluntary Tire Safety Refund Reimbursement Program or Customer Satisfaction Program. We are pleased to inform you that Bridgestone/Firestone, Inc. has decided you should receive a refund. Enclosed is a refund check. If you feel you did not receive the correct amount, please contact your State Attorney General in writing.

We are glad that this settlement allowed the Attorneys General to assist you in getting your refund request reviewed and ultimately paid.

**ON BEHALF OF THE ATTORNEYS GENERAL
IN THE BRIDGESTONE/FIRESTONE WORKING GROUP**

PAUL G. SUMMERS
Attorney General

Enclosure:
   Refund check

49732



# COLLECTIVE EXHIBIT 5

[Bridgestone/Firestone Letterhead]


(DATE)


Re:     Attorneys General Settlement with Bridgestone/Firestone, Inc.

Dear Consumer:

Some time ago, under the Attorneys General settlement, you asked that your request for reimbursement under the Bridgestone/Firestone, Inc. Voluntary Safety Tire Recall Reimbursement Program or Customer Satisfaction Program be reconsidered. The company has carefully reviewed your reconsideration request under the "credible evidence" standard as required by the Attorneys General settlement with Bridgestone/Firestone, Inc. Our company has determined that your request does not meet the requirements of the Voluntary Safety Tire Recall Reimbursement Program or Customer Satisfaction Program indicated below:

(PLEASE NOTE Bridgestone/Firestone may merely insert applicable reason for denial)

❑     The replacement tires were purchased or adjusted prior to January 1, 2000.

❑     The tires replaced were not part of the August 9, 2000 recall or NHTSA Consumer Advisory.

❑     The purchase of replacement tires between January 1, 2000 and August 9, 2000 was from a competitive retailer or was not on a pro-rata, customer satisfaction basis.

❑     The request was for the recovery of costs over the limit of $100.00 or $140.00 per tire, as applicable, for replacement tires purchased from a competitive retailer.

❑     The request was to recover the cost of items not covered in the Voluntary Safety Tire Recall Reimbursement Program or Customer Satisfaction Program.

❑     Reimbursement previously was made.

❑     Insufficient substantiation of request; additional information needed.

        [Insert additional information needed _____

If you disagree with our decision for any reason, you have the right to submit your request for review, at no cost to you, by an independent arbitrator who has already been selected. If you elect to do so, please indicate your decision by completing the attached arbitration form and returning it to the following address no later than sixty-three (63) days after the post mark on the



EXHIBIT
5

envelope in which you received this letter.  You may also submit any additional written materials you wish the arbitrator to consider along with this form to:

### [INSERT ADDRESS]

You should be aware that the arbitrator's decision is not appealable by you and that any award you may receive may be used as a set-off against any recovery you may receive under these Programs in any other proceeding.

While your request unfortunately did not qualify for reimbursement under either the Voluntary Safety Tire Recall Reimbursement Program or Customer Satisfaction program, we assure you we did carefully review and reconsider your request.  Thank you for your patience and we sincerely regret any inconvenience involved.

In any case, for safety's sake, we urge you in the future to properly maintain and inflate your tires.

Bridgestone/Firestone, Inc.

Enclosure:     Request for Arbitration Form

49791



EXHIBIT
5

# ATTORNEYS GENERAL SETTLEMENT WITH BRIDGESTONE/FIRESTONE, INC. REQUEST FOR ARBITRATION FORM

**Return Request for Arbitration Form to:**

**(INSERT ADDRESS)**

**IMPORTANT NOTE THIS FORM MUST BE RETURNED TO THE ABOVE ADDRESS BY NO LATER THAN (insert date: 47 days from mailing) TO BE ELIGIBLE FOR ARBITRATION AND A POSSIBLE REFUND.**

**If after reviewing the letter accompanying this form, you would like to request your request for refund or reimbursement involving Bridgestone/Firestone, Inc., be sent to an independent arbitrator at no cost to you, please complete this form and <u>provide copies of all information you want considered by the arbitrator.</u>**

**Please type or clearly print your responses to the following items:**

Name: _____

Address: _____

City, State: _____

Zip Code: _____

Daytime telephone number: _____

Evening telephone number: _____

_____     _____
Signature                                              Date

**You should initially hear from Arbitrator in approximately 15 weeks.**

**PLEASE KEEP A COPY OF THIS REQUEST FOR ARBITRATION FORM, COVER LETTER AND ATTACHMENTS FOR YOUR RECORDS.**

49568



EXHIBIT
5

**EXHIBIT 6**

STATE OF TENNESSEE

# Office of the Attorney General



**PAUL G. SUMMERS**
ATTORNEY GENERAL AND REPORTER

**ANDY D. BENNETT**
CHIEF DEPUTY ATTORNEY GENERAL

**LUCY HONEY HAYNES**
ASSOCIATE CHIEF DEPUTY
ATTORNEY GENERAL

(Date)

**MICHAEL E. MOORE**
SOLICITOR GENERAL

**425 FIFTH AVENUE NORTH**
NASHVILLE, TN 37243-0485

TELEPHONE (615) 741-3491
FACSIMILE (615) 741-2009

RE:    Attorneys General Settlement with Bridgestone/Firestone, Inc.

Dear Consumer:

Some time ago, under the Attorneys General settlement with Bridgestone/Firestone, you requested that your claim involving the Bridgestone/Firestone, Inc. Voluntary Safety Tire Recall Reimbursement Program or Customer Satisfaction Program be reviewed by an independent arbitrator. We are pleased to inform you that the independent arbitrator has decided you should receive a refund. Enclosed is a refund check. If you feel you did not receive the correct amount, please contact your State Attorney General in writing.

We are glad that this settlement allowed the Attorneys General to assist you in getting your refund request reviewed and ultimately paid.

**ON BEHALF OF THE ATTORNEYS GENERAL
IN THE BRIDGESTONE/FIRESTONE WORKING GROUP**

PAUL G. SUMMERS
Attorney General

Enclosure:
    Refund check

49731


EXHIBIT
6

**EXHIBIT 7**

# PAYMENT TO THE STATES

Pursuant to Section 13 of each respective state's Agreed Final Judgment, the following monetary amounts will be paid to the members of the multistate working group.

| STATE | MONETARY PAYMENT AMOUNT |
|---|---|
| Alabama | $530,000.00 |
| Alaska | $526,000.00 |
| Arizona | $530,000.00 |
| Arkansas | $530,000.00 |
| California | $530,000.00 |
| Colorado | $530,000.00 |
| Connecticut | $1,205,000.00 |
| Delaware | $525,000.00 |
| District of Columbia | $526,250.00 |
| Florida | $1,812,588.54 |
| Georgia | $1,439,807.43 |
| Hawaii | $530,000.00 |
| Idaho | $530,000.00 |
| Illinois | $1,205,000.00 |
| Indiana | $530,000.00 |
| Iowa | $528,000.00 |
| Kansas | $527,500.00 |
| Kentucky | $525,000.00 |
| Louisiana | $525,000.00 |
| Maine | $525,000.00 |
| Maryland | $530,000.00 |
| Massachusetts | $530,000.00 |
| Michigan | $530,000.00 |



EXHIBIT

7

| STATE | MONETARY PAYMENT AMOUNT |
|---|---|
| Minnesota | $530,000.00 |
| Mississippi | $530,000.00 |
| Missouri | $525,000.00 |
| Montana | $526,000.00 |
| Nebraska | $530,000.00 |
| Nevada | $530,000.00 |
| New Hampshire | $530,000.00 |
| New Jersey | $530,000.00 |
| New Mexico | $525,000.00 |
| New York | $525,000.00 |
| North Carolina | $530,000.00 |
| North Dakota | $527,500.00 |
| Ohio | $530,000.00 |
| Oklahoma | $530,000.00 |
| Oregon | $530,000.00 |
| Pennsylvania | $539,600.00 |
| Puerto Rico | $530,000.00 |
| Rhode Island | $525,000.00 |
| South Carolina | $530,000.00 |
| South Dakota | $525,000.00 |
| Tennessee | $3,425,706.30 |
| Texas | $1,205,000.00 |
| Utah | $525,000.00 |
| Vermont | $525,500.00 |
| Virgin Islands | $525,000.00 |
| Virginia | $530,000.00 |
| Washington | $583,179.49 |

**EXHIBIT**

7

| STATE | MONETARY PAYMENT AMOUNT |
|---|---|
| West Virginia | $525,000.00 |
| Wisconsin | $1,205,000.00 |
| Wyoming | $527,500.00 |
| Sears Grant Payment | $150,000.00 |
| Cost Share Account | $84,000.00 |

49819

EXHIBIT
7

**IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO**

**01CVH11  11036**

STATE OF OHIO, *ex rel.*                    )
BETTY D. MONTGOMERY                )    CASE NO.
ATTORNEY GENERAL                      )
30 East Broad Street                           )
State Office Tower – 25th Floor            )    JUDGE
Columbus, Ohio 43215-3428               )
                                                          )
           Plaintiff,                               )
                                                          )
v.                                                       )
                                                          )    **COMPLAINT FOR**
BRIDGESTONE/FIRESTONE, INC.       )    **DECLARATORY JUDGMENT,**
50 Century Boulevard                         )    **RESTITUTION, INJUNCTIVE**
Nashville, Tennessee 37214                 )    **RELIEF AND COSTS**
                                                          )
           Defendant.                            )

## JURISDICTION

1.      Plaintiff, State of Ohio, by and through the Attorney General of Ohio, Betty D.

Montgomery, having reasonable cause to believe that violations of Ohio's consumer

laws have occurred, brings this action in the public interest and on behalf of the State

of Ohio under the authority vested in her pursuant to Ohio Revised Code (R.C.)

1345.07 of the Consumer Sales practices Act.

2.      The actions of Defendant, hereinafter described, have occurred in the State of Ohio,

County of Franklin and various other counties, and as set forth below, are in violation

of the Consumer Sales Practices Act, R.C. §1345.01 *et seq*.

3.      Defendant, as described below, is a "supplier" as that term is defined in R.C.

§1345.01(C) as Defendant was, at all times relevant herein, engaged in the business

of effecting "consumer transactions" by producing, manufacturing, distributing, selling, and advertising certain tires to individuals in Ohio for purposes that were primarily personal, family or household within the meaning specified in R.C. §1345.01(A) and (D).

4.  Jurisdiction over the subject matter of this action lies with this Court pursuant to R.C. §1345.04 of the Ohio Consumer Sales Practices Act.

5.  This Court has venue to hear this case pursuant to Ohio Civ. R. 3(B)(1)-(3), in that some of the transactions complained of herein and out of which this action arose, occurred in Franklin County.

## NATURE OF DEFENDANT'S BUSINESS

6.  The Defendant, Bridgestone/Firestone, Inc., (hereinafter Bridgestone/Firestone) is and/or was engaged in the business of producing, manufacturing, distributing, selling and advertising automotive tires.

7.  Defendant Bridgestone/Firestone, Inc., is a corporation organized under the laws of the State of Ohio, with its principal place of business in Nashville, Tennessee.

## STATEMENT OF THE FACTS

8.  The Defendant manufactured the following defective tires: (1) Tires covered by the voluntary recall announced by Defendant in August of 2000 ("First Recall") which included all P235/75 R15 Firestone Radial ATX, all P235/75 R15 Firestone Radial ATXII, and the P235/75 R15 Firestone Wilderness AT tires which were manufactured at the Defendant's Decatur, Illinois plant. (2)

2

Tires included in the Customer Satisfaction Program announced by Defendant
on September 12, 2000.  A list of the tires involved in that program are
attached as Exhibit A.  (3) Tires included in the second recall ("Second
Recall") announced on October 4, 2001 include all Firestone Wilderness AT
tires in the  P235/75R15 and P255/70R16 sizes which were produced before
May 1998 and used as original equipment on Ford Explorers and Mercury
Mountaineers for model years 1995 through 1998.  The tires involved in the
First Recall, Second Recall, and the Customer Satisfaction Program are
hereinafter referred to as the "Defined Tires."  This Complaint only covers
issues associated with Defined Tires. Nothing herein shall be construed to
indicate that the State has raised claims broader in scope than the Defined
Tires.

9.     From the time of its formation in 1900 through the present, the Firestone Tire
and Rubber Company and/or Bridgestone/Firestone, Inc., has been engaged in
the consumer retail and wholesale business, and has transacted commerce
from its tire manufacturing plant located in Akron, Ohio its corporate
headquarters are located in Davidson County, Tennessee, and its many stores
and establishments located throughout the State of Ohio including several
stores in Franklin County, Ohio.  Bridgestone/Firestone, Inc. engages in the
business of manufacturing automotive tires, and supplying tires, parts and
services to consumers as defined in  R. C. 1345.01(D), (hereinafter
"consumers").  Defendant was engaged in this business at all times relevant to

3

this complaint.

10.     Some consumers purchase Defendant's tires through stores owned by Defendant or by independently owned dealers.  Other consumers purchase Defendant's tires from motor vehicle dealers as original equipment in connection with the purchase of a new motor vehicle.  In addition, motor vehicle manufacturers purchase Defendant's tires directly from Defendant for use as original equipment to be sold to the public with new motor vehicles.

11.     By at least 1997, Defendant agreed to a manufacturer's customer notification enhancement action regarding a subset of Defined Tires overseas, but made no disclosure of either the defects or the overseas notification program to consumers in the United States.  As part of this program, the tires, including some of the Defined tires, were replaced because of an alleged safety related defect.  These tires had been and continued to be sold in the United States.

12.     Beginning in 1990, Defendant sold to consumers certain Defined tires which it had manufactured for use on sport utility vehicles.   Defendant did not disclose to consumers, or request manufacturers of, or dealers in, new vehicles equipped by the manufacturer with these tires as original equipment, that under the advertised conditions the Defined Tires had a higher risk of tire failure.

13.     On August 9, 2000, the National Highway Traffic Safety Administration (NHTSA) announced that it had found safety-related defects in the tires involved in the First Recall.

14.     On August 9, 2000, Defendant, in conjunction with the National Highway Traffic

4

Safety Administration announced a Voluntary Safety Tire Recall Reimbursement Program. This announcement was the first disclosure by Defendant to the public that the following subgroup of Defined Tires should be removed from vehicles. This group of tires included the Firestone Radial ATX, the Firestone Radial ATXII, and the Firestone Wilderness AT in the P235/75 R15 size which were manufactured at the Defendant's Decatur, Illinois plant. Up until this time, Defendant maintained publicly that this

subgroup of Defined tires was safe to use on any appropriate vehicle.

15.     Beginning in August 2000, the Office of the Ohio Attorney General received information from consumers to the effect that Defendant and its agents were violating the Consumer Sales Practices Act and that certain aspects of the recall were leading to undisclosed risks to consumer safety. As a result of this information, the Ohio Attorney General joined other State Attorneys General and various consumer agencies in a Multi-state Working Group to evaluate this information and to make the States' concerns known to Defendant.

16.     In or about September 2000, the Multi-state Working Group expressed concern that unsafe recalled tires (a subgroup of the Defined Tires) were being re-sold to unsuspecting consumers by unscrupulous third parties. On September 21, 2000, Defendant announced a "bounty program" to pay ten dollars ($10.00) per recalled tire (a subgroup of the Defined tires) in order to ensure all such tires were removed from the stream of commerce.

17.     On September 1, 2000, NHTSA expressed concern about the possible safety risks

5

associated with certain tires manufactured by Defendant not involved in the Voluntary Recall announced on August 9, 2000. NHTSA issued a consumer advisory to inform consumers that certain tires had tread separation rates exceeding those of the August 9, 2000 recall tires, sometimes by a large margin.

18.    On September 12, 2000, Defendant announced a Customer Satisfaction Program, which included the Consumer Advisory tires. This announcement was the first time Defendant publicly disclosed that this subgroup of Defined tires should be removed from vehicles. Defendant refused to initiate a voluntary recall of these tires despite NHTSA's request to do so.

19.    Under the customer satisfaction program, Defendant agreed to replace the consumer advisory tires or reimburse a consumer up to $140.00 per tire for the purchase of new tires, only if requested to do so by a consumer who owned a Consumer Advisory tire.

20.    On October 4, 2001, NHTSA made an initial decision that a defect related to motor vehicle safety existed in Firestone Wilderness AT tires in sizes P235/75 R15 and P255/70 R16 which were manufactured before May 1998 to the vehicle manufacturer's specifications, and that were installed as original equipment on certain sport utility vehicles.

21.    On October 4, 2001, Defendant announced a voluntary recall program (Second Recall) to replace the tires identified in NHTSA's decision of the same date. This announcement was the first time Defendant publicly disclosed that these tires should be removed from certain vehicles for safety reasons. The subject tires

6

were the Firestone Wilderness AT tires in the P235/75 R15 and P255/70 R16 sizes which were produced before May 1998 and used as original equipment on Ford Explorers and Mercury Mountaineers for model years 1995 through 1998.

22.  Defendant, motor vehicle manufacturers, and dealers which sold the Defined Tires publicly advertised to consumers that the Defined Tires were suitable and intended for use on sport utility vehicles under fully loaded highway and off-road conditions at the inflation pressure of twenty-six pounds per square inch. Before and during the time of these representations, Defendant knew or should have known that neither it nor the vehicle manufacturer possessed competent and reliable scientific evidence to substantiate the suitability for use of these Defined tires under the advertised conditions.

23.  Defendant, and the motor vehicle manufacturers and dealers which sold the Defined Tires, publicly advertised to consumers that the Defined Tires would have "long, even tread wear" or "long, even wear" under the intended conditions of use. Before and during the time these representations were made, Defendant knew or should have known that neither it nor the vehicle manufacturer possessed competent and scientific evidence to substantiate these claims.

24.  Defendant, and the motor vehicle manufacturers and dealers which sold the Defined Tires, implied that the normal end of useful life for the Defined Tires would be upon exhaustion of the tread down to the legal minimum, when Defendant knew or should have known that there was an unreasonable risk that the Defined tires would experience structural failure of components, including but

7

not limited to belts and wedges, before the tread was exhausted.

25.     The Defendant: (a) warranted to consumers that the Defined Tires, if used under the intended conditions, would last for a particular mileage or time frame, or the consumer would have the tire replaced with an equivalent tire or adjusted based on the amount of tread life used if the tire becomes unusable. In some cases, Defendant and its agents failed to provide consumers with an equivalent tire when the Defined Tires failed under the mileage warranty; (b) retroactively changed the terms of existing tire warranties Defined Tires, representing that the warranties had been "expanded" despite reduction in certain terms of coverage; and, (c) replaced Defined Tires with tires which were not "equivalent" to the warranted tire under the terms of the consumer's warranty and failed to reimburse the consumer with the monetary difference in value.

26.     In conjunction with the August 2000 Voluntary Safety Recall Reimbursement Program, Defendant announced that it was manufacturing specific replacement tires to be used in replacing the recalled tires (a subgroup of the Defined tires). Defendant and its agents failed to comply with the terms of the announced Recall program as to all consumers, and gave consumers incorrect, confusing or misleading information regarding the availability of program replacement tires and the costs associated with obtaining such tires. Specifically, Defendant and its agents took the following actions:

(a)     charged some consumers for installation of recall program replacement tires or for the recall program tires themselves;

8

(b)    communicated to some consumers that program replacement tires were
       unavailable and that the consumer would either have to wait for recall
       program replacement tires,  or pay to upgrade to a more expensive tire,
       when in fact a program replacement tire was available;

(c)    charged some consumers for road hazard warranties on replacement tires
       even though the consumer had purchased the road hazard warranty on the
       recalled tires; and,

(d)    replaced recalled tires with non-program replacement tires which were not
       the recalled tires under the terms of the warranty and recalls and failed to
       reimburse the consumer with the monetary difference in value.

These practices were not consistent with the terms of the Defined tire's warranty
and the Voluntary Safety Recall Reimbursement Program as announced and
promoted by Defendant publicly and privately to consumers.

27.    As part of its recall program, Defendant and its agents announced publicly to
       consumers that Defendant had retained an independent expert to conduct an
       independent analysis of incidents involving tires affected by the recall and
       promoted that "We are taking this step because we are committed to finding out
       what, if any, problems may have led to the incidents involving the affected tires".
       The Defendant also stated that they would rely on the independent expert to
       examine and verify our own internal investigation process.  However, Defendant
       failed to provide all requested information to the independent expert, and failed to
       publicly inform consumers that it had failed to do so.

9

28.  Defendant engaged in a silent warranty on a subgroup of Defined Tires when the
Defendant and/or its agents informed consumers who owned Defined Tires to
bring in their vehicles for a non-tire related purpose when in fact the purpose was
to enable Defendant's agents to inspect tires and determine whether they should be
replaced.

29.  Defendant has ceased manufacturing and distributing the Defined Tires as either
original equipment tires or replacement market tires.

30.  Defendant has made restitution to a number of consumers through its publicly
announced recall and customer satisfaction programs.  However, a number of
other consumers have been unjustly denied restitution despite having purchased
one of the Defined Tires and having made a claim to Defendant.  Further,
Defendant in some cases failed to inform consumers of their right to appeal a
denial of restitution.

## IV. CAUSES OF ACTION

### UNFAIR OR DECEPTIVE ACTS OR PRACTICES

#### COUNT ONE

31.  Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

32.  Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
seq.*, by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to, failing to clearly and conspicuously disclose prior to
purchase all material and necessary safety disclosures associated with the use of

10

the Defined Tires in a manner designed to arrest the eye or attract the attention of the average purchaser of the product.

## COUNT TWO

33.    Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

34.    Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, providing consumers with inconsistent warning labels or instructions (such as but not limited to inconsistent tire pressure information) for the Defined Tires.

## COUNT THREE

35.    Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

36.    Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, promoting Defendant's Defined Tires as appropriate for use off road by using such statements as "For on and off-road driving", "outstanding off-road capability", and "Hunting, fishing, or camping --wherever you're going, these rough aggressive tires can take you there. Deep tread designs and steel belted construction give you the traction and impact resistance you need on remote back roads" but later disallowing warranty claims because of

11

"consumer abuse" associated with off road use or punctures.

## COUNT FOUR

37.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set

forth in paragraphs One through Thirty (1-30) of this complaint.

38.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et*

*seq*., by engaging in various unfair, misleading or deceptive acts or practices,

including but not limited to, promoting Defendant's Defined Tires as appropriate

for use off road by using such statements as "For on and off-road driving",

"outstanding off-road capability", and "Hunting, fishing, or camping --wherever

you're going, these rough aggressive tires can take you there.  Deep tread designs

and steel belted construction give you the traction and impact resistance you need

on remote back roads" but later disallowing warranty claims because of

"consumer abuse" associated with off road use or punctures.

## COUNT FIVE

39.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set

forth in paragraphs One through Thirty (1-30) of this complaint.

40.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et*

*seq*., by engaging in various unfair, misleading or deceptive acts or practices,

including but not limited to, failing to clearly and conspicuously disclose that

Defendant's Defined Tires were defective.

## COUNT SIX

12

41.  Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

42.  Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
seq.*, by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to, selling Defined Tires which are defective without
clear and conspicuous disclosure of that fact.

## COUNT SEVEN

43.  Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

44.  Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
seq.*, by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to, marketing the Defined Tires for particular use when
the tires present a risk of harm to consumers.

## COUNT EIGHT

45.  Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

46.  Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
seq.* by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to, failing to disclose material facts associated with the
purchase and use of the Defined Tires, such as but not limited to their
susceptibility for tread separations.

## COUNT NINE

13

47.   Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

48.   Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
seq*., by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to misrepresenting or implying a particular inflation tire
pressure is safe and appropriate inflation for its Defined Tires when it is not safe
and appropriate.

## COUNT TEN

49.   Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

50.   Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
seq*., by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to, misrepresenting the tire load capacity of its Defined
Tires or by implying that the Defined Tires could carry a larger load than it
actually could.

## COUNT ELEVEN

51.   Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
forth in paragraphs One through Thirty (1-30) of this complaint.

52.   Defendant has violated the Ohio Consumer Sales Practices Act R. C. §1345.01 *et
seq*. by engaging in various unfair, misleading or deceptive acts or practices,
including but not limited to, misrepresenting or implying that its Defined Tires
were appropriate for highway use at maximum posted speed limits and maximum

14

weight at expected driving conditions, when such is not the case.

## COUNT TWELVE

53.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
         forth in paragraphs One through Thirty (1-30) of this complaint.

54.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
         seq.,* by engaging in various unfair, misleading or deceptive acts or practices,
         including but not limited to, misrepresenting or implying the number of miles or
         number of years that its Defined Tires will be useful.

## COUNT THIRTEEN

55.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
         forth in paragraphs One through Thirty (1-30) of this complaint.

56.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
         seq.,* by engaging in various unfair, misleading or deceptive acts or practices,
         including but not limited to, misrepresenting or implying that its Defined Tires
         were appropriate for use on a light truck or sport utility vehicle.

## COUNT FOURTEEN

57.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
         forth in paragraphs One through Thirty (1-30) of this complaint.

58.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
         seq.,* by engaging in various unfair, misleading or deceptive acts or practices,
         including but not limited to, misrepresenting or implying that its Radial ATX tires
         (a subset of the Defined Tires) are "Our Best Tires", when such is not the case.

15

**COUNT FIFTEEN**

59.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

60.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, misrepresenting or implying the durability of its Wilderness AT (a subset of the Defined Tires) as "resistant to cuts, punctures and impact" when Defendant denied warranty claims on the tires for "consumer abuse" resulting from cuts and punctures and impact.

**COUNT SIXTEEN**

61.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

62.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, misrepresenting the benefits of its Wilderness AT tire (a subset of the Defined Tires), including but not limited to "long, even wear" when such is not the case on the certain sport utility vehicles.

**COUNT SEVENTEEN**

63.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

64.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices,

16

including but not limited to, misrepresenting the length of time its Defined Tires
would last.

## COUNT EIGHTEEN

65.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
        forth in paragraphs One through Thirty (1-30) of this complaint.

66.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
        seq.* , by engaging in various unfair, misleading or deceptive acts or practices,
        including but not limited to, failing to comply with offered or implied warranties
        or guarantees on its Defined Tires.

## COUNT NINETEEN

67.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
        forth in paragraphs One through Thirty (1-30) of this complaint.

68.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et
        seq.*, by engaging in various unfair, misleading or deceptive acts or practices,
        including but not limited to, promoting a guarantee or warranty of a Defined Tire
        which under normal conditions is impractical to fulfill or which covers such a
        period of time or number of miles as to mislead consumers into the belief that the
        tires so guaranteed or warranted have a greater degree of serviceability or
        durability than is true in fact.

## COUNT TWENTY

69.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set
        forth in paragraphs One through Thirty (1-30) of this complaint.

17

70. Defendant has violated the Ohio Consumer Sales Practices Act, R.C. §1345.01 *et seq*., by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, making misrepresentations to consumers regarding the Defined Tires itself, through its company owned stores, or through its authorized dealerships during the voluntary recall and consumer satisfaction program involving the Defined Tires such as engaging in bait and switch, charging consumers for items promised or promoted as free of charge.

## COUNT TWENTY-ONE

71. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

72. Defendant has violated the Ohio Consumer Sales Practices Act, R.C. §1345.01 *et seq*., by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, using illustrations or statements which imply that certain Defined Tires are appropriate for use on certain sport utility vehicles, when such is not the case.

## COUNT TWENTY-TWO

73. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

74. Defendant has violated the Ohio Consumer Sales Practices Act, R.C. §1345.01 *et seq*., by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, replacing Defined Tires with tires of lower quality or lower mileage warranty.

18

## COUNT TWENTY-THREE

75.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

76.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, replacing Defined Tires with private label tires made by the Defendant when a consumer specifically requested a tire not made by the Defendant.

## COUNT TWENTY-FOUR

77.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

78.     Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, making misleading statements in advertisements after the recall about the Defined Tires.

## COUNT TWENTY-FIVE

79.     Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

80.     Defendant has violated the Ohio Consumer Sales Practices Act, R.C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, advertising that the Defined Tires which are blemished, imperfect or which for any reason are defective without conspicuous

19

disclosure of that fact.

## COUNT TWENTY-SIX

81. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

82. Defendant has violated the Ohio Consumer Sales Practices Act, R.C. §1345.01 *et seq.*, by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, using or employing a silent warranty to replace the Defined Tires.

## COUNT TWENTY-SEVEN

83. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

84. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, denying refunds and/or warranty replacements to consumers prior to the recall and after the recall for the Defined Tires that Defendant knew or should have known were defective.

## COUNT TWENTY-EIGHT

85. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

86. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, failing to notify consumers in the United States about

silent warranties or similar programs in foreign countries involving Defined Tires also sold in the United States.

## COUNT TWENTY-NINE

87. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

88. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, promoting that Defendant is "expanding" its warranties during the Voluntary Recall involving Defined Tires, when such is not the case.

## COUNT THIRTY

89. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

90. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, directing employees to merely replace the Defined Tires on the consumer's vehicle and tell them the vibration problem arises from something other than the tires.

## COUNT THIRTY-ONE

91. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

92. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et*

21

*seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, promoting or implying that Defendant will provide an expert with all the information needed to evaluate the problems with the Defined Tires and then failing to give the expert the documents and access to documents represented or implied to the public.

## COUNT THIRTY-TWO

93. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

94. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, representing that Defined Tires will last a certain length of time or number of miles, when Defendant does not have competent and reliable scientific evidence that such is the case.

## COUNT THIRTY-THREE

95. Plaintiff incorporates by reference, as if fully rewritten herein, the allegations set forth in paragraphs One through Thirty (1-30) of this complaint.

96. Defendant has violated the Ohio Consumer Sales Practices Act, R. C. §1345.01 *et seq.,* by engaging in various unfair, misleading or deceptive acts or practices, including but not limited to, promoting that the Wilderness AT (a subset of the Defined Tires) was the "best" tire in a good, better, best comparison, when such is not the case.

22

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Adjudge and decree that Defendant has engaged in acts or practices in violation of the Ohio Consumer Sales Practices Act., R. C. 1345.01 *et seq.,* as previously set forth.

(2)     Permanently enjoin and restrain the Defendant from engaging in deceptive and unfair practices set forth herein and from violating the Ohio Consumer Sales Practices Act.

(3)     Orders or render such judgments as may be necessary to restore to any consumer or other person any ascertainable losses (including statutory interest)  suffered by reasons of the alleged violations of the Ohio Consumer Sales Practices Act.

(4)     Adjudge and decree that the Defendant is liable to the State for the reasonable costs and expenses of the investigation and prosecution of the Defendant's actions, including attorneys' fees.

(5)     Assess, fine and impose upon Defendant a civil penalty pursuant to R. C. §1345.07(D) of Twenty-Five Thousand Dollars ($25,000.00) for each unfair, deceptive or unconscionable act or practice alleged herein.

(6)     That all costs in this cause be taxed against Defendant.

(7)     Grant Plaintiff such other and further relief as this Court deems just, equitable and appropriate.

23

Respectfully submitted,

BETTY D. MONTGOMERY
Attorney General


SANDRA L. LYNSKEY
Ohio Sup. Ct. Atty. No.  0067618
Assistant Attorney General
Consumer Protection Section
30 East Broad Street – 25th floor
Columbus, Ohio 43215-3428
(614) 644-9618
(614) 466-8898 (FAX)

Counsel for Plaintiff


MICHAEL S. ZIEGLER
Ohio Sup. Ct. Atty. No.  0042206
Assistant Attorney General
Consumer Protection Section
30 East Broad Street – 25th floor
Columbus, Ohio 43215-3428
(614) 644-9618
(614) 466-8898 (FAX)

Counsel for Plaintiff


F:consumer/0cases/fierstone/pleadings/complaint

24

**EXHIBIT A**

# TIRES INCLUDED IN THE SEPTEMBER 1, 2000
# NHTSA CONSUMER ADVISORY

| Tire Line | Size | Plant Code | Original Installation** |
|---|---|---|---|
| ATX | P205/75R15 | VD | 1991 Chevy Blazer |
| ATX | P225/75R15 | HY | |
| ATX | 30X9.50R15LT | VD | |
| ATX | 31X10.50R15LT | VD | 1991-1994 Nissan Pick up |
| ATX | 32X11.50R15LT | VD | |
| ATX | 31X10.50R16.5LT | VD | |
| ATX | 33X12.5R16.5LT | VD | |
| Firehawk ATX | 27X8.50R14LT | VD | |
| Firehawk ATX | 235/75R15* | VD | |
| Firehawk ATX | 30X9.50R15LT | VD | |
| Firehawk ATX | 31X10.5R15LT | VD | |
| Firehawk ATX | 32X11.50R15LT | VD | |
| Firehawk ATX | 33X12.50R15LT | VD | |
| Firehawk ATX | 265/75R16LT | VD | |
| Firehawk ATX | 255/85R16LT | VD | |
| Firehawk ATX | 31X10.5R16.5LT | VD | |
| Firehawk ATX | 33X12.50R16.5LT | VD | |
| ATX 23 Degree | 31X10.50RLT | VD | |
| ATX 23 Degree | 33X12.50R16.5LT | VD | |
| Widetrack Radial Baja | P225/75R15 | HY | |

MHGAD-Bayonne, N. J.   STATE'S EXHIBIT A

| Tire Line | Size | Plant Code | Original Installation** |
|---|---|---|---|
| Widetrack Radial Baja A/S | 32X11.50R15LT | VD | |
| Wilderness AT | P235/70R16 | W2 | 1996-98 Ford F150 |
| Wilderness AT | 33X12.50R16.5LT | VD | |
| Wilderness HT | P255/70R15 | VD | |

\*      Firestone's lists this model as a LTP235/75R15

\*\*    Only some of the listed models had these tires installed as original equipment

49624

STATE'S EXHIBIT

A

PENGAD-Bayonne, N. J.

# EXHIBIT J

## IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO

STATE OF OHIO *EX REL.*          )
ATTORNEY GENERAL JIM PETRO,      )    CASE NO. 05-CVH-06-06060
                                 )
                                 )    JUDGE LYNCH
          PLAINTIFF,             )
                                 )
     v.                          )
                                 )
CRAFTMATIC ORGANIZATION, INC.    )    **AGREED FINAL JUDGMENT**
                                 )    **ENTRY AND ORDER**
          And                    )
                                 )    **RECEIVED**
J. KAZ, INC. d/b/a               )    ATTORNEY GENERAL OF OHIO
CRAFTMATIC OF PITTSBURGH,        )
                                 )    JUL 2 5 2005
                                 )
          DEFENDANTS.            )    CONSUMER PROTECTION SECTION
                                      PUBLIC INSPECTION FILE

This matter came to be heard upon the filing of a Complaint by the Attorney General of

Ohio, Jim Petro, charging the Defendants with violations of Ohio's Consumer Sales Practices

Act and Substantive Rules, Ohio Revised Code 1345.01 et seq. and Ohio's Home Solicitation

Sales Act, 1345.21 et seq.   The Attorney General has reached agreement with Defendants

Craftmatic Organization, Inc. (Craftmatic) and J. Kaz, Inc. d/b/a Craftmatic of Pittsburgh (J.

Kaz) and this Agreed Final Judgment Entry and Order ("Agreed Order") is intended to resolve

the claims against the Defendants in this case.   By signing this Agreed Order the Defendants

submit to the personal jurisdiction of this Court, and consent to the Entry of this Judgment

pursuant to R. C. 1345.07(F).

## AGREED FINDINGS OF FACT

1.      Defendant Craftmatic Organization, Inc. (Craftmatic) is a foreign corporation with its principal place of business at 2500 Interplex Drive, Trevose, Pennsylvania, 19053. Craftmatic causes Craftmatic Adjustable Beds to be manufactured, creates advertisements for its distributors, and sells those beds to its distributors, including J. Kaz.  Craftmatic does not sell beds directly to Ohio consumers nor does it extend credit or arrange financing for any purchasing Ohio consumer.

2.      Defendant, J. Kaz, Inc. d/b/a Craftmatic of Pittsburgh (J. Kaz) is a foreign corporation with its principal place of business at 4230 Verona Road, Verona, Pennsylvania, 15147. J. Kaz is currently the exclusive authorized Craftmatic distributor in Ohio, and it advertises and sells Craftmatic Adjustable Beds to individuals in various Ohio counties, including Franklin County.

3.      Craftmatic creates advertising and other lead generation programs, including sweepstakes, for the purpose, among others, of securing personal contact information about individual consumers, which information is then forwarded to distributors, including J. Kaz, for the purpose of attempting to arrange an in-home sales presentation.

4.      Craftmatic creates and distributes print, audio and video advertising to and for its distributors, including J. Kaz, to use in connection with the solicitation and sale of Craftmatic beds.

5.      J. Kaz trains salespersons through a training program which is in part based on a written training program.

6.     Craftmatic, during a portion of the time period relevant to this case, operated a "Special Counsel for Consumer Affairs" hotline to address problems that consumers have with distributors; said hotline number appears on the back of some J. Kaz purchase contracts.

7.     J. Kaz's sales leads are obtained, in whole or in part, through the advertising created by Craftmatic.

8.     J. Kaz contacts the sales lead, makes a sales appointment, and notifies the salesperson of such appointment, whereupon the salesperson arrives at the consumer's home and makes an in-home sales presentation to the consumer.

9.     Craftmatic's sweepstakes entry form does not state that the request for a telephone number thereon is in part for the purpose of J. Kaz contacting the participant to attempt to arrange an in-home sales presentation of Craftmatic beds.

10.     Some advertisements in Ohio represent that consumers can obtain a Craftmatic Model II Adjustable Bed at a price comparable to, or less than, prices charged for "quality flatbeds."

11.     Craftmatic advertisements in Ohio offer for sale four different beds, the Monaco, Model I, Model II and Model III.

12.     Approximately 85% of the actual Craftmatic bed sales in Ohio are of the Model I bed with less than 1% of actual sales consisting of the advertised Monaco or Model III beds.

13.     Craftmatic's and J. Kaz's "sweepstakes" advertised prize is a Craftmatic Model III bed with an estimated minimum retail value of $437.

14.     J. Kaz's salespersons utilized a retail price in excess of $437 for the Craftmatic III twin bed in Ohio.

15.     During the in-home sales presentations, the J. Kaz salespersons often advise the consumer that the Craftmatic III bed is intended for temporary use only and is of a lower quality than the other beds offered by J. Kaz.

16.     J. Kaz's in-home sales presentations often last several hours and in some instances extended well into the late evening hours.

17.     During the in-home sales presentations, J. Kaz instructs its salespersons to perform a number of sales steps, including:  bringing a small "gift" to the consumer; obtaining detailed information about the consumer's medical condition and medical problems; showing the consumer a Craftmatic video; often engaging in price "negotiations" then executing a series of documents related to the purchase, including a contract, supplemental warranties, mattress replacement "guarantees," an "Information and Benefits" form, and in some cases completing credit applications.

18.     Since the J. Kaz sales presentations occur in the home of the consumers, the consumers, prior to the delivery of their purchased bed, are unable to feel, touch, sample, sit on, lie on, or in any way tangibly assess the sales representations made about the quality, characteristics, uses, comfort, or benefits of the Craftmatic bed prior to the purchase of the bed and in most instances prior to the expiration of the consumers' three-day right to cancel.

19.     During the in-home sales presentations, the J. Kaz salespersons make oral, visual, and written representations regarding the quality, comfort, characteristics, uses, and benefits of the Craftmatic bed.

20.     Once the consumer contracts to purchase the adjustable bed from J. Kaz, delivery and assembly of the bed usually occurs in one to three weeks, but in almost every

4

transaction, delivery and assembly occurs after the consumer's cancellation right has expired.

21. In connection with the price "negotiation" for the Craftmatic Model I bed, the J. Kaz salesperson, by design, offers the consumer a "first day benefit" of $250, a "benefit" that every prospective purchaser is offered for a Craftmatic Model I bed.

22. In connection with the price "negotiation" for the Craftmatic Model I bed, that bed is offered in combination with a television, VCR or microwave oven for a combined price, and the J. Kaz salesperson, by design, offers the consumer a $250 price reduction if the consumer chooses to forego the appliance that is offered to the consumer as a "combination" offer.

23. In the event that the price "negotiation" between the J. Kaz salesperson and the consumer fails to result in a purchase agreement, J. Kaz often offers additional "reductions" from the initial price via telephone by its "executive sales team."

24. J. Kaz utilizes a sales contract whereby "TERMS AND CONDITIONS OF SALE" are listed on the reverse side of the contract, which is a legal size document in eight point type size, and there is no smaller type font found on the sales contract. The "TERMS AND CONDITIONS OF SALE" include terms such as "CANCELLATION" rights, "REFUND POLICY," and "RETURN POLICY," the accelerated payment terms upon default and the terms for use of promotional certificates.

25. J. Kaz's sales contract limits the implied warranty of merchantability and fitness for a particular purpose for the Craftmatic beds to the terms of the express warranty set forth in the sales contract.

5

26.   J. Kaz's express warranty appears on the back of the sales contract and provides that, except for unusual repairs, all repairs and replacements will be made at the place of delivery (the consumer's home) and that after the one-year warranty expiration, repairs and/or replacements will be made at the then prevailing parts and labor charges.

27.   J. Kaz's sales contract includes a provision that requires the consumer to pay "reasonable collection charges and all reasonable attorney's fees whether or not suit is commenced to enforce collection."

28.   In many cases, J. Kaz assists in arranging financing for consumer purchasers.

29.   In isolated cases, J. Kaz delivered and assembled the Craftmatic bed prior to the expiration of the consumer's three-day cancellation right with the consumer required to sign a Delivery Receipt that, inter alia, stated that all sales were final and that the consumer was 100% satisfied with the bed.

30.   J. Kaz provided consumers with a form entitled "IMPORTANT Warranty Registration" which states "Please complete the shaded areas and give this form to the delivery personnel to register your warranty." The shaded area of the form requests the name, address and telephone numbers of three of the consumers' friends or family members for entry into the Craftmatic sweepstakes. The form also states "there's no obligation, you're just entering them in the sweepstakes." The form does not disclose that one of the purposes of the form is to obtain the names and telephone numbers of other consumers that J. Kaz intends to call in an attempt to set up in-home sales presentations.

## THE ATTORNEY GENERAL'S ADDITIONAL FACTUAL ASSERTIONS

In addition to the facts contained in the Agreed Findings of Fact, the Attorney General makes the following assertions of fact, based on his investigation, which Craftmatic and J. Kaz specifically dispute, to the extent applicable to each of them:

33.     J. Kaz utilizes videos, product information bulletins, and related sales documents executed at the time of the sale, some of which were created, in whole or in part, by Craftmatic.

34.     During the initial telephone contact by J. Kaz, consumers are not clearly, affirmatively and expressly informed that the purpose of the contact is to effect a sale of Craftmatic beds.

35.     Craftmatic's "sweepstakes" advertisements often picture a different bed than the bed that is the "sweepstakes" award.

36.     J. Kaz uses a salesperson compensation plan which is designed to penalize or prevent the salesperson from selling the advertised beds.

37.     In addition to those sales steps performed by the J. Kaz salesperson during the in-home sales presentation, as set forth in paragraph 17 of the Agreed Findings of Fact, the Attorney General asserts the following additional facts: during the in-home sales presentation, the salesperson performs a number of specifically required sales steps in addition to those enumerated in paragraph 17 including, in the consumer's bedroom the salesperson claims to simulate the quality, comfort, uses and benefits of the Craftmatic bed by building a bed using soft pillows, blankets, and a hand held massager; represents that the Craftmatic bed will resolve the consumer's medical problems; and creates a sense of urgency about the necessity of committing to a purchase.

38.   J. Kaz, in its sales presentations, quotes an initial price for the adjustable bed, and then the salesperson grants an immediate reduction, representing that the consumer is receiving a discount.

39.   Craftmatic and J. Kaz, in the course of advertising and soliciting sales to Ohio consumers, including during face to face solicitation visits in consumers' homes, have made representations either directly, indirectly, or by implication that:

   a.   the consumer can receive a special price, a discount or a price reduction from the "regular price" of the Craftmatic Adjustable Bed;

   b.   the discounts offered represent significant reductions in the price at which the beds normally sell;

   c.   the consumer can obtain a Craftmatic Adjustable Bed at a price comparable to prices charged for "quality flatbeds."

40.   In some cases, J. Kaz salespersons have represented to consumers that using the Craftmatic bed will resolve the consumer's medical problems.

41.   In some cases, J. Kaz salespersons have represented to consumers that the rental cost of a comparable adjustable hospital bed to be $300 to $400 a month.

42.   In some cases, J. Kaz salespersons have discouraged consumers from utilizing Ohio's three-day right to cancel that is required in home solicitation sales.

43.   In some cases, J. Kaz salespersons have failed to correctly complete the legally required Notice Of Cancellation form provided to purchasing consumers in connection with a home solicitation sale.

44.   In some cases, J. Kaz failed to honor valid consumer cancellations.

8

45. In some cases, the consumer's three-day right to cancel period required to be provided by J. Kaz commenced prior to financing terms being set.

46. In some cases, J. Kaz salespersons failed to orally inform the buyer, at the time the home solicitation sale contract was signed, of the buyer's right to cancel.

47. In some cases, consumers were not provided material lending terms and conditions by J. Kaz prior to executing the home solicitation sales contract.

48. In some cases, the terms of the J. Kaz assisted financing were less favorable to the consumer than promised by J. Kaz.

49. In some cases, consumers were not provided by J. Kaz with material lending terms as required by the federal Truth In Lending Act, 15 U.S.C.A. 1601 et seq. and 12 C.F.R. Part 226 (also known as Regulation Z).

## AGREED CONCLUSIONS OF LAW

50. The Ohio Attorney General is the proper party to commence these proceedings under the authority provided him under R.C. 1345.07 and by virtue of his statutory and common law authority to protect the interests of the citizens of the State of Ohio.

51. Jurisdiction over the subject matter of this action lies with this Court pursuant to R.C. 1345.04 of the Ohio Consumer Sales Practices Act.

52. This Court has venue to hear this case pursuant to Ohio Civ. R. 3(B)(1)-(3), in that some of the transactions complained of herein, and out of which this action arose, occurred in Franklin County, Ohio.

53. J. Kaz is a "supplier" as that term is defined in R.C. 1345.01(C) because it, at all times relevant herein, engaged in the business of effecting "consumer transactions" by

9

soliciting and selling adjustable beds to "individuals" in Franklin County and other
counties in Ohio for purposes that were primarily personal, family or household within
the meaning specified in R.C. 1345.01(A) and (D).

54.     J. Kaz was, at all relevant times hereto, a "seller" engaged in the business of effecting
home solicitation sales by soliciting and selling adjustable beds to "buyers" at the
buyers' personal residences in Franklin County, and other counties in Ohio, for
purposes that were primarily personal, family or household within the meaning
specified in R.C. 1345.21(A) and (E).

55.     Craftmatic is a "supplier" as that term is defined in R.C. 1345.01(C) because it, at all
times relevant herein, engaged in the business of effecting "consumer transactions" by
advertising adjustable beds to "consumers," and conducting a "sweepstakes" with an
award by chance in Franklin County and other counties in Ohio for purposes that are
primarily personal, family or household within the meaning specified in R.C.
1345.01(A) and (D).

## CONCLUSIONS OF LAW ASSERTED BY THE ATTORNEY GENERAL
## AND ADOPTED BY THE COURT

56.     A supplier commits unfair and deceptive acts and practices in violation of R.C.
1345.02(B)(8) by representing to consumers that a specific price advantage exists, when
such in fact is not true.  Such acts and practices have been previously determined by
Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such
decisions are and have been available for public inspection pursuant to R.C.
1345.05(A)(3).

10

57.     A supplier commits unfair and deceptive acts or practices in violation of the Consumer

Sales Practices Act, R.C. 1345.02(A) and the Ohio Adm. Code 109:4-3-12(E) if their

out-of-store advertising used such terms as "... *regularly ___ now___* ..." when the

comparison was not to the supplier's true regular price, or when no fixed pricing existed

at the time the consumer transactions were effected.

58.     A supplier commits unfair and deceptive acts or practices in violation of the Consumer

Sales Practices Act, R.C. 1345.02(A) and the Ohio Adm. Code 109:4-3-12(G) if their

out-of-store advertising made a comparison between the prices of similar, but non-

identical goods and the non-identical goods are not of essentially similar quality to the

advertised goods unless the dissimilar aspects are clearly and conspicuously disclosed

in the advertisements.

59.     A supplier commits unfair and deceptive acts or practices in violation of the Consumer

Sales Practices Act, R.C. 1345.02(A) and the Ohio Adm. Code 109:4-3-12(I) if its out-

of-store advertising uses such terms as "sale," "discount," "bargain," or any other terms

indicating a savings or reduction in price unless:  (1) the savings or reduction is a

meaningful reduction; or (2) the actual amount of percentage of savings is clearly and

conspicuously indicated in the advertisement.

60.     A supplier commits unfair and deceptive acts or practices in violation of the Consumer

Sales Practices Act, R.C. 1345.02(A) and OAC 109:4-3-10(A) if it makes

representations, claims, or assertions of fact, orally or in writing, which would cause a

reasonable consumer to believe such statements are true, unless the supplier, at the time

such representations, claims or assertions are made, possessed or relied on a reasonable

basis in fact such as factual, objective, quantifiable, clinical or scientific data or other

11

competent and reliable evidence which substantiates such representations, claims, or assertions of fact.

61.     A supplier commits unfair, deceptive and unconscionable acts or practices in violation of the Consumer Sales Practices Act, R.C. 1345.02 and 1345.03 if it makes false and misleading statements to consumers during sales presentations.  Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such decisions are and have been  available for public inspection pursuant to R.C. 1345.05(A)(3).

62.     A supplier commits unfair, deceptive and unconscionable acts or practices in violation of the Consumer Sales Practices Act, R.C. 1345.02(A), 1345.03(B)(1) if it subjects consumers to high pressure sales tactics by creating a false sense of urgency.

63.     A supplier commits unfair and deceptive acts and practices in violation of 1345.02, 1345.23(A), 1345.23(B)(3), 1345.23(D)(2)-(4), and Ohio Adm. Code 109:4-3-11(A)(5) if it fails to provide a written agreement with the required Notice of Cancellation, fails to notify consumers of their cancellation rights, fails to accurately complete the cancellation notice prior to providing it to the consumer, misrepresents the consumer's right to cancel, or fails to honor valid notices of cancellation.

64.     A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02(A) and 1345.02(B)(10), if it fails to honor express warranties made, and if it makes specific express representations as to the quality and uses of its goods, then disclaims those representations in its sales and warranty documents.  Such acts and practices have been previously determined by Ohio courts to violate the Consumer

12

Sales Practices Act, R.C. 1345.01 et seq. and such decisions are and have been available for public inspection pursuant to R.C. 1345.05(A)(3).

65. A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02 and Ohio Adm. Code 109:4-3-11(A)(1) if it engages in direct solicitation sales without clearly, affirmatively, and expressly revealing at the time it initially contacts the consumer, before making any statement, asking any question, or entering the residence of the consumer, that the purpose of the contact is to effect a sale, stating in general terms the goods or services the supplier has to offer unless the consumer was solicited by mail.

66. A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02 and Ohio Adm. Code 109:4-3-11(A)(3) if it engages in direct solicitation sales and during the sales presentation represents that the consumer has been specially selected to receive a bargain, discount, or other advantage when such in fact is not true.

67. A supplier commits unfair and deceptive acts and practices in violation of 1345.02 and Ohio Admin. Code 109:4-3-03(B) if it makes an offer of sale of any goods or services when such offer is not a bona fide effort to sell such goods or services.

68. A supplier commits unfair and deceptive and unconscionable acts or practices in violation of R.C. 1345.02 and 1345.03(B)(1) if it knowingly takes advantage of the inability of the consumer to reasonably protect his or her interests because of his or her physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement. Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such

13

decisions are and have been available for public inspection pursuant to R.C. 1345.05(A)(3).

69.     A supplier commits unfair and deceptive and unconscionable acts or practices in violation of the Consumer Sales Practices Act, R.C. 1345.02 and 1345.03(B)(3) if it knows at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the transaction. Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such decisions are and have been available for public inspection pursuant to R.C. 1345.05(A)(3).

70.     A supplier commits unfair and deceptive and unconscionable acts or practices in violation of the Consumer Sales Practices Act, R.C. 1345.02 and 1345.03(B)(6) if it knowingly makes misleading statements of opinion upon which the consumers relied to their detriment. Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such decisions are and have been available for public inspection pursuant to R.C. 1345.05(A)(3).

71.     A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02 and 1345.23 if it fails to disclose the material terms and conditions of any financing agreements, and if it fails to incorporate directly or by reference into the purchase contract such material terms and conditions, prior to the commencement of the three-day right to cancel. Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such

decisions are and have been available for public inspection pursuant to R.C. 1345.05(A)(3).

72.      A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02 and Ohio Adm. Code 109:4-3-02(A)(1) if it makes any offer in written or printed advertising or promotional literature without stating clearly and conspicuously in close proximity to the words stating the offer all material exclusions, reservations, limitations, modifications or conditions.

73.      A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02 if it utilizes sales contracts containing provisions that require the consumer to pay attorney's fees occasioned by a breach of contract.  Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. 1345.01 et seq. and such decisions are and have been available for public inspection pursuant to R.C. 1345.05(A)(3).

74.      A supplier commits unfair and deceptive acts and practices in violation of R.C. 1345.02 and Ohio Adm. Code 109:4-3-04 if it offers a "gift" to the consumer in connection with the consumer purchasing a product if in reality the sales price is for the combination of goods and it is a fiction that any portion of the offer is a "gift."

**NON-ADMISSION**

75.      Neither Craftmatic nor J. Kaz admits that it engaged in any wrongdoing and the Court makes no finding that either company has operated in violation of the Consumer Sales Practices Act, R.C. 1345.01, et seq. or the Home Solicitation Sales Act, R.C. 1345.21,

15

et seq.  Craftmatic and J. Kaz enter into this Agreed Final Judgment Entry and Order with the Attorney General to resolve the matters pertaining to them before this Court.

## ORDER

THEREFORE, it is hereby ORDERED, ADJUDGED and DECREED that:

1.    It is hereby DECLARED that the acts set forth above in the Conclusions of Law Asserted by the Ohio Attorney General and Adopted by the Court violate the Ohio Consumer Sales Practices Act, R.C. 1345.01 et seq. and/or Ohio's Home Solicitation Sales Act, R.C. 1345.21 et seq.

2.    Defendants Craftmatic and J. Kaz, and on behalf of their officers, partners, agents, servants, salespersons, employees, independent contractors, successors or assigns, and all persons acting in concert and participation with them, directly or indirectly, through any corporate device, partnership or association, in connection with any consumer transaction in Ohio, are hereby PERMANENTLY ENJOINED from engaging in acts and practices that violate the Consumer Sales Practices Act, R.C. 1345.01 et seq., including but not limited to those acts and practices described in this Order's Conclusions of Law to the extent applicable to each of them.

3.    Defendant J. Kaz, and on behalf of its officers, partners, agents, servants, salespersons, employees, independent contractors, successors or assigns, and all persons acting in concert and participation with them, directly or indirectly, through any corporate device, partnership or association, in connection with any consumer transaction in Ohio, is hereby PERMANENTLY ENJOINED from engaging in acts and practices that violate Ohio's Home Solicitation Sales Act, R.C 1345.21 et seq., and/or the federal Truth in

16

Lending Act, 15 U.S.C.A. 1601 et seq. including 12 C.F.R. Part 226 (Regulation Z), including but not limited to those acts and practices described in this Order's Conclusions of Law related thereto.

4.      Craftmatic and J. Kaz further agree, and it is Ordered, Adjudged, and Decreed, that they shall comply with all of the following with respect to the advertisement, solicitation and sale of Craftmatic beds in Ohio to the extent applicable to each of them:

    a.    Craftmatic and J. Kaz shall comply with O.A.C. 109:4-3-06. The sweepstakes entry may contain a space for the consumer's telephone number as long as the rules on the entry contain a statement that the entrant may be contacted by Craftmatic to see if the entrant is interested in learning more about Craftmatic Adjustable Beds. Craftmatic shall not manufacture or cause to have manufactured, and shall not distribute, a sweepstakes entry form that does not comply with this provision.

    b.    Craftmatic and J. Kaz will not make any price comparisons between flat beds and the Craftmatic Model I bed. Craftmatic and J. Kaz will not make any price comparisons between any Craftmatic bed and flat beds that use the words discount, sale, special value, dollar savings or percentage differential or any other language that references a price savings.

    c.    Craftmatic and J. Kaz will not make any price comparison by the use of such terms as "regularly …, now …," "…per cent off," "reduced from … to …," "save $…," unless the comparison is to the supplier's regular price. Craftmatic and J. Kaz will not make any price comparisons to the price of the Model I or any model that is offered at a negotiated price.

    d.    Craftmatic and J. Kaz shall not represent to consumers that the Craftmatic Adjustable Bed provides any specific therapeutic benefit or that it will cure or resolve any consumer's medical problem, except that this Agreed Order does not bar those representations that have been the express subject of a concurrence letter issued by the United States Food and Drug Administration ("FDA") provided that such representations are made in a non-deceptive manner and further provided that any qualifying or limiting language required or suggested by the FDA is incorporated as a part of such representations in each advertisement in which they are made.

    e.    J. Kaz shall not make any price comparison of the Craftmatic Adjustable Bed to a hospital bed and shall not represent that the Craftmatic Adjustable Bed is a hospital bed.

f.     Prior to the execution of the contract, J. Kaz will clearly and conspicuously offer a mattress exchange program that allows the consumer to request a one-time exchange of their mattress at no cost and no delivery charge to the consumer after 30 days but no later than 60 days after the consumer receives the mattress. If the consumer requests, J. Kaz will promptly exchange the consumer's mattress. Prior to the execution of the contract, J. Kaz will also clearly and conspicuously disclose in writing that the consumer cannot return the sleep system after the expiration of the cooling off period if the consumer finds it unacceptable, that the mattress exchange program is the consumer's sole remedy after the cooling off period if the consumer finds the sleep system unacceptable, and that the express warranties do not include a warranty as to the consumer's perceived comfort of the sleep system.

g.     Craftmatic and J. Kaz will not use the word "free" or "gift" or any similar term in connection with an item that is offered at a price other than its genuine "regular price."

h.     J. Kaz shall not use the Warranty Registration or any other form or practice that requires the consumer to provide names of friends or family members to J. Kaz or any other person or entity.

i.     Craftmatic and J. Kaz, in advertising, will not engage in price comparisons using any Craftmatic model bed or type that does not constitute more than 5% of J. Kaz actual sales in the preceding calendar year.

j.     J. Kaz shall clearly and conspicuously disclose in writing the price and availability for purchase of the Craftmatic Models II, III, the Monaco or any other model J. Kaz offers at a fixed price to every consumer during the in-home demonstration. J. Kaz will clearly and conspicuously disclose that the price of the Model I, or any model J. Kaz may offer at a negotiable price, is a negotiable price; and during the negotiation process therefor, J. Kaz will not use language such as discount, sale, special value, dollar amount or percentage off, or words of similar meaning. J. Kaz does not violate this provision if it states during the price negotiation that it is reducing its price offer. J. Kaz will create internal compliance procedures to ensure that those persons identified in Paragraph 3 of this Order comply with this provision.

k.     J. Kaz shall not use the "Price Release Waiver" or any similar form or representation regarding the future availability of the Craftmatic bed at a specific price.

l.     J. Kaz shall cease using any form that the consumer signs in connection with the transaction that contains any representation that the consumer is satisfied with the Craftmatic bed until the consumer has had a reasonable opportunity of not less than 30 days to use the bed.

18

m.  J. Kaz shall cease making any representation as to the number of satisfied bed purchasers unless and until Craftmatic and/or J. Kaz have conducted scientifically valid and significant survey research that substantiates any such statement. It shall not be a violation of this provision if Craftmatic and/or J. Kaz make a representation as to the number of beds sold and delivered during any specific time period providing said representation is true and can be substantiated.

n.  J. Kaz shall not use a sales plan or method of compensation of sales personnel which is designed to penalize or prevent a salesperson from selling the advertised goods.

o.  J. Kaz shall not complete online financing applications unless it has a consumer's prior written approval.

p.  J. Kaz will present to the consumer and have executed all sales-related financing documents in a face-to-face meeting between the consumer and a J. Kaz agent or representative.

q.  J. Kaz shall not state orally or in writing to the purchasing consumer that "All Sales Are Final."

r.  J. Kaz shall not request or permit a consumer to sign blank or partially completed credit applications or credit card receipts.

s.  J. Kaz shall not use the words "Special Counsel" or any similar term in reference to customer service contacts provided to the consumer.

t.  When the consumer expresses interest in financing their purchase through lenders made available by J. Kaz, then J. Kaz shall provide the consumer with a choice, if available, of financing companies and the following:

   i.  The identity of potential lenders and whether the financing would be open-ended (revolving credit) or close-ended (retail installment credit) and their respective Annual Percentage Rate.

   ii.  All disclosures required by the Federal Truth in Lending Act, 15 U.S.C.A. §1601 *et seq.* including 12 C.F.R. Part 226 (Regulation Z).

   iii.  A copy of the credit application, signed by the consumer, that is used to apply for the financing.

   iv.  Disclosure that financing obtained through J. Kaz is pursuant to agreements between those lenders and J. Kaz and that, based on the consumer's credit rating, the terms may or may not be the best available to the consumer.

u.  J. Kaz will not conduct a bedroom demonstration unless it clearly and conspicuously discloses that the presentation's purpose is to demonstrate the

19

Craftmatic bed positioning and that the pillows used during the demonstration do not actually represent the feel of the Craftmatic Adjustable Bed mattress. J. Kaz will not use language to state or imply that it provides a warranty, guarantee or words of similar meaning, as to the consumer's comfort.

v.      Craftmatic and J. Kaz, in advertising, will comply with the "FTC Guide Concerning Use of Endorsements and Testimonials in Advertising" as it relates to endorsements and testimonials.

w.     Craftmatic and J. Kaz will not advertise any item for which there is no genuine attempt to sell such item. J. Kaz will not offer any item for which there is no genuine attempt to sell such item.

x.      J. Kaz will clearly and conspicuously place on the front page of the purchase contract its return policy. In addition, the following statement in 14-point bold red type shall appear on the front page of the purchase contract: See Reverse Side for Complete Terms and Conditions of Sale. The Terms and Conditions of Sale shall be printed in no less than 12-point type.

y.      J. Kaz shall, as part of its sales representative training program, instruct present and future sales representatives that they are not to disparage any Craftmatic Adjustable Bed in any respect. It may, however, refer to the Craftmatic Model III Adjustable Bed as the "economy model" or "suitable for short term or temporary use."

z.      In connection with any advertisements or promotional materials prepared by Craftmatic, it shall not be a violation of this Agreed Order if such material clearly and conspicuously states "Not Valid In Ohio."

5.   Craftmatic and J. Kaz are provided a ninety (90) day period from the filing of this Agreed Order signed by the parties and the Court to come into compliance with the provisions of paragraphs 4a-z and a one hundred eighty (180) day period to come into compliance with any provision that involves Craftmatic's television advertisements or its sweepstakes. J. Kaz shall produce and utilize a new purchase contract that is compliant with this Agreed Order and a new mattress exchange policy described in subparagraph 4.f. within a sixty (60) day period. It shall not be a violation of this provision if a third party distributes a sweepstakes entry form that violates this Agreed Order. Within fifteen (15) days of the filing of this Agreed Order, J. Kaz shall

communicate to its salespersons the fact that the Agreed Order has been filed and specifically that it includes the provisions of subparagraphs 4.c., d., e., h., k., o., q and u. This undertaking by J. Kaz will have no impact on the implementation periods described in this paragraph.

6.      J. Kaz shall pay $200,000.00 pursuant to R.C. 1345.07(B) to the Attorney General for reimbursement to the consumers identified on Addendum A, attached hereto and incorporated by reference, payment to be as follows:  $50,000.00 within fifteen (15) days of the entry of this Agreed Order and the balance of $150,000 within thirty (30) days of the entry of this Agreed Order.  The payment shall be made by wire transfer to the Office of the Attorney General, Consumer Protection Section, in accordance with the wire transfer instructions provided by the Attorney General.  Restitution distribution shall be at the sole discretion of the Attorney General, but participation in the distribution shall be limited to those eligible individuals identified on Addendum A hereto.  The Attorney General agrees to obtain a signed release of liability in the form attached hereto as "Addendum B," from every consumer who participates in this restitution distribution.  The Attorney General shall deliver to Craftmatic's or J. Kaz's attorneys the original signed and notarized releases within fifteen (15) days of their receipt by the Attorney General.

7.      Within thirty (30) days of the entry of this Agreed Order, Craftmatic shall pay a civil penalty of $20,000.00 and J. Kaz will pay a civil penalty of $80,000.00, each pursuant to R.C. 1345.07(D).  On or before the first anniversary of the entry of this Agreed Order, Craftmatic will pay an additional civil penalty of $5,000.00 and J. Kaz will pay an additional civil penalty of $20,000.00, each pursuant to R. C. 1345.07(D).  On or

21

before the second anniversary of the entry of this Agreed Order, Craftmatic will pay an additional civil penalty of $5,000.00 and J. Kaz will pay an additional civil penalty of $20,000.00, each pursuant to R. C. 1345.07(D). On or before the third anniversary of the entry of this Agreed Order, Craftmatic will pay an additional civil penalty of $5,000.00 and J. Kaz will pay an additional civil penalty of $20,000.00, each pursuant to R. C. 1345.07(D). The payments shall be made by wire transfer to the Office of the Attorney General, Consumer Protection Section, in accordance with the wire transfer instructions provided by the Attorney General.

8.     J. Kaz shall mediate in good faith any consumer complaint received by the Attorney General subsequent to the execution and filing of this Agreed Order.

9.     As a means of ensuring compliance with this Court's Order, and with the consumer protection laws of Ohio, Craftmatic shall maintain in their possession and control, for a period of three (3) years, all business records relating to Craftmatic's advertising of and sweepstakes related to Craftmatic Adjustable Beds in Ohio. Craftmatic shall permit the Ohio Attorney General or his designated representative, upon five (5) business days notice, to inspect and/or copy any and all records during normal business hours. J. Kaz shall maintain in their possession and control, for a period of three (3) years, all business records relating to J. Kaz's solicitation and sale of Craftmatic Adjustable Beds in Ohio. J. Kaz shall permit the Ohio Attorney General or his designated representative, upon five (5) business days notice, to inspect and/or copy any and all records during normal business hours.

10.    Within thirty (30) days of the entry of this Agreed Order, Craftmatic shall pay the Ohio Attorney General $15,000.00 and J. Kaz will pay $35,000.00 for attorney fees and

22

investigative costs.  The payments shall be made by wire transfer to the Office of the

Attorney General, Consumer Protection Section, in accordance with the wire transfer

instructions provided by the Attorney General.

11.    Defendants shall pay all court costs in this case.  It is further agreed by the parties that

upon the execution and filing of this Agreed Order they will execute and file a

Stipulation of Dismissal, pursuant to Civ. R. 41(A)(1)(b), in the related case captioned

*State of Ohio v. Craftmatic Organization Inc. and J. Kaz, Inc. d/b/a Craftmatic of*

*Pittsburgh*, Case No. 03-CVH-12-14158.  Said Stipulation of Dismissal shall be with

prejudice, each side to bear its own attorney fees and costs, with court costs to be paid

by Craftmatic and J. Kaz.  The form of the Stipulation is attached hereto as Addendum

"C."

12.    The Attorney General shall, absent exigent circumstances, give Craftmatic and/or J. Kaz

fourteen (14) calendar days notice before filing a motion or other pleading seeking

contempt of court or other sanctions for violation of this Agreed Order.  The notice shall

be in writing and set forth those provisions in the Agreed Order that the Attorney

General believes have been violated.  The fourteen (14) calendar days notice period

shall provide an opportunity for Craftmatic and/or J. Kaz to respond to the assertions of

the Attorney General and the parties may use the notice period to attempt a resolution of

the concerns.  Upon receipt of the written notice, Craftmatic and/or J. Kaz shall respond

in writing within seven calendar days and may request a meeting with the Attorney

General (or a staff person designated by the Attorney General) for the purpose of

attempting to resolve the concerns set forth in the Attorney General's notice.  The

Attorney General shall not unreasonably deny the request for such a meeting.  This

23

provision does not preclude the Attorney General from filing a motion or other pleading seeking contempt of court or other sanctions without complying with this provision if the Attorney General believes such immediate action is necessary.

13.     The Attorney General may notify or serve J. Kaz as provided under this Agreed Order or in any subsequent action at the following address and telephone number:

> J. Kaz, Inc. d/b/a Craftmatic of Pittsburgh
> Attention:  John Girty
> 4230 Verona Road
> Verona, Pennsylvania 15147
> (412) 242-2200

The Attorney General may notify or serve Craftmatic as provided under this Agreed Order or in any subsequent action at the following address and telephone number:

> Craftmatic Organization Inc.
> Attention:  Stanley Kraftsow
> 2500 Interflex Drive
> Trevose, Pennsylvania 19053
> (215) 639-1310

Craftmatic and/or J. Kaz, if necessary, may notify the Attorney General under this Agreed Order at the following address and telephone number:

> Mr. Robert Hart
> Assistant Attorney General
> Consumer Protection Section
> 30 East Broad Street, 14th Floor
> Columbus, Ohio 43215
> (614) 466-1305

If Mr. Hart is unavailable, notification to the Attorney General at the following address and telephone number:

> Senior Deputy Attorney General
> Consumer Protection Section
> 30 East Broad Street, 14th Floor
> Columbus, Ohio 43215
> (614) 644-9618

14.     Failure of the Attorney General to timely enforce any term, condition, or requirement of this Agreed Order shall not provide, nor be construed to provide, Craftmatic or J. Kaz a defense for noncompliance with any term of this Agreed Order or any other law, rule, or regulation; nor shall it stop or limit the Attorney General from later enforcing any term of this Agreed Order or seeking any other remedy available by law, rule, or regulation.

15.     J. Kaz shall inform those officers, agents, servants, salespersons, employees, independent contractors, successors or assigns involved in the sale of a Craftmatic Adjustable Bed to consumers in the State of Ohio of the content of this Agreed Order.

16.     Craftmatic shall inform those officers, agents, servants, employees, independent contractors, successors or assigns involved in the development and/or placement of advertisements or contests in Ohio of the content of this Agreed Order.

17.     Craftmatic and J. Kaz shall not represent directly or indirectly or in any way whatsoever that the Court or the Ohio Attorney General has sanctioned, condoned, or approved any part or aspect of their business operations.

18.     This Agreed Order resolves and terminates any and all claims asserted in this case by the Attorney General, except that this Court retains jurisdiction of this case solely for the purpose of enforcing the terms and conditions of this Agreed Order, if necessary.

     IT IS SO ORDERED.


Date: _____        _____
                                                        Judge Lynch

APPROVED:

APPROVED:

_____
Robert M. Hart, AAG [0014854]
Erin Leahy, AAG [0069509]
30 East Broad Street, 14th Floor
Columbus, Ohio 43215-3428
614-466-1305
614-488-8898 [facsimile]
Rhart@ag.state.oh.us
Eleahy@ag.state.oh.us

_____
Thomas B. Ridgley [0000910]
David F. Axelrod [0024023]
Kevin R. Conners [0042012]
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
614-464-6229
614-719-4923 [facsimile]
tbridgley@vssp.com
dfaxelrod@vssp.com
krconners@vssp.com

Charles B. Chernofsky, Esq.
114 Main Street
4499 Route 27
Kingston, NJ 08528

Counsel for J. Kaz, Inc. d/b/a Craftmatic of
Pittsburgh

_____
Helen Mac Murray [0038782]
Kegler Brown Hill & Ritter
Capitol Square, Suite 1800
65 E. State Street
Columbus, Ohio  43215-4294
hmacmurray@keglerbrown.com

Charles Greenman
Karen F. Lederer
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174

Counsel for Craftmatic Organization, Inc.

26

Addendum A

|    | Last Name | First Name |    | Last Name | First Name |
|----|-----------|------------|----|-----------|------------|
| 1  | Ackley | William and Pansy | 53 | Lindsey | Robert & Lula |
| 2  | Aleshire | Kathleen and Jimmy | 54 | Lindsey | Elsie |
| 3  | Ball | c/o Barbara (Roy and Bertie) | 55 | Little | Alda |
| 4  | Barnett | Norman | 56 | Loder | Ricky |
| 5  | Baumgarner | Margaret | 57 | Louden | Mary |
| 6  | Baxter | William and Mary | 58 | Love | Kenneth |
| 7  | Behnke | Catherine | 59 | Lucas | Albert & Barbara |
| 8  | Blosser | Helen | 60 | Manion | Virginia |
| 9  | Bollinger | Natalia & Art | 61 | Manning | Alice |
| 10 | Brown | Nellie | 62 | McNeeley | Margaret |
| 11 | Bryan | Hilda and William | 63 | Michael | Mary |
| 12 | Buffington | Nina | 64 | Miller | Jean |
| 13 | Chiappone | Eva | 65 | Monschein | Marilyn |
| 14 | Chillo | Antonio | 66 | Montgomery | Elizabeth |
| 15 | Clark | LaDonna & Robert | 67 | Morrison | Mary Lou |
| 16 | Condit | Milo and Doris | 68 | Mosher, Sr. | Thomas |
| 17 | Cumba-Rodriguez | Margarita and Alvaro | 69 | Myers | Marion |
| 18 | Cutright | Ida | 70 | Park | Thomas |
| 19 | Donahue | Richard | 71 | Parsons | Dormal |
| 20 | Estep | Joan | 72 | Peppard | Joyce |
| 21 | Fahrbach | Rosemary | 73 | Pitts | Charlie |
| 22 | Ferguson | Scott | 74 | Raies | Gregory |
| 23 | Ferguson | Charles and Phyllis | 75 | Rinehart | Vivian |
| 24 | Ford | Esther | 76 | Ringenbach | Ruby |
| 25 | Friedt | Blake & Wilma | 77 | Robinson | Larry and Sharon |
| 26 | Fullenkamp | James | 78 | Sarver | Lelia |
| 27 | Gennaro | Anthony | 79 | Schillinger | Patricia |
| 28 | Gibson | James & Juanita | 80 | Schneider | Ruth |
| 29 | Gilbert | Dorothy | 81 | Schwarz | Robert |
| 30 | Gillett | Jerry and Judy | 82 | Sheridan | Pat |
| 31 | Goldschmidt | Henry | 83 | Skully | Adeline |
| 32 | Griffith | Angela | 84 | Smith | Donald & Marion |
| 33 | Griggs | Rosalie | 85 | Smith | Rose |
| 34 | Grove | Raymond | 86 | Smith | Duane & Lucille |
| 35 | Gump, Jr. | Irvin | 87 | Smith | David and Helen |
| 36 | Gundel | Claire | 88 | Stewart | Ronald |
| 37 | Hattery | Lillian | 89 | Stover | Wilda (Geraldine) |
| 38 | Hemmelgarn | Kathryn | 90 | Stright | Daniel |
| 39 | Hobbs | Douglas | 91 | Sweatt | Lorali |
| 40 | Hodgman | Ethel & Glenn | 92 | Terry | Pearlie |
| 41 | Holder | Thora | 93 | Thomas | Richard and Regina |
| 42 | Holeton | Allen and Carol | 94 | Thompson | Janice |
| 43 | Horning | Oliver | 95 | Tilton (Campana) | Gae and Tom |
| 44 | Howell | Iris | 96 | Twyman | Earlene |
| 45 | Hughart | Roger and Juanita | 97 | White | Carl |
| 46 | James | Glenford and Hazel | 98 | Wildman | Sara |
| 47 | Jodrey | Ella | 99 | Wittway | Jenny |
| 48 | Kaplan | Barbara Jean | 100 | Woods | Mabel |
| 49 | King | Betty | 101 | Wright | Kathleen |
| 50 | Krenzel | John & Meredith |    |           |            |
| 51 | Lampshire | Vera |    |           |            |

Page 1

Addendum A

| | Last Name | First Name | | Last Name | First Name |
|---|---|---|---|---|---|
| 52 | Lewis | Kathryn | | | |

Addendum B

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

_____ and _____ residing at _____
_____, Ohio, _____ (defined herein as "BUYER/RELEASOR"), in consideration
of the sum of _____ Dollars ($_____) and other good and valuable
consideration received from J. Kaz, Inc. d/b/a Craftmatic of Pittsburgh and Craftmatic
Organization, Inc. (defined collectively herein as "RELEASEES"), receipt whereof is hereby
acknowledged, hereby agree as follows:

BUYER/RELEASOR hereby release and discharge the RELEASEES, RELEASEES'
officers, partners, agents, servants, salespersons, employees, independent contractors,
successors or assigns, and all persons acting in concert and participation with them
(collectively, the "RELEASED PARTIES"), from any and all actions, causes of action,
suits, charges and obligations, debts, dues, sums of money, accounts, reckonings, bonds,
bills, specialties, covenants, contracts, controversies, agreements, promises, variances,
trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in
law, admiralty or equity, which BUYER/RELEASOR ever had, now have or hereafter
can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever
from the beginning of time to the date of this RELEASE, against the RELEASED
PARTIES or any of them, and more specifically arising out of the purchase of a
Craftmatic Adjustable Bed.

Wherever the sense of this SETTLEMENT AGREEMENT AND GENERAL RELEASE
requires, a singular number shall be construed to be plural and vice versa, and words of the
masculine gender shall be construed to be feminine and vice versa.

This SETTLEMENT AGREEMENT AND GENERAL RELEASE may only be changed
in writing signed by both BUYER/RELEASOR and RELEASEES.

IN WITNESS WHEREOF, the BUYER/RELEASOR has executed this SETTLEMENT AGREEMENT AND GENERAL RELEASE on the _____ day of _____, 2005.

WITNESS:

_____

_____
BUYER/RELEASOR

_____
BUYER/RELEASOR

STATE OF OHIO, COUNTY OF _____ ss.:

On _____, 2005 before me Notary Public personally came _____ and _____ to me known, and known to me to be the individual(s) described in, and who executed the foregoing Settlement Agreement and General Release, and duly acknowledged to me that (t)(s)he(y) executed the same.

_____
Notary Public

Addendum C

## IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO *EX REL.*<br>ATTORNEY GENERAL JIM PETRO,<br><br>PLAINTIFF,<br><br>v.<br><br>CRAFTMATIC ORGANIZATION, INC.<br><br>And<br><br>J. KAZ, INC. d/b/a<br>CRAFTMATIC OF PITTSBURGH,<br><br>DEFENDANTS. | ) CASE NO. 03-CVH-12-14158<br>)<br>) JUDGE PFEIFFER<br>)<br>)<br>)<br>)<br>)<br>)<br>) **STIPULATION OF DISMISSAL**<br>) **WITH PREJUDICE**<br>)<br>)<br>)<br>)<br>) |

Pursuant to Civil Rule 41(A)(1)(b) the State of Ohio ex rel Attorney General Jim Petro, Craftmatic Organization, Inc., and J. Kaz, Inc. d/b/a Craftmatic of Pittsburgh, hereby stipulate to the dismissal of this action with prejudice, each party to bear their own legal fees and costs, Craftmatic Organization Inc. and J. Kaz to pay all court costs.

APPROVED:                                    APPROVED:

_____             _____
Robert M. Hart, AAG [0014854]                David F. Axelrod [0024023]
Erin Leahy, AAG [0069509]                    Thomas B. Ridgley [0000910]
30 East Broad Street, 14th Floor             Vorys, Sater, Seymour and Pease LLP
Columbus, Ohio 43215-3428                    52 East Gay Street
614. 466.1305                                Columbus, Ohio 43215
614 488.8898 [facsimile]                     614.464.6400
Rhart@ag.state.oh.us                         614.719.4612 [facsimile]
Eleahy@ag.state.oh.us                        dfaxelrod@vssp.com
                                             tbridgley@vssp.com

                                             Charles B. Chernofsky, Esq.
                                             114 Main Street
                                             4499 Route 27
                                             Kingston, NJ 08528

                                             Counsel for J. Kaz Inc.


                                             _____
                                             Helen Mac Murray
                                             Kegler Brown Hill & Ritter
                                             Capitol Square, Suite 1800
                                             65 E. State Street
                                             Columbus, OH  43215-4294

                                             Charles Greenman
                                             Karen F. Lederer
                                             Troutman Sanders LLP
                                             The Chrysler Building
                                             405 Lexington Avenue
                                             New York, NY  10174

                                             Counsel for Craftmatic Organization, Inc.

# EXHIBIT K

| PIF Number: | 10001995 |
| Case Name: | KHOURI V. DON LEWIS |
| Case Number: | 342098 |

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

YOLANDA KHOURI ) CASE NO. 342098
)
PLAINTIFF ) JUDGE BRIAN J. CORRIGAN
vs. )
)
DON LEWIS, ET AL )
) JUDGMENT JOURNAL ENTRY
DEFENDANTS )

---

APPEARANCES:

For Plaintiff, Ronald I. Frederick, Cleveland

Defendant, Pro Se

BY: JUDGE, BRIAN J. CORRIGAN

RECEIVED
ATTORNEY GENERAL OF OHIO

AUG 0 8 2001

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

---

Plaintiff Yolanda Khouri filed this action against defendants Don Lewis and D.R.L.

Complete Auto Repairs for violations of the Consumer Sales Practices Act (CSPA) and Common

Law Fraud. Defendant D.R.L. Complete Auto Repairs is not incorporated in the State of Ohio,

nor has defendant Don Lewis registered D.R.L. as a trade or fictitious name in the State of Ohio.

Therefore, the Court will refer to defendants Don Lewis and D.R.L. as "Defendant" or "Don

Lewis". Defendant failed to appear at trial, therefore plaintiff Yolanda Khouri is entitled to

judgment. Following are this Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### First Attempt to Fix Vehicle

On or about January 15, 1997, plaintiff had her vehicle repaired by Defendant. The repairs consisted of a rebuilt engine replacement and a rear bumper. When Defendant completed work on the vehicle, he demanded the sum of $873.00 and plaintiff paid Defendant for the repairs. Plaintiff did not receive a written estimate for the repairs that were made to her vehicle prior to Defendant's commencement of work on plaintiff's vehicle, nor did she receive an itemized list of labor costs associated with each individual repair, as required by the CSPA. Defendant failed to tender parts to plaintiff after repairs, as required by the CSPA. Plaintiff returned the vehicle to Defendant within a few days because the vehicle failed to run properly. Defendant examined and returned the vehicle to plaintiff without making any repairs whatsoever.

### Second Attempt to Fix Vehicle

In February 1997, plaintiff again returned the vehicle to Defendant, since it failed to run properly. When Defendant completed work on the vehicle, he demanded a sum of $190.00 and plaintiff paid Defendant the requested sum. Defendant did not provide a written estimate for the repairs that were made to plaintiff's vehicle before Defendant commenced work on plaintiff's vehicle, nor did plaintiff receive an itemized list of parts or labor costs associated with each individual repair, as required by the CSPA. Defendant failed to tender parts to plaintiff after repairs, as required by the CSPA.

### Third Attempt to Fix the Vehicle

On March 26, 1997, plaintiff returned the vehicle to Defendant for more repairs. When Defendant completed work on the vehicle, he demanded a sum of $310.00 and plaintiff paid Defendant for the repairs. Defendant did not provide a written estimate for the repairs that were made to plaintiff's vehicle before he worked on plaintiff's vehicle, nor did plaintiff receive an itemized list of labor costs associated with each individual repair, as required by the CSPA. Defendant failed to tender parts to plaintiff after repairs, as required by the CSPA.

### Fourth Attempt to Fix the Vehicle

On July 17, 1997, plaintiff elected to take the vehicle to another auto repair facility. The new repair company, R&R Auto Repair, determined upon examination of the vehicle, that the engine purchased from the Defendant was not rebuilt.

* * *

## CONCLUSIONS OF LAW

<u>General Principals of The Consumer Sales Practices Act</u>

The purpose of the CSPA is to prohibit suppliers from engaging in unfair and/or deceptive or unconscionable trade practices. In addition to the statutes comprising the CSPA, the Attorney General is required to maintain documents in the public inspection file. R.C. § 1345.05(A)(3).

A consumer has a cause of action and is entitled to relief when:

A supplier acts in a way that violates the CSPA ,

> where the act was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of § 1345.02 or the Revised Code before the transaction on which the action is based, or an act or practice determined by a court of this state to violate § 1345.02 or § 1345.03 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) or § 1345.05 of the Revised Code....

R.C. § 1345.09(B). Furthermore, "[t]he CSPA is a remedial law designed to compensate for traditional consumer remedies and, thus must be liberally construed. *Crye v. Smolak*, 110 Ohio App.3d 504, 512, 624 N.E.2d. 779, 784 (Franklin Cty. 1996), *citing Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29, 548 N.E.2d 933, 935 (1990). Where a supplier is found to have engaged in acts that constitute violations of separate rules or court rulings interpreting R.C. § 1345.02 or § 1345.03, the consumer is entitled to $200 per violation or [three times] [sic] his or her actual damages whichever is greater." *Id.*; See also, *Keller v. Pride Chevrolet, Inc.*, C.A. No. 13536 (Ct. App., 9th District, Summit Co., October 12, 1988; *Calderone v. Jim's Body Shop*, 75 Ohio App.3d 506, 599 N.E.2d 848 (1991); *Gaylan v. Dave Towell Cadillac, Inc.*, 15 Ohio Misc.2d 1, 3, 473 N.E.2d 64, 15 (C.P. 1984);. *Shabazz v. Term Auto Sales, Inc.*, Case No. 113734 (C.P. Cuyahoga Co., August 11, 1987). "The remedies in §§ 1345.01 to 1345.13 of the Revised Code, are in addition to remedies otherwise available for the same conduct under state or local law."

R.C. § 1345.13.

### Elements for a CSPA Claim

A CSPA claim consists of three elements that must be met to be a deceptive sales practice. These elements are spelled out in R.C. § 1345.01. First, the Defendants must be a "supplier"; second, the plaintiff must be a "consumer" who engages in a "consumer transaction; and third, the transaction must be an unfair or deceptive practice. R.C. § 1345.01 defines the individuals who fall under the CSPA.

### Defendant Don Lewis is a "supplier" as defined in R.C. § 1345.01(C).

A supplier is, "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer." R.C. § 1345.01(C).

Don Lewis is a supplier since he was in the business of repairing automobiles and effected consumer transactions.

### Plaintiff's Status As a Consumer Who Entered a Consumer Transaction

Plaintiff Yolanda Khouri is a "consumer" who entered into a "consumer transaction" with Defendant.

### Defendant Committed Unfair or Deceptive Acts

It is a violation of the CSPA if a supplier commits a deceptive act or practice, "in connection with a consumer transaction." R.C. § 1345.02(A). A violation may occur before, during, or after the transaction. Defendant engaged in various unfair or deceptive acts by violating specific provisions of the CSPA. Defendant entered into at least three (3) consumer transactions with plaintiff Khouri. These consumer transactions took place on January 15, 1997, February 1997 and March 26, 1997.

Since each visit to Defendant's repair facility involved a separate repair order resulting in plaintiff receiving a separate receipt, and since plaintiff tendered money separately on each such date set forth above, each such consumer transaction constitutes a separate transaction and occurrence. As such, plaintiff Khouri may maintain individual actions against Defendant for each such consumer transaction. Therefore, it is appropriate to award damages separately for violations of the Consumer Sales Practices Act for all of the substantive rule violations for each individual transaction. *Pasco v. McCoy*, 1995 WL 386441 (Ohio App. 6 Dist. 1995). Following are the specific violations by the Defendant of the CSPA.

## Violations of the CSPA

### Failure to Itemize Repairs and Services

It is a violation of the CSPA if a person providing repairs and/or service for a motor vehicle to fails to itemize the charges for parts and/or labor. OAC § 109:4-3-13(C)(12). Don Lewis failed to itemize the repairs for either parts or labor or both on the repair orders dated "1-97, 2-97, and 3-97." By failing to provide an itemization of charges for repairs and/or services for a motor vehicle, this Court holds Defendant Don Lewis violated the CSPA and awards damages to plaintiff for this violation in the statutory amount of $200.00 for each of the three violations, for a total of $600.00.

Failure to Tender Parts

A supplier of automotive repairs and/ or services commits a deceptive act or practice in a
consumer transaction when it "fails to tender to the consumer any replaced parts, unless the parts
are to be rebuilt or sold by the supplier, or returned to the manufacturer in connection with
warranted repairs or services, and such intended reuse or return is made known to the consumer
prior to commencing any repair or service." OAC 109-4-3-13(C)(13).  When plaintiff paid
Defendant for repairs to her vehicle, Defendant failed to tender to plaintiff any replaced parts.
More specifically, even though the motor was to be rebuilt, Defendant failed to tender all other
parts listed on the repair orders.  Failure to tender specific parts when Defendant did not advise
plaintiff that the parts would be rebuilt or returned to the manufacturer, as required by
OAC 109-4-3-13(C)(13), is a violation of the CSPA.  Since Defendant failed to tender parts as
required by OAC § 109:4-3-13(C)(13), this Court holds that Defendant violated the CSPA and
awards damages to plaintiff for this violation in the statutory amount of $200.00 for each of the
three violations, for a total of $600.00.

Failure to Provide Estimate

It is a violation of the CSPA if a person providing repairs and/or service for a motor
vehicle to fails to provide an estimate.  OAC 109-4-3-13(A)(1).  Defendant failed to provide
plaintiff with an estimate prior to beginning any repairs.  Defendant never informed plaintiff of her
right to an estimate prior to the commencement of repairs to plaintiff's vehicle.  Defendant
demanded payment for repairs completed before releasing the vehicle to plaintiff.  Defendant
demanded a total of $1373.00 for repairs on three occasions.  Since Defendant failed to provide
an estimate as  required by OAC § 109:4-3-13(A)(1).  All of the money received by Defendant in
violation of OAC § 109:3-4-13(A)(1) constitutes damages plaintiff incurred.  *Rubin v. Gallery*,