1997 WL 1068459 (Ohio C.P., June 23, 1997). This Court holds that Defendant violated the CSPA and awards three times her actual damages of $1373.00 for a total of $4119.00 for this violation.

### Failure to Honor Express and Implied Warranties as required by the CSPA.

Failure by a supplier in connection with a consumer transaction to honor express and implied warranties, constitutes deceptive acts and practices in violation of the Ohio Consumer Sales Practices Act. R.C. § 1345.02(A) and R.C. § 1345.02(B)(10). *See, Brown v. Lyons*, 43 Ohio Misc. 14, 19, 332 N.E.2d 380, 385 (Ohio Com.Pl. 1974); *State ex rel. Fisher v. Buckeye Home Improvement*, Case No. 92CV6602 1079, Franklin Cty. C.P., May 24, 1993); *Matthews v. Route 53 Marina, Inc.*, Case No. 86-CVF-514 (Muni Ct., April 23, 1987). In addition, it is a violation of the Ohio Consumer Sales Practices Act when a supplier fails to honor implied warranties of merchantability. *Id.* Moreover, the damages for the breach of contract are also trebled as a violation of the Consumer Sales Practices Act. *Brown v. Spears*, No. 8897 (Franklin Muni. Ct., Aug. 20, 1979).

In the case *sub judice*, Plaintiff purchased a rebuilt engine in response to Defendant's representations that the rebuilt engine would be reliable and dependable and in reliance upon the express and implied warranties that were made by Defendant with respect to that engine. Defendant failed to remedy and repair plaintiff's vehicle from defects to conform with the express and implied warranties.

The measure of damages or breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. R.C. § 1302.88(B) or, as an alternative, the court may award damages based upon the

VOL 2598 PG 172

cost to repair. *See, Tighe v. Bodyguard Rustproofing Co.*, 1983 WL 4243 (Ohio Ct. App. 9th Dist., Sept. 21, 1983). *See also, Universal Medical System, Inc. v. Duke*, 1995 WL 79782 (Ohio Ct. App. 8th Dist., Feb. 23, 1995). Plaintiff received an estimate from an independent repair company for a rebuilt engine at a cost of $2,865.45.

Where is a breach of warranty, as there is here, the proper measure of damages are the damages for breach and damages for the violation of the CSPA which are to be trebled damages for a total of four times actual damages. R.C. § 1345.02(A) and R.C. § 1345.02(B)(10). *Brown v. Spears, supra; Valadingham v. Jack Walker Pontiac Toyota*, Case No. 81-2686 (C.P. Montgomery Cty., July 14, 1982); *Kuhn v. Tracy, supra*.

Although the award of four times actual damages seems rather harsh, it is justified. It is justified because the law mandates such a result. Damages under the CSPA ["are in addition to remedies otherwise available for the same conduct under state or local law."[ R.C. § 1345.13. [Emphasis added.] Defendant breached express and implied warranties provided to plaintiff which makes defendant liable to plaintiff. Also, since cases in this state which are within the Public Inspection File have held that a supplier's breach of warranty in a consumer transaction is a deceptive act or practice. Since defendant breached express and implied warranties given to plaintiff, then plaintiff is entitled to trebled damages for violations of the CSPA related to the breach of warranty.

The result here may seem harsh. However, the result is consistent with the intentions of the CSPA and the general scheme of consumer protection statutes. The CSPA has as its stated purpose to eliminate any monetary incentives for suppliers to engage in unfair and deceptive practices. (137 Ohio Laws, Part II, 3219.) "A judgment for the consumer in such a case may discourage violations of the Act by others." *Bitner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d

143, 144, 569 N.E.2d 464, 466 (1991). "The sole purpose of the Act is to protect consumers and eradicate deceptive trade practices which necessarily entails a liberal interpretation of the Act to effectuate this legislative intent." *Fletcher v. Don Foss of Cleveland, Inc.*, 90 Ohio App.3d 82, 87, 628, N.E.2d 60, 63 (Ohio App. 8th Dist., 1993). Thus, the above result is mandated in light of the remedial purpose of the Act.

Accordingly, this Court holds that Defendant breached the express warranty and violated the CSPA and awards four times plaintiff's actual damages of $2,865.45 for a total of $11,461.18.

Fraud

A supplier commits fraud when all the following elements are established:

"(1)  A false representation concerning a fact.

(2)  Knowledge of the falsity of the representation or utter disregard for truthfulness.

(3)  To induce reliance upon the representation.

(4)  Reliance upon the representation.

(5)  Proximately caused by Defendant."

*Beder v. Cleveland Browns, Inc.*, 1998 WL 382179 at *5 (Ohio Ct. App. 8th Dist., July 20, 1998). Defendant falsely and fraudulently represented that the engine was rebuilt, when in fact it was not rebuilt and this representation was material to plaintiff's transaction. Defendant knew that the representations were false and were made with the intent to deceive or defraud plaintiff and to induce her into providing Defendant with payment for a rebuilt engine. Moreover, plaintiff lacked any knowledge that the engine was not rebuilt, but instead relied upon Defendant's representations to her detriment and subsequently incurred significant damages. Since plaintiff

satisfied all elements for common law fraud, this Court grants plaintiff damages for her fraud claim in the amount of $873.00.

Injunctive Relief

Under the Consumer Sales Practices Act, this Court is vested with the power to enjoin Defendant Don Lewis from engaging in practices found to be in violation of the CSPA. R.C. § 1345.09(D). This Court grants plaintiff's request for injunctive relief and therefore orders that Defendant Don Lewis, his agents, representatives, employees, sucessors and assigns, and all persons acting in concert and participation with Defendant, directly or indirectly, through any corporate device, partnership, or other association, are hereby permanently enjoined from:

(a)   Failing to provide an itemization of charges for repairs and/or services for a motor vehicle.

(b)   Failing to tender parts as required by the CSPA.

(c)   Failing to provide an estimate of repairs or services as required by the CSPA.

(d)   Failing to honor express and implied warranties as required by the CSPA.

(e)   Performing any act or practice, by any means whatsoever, which is declared to be deceptive or unconscionable under the terms of this judgment, and committing any other deceptive act or practice which violates Ohio Revised Code § 1345, *et seq.*

(f)   Performing any act or practice, by any means whatsoever, which is declared to be fraudulent under the terms of this judgment.

Attorney's Fees

Plaintiff is entitled to an award of attorney's fees pursuant to R.C. § 1345.09(F)(2). This Court's determination of awarding attorney's fees follows the reasoning in accord with *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 464 (1991). In *Bittner*, the court held that "[t]he thrust of the CSPA is to not make wronged consumers whole, but to eliminate any injunctive incentive to the supplier to violate provisions of the act." Moreover, the court noted that the CSPA must be liberally construed for the benefit of the consumer. Attorney's fees awarded may also produce a "general" benefit to the community via the deterrent effect.

Plaintiff's counsel has submitted attorney fees based upon 63 hours expended by the attorney and his staff for a total of $6,450.00. The Court finds that the hours expended and the amount per hour is reasonable for this type of case. In addition, expenses of $115.86 are also awarded for a total of $6,565.86. (See Affidavit of Ronald Frederick, Exhibit A)

Although it appears this Court has granted plaintiff damages which are substantially in excess of the amounts paid by plaintiff, the CSPA and regulations are clear. As was so very well stated by Judge Boyko of the Cuyahoga County Court of Common Pleas in *Rubin v. Gallery Auto Sales, supra*:

> The result is both warranted, yet unfortunate. It is warranted based upon the purpose and deterrent affect of the consumer laws and the facts of this case. It is unfortunate that neither defense counsel nor the defendants had the clear vision to stop the bleeding early on and award the exposure which came to fruition.
>
> The Court finds it incredulous that defendants still maintains he did nothing wrong. While the Court acknowledges defendant's naivete and small businessman status, the law is clear and makes no exceptions for small car [repair] operations.

VOL 2598 PG 176

The message to other car [repair] operations from this case should be clear:

The law will be strict and unforgiving to those who would seek to avoid the
protection given to consumers in this highly susceptible market.

_Rubin v. Gallery Auto Sales_, Case No. 303854 (Court of Common Pleas, Cuyahoga Cty. June 23,
1997 WL).

* * *

## SUMMARY OF DAMAGES AWARDED

### Violations of the Consumer Sales Practices Act

Defendant committed eleven (11) separate violations of the CSPA. Six (6) of the violations did not result in any quantifiable damage to plaintiff. Thus, plaintiff is entitled to the statutory amount of $200.00 for each of those claims or $1,200.00. R.C. §1345.09(B). *Crye v. Smolak* at 784.

Moreover, plaintiff is entitled to three times actual damages on the remaining causes of action for violations by Defendant of the CSPA. Defendant failed to provide an estimate for repairs performed on three separate occasions. Plaintiff's actual damages were the total cost of plaintiff's repairs of $1373.00. Therefore, the damage award for this violation is three times plaintiff's actual damages for three repairs for a total of $4119.00.

In addition, plaintiff is entitled to three times actual damages for Defendant's breach of warranty in violation of the CSPA. Plaintiff's actual damages are: $2,865.45 for the cost to repair. Thus, the trebled damages award for this cause of action is $8,596.35.

In total, damages awarded for violations of the CSPA are $13,915.35.

### Additional Damages for Breach of Warranty

Where there is a breach of warranty, plaintiff is entitled to the proper measure of damages which consists of damages for breach and trebled damages for a total of four times actual damages. Thus, this Court awards plaintiff separate damages for the breach of warranty in the amount of $2,865.45.

### Damages for Common Law Fraud

Since plaintiff satisfied all elements of common law fraud, this Court grants plaintiff damages in the amount of $873.00.

Injunctive Relief

This Court awards injunctive relief as set forth above.

Attorneys' Fees

This Court grants attorney's fees and costs pursuant to R.C. § 1345.09(F)(2) in the amount of $6,565.86.

Total Verdict

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Judgment be entered in favor of plaintiff Yolanda Khouri against defendants Don Lewis and D.R.L., jointly and severally, in the amount of $24,219.66.

DATED: 5/18/2001

JUDGE BRIAN J. CORRIGAN

RECEIVED FOR FILING

MAY 21 2001

GERALD E. FUERST, CLERK
BY _____ DEP.

# EXHIBIT L

| PIF Number: | 10001524 |
| Case Name: | MARY WALLS V. HARRY WILLIAMS; BUTCH'S AUTO SALES |
| Case Number: | 94CVH369 |

IN THE MUNICIPAL COURT OF STEUBENVILLE, OHIO

MARY WALLS,

          Plaintiff,

     v.

HARRY WILLIAMS
dba BUTCH'S AUTO SALES

          Defendant.



Case No. 94-CVH-36...

Judge Powell

JUDGMENT ENTRY

RECEIVED
MAY 2 4 1995
ATTORNEY GENERAL OF OHIO
CONSUMER FRAUDS & CRIMES
PUBLIC INSPECTION FILE

     Plaintiff on April 19, 1995, filed a Motion to Show Cause as
to Injunction under Ohio Revised Code Section 1345.09(D), along
with a Notice of Hearing, sent both regular and certified U.S. mail
to Defendant.   Defendant was duly served with the motion and
hearing notice as evidenced by a domestic return receipt dated
April 20, 1995.   This Court held a hearing on May 5, 1995, upon
Plaintiff's motion.  Defendant failed to appear at the hearing and
further failed to otherwise communicate with this Court and with
Plaintiff's counsel.

     Upon Plaintiff's motion and for good cause shown, it is hereby
**ORDERED, ADJUDGED, AND DECREED** that Defendant, Harry Williams, dba
Butch's Auto Sales, shall be enjoined from committing the following
acts and omissions, pursuant to **O.R.C. Section 1345.09(D)** of the
Ohio Consumer Sales Practices Act:

     1.   Deceptively   representing   that   vehicles   are   of   a
particular quality or standard when they are not;

     2.   Failing to honor rescission of agreements;

     3.   Selling cars at prices substantially in excess of price
at which similar goods were available in similar transactions;

4.   Failing to honor express warranties;

5.   Failing to incorporate into written contract material statements by you;

6.   Failing to transfer titles at time of purchase;

7.   Failing to register/report with Secretary of State use of fictitious name; and

8.   Committing further violations of the CSPA, as defined in O.R.C. Chapter 1345.

**IT IS SO ORDERED.**

Dated: _____                    JUDGE RICHARD POWELL

Prepared and submitted by:

**SOUTHEASTERN OHIO**
**LEGAL SERVICES PROGRAM**

Theresa E. Morelli   (0042098)
Attorneys for Plaintiff
406 Adams Street
Steubenville, OH  43952
Telephone:  (614) 283-4781

walla4.jje\tm\pld\cm

2

# EXHIBIT M

FILED

IN THE MUNICIPAL COURT OF FRANKLIN, OHIO

'79 AUG 20 AM 9:05

DONALD BROWN, et al )
                    )
        Plaintiffs  )
                    )          Case No. 8897
    -vs-            )
                    )
DONALL G. SPEARS, et al )
                    )
        Defendants  )          DECISION AND ENTRY
                    )
------------------------------------------------------------

RECEIVED
MAY 0 1 1981
ATTORNEY GENERAL OF OHIO
CONSUMER FRAUDS & CRIMES
PUBLIC INSPECTION FILE

This cause comes before the Court on the plaintiffs' motion for default judgment against defendant Donall G. Spears, individually, and defendant Donall G. Spears, dba Springboro Heating and Air Conditioning. The Court finds upon a review of the record that these two defendants were served on June 1, 1979, and have failed to answer the allegations of the complaint or to otherwise appear before the Court. On July 20, 1979, this Court heard the plaintiffs present evidence in support of damages in their cause. However, before deciding the question of damages, this Court must turn to a review of the law to determine the legal sufficiency of the claims which the plaintiffs bring before it.

Initially, this Court finds that the plaintiffs were consumers and the defendants were merchants and suppliers within the meaning of the Ohio Consumer Sales Practices Act, O.R.C. 1345.et seq, and further that the parties to this action did engage in the consumer transactions which are alleged in the complaint.

Briefly stated, plaintiffs' first claim alleges that the defendants committed an unfair or deceptive act in violation of O.R.C. 1345.02(A) by their use of the word "warranty" on the contract offer which is attached to the complaint as Exhibit A, which itself allegedly violates the Magnuson Moss Warranty Act, 15 U.S.C. §2301 et seq. The Court has examined the language used by the defendants in the contract offer, and has further examined 15 U.S.C. §2303, Statute, in that the defendants contract offer states that there is a "ten year warranty on heat exchanger" but fails to designate said warranty as either "full" or "limited". The effect of this violation is seen by examining 15 U.S.C §2310(b) which states that a violation of the Magnuson Moss Warranty Act is itself a violation of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1). Turning to 15 U.S.C. §45, this Court finds that the United States Congress has declared unlawful "unfair or deceptive acts or practices in or affecting commerce".

The Court having found that the defendants have violated Federal Law, the question next presented by the plaintiffs first claim is whether that violation constitutes a violation of Ohio's Consumer Sales Practices Act. Plaintiffs urge two grounds on which to so hold. First, the plaintiffs urge that when a defendant-supplier violates a Federal Statute, his act in so doing is inherently and necessarily an unfair or deceptive act, which violates the Ohio Statute. In support thereof plaintiffs cite Brown v. Lyons, 43 O. Misc. 14, 72 O. O. 2d 216, 332 N. E. .2d 380 (1974). The Court finds the second reason, however, cited by the plaintiffs to be an even more cogent ground on which to uphold the legal sufficiency of plaintiffs' first claim, that being that State Law requires this Court to look to Federal Law in construing "unfair and deceptive" and since a violation of Federal Law has already been found by this Court, then a violation of the State Law must also be seen to exist.

Referring to O.R.C. 1345.02(C), this Court finds that, as a matter of law, this Court is directed to give "due consideration and great weight" to the fact that the defendants have been found to violate 15 U.S.C. 45(a)(1), in this Court's construction of whether or not the defendants have committed an unfair or deceptive act or practice under Ohio Law.

Page Two.

Therefore, this Court finds, as a matter of law, that where a defendant-supplier violates 15 U.S.C. §2303, his act in so doing is inherently and necessarily a violation of O.R.C. 1345.02(A).

Turning to plaintiffs' second claim, the allegations found here by the court are much the same as in the first claim, except that the violation by the defendants here alleged is in their use of the word "warranty" without the qualifying phrase on the job invoice, which is attached to the complaint as Exhibit B.

As cited herein, the Court finds as a matter of law that the conduct alleged in the second claim is a violation of O.R.C. 1345.02(A).

Plaintiffs' third claim is grounded on the alleged breach of contract by the defendants, in that the defendants violated the express warranties in the contract. Upon a review of the contract proposal and job invoice, the Court finds these documents to be a contract between the parties whereby the plaintiffs promised to pay the defendants $600 and the defendants committed themselves to install properly and correctly an oil furnace in the residential premises owned by the plaintiffs. In addition thereto, the defendants gave "a ten year warranty on heat exchanger, one year parts and labor guarantee as per contract". The Court finds that the plaintiffs have performed their part of the contract.

The Court finds that the plaintiffs reasonably relied upon the warranties and representations given by the defendants to induce them to enter into this contract. Those representations included that the defendants would remedy any defects in the oil furnace which manifested themselves within the first year, at no cost to the plaintiffs. The Court further finds that shortly after the installation of the furnace by the defendants, a defect or other mechanical problem did arise in the furnace and that as a result thereof a dark, filmy dirt and soot material was emitted by the furnace throughout the entire interior of plaintiffs' home. The Court further finds that the plaintiffs did make numerous complaints and telephone calls to the defendants, but the defendants did not correct the problem. The Court finds that the plaintiffs did provide the defendants with an adequate number of opportunities to repair the problem under the terms of the warranties, but that the defendants refused or failed to do so and thereby breached their contract with these plaintiffs. The plaintiffs introduced numerous photographs into evidence and testified at length about the damages caused by this soot which was emitted by the furnace, and about the numerous attempts they made to contact the defendants and the numerous promises made by the defendants to come out and repair the furnace, all of which were to no avail.

Turning to the plaintiffs' fourth claim, the plaintiffs allege therein that the intentional breach of a contract by a supplier-defendant is a violation of O.R.C. 1345.02(A). In reliance thereon, the plaintiffs cite Brown v. Lyons, supra.

12. Where a supplier has legal obligations to consumers, and where there are no valid legal defenses for not performing those obligations, a supplier who avoids or attempts to avoid those obligations commits a deceptive act or practice in violation of the Ohio Consumer Sales Practices Act, R.C. §1345.02(A). 43 O. Misc. at 20; 72 O.O. 2d at 219; 332 N. E. 2d at 386.

The Court finds as a matter of law that where a defendant-supplier breaches his contract with a plaintiff-consumer, without any legal defenses for not performing those obligations, then he has committed an unfair or deceptive act or practice in violation of O.R.C. 1345.02(A).

Lastly, plaintiffs' fifth claim alleges that "in its handling and servicing attempts to repair the furnace's defects and problems, defendants have, jointly

Page Three.

and severally, consistently maintained a pattern of inefficiency, incompetency, and continually stalled and evaded their legal obligations to properly perform the warranty work contracted for with these plaintiffs," and thereby have violated O.R.C. 1345.02(A) and/or O.R.C. 1345.03(A).

In making the determination of unconscionability, this Court must look to the activity of the defendant-suppliers herein. Brown v. Market Development, Inc., 41 O. Misc. 276, 68 O.O. 2d 276 (1974). In so doing, the Court finds that the plaintiffs made repeated telephone calls and inquiries of the defendants, continually expressing their complaints and problems which they were experiencing throughout the warranty period with this furnace. The Court further finds that the defendants did repeatedly promise the plaintiffs that they would come out and fix the furnace, but failed to so do.

The Court finds as a matter of law that where a defendant-supplier, in connection with a consumer transaction, continually stalls and evades his legal obligation to consumers, he thereby commits an unconscionable act and practice in violation of O.R.C. §1345.03(A). Brown v. Lyons, supra. It is clear from the evidence adduced at the hearing on July 20, 1979, which the defendants have failed to respond to, that the defendants herein did indeed stall and evade their legal obligation to these plaintiffs-consumers.

This Court now turns to the question of damages. The Court finds that on plaintiffs' first and second claim, that the mere use of words which violate Federal Law, absent a showing of damages flowing therefrom, entitles the plaintiffs to $200 on each claim, as allowed by O.R.C. 1345.09.

On plaintiffs' third claim, which is founded on the defendants' breach of contract, the Court has reviewed the evidence presented and finds that the plaintiffs have suffered actual damages in the amount of $2,981.67.

Turning to plaintiffs' fourth and fifth claims, the Court finds that the plaintiffs are entitled to treble actual damages pursuant to O.R.C. 1345.09.

However, the plaintiffs are limited to the amount pleaded in their complaint, and the Court therefore finds that the total damages to be allowed the plaintiffs on their claims is the amount of $9,400.90, plus their costs herein.

The Court now turns to the question of attorney fees, and in so doing the Court allows the plaintiffs the amount of $200 as reasonable attorney fees pursuant to O.R.C. 1345.09(F)(2).

The Court, lastly, is not unmindful that the defendant, Donall G. Spears, has been sued herein in his individual capacity as well as his status as sole proprietor and corporate officer of the defendant, Springboro Heating and Air Conditioning. However, the Court finds as a matter of law that corporate officers who have participated in a deceptive consumer sales practice may be held personally liable in an action under R. C. Chapter 1345. Quality Carpet Company v. Brown, 6 O. O. 3d 185 (1977); Brown v. The Wonderful World Publishing Company, Case No. 74 CV-12-4741 (C.P. Franklin County, 7-28-76).

It is therefore ordered, adjudged and decreed that the plaintiffs, Donald Brown and Mary Brown, shall recover of the defendants, Donall G. Spears, individually, and Donall G. Spears, dba Springboro Heating and Air Conditioning, jointly and severally, the sum of $9,600.90, plus their costs in this action, plus interest at the rate of 7% per annum.

JOHN B. TRACY, JUDGE

cc: Ronald L. Burdge, Attorney for Plaintiffs
    Donall G. Spears

# EXHIBIT N

| PIF Number: | 10001427 |
| Case Name: | LINDA BRINKMAN V. MAZDA MOTOR OF AMERICA, INC., ET AL. |
| Case Number: | CV 920479 |

RECEIVED

MAY 2 5 1994

ATTORNEY GENERAL OF OHIO
CONSUMER FRAUDS & CRIMES
PUBLIC INSPECTION FILE

IN THE COURT OF APPEALS OF LUCAS COUNTY

Linda Brinkman                     Court of Appeals No. L-93-142

            Appellant             Trial Court No. CV 92-0479

v.

                        FILED
                  COURT OF APPEALS

Mazda Motor of America,
Inc., et al.                  MAY 1 3 1994  OPINION AND JUDGMENT ENTRY

            Appellees     LUCAS COUNTY OHIO  Decided: May 13, 1994
                          Harry Barlos, Clerk
                          * * * * *

            David Klucas, for appellant.

            Douglas P. Holthus, for appellee.          **COPY**

                          * * * * *

            ABOOD, P.J.  This is an appeal from a judgment of the

Lucas County Court of Common Pleas which, in accordance with a

jury verdict, found in favor of appellees Mazda Motor of America,

Inc. and Brown Mazda on all of appellant Linda Brinkman's claims

arising from her purchase of a 1991 Mazda automobile.

            Appellant sets forth two assignments of error on

appeal:

            "FIRST ASSIGNMENT OF ERROR
            THE TRIAL COURT COMMITTED REVERSIBLE ERROR
            WHEN IT FAILED TO INSTRUCT THE JURY ON THE
            PROPER MANNER TO CONSIDER THE CLAIMS OF THE
            APPELLANT ARISING FROM OHIO'S NONCONFORMING
            MOTOR VEHICLE LAW, OHIO REVISED CODE
            §§1345.71 ET SEQ. (Tran. pp. 214-16, 221)

1.

"SECOND ASSIGNMENT OF ERROR
THE TRIAL COURT COMMITTED REVERSIBLE ERROR
WHEN IT SUBMITTED INTERROGATORIES TO THE JURY
WHICH CONTAINED MISLEADING QUESTIONS ADDRES-
SING THE CLAIMS OF APPELLANT ARISING FROM
OHIO'S NONCONFORMING MOTOR VEHICLE LAW, OHIO
REVISED CODE §§1345.71 ET SEQ. (Tran. pp.
214-16, 221)"

On February 14, 1992, appellant filed this suit against

Mazda Motor of America, Inc.("Mazda") and Brown Mazda, Brown

Motor Sales Co., and Brown Automotive Group Brown Imports Company

("Brown Mazda"), in which she set forth eight causes of action[1]

arising out of her purchase of a 1991 Mazda 626 LX.   The case

proceeded to trial on all claims.  Several were dismissed during

the trial, however, and the jury was instucted only on those of

(1) breach of express and implied warranty; (2) unfair and

deceptive acts under Ohio's Consumer Sales Practices Act, and

(3) breach of Ohio's Lemon Law.  By agreement of the parties, the

alleged violations of Ohio's Consumer Sales Practices Act,

including the Lemon Law claim, were prosecuted only as to

appellee Mazda.  At the conclusion of the trial the jury found in

favor of the defendants on all claims. This appeal has been

brought, however, only as to appellant's Lemon Law claims against

Mazda.

The facts that are relevant to the Lemon Law issues

raised by this appeal are as follows.  At trial appellant

2.

testified that she paid $16,042 for the Mazda, financed the
purchase through a loan from what is now the Bay Credit Union,
and took delivery on February 9, 1991. She stated that within
the first couple weeks of driving her new car she noticed a
buzzing noise when she turned the key and felt grabbing with the
brakes. Later, the brakes started to "growl" and make a
"chattering noise" and, on May 2, 1991, she took the car back to
Brown Mazda to be serviced. At that time she had almost 5,000
miles on the car. On August 29, 1991, appellant took the Mazda
in for service again, this time because of a "buzzing and
grinding" noise, a leak in the trunk, and for an estimate on the
small amount of damage that had been done to the car when her
husband hit their mailbox. When asked by her counsel how the car
had operated between May and August 1991, she stated "fine ***
except for the fact that I was intimidated or frightened of the
buzzes, and it progressively was getting louder and more often
*** it was something that was hardly there in the beginning now
was getting to be a nuisance." She stated that she complained to
a Brown Mazda salesmanager about the buzzing noise and the brake
chattering once between May and August 1991 and that after the
August 29, 1991 service it continued to get worse. She made
another appointment for the car on October 31, 1991, and told the
service department at that time that, after having her friend

3.

speak with a chief engineer at Mazda, she thought it was the
hydraulic pump in the antilock braking system ("ABS") that was
the problem.  When she picked her car up, the mechanic told her
that they took a fine cut off the rotor and changed the brake
pads.  The buzzing never changed and three days later the brakes
began to grind again and she contacted the Mazda 800 number to
find out if anything else could be done.  They sent a representa-
tive, William Cowen, to check the car over.  She stated that
Brown Mazda then informed her that the noise was from the ABS
braking system and "there was suggestion made I bring the car
back in."  Appellant stated that she no longer trusted the car
and in December 1991, she parked it and has not driven it since.
On January 23, 1992, her attorney sent a revocation of acceptance
letter to Mazda, Brown Mazda and the other named defendants.

        On cross-examination, appellant acknowledged that she
never had any problem coming to a complete stop in the car, that
the brakes never failed, and that the brakes never caused her to
lose control of the vehicle.  She stated that no one ever told
her if the car was safe or unsafe but she did not want to drive
the car.  When asked if it was true that Cowen and Mazda offered
to replace the ABS pump she replied "[t]here was an attempt to
make another appointment.  I'm not -- I assume that's what they
intended to do."  As to the water in her trunk, she stated that

4.

there was a plug found to be missing and that it was replaced.

She stated that she did not hear the grinding noise each and

every time she applied the brake and that she never saw the ABS

warning light on the dash go on.  When asked if the brake

problems ever impaired the use of the vehicle, appellant

responded "[t]here's times they grabbed.  They grabbed real hard

and real quick.  But, no, I never hit anybody and no one hit me."

Appellant also testified that although she continued to drive it

despite the noises, she was concerned about the safety of the

vehicle.

        The defense called William Cowen, district service

manager for Mazda Great Lakes, who testified that he has been a

certified technician for fifteen years and that he was called in

to assist in resolving appellant's repair problems.  He stated

that he first inspected her Mazda 626 on December 16, 1991 when

he test drove it and was able to hear the noise from under the

hood but never heard the grinding sound. In response, he told the

service manager to advise appellant that Mazda was willing to

replace the ABS hydraulic pump to correct the problem.  He stated

that he also inspected the brake pads but found nothing wrong.

In August 1992, he tested the vehicle a second time and did

notice brake noise but attributed it to rust build-up on the

rotors because the car had been sitting outside for some time and

5.

the noise disappeared after the first one hundred to one hundred
fifty feet. He testified that to a reasonable degree of
professional certainty based on his training, knowledge and
expertise, neither the buzzing noise, the grinding noise, nor the
ABS hydraulic pump, substantially impaired the value, safety or
use of the vehicle. He stated that even if there was an ABS
system failure the car's normal braking system would bring the
car to a stop and that he believed the car was safe to drive. He
testified that appellant decided not to have anything further
done on the vehicle.

The defense also called Rick Hansen, service manager
for Brown Mazda, who testified that he had been involved with the
service of appellant's 1991 Mazda from the time she purchased the
vehicle. Hansen related the service history and acknowledged
that all of the service on appellant's vehicle was performed
pursuant to the warranty terms and conditions. He stated that he
felt that the vehicle was safe to drive and fit for its intended
use and that the value was not substantially impaired.

At the conclusion of the evidence the court gave
counsel for both sides the opportunity to review its proposed
jury instructions and interrogatories. Appellant's trial counsel
objected to several portions of the jury instructions and to
interrogatories three through five. He requested that, in

6.

accordance with R.C. 1345.72, the words "to the Plaintiff" be

added after any language in the instructions and interrogatories

that asked the jury to consider whether the defect or condition

substantially impaired the use, value, or safety of the Mazda.

The court overruled appellant's objections based on the *defini-*

*tion* of "nonconformity" as set forth in R.C. 1345.71(E).

Following closing arguments, the jury was charged on the Lemon

Law, in relevant part, as follows:

>          "If a new car has a defect or condition which
>          substantially impairs its use, value or
>          safety, and the buyer reports this either to
>          the manufacturer, its agent or its authorized
>          dealership one year from date of delivery or
>          during the first 18,000 miles, then the
>          manufacturer, its agent or dealer must repair
>          the nonconformity.
>
>          "Now, a nonconformity is any defect or
>          condition which substantially impairs the
>          use, value or safety of an automobile.
>
>          "If the manufacturer, its agent or dealer
>          fails to repair a nonconformity in a reason-
>          able number of repair attempts, the manu-
>          facturer must at the buyer's option replace
>          the car with a new one acceptable to the
>          buyer or accept a return of the vehicle from
>          the buyer and refund each of the following:
>
>          "***
>
>          "The lemon law presumes that a reasonable
>          number of repair attempts have been made by
>          the manufacturer, its agent or dealer if
>          during the first year or 18,000 miles of
>          driving any of the following apply:

7.

"First, substantially the same nonconformity
exists after a car has been subject to repair
three or more times; two, the car is out of
service for repair for 30 or more calendar
days; or, three, there have been eight or
more attempts to repair any nonconformity
that substantially impairs the use and value
of the car to the buyer.

"If you find by a preponderance of the
evidence that Linda Brinkman's Mazda 626 had
any defect or condition that substantially
impaired its use, value or safety and if you
find that defendants were given reasonable
opportunity to repair the defect or condi-
tion, then you must find in favor of Plain-
tiff Linda Brinkman.

The jury was also given the following interrogatories:

"INTERROGATORY NO. 3

"Was there any defect or condition which
substantially impaired the use of the Mazda
626 bought by plaintiff?

"INTERROGATORY NO. 4

"Was there any defect or condition which
substantially impaired the value of the Mazda
626 bought by plaintiff?

"INTERROGATORY NO. 5

"Was there any defect or condition which
substantially impaired the safety of the
Mazda 626 bought by plaintiff?"

The case was submitted to the jury, which returned a

verdict in favor of Appellee Mazda on the Lemon Law claim.  It is

from the trial court's ruling on the objections to the jury

8.

instructions and interrogatories that appellant has filed this appeal.

This court will address appellant's assignments of error together since the arguments presented therein raise a single issue: whether the court should have instructed the jury to consider the Lemon Law claim from the perspective of the consumer by including the language "to the consumer" or "to the plaintiff" in its instructions and interrogatories that directed the jury to consider whether a defect or condition existed that substantially impaired the use, value, or safety of the vehicle. Appellant argues that both the jury instructions and the jury interrogatories failed to ensure that the jury would undertake a subjective analysis as required by the applicable statute. Appellant submits that in determining whether a nonconformity "substantially impairs the use, value, or safety of a motor vehicle" the jury should focus on the perspective and perception of the consumer and that the trial court, in denying appellant's request to add the words "to the Plaintiff" after the operative phrases, failed to give effect to R.C. 1345.71, et seq.

Appellee responds that the unambiguous definition of "nonconformity", as set forth in R.C. 1345.71(E), does not impose a subjective standard for determining whether a valid claim exists, and the trial court's instructions and interrogatories

9.

properly mirrored that definition.  Appellee argues that a purely

subjective standard would eliminate the need for a jury because

any claim of substantial impairment by the consumer would qualify

as a nonconformity.

Ohio's Lemon Law was enacted in 1987 to provide an

additional and more comprehensive remedy to consumers who

purchase defective automobiles.  See Comments, Ohio's Lemon Law:

Ohio Joins the Rest of the Nation in Waging War Against the

Automobile Limited Warranty (1989), 57 U. Cin. L. Rev. 1015,

1027.  Prior to its enactment, consumer's had to resort to the

technical and often inadequate remedies provided in the Uniform

Commercial Code.

In order to determine whether appellant, as a consumer

implementing the protections afforded under Ohio's Lemon Law, was

entitled to have the jury consider her claims from the perspec-

tive of appellant herself, this court must carefully examine the

language and meaning of R.C. 1345.71, et seq.  R.C. 1345.72

states in pertinent part:

> "(A) If a new motor vehicle does not conform
> to any applicable express warranty and the
> consumer reports the nonconformity to the
> manufacturer, its agent, or its authorized
> dealer during the period of one year follow-
> ing the date of original delivery or during
> the first eighteen thousand miles of opera-
> tion, whichever is earlier, the manufacturer,
> its agent, or its authorized dealer shall
> make any repairs as are necessary to conform

10.

the vehicle to such express warranty,
notwithstanding the fact that the repairs are
made after the expiration of the appropriate
time period.

"(B) If the manufacturer, its agent, or its
authorized dealer is unable to conform the
motor vehicle to any applicable express
warranty by repairing or correcting any
defect or condition that substantially
impairs the use, safety or value of the motor
vehicle to the consumer after a reasonable
number of repair attempts, the manufacturer
shall, at the consumer's option, and subject
to division (D) of this section replace the
motor vehicle with a new motor vehicle
acceptable to the consumer or accept return
of the vehicle from the consumer and refund
each of the following: ***"   (Emphasis
added.)

R.C. 1345.72(A) protects the purchaser of a new motor

vehicle by imposing a duty on the manufacturer, its agent, or its

authorized dealer to repair the motor vehicle if (1) that motor

vehicle does not conform to any applicable express warranty and

(2) the consumer reports the nonconformity to the the proper

authority within the specified time limits.   As used in R.C.

1345.72(A), "'[n]onconformity' means any defect or condition

which substantially impairs the use, value, or safety of the

motor vehicle and does not conform to the express warranty of the

manufacturer or distributor." R.C.1345.71(E)   A consumer meets

the burden under R.C.1345.72(A) by presenting evidence from which

a reasonable inference can be made that a specific problem with

the vehicle is due to a defective part which is covered by

warranty.   Reddin v Toyota Motor Distribs., Inc. (February 22,

11.

1991), Wood App. No. WD-90-2, unreported.   Problems accredited
to the normal usage of an automobile or those outside any
reasonable person's notion of what constitutes an actionable
claim are eliminated because the defect or condition must be one
that does not conform to any applicable express warranty.  R.C.
1345.72(A); Lyons v. Cross Rds. Lincoln-Mercury, Inc. (1990), 61
Ohio Misc.2d 180; Smith v. Toyota (February 24, 1994), Scioto
App. No. 2139, unreported.

       R.C. 1345.72(B) provides that if the manufacturer, its
agent, or its authorized dealer is unable, after a reasonable
number of repair attempts, to repair or correct a defect or
condition that "substantially impairs the use, safety, or value
of the motor vehicle to the consumer", then the manufacturer
shall either replace or accept the return of the motor vehicle in
accordance with the terms set forth in the statute.  (Emphasis
added.)

       Upon consideration of the foregoing, this court finds
that (1) the clear and unambiguous language of R.C. 1345.72(B)
requires that the determination as to whether the impairment in
the vehicle's use, safety, or value is deemed substantial
necessarily depends on an examination of the consumer's perspec-
tive; and (2) the court erred by not including the language "to
the consumer" or "to the plaintiff" in its instructions and
interrogatories that directed the jury to consider whether a

12.

defect or condition existed that substantially impaired the use, value or safety of the vehicle.

Since the trial court herein did not so instruct the jury, we must now determine whether or not that failure con-stitutes reversible error. "A charge to the jury should be a plain, distinct and unambiguous statement of the law as applica-ble to the case made before the jury by the proof adduced." Marshall v. Gibson (1985), 19 Ohio St.3d 10, 12, citing Parmlee v. Adolph (1875), 28 Ohio St. 10, paragraph two of the syllabus. "*** [A]n incomplete charge will constitute grounds for reversal of a judgment where the charge as given misleads the jury." Marshall, supra, at 12.   Jury instructions must be veiwed in their totality, and if the law is clearly and fairly expressed a reviewing court should not reverse a judgment based upon an error in a portion of a charge.   Margroff v. Cornwell Quality Tools, Inc. (1991), 81 Ohio App.3d 174, 177; Yeager v. Riverside Methodist Hosp. (1985), 24 Ohio App.3d 54, 55.

As to the trial court's rejection of appellant's proposed jury interrogatories, "[t]he wording of Civ.R. 49(B), that the 'court shall submit written interrogatories *** upon request of any party,' is mandatory in character and leaves no discretion in the trial court on the question of submission, upon request, of proper interrogatories to the jury.  The rule, however, reposes discretion in the court to pass upon the content

13.

of requested interrogatories as they 'shall be submitted to the jury in the form the court approves.'" Riley v. Cincinnati (1976), 46 Ohio St.2d 287, 298, citing Ragone v. Vitali & Beltrami, Jr., Inc. (1975), 42 Ohio St.2d 161, 165.  Jury interrogatories serve to test the correctness of the general verdict by eliciting from the jury its assesment of the determinative issues presented in a given case in the context of the evidence presented at trial.  Cincinnati Riverfront Coliseum, Inc. v. McNulty Co. (1986), 28 Ohio St.3d 333, 336-37; Davison v. Flowers (1930), 123 Ohio St. 89.

In this case, the jury instructions, when viewed as a whole and considered with the interrogatories, were incomplete statements of the applicable law and on the issues raised at trial.  As set forth above, R.C. 1345.72(B) requires that the consumer's persepective be taken into consideration.  The testimony at trial included statements made by appellant that her confidence in the vehicle's safety had diminished, thereby causing a diminution in the vehicle's value to her.

Upon consideration of the entire record of proceedings before the trial court and the law as set forth above, this court finds that appellant was prejudiced by the trial court's failure to inform the jury that the perspective of the consumer should be taken into account when determining whether the defect or condition she complained of substantially impaired the vehicle's

14.

use, safety or value.  Accordingly, appellant's two assignments
of error are found well-taken.

Upon consideration whereof, this court finds that
substantial justice has not been done the party complaining, and
the judgment of the Lucas County Court of Common Pleas is hereby
reversed and the case is remanded for a new trial.  Court costs
are assessed to appellee.

JUDGMENT REVERSED.

A certified copy of this entry shall constitute the
mandate pursuant to App.R. 27.  See, also, 6th Dist.Loc.App.R. 4,
amended 7/1/92.

Peter M. Handwork, J.

_____
JUDGE

George M. Glasser,  J.

Charles D. Abood, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____

¹In the complaint appellant alleged the following
causes of action: (1) breach of contract and express and implied
warranties under Ohio law; (2) breach of express and implied
warranties under the Magnuson-Moss Act; (3) unfair, deceptive,
and unconscionable selling practices in violation of the Ohio's
Consumer Sales Practices Act; (4) fraud; (5) negligence;
(6) strict liability; (7) breach of contract; and (8) violations
of Ohio's Nonconforming New Motor Vehicle Law, known as the
"Lemon Law."

15.

# EXHIBIT O

| PIF Number: | 10002077 |
|---|---|
| Case Name: | BELLINGER V. HEWLETT-PACKARD COMPANY |
| Case Number: | 20744 |

[Cite as *Bellinger v. Hewlett-Packard Co.*, 2002-Ohio-1643.]

STATE OF OHIO        )
                   )ss:
COUNTY OF SUMMIT   )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

PHYLLIS M. BELLINGER

     Appellant

     v.

HEWLETT-PACKARD COMPANY

     Appellee
C.A. No.     20744

**RECEIVED**
ATTORNEY GENERAL OF OHIO

APR 2 5 2002

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2000 12 5786

DECISION AND JOURNAL ENTRY

Dated: April 10, 2002

     This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:

————————————

     WHITMORE, Judge.

     {¶1}   Plaintiff-Appellant Phyllis M. Bellinger has appealed from an order of the Summit County Court of Common Pleas that dismissed her complaint against Defendant-

Appellee Hewlett-Packard Co. ("HP") for failure to state a claim upon which relief can be granted. This Court affirms.

I

{¶2}   HP manufactures and sells inkjet printers.   HP also separately sells replacement ink cartridges to service its printers, which come with a variety of features and contain different amounts of ink.

{¶3}   With each inkjet printer it sells, HP includes one black and one color ink cartridge.  Beginning in 1998, HP began including with certain of its low-end inkjet printers what it has called "economy" cartridges.  The distinguishing feature of these economy cartridges is that they contain approximately one-half the volume of ink as HP's "large" replacement cartridges.

{¶4}   The ink cartridges that HP provided with its printers did not come installed in the hardware, but were included in self-contained packages inside the printer boxes. The packaging containing the cartridges described their contents as economy cartridges. The outside of the printer box, however, as well as HP's marketing and promotional materials, stated only that ink cartridges were included; they did not describe the ink cartridges as economy cartridges.

{¶5}   In December 1999, Appellant purchased a HP inkjet printer which included an economy ink cartridge.  Appellant thereafter filed a complaint against HP seeking certification of a statewide class consisting of purchasers of HP products which included the economy ink cartridges.  Appellant's complaint asserted causes of action based on fraud, violations of the Consumer Sales Practices Act (R.C. 1345.01 *et seq.*) ("CSPA"), and negligent misrepresentation.   Appellant alleged that HP unlawfully

concealed that the ink cartridges it included with its printers were economy cartridges or otherwise contained less than a "full" amount of ink.  HP responded by filing a motion to dismiss Appellant's complaint pursuant to Civ.R. 12(B)(6) for failure to state a claim upon which relief can be granted.  The trial court granted HP's motion to dismiss the complaint.  Appellant has timely appealed, asserting one assignment of error.

II

Assignment of Error

{¶6}    **The trial court erred in granting [HP's] motion to dismiss, including, but not limited to, in:**

{¶7}    **A.  Finding that HP made no affirmative misrepresentation regarding the amount of ink in its print cartridges included with its low-end printers.**

{¶8}    **B.  Finding that an affirmative misrepresentation is necessary for a violation of the CSPA.**

{¶9}    **C.  Finding that [Appellant] failed to set forth a claim under the consumer sales protection act.**

{¶10}  **D.  Finding that [Appellant] failed to plead her fraud claim with sufficient particularity.**

{¶11}  This Court reviews an entry of dismissal under Civ.R. 12(B)(6) *de novo*. *Hunt v. Marksman Prod., Div. of S/R Industries, Inc.* (1995), 101 Ohio App.3d 760, 762, appeal not allowed (1995), 73 Ohio St.3d 1427.  "In order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ.R. 12(B)(6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. University Community Tenants Union* (1975), 42 Ohio St.2d 242, syllabus.  For purposes of ruling upon a Civ.R. 12(B)(6) motion, the trial

court must accept all factual allegations as true and make every reasonable inference in

favor of the nonmoving party. *Shockey v. Wilkinson* (1994), 96 Ohio App.3d 91, 94.

Appellant's CSPA Claim

{¶12} "(5) Appellant's complaint alleged that HP violated R.C. 1345.02, which

provides:

{¶13} "(A) No supplier shall commit an unfair or deceptive act or
practice in connection with a consumer transaction. Such an unfair or deceptive
act or practice by a supplier violates this section whether it occurs before, during,
or after the transaction.

{¶14} "(B) Without limiting the scope of division (A) of this section, the
act or practice of a supplier in representing any of the following is deceptive:

{¶15} "(1) That the subject of a consumer transaction has sponsorship,
approval, performance characteristics, accessories, uses, or benefits that it does
not have;

{¶16} "(2) That the subject of a consumer transaction is of a particular
standard, quality, grade, style, prescription, or model if it is not;

***

{¶17} (6) That the subject of a consumer transaction will be supplied in
greater quantity than the supplier intends[.]"

{¶18} Appellant's complaint also alleged that HP violated R.C. 1345.03, which

provides:

> (A) No supplier shall commit an unconscionable act or
> practice in connection with a consumer transaction.
> Such an unconscionable act or practice by a supplier
> violates this section whether it occurs before, during, or
> after the transaction.

{¶19} HP has argued that Ohio law requires an affirmative representation of

some inaccurate or false information in order for a claim to be actionable under the

CSPA. See *Lintermoot v. Brown* (Aug. 2, 1988), Van Wert App. No. 15-86-25,

unreported, 1988 Ohio App. LEXIS 3065. Appellant, on the other hand, has contended that a knowing failure to disclose material information can constitute a deceptive act or practice under the CSPA. See *Swiger v. Terminix Int'l Co. L.P.* (June 28, 1995), Montgomery App. No. 14523, unreported, 1995 Ohio App. LEXIS 2826. This Court declines to hold, as HP has urged, that a failure to disclose information in the absence of an affirmative representation that is false or inaccurate can never give rise to an actionable claim under the CSPA. Even accepting all the factual allegations in Appellant's complaint as true, however, we conclude that neither the affirmative representations nor any unstated implications made by HP with respect to its ink cartridges support a claim that HP engaged in deceptive or unconscionable acts or practices under R.C. 1345.01 *et seq.*

{¶20} It is undisputed that the outside of the printer box and the promotional and advertisement materials disseminated by HP represented that printers of the type purchased by Appellant included ink cartridges, and that ink cartridges were in fact included with the printers. Appellant's complaint, however, alleges that HP's failure to describe the ink cartridges included with its printers as "one-half full," "starter cartridges," or "economy cartridges" was a deceptive and unconscionable practice under the CSPA. The gravamen of Appellant's allegations is that HP's statement that ink cartridges were included with its printers constitutes a half-truth — that is, a statement true on its face that nevertheless implies in the mind of the prospective purchaser a belief that is not in accord with the facts. See, *e.g.*, *State ex rel. Brown v. Bredenbeck* (C.P.1975), 2 O.O.3d 286, 287. Specifically, Appellant's complaint alleges that HP's representation that its printers included ink cartridges implied in the mind of the

consumer that the ink cartridge would be a large—what Appellant has called a "full"—
cartridge.

{¶21}  Appellant has consistently described the ink cartridges provided by HP as
"half-full," which is accurate inasmuch as the economy cartridge contained
approximately one-half the quantity of ink as the large cartridge.   The "half-full"
description, however, falls short of establishing that the statement "ink cartridge
included" implies in the mind of the consumer a belief that is not in accord with the facts.
If the statement "ink cartridge included" implied in the mind of the consumer that a *full*
ink cartridge must be included, the amount of ink would only be important as a measure
of how "empty" of ink the cartridge was.[1]   Whether HP's representation that ink
cartridges were included with its printers is deceptive or unconscionable, however,
cannot depend upon a measure of the unfilled volume of the cartridge, irrespective of the
quantity of ink it contains.

{¶22}  Appellant has also phrased HP's allegedly deceptive conduct as
"misleading" consumers into believing that "the cartridges had the standard amount of
ink."  Appellant's complaint, however, has failed to allege any basis for the conclusion

---

[1] Thus, under Appellant's "half-full" theory, if HP supplied printer cartridges that
were five times the size of the large cartridges yet were only half full of ink, its
representation would still be a half-truth because the expectation that a *full* printer
cartridge would be supplied had not been met.  Conversely, if HP included ink
cartridges that were one-fifth the size of the economy cartridge but were full of
ink, HP's representation would not be a half-truth.

that "ink cartridge" implies in the mind of the consumer a "standard amount" of ink, or to identify what quantity of ink constitutes a "standard amount."[2]

{¶23} Appellant has also argued that HP's representation that its printers included ink cartridges implied that the cartridges would be the large, rather than the economy, cartridges sold by HP as replacements. Again, however, Appellant has failed to allege any basis for her contention that consumers were somehow entitled to large rather than economy cartridges, when both sizes were marketed and sold by HP as replacement cartridges for its printers. The mere fact that HP once included large cartridges in all its printers cannot reasonably be interpreted by Appellant to mean that HP's later inclusion of economy cartridges with its inexpensive line of printers is deceptive or unconscionable.

{¶24} Appellant has also argued that HP's use of the word "economy" to describe the cartridges with the lesser amount of ink constitutes a deceptive or unconscionable practice. The crux of Appellant's objection to HP's use of the word "economy" is that products labeled "economy" are understood to provide more volume per dollar than "standard" or "large" products, whereas HP's economy cartridges provide less ink than its large cartridges. Appellant relies upon a Federal Trade Commission ("FTC") regulation, 16 C.F.R. 502.102, which describes the manner in which the term

---

[2] Ink cartridges differ in this respect from items that are by definition sold with readily quantifiable specifications, such as a gallon of milk or a 60-watt light bulb. An analogue better suited to the ink cartridge is the batteries sometimes included with battery-operated consumer devices. Although the consumer might desire brand-name, alkaline batteries, the representation that "batteries are included" is

---

"economy size" may be used on certain consumer commodities. However, the FTC's own interpretive bulletins and subsequent regulations explicitly exclude ink-related products from the "consumer commodities" to which the regulation applies. See 16 C.F.R. 503.5(d); 16 C.F.R. 503.2(a). Moreover, Appellant's complaint alleges — and the entirety of the CSPA claims in her complaint are based upon the fact — that the outer packaging of the printers and HP's promotional materials *omit* the modifier "economy" in describing the included ink cartridges. The word "economy" appeared only on the packaging of the individual cartridges inside the printer box, where a consumer would only find it after he had purchased and removed the printer from its packaging.

{¶25} Finally, Appellant has devoted a significant portion of her brief to her argument that the CSPA claims in her complaint meet the statutory requirements to proceed as a class action. The trial court, however, found that Appellant's failure to state a CSPA claim upon which relief can be granted as an individual rendered unnecessary any consideration of whether Appellant's claims are properly maintainable as a class action. Accordingly, the class action question is not properly before, and will not be addressed by, this Court.

{¶26} Even accepting all the factual allegations in Appellant's complaint as true and drawing every reasonable inference in favor of Appellant, this Court concludes that Appellant's complaint fails to state a claim upon which relief can be granted pursuant to R.C. 1345.02(A) or R.C. 1345.03(A). HP's representation that its printers included ink cartridges was true on its face. Moreover, Appellant's complaint fails to state any

_____

not a half-truth if the consumer instead receives generic batteries with a shorter

_____

reasonable basis for its conclusion that HP's undisputedly true representation could imply in the mind of the consumer a belief that the cartridges would contain more ink than HP in fact supplied — *i.e.*, was a half-truth. Accordingly, the trial court properly dismissed Appellant's claim for alleged violations of the CSPA for failure to state a claim upon which relief can be granted.

## Appellant's Fraud Claim

{¶27} Appellant has dedicated the balance of her brief to arguing that the trial court erred in finding that Appellant failed to plead her fraud claim with sufficient particularity. Appellant has contended that her complaint both states a claim for fraud under Ohio law, and pleaded the allegations of fraud with particularity as required by Civ.R. 9(B).

{¶28} In order to maintain an actionable claim for fraud, a plaintiff must establish the following elements:

(a)    a representation or, where there is a duty to disclose, concealment of a fact,

(b)    which is material to the transaction at hand,

(c)    made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d)    with the intent of misleading another into relying upon it,

(e)    justifiable reliance upon the representation or concealment, and

(f)    a resulting injury proximately caused by the reliance.

---

life expectancy.

---

{¶29}  *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, paragraph two of the syllabus.  In addition, plaintiffs in Ohio must plead with particularity their allegations of fraud:

{¶30}  In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

{¶31}  Civ.R. 9(B).  The requirements of Civ.R. 9(B) are satisfied if the plaintiff's complaint specifies "(1) [the] specific statements claimed to be false; (2) the time and place the statements were made; and (3) which defendant made the false statements."  *Pollock v. Kanter* (1990), 68 Ohio App.3d 673, 681-682.

{¶32}  In the instant case, Appellant has failed to identify any false or fraudulent representation made by HP.  The only representation that Appellant's complaint alleges that HP made was that ink cartridges were included with its printers.  This representation, however, was not false; it was true.

{¶33}  Nor can "concealment of a fact" form the basis of Appellant's fraud claim, because Appellant does not allege any cognizable duty on the part of HP to disclose any facts about its ink cartridges.  See *Fed. Mgt. Co. v. Coopers & Lybrand* (2000), 137 Ohio App.3d 366, 383, appeal not allowed (2000), 90 Ohio St.3d 1424 ("[A] duty to disclose is a requirement if concealment of fact is alleged as a basis for fraud.").  Appellant's complaint does not allege, for example, that any special or fiduciary relationship existed between HP and herself or other consumers that would give rise to a duty to disclose.  See *Federated Mgt.*, 137 Ohio App.3d at 383 ("[T]he duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.").

{¶34} Finally, HP's unqualified representation that "ink cartridges are included" cannot itself be construed as imposing upon HP a duty to further describe the cartridges as economy cartridges, because HP's representation was not a half-truth. As discussed *supra*, HP's representation that ink cartridges are included is not rendered untrue or misleading by HP's omission of the fact that the ink cartridges included were economy cartridges.

{¶35} Even accepting all the factual allegations in Appellant's complaint as true and drawing every reasonable inference in favor of Appellant, therefore, Appellant's complaint fails to state a claim for fraud upon which relief can be granted. The trial court properly dismissed Appellant's claim for fraud for failure to plead with sufficient particularity any false or fraudulent representations made by HP.

III

{¶36} Appellant's sole assignment of error is overruled. The judgment of the trial court is affirmed.

*Judgment affirmed.*

———————————

BETH WHITMORE
FOR THE COURT

BAIRD, P. J.
BATCHELDER, J.
CONCUR

APPEARANCES:

A. RUSSELL SMITH and R. BRYAN NACE, Attorneys at Law, 159 S. Main St., Suite 503, Akron, Ohio 44308, for Appellant.

———————————————————————————

Court of Appeals of Ohio, Ninth Judicial District

MARY M. BITTENCE and MARCIA E. MARSTELLER, Attorneys at Law, 3200
National City Center, 1900 East 9th St., Cleveland, Ohio 44114, for Appellee.

# EXHIBIT P

[Cite as *Borror v. MarineMax of Ohio, Inc.*, 2007-Ohio-562.]

RECEIVED
ATTORNEY GENERAL OF OHIO

FEB 1 2 2007

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Douglas G. Borror

    Appellee

v.

MarineMax of Ohio, Inc., et al.

    Appellant

Court of Appeals No. OT-06-010

Trial Court No. 03-CVH-130

**DECISION AND JUDGMENT ENTRY**

Decided: February 9, 2007

\* \* \* \* \*

James E. Arnold and James G. Vargo, for appellee.

Irene C. Keyse-Walker, Karl A. Bekeny, David Cooper, and
Jeffrey D. Smith, for appellant.

\* \* \* \* \*

GLASSER, J.

    {¶ 1}  This is an appeal from a judgment of the Ottawa County Court of Common Pleas that found in favor of appellee on his claims for fraud and violations of the Ohio Consumer Sales Practices Act.  For the following reasons, the judgment of the trial court is affirmed in part and reversed in part.

{¶ 2}  The facts giving rise to this appeal reach back nearly six years.  Following are the undisputed facts relevant to the issues raised on appeal.  In May 2001, a 51-foot Sea Ray 510 luxury motor boat was delivered from the factory to appellant MarineMax of Ohio, Inc. ("MarineMax").  Several weeks later, one of appellant's employees took the boat out for a "sea trial" and ran the boat into a reef.  Appellant immediately returned the boat to the Sea Ray factory in Florida to be repaired.  Sea Ray made repairs costing more than $76,000 and returned the boat to MarineMax in September 2001.  MarineMax inspected the boat, determined that it had been repaired satisfactorily, and placed it in winter storage.  In April 2002, while the boat was still in storage, Karl Oreskovich, appellant's service manager, noticed cracking in the gel coat of the engine "stringers." According to testimony at trial, "stringers" are the "backbone" of a boat; they run parallel to the center line of the boat and are fastened to the bottom, providing reinforcement and rigidity.  Oreskovich contacted Sea Ray, and the manufacturer arranged for the boat to be repaired locally.  Sea Ray was billed $22,507 for those repairs.  The boat was returned to MarineMax and cleared for sale in July 2002.

{¶ 3}  On Friday, August 2, 2002, appellee Douglas Borror, an experienced boater, visited MarineMax and took the 51-foot Sea Ray 510 for a test ride.  Afterward, salesman Mark Walker told Borror the boat had been damaged during its initial sea trial and repaired and was therefore offered with an extended warranty.  The parties disagree as to how much detail Walker gave Borror about the extent of the damage and how it occurred.  Borror testified he was told the boat "hit a can" (buoy) by the reef.  Salesman

2.

Walker testified he told Borror the boat hit the reef by the buoy.  Upon learning of the

damage, Borror indicated he wanted to talk to Oreskovich about the boat's condition.

Oreskovich was on vacation, however, and the parties again disagree as to whether

Borror talked to him that day or the next.  Nevertheless, within an hour of speaking to

Oreskovich, Borror agreed to purchase the boat.  On August 9, 2002, Borror purchased

the boat for $780,151.83 (including tax).  Along with other purchase documents, Borror

was asked to sign a document captioned "Disclosure Acknowledgement" which stated:

{¶ 4}   "In conjunction with the purchase of the boat listed below, as the purchaser,

I hereby acknowledge that the following history of this boat has been disclosed to me."

{¶ 5}   After listing the boat's identification numbers, the document stated:

{¶ 6}   "* The boat sustained damage prior to my purchase.

{¶ 7}   "* The boat was returned to the manufacturer and repaired to factory

specifications.

{¶ 8}   "* All normal factory warranties are in effect with a six (6) month

extension of the Sea Ray limited warranty."

{¶ 9}   Appellant signed and dated the document.  After the sale was completed,

Borror took delivery of the boat and used it for approximately three weeks before putting

it in dry storage for the winter.

{¶ 10} Gregory Group, a marine surveyor who inspects boats to establish their

condition and value, testified at trial that in October 2002, while he was surveying

another boat stored near Borror's, he noticed that the boat was sagging slightly where the

3.

hull had been placed on a large wooden keel block.  Group, apparently already aware of the boat's "history," suggested that more blocking be added.  In  January 2003, Borror hired South Shore Marine to wax the underside of his boat.  Borror was contacted by an employee of South Shore Marine who told him that he found some problems with the bottom of the boat while waxing it.  Borror immediately contacted Group, who told him that the boat had been grounded and severely damaged.  He also told Borror that the boat's stringer system had suffered extensive damage and had undergone extensive repairs.  Appellant maintains that this information contradicted what he had been told by Walker and Oreskovich.

{¶ 11} Borror then hired Group to perform a survey of the boat.  Group inspected the boat on January 31, 2003.  Based on his inspection and knowledge of the boat's repair history, Group prepared a seven-page report in which he noted, among other findings, six areas of "existing damage and/or extremely poor repair" to the exterior and interior hull; pockets of elevated moisture in the deck, and "copious" leaking of crankcase oil from the starboard engine, which he stated is unusual for an engine with little use but not unusual for an engine that has been run aground "at speed."  Group offered his opinion that the true scope of structural damage had not been assessed because only those areas that were readily accessible in the engine compartment were inspected and repaired.

{¶ 12} Group concluded that the boat was not seaworthy or otherwise fit for use as a recreational sport yacht.  He further stated that when Borror purchased the boat, it was worth only $300,000.  This conclusion was based on the deficiencies outlined in the

4.

report, "* * * the wrecked and repaired condition of the hull, the failure of the repairs at the bottom and stern, and the necessary repairs to the stern platform/lift."   Borror did not use the boat again.

{¶ 13} On March 17, 2003, Borror's legal counsel wrote a letter to MarineMax explaining that "because of the misrepresentations made concerning the quality and integrity of this boat, and its actual questionable safety," Borror was revoking his acceptance of the boat, making the boat available for MarineMax to take possession, and demanding a refund of the purchase price.  In the alternative, Borror stated he was willing to select another boat of like quality from appellant's stock with the understanding that if the replacement boat cost less he would receive a refund for the difference between that price and what he paid for the Sea Ray 510.

{¶ 14} Borror contends that MarineMax ignored his request, and on May 19, 2003, he filed a complaint against MarineMax and Mark Walker, the salesman who sold him the boat.  (Borror's claims against Walker were eventually dismissed.)  Borror asserted a claim for fraud, alleging that appellant knowingly made false representations regarding the damage to the boat and the repairs, and a claim alleging that MarineMax knowingly committed unfair, deceptive and unconscionable acts and practices in violation of the Ohio Consumer Sales Practices Act ("CSPA") in violation of R.C. 1345.01 et seq.  Borror asserted a third count in which he claimed damages as a result of appellant's failure to honor his revocation of acceptance or refund the full purchase price as previously demanded.

5.

{¶ 15} On June 12, 2003, MarineMax and Walker filed an answer denying liability and stating that full disclosure was made to Borror regarding the damage to the boat and subsequent repairs.  They further denied that Borror's March 17, 2003 letter constituted a valid revocation of his acceptance of the boat.

{¶ 16} The record contains correspondence from appellant's counsel dated November 3, 2003, stating that it had hired its own surveyor, who indicated that the boat was seaworthy.  MarineMax expressed its understanding that any further repairs that were necessary would be covered by the Sea Ray warranty.  The company offered to do whatever was necessary to facilitate approval and completion of work done under that warranty and stated that its offer to complete all warranty work was unconditional and did not require Borror to release any of his legal claims.  In a letter dated March 17, 2004, MarineMax again offered to handle the necessary repairs to the boat.

{¶ 17} A three-day bench trial was held on May 2, 3, and 4, 2005.  Pursuant to the court's request, the parties filed proposed findings of fact and conclusions of law on June 6, 2005.  On September 12, 2005, the trial court filed its "Findings of Fact & Conclusions of Law; Order."  The issues before the trial court were whether MarineMax violated the CSPA by engaging in deceptive acts and practices regarding the sale of the boat to Borror and whether MarineMax engaged in fraud and deception, intentionally misleading Borror as to the severity of the damages to the boat.

{¶ 18} First, the trial court concluded that MarineMax violated the CSPA and that Borror is entitled to treble damages.  Specifically, the trial court found that MarineMax,

6.

"both implicitly and explicitly" represented that the vessel sustained only minor, non-structural damage and that Borror relied on the seller's assurances that the damage was minor.  The trial court found that service manager Ken Oreskovich failed to tell Borror that the boat ran aground on a reef, sustained severe structural damage to its stringer system, and had undergone two rounds of repairs.  The trial court further found that the Disclosure Acknowledgment did not set forth "critical facts" concerning the extent of the damage, how it occurred, and the repair history – information that would have put Borror on notice that additional investigation would be appropriate.  The trial court concluded that the failure to disclose that information constituted a deceptive act.  As to Borror's revocation of the sale, the trial court found that his actions were justified in so doing and that appellant's refusal to accept the revocation was an additional violation of the CSPA.

{¶ 19} As to damages pursuant to the CSPA, the court found that Borror originally paid $780,151.83 for the boat and sold it in March 2004 for $350,000.  The difference between those two figures ($430,151.83) was added to $54,439.44 which the trial court determined appellant incurred as expenses related to the boat, for a total of $484,591.27 in actual damages.  Three times the actual damages results in a total amount of $1,453,773.81.

{¶ 20} The trial court further found that MarineMax engaged in common-law fraud and deception, intentionally misleading Borror as to the severity of the damage to the boat.  The trial court found that Borror was entitled to punitive damages of $484,591.27, which is equal to the amount of actual damages, because the wrong

7.

committed was "conscious, deliberate, intentional, malicious, deceitful, and particularly gross and egregious."

{¶ 21} Additionally, the trial court determined that Borror was entitled to attorney fees under the CSPA and fraud claims and set the matter for hearing on October 10, 2005, to take evidence as to the work "reasonably performed" by Borror's attorneys.

{¶ 22} On February 15, 2006, the trial court filed its decision and order as to attorney fees and an order as to Borror's motion for prejudgment interest.  Regarding attorney fees, the trial court reiterated its earlier finding that appellant knowingly committed an act or practice that violated the CSPA when it failed to disclose the extent of the structural damage to the boat and refused to accept appellee's revocation of the boat.  The record reflects that Borror sought attorney fees of $181,850.75 and asked the trial court to modify the amount upward by the application of factors listed in DR 2-106(B) and the law set forth in *Bittner v. Tri-County Toyota, Inc.* (1991), 58 Ohio St.3d 143.  In its decision, the trial court noted that appellant did not object to the reasonableness of the hourly rates, expenses and number of hours charged, with the exception of $2,421 charged for paralegal work.  The court also noted that appellant objected to the award being modified upward.  The trial court concluded that Borror was entitled to charge for reasonable expenses related to the work performed by a paralegal. Additionally, the trial court modified the award of attorney fees that was based on the

8.

"lodestar"[1] amount upward by $240,000 for a total award, after reasonable expenses were added, of $484,727.43.

{¶ 23} Finally, as to Borror's motion for prejudgment interest, on February 15, 2005, the trial court found that Borror was entitled to prejudgment interest on the entire judgment, excluding punitive damages, to be calculated from the date the cause of action accrued to the date on which the judgment was rendered.

{¶ 24} It is from the judgments summarized above that appellant now appeals, setting forth the following assignments of error:

{¶ 25} "I. The trial court erred and misapplied Ohio's Consumer Sales Practices Act (CSPA) when it concluded that the plaintiff rescinded the sales contract but awarded trebled, contract damages.

{¶ 26} "II. The trial court erred and abused its discretion when it awarded attorney's fees under the CSPA; even if a reasonable attorney fee could be awarded, the trial court erred and abused its discretion when it awarded 'enhanced' fees exceeding $420,000.

{¶ 27} "III. The evidence is insufficient, as a matter of law, to support a claim of fraud, much less egregious fraud, punitive damages, and attorney's fees; even if supported by some evidence, the trial court's findings of fraud and egregious fraud are unsupported

---

[1]The "lodestar" amount is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  In this case, the lodestar was $181,850.75.

9.

by the manifest weight of the evidence, and tainted by 'facts' that appear nowhere in the record.

{¶ 28} "IV. Alternatively, the trial court erred when it awarded punitive damages in addition to trebled damages, and after plaintiff abandoned his claim for punitive damages, and in its calculation of attorney's fees.

{¶ 29} "V. The trial court erred and abused its discretion when it awarded prejudgment interest."

{¶ 30} Appellant presents two arguments in support of its first assignment of error. First, appellant asserts that the trial court erred by awarding contract damages because Borror had elected to void the contract in his March 17, 2003 letter to appellant. Appellant argues that Borror's actions in rescinding the purchase contract in his letter constituted a binding election of CSPA remedies and that he could not thereafter revive the contract and seek actual or treble damages.

{¶ 31} Appellant argues repeatedly that Borror rescinded the purchase contract. However, the record reflects only that Borror *attempted* to rescind; he demanded rescission in his March 2003 letter to appellant and appellant refused the request, offering to make further warranty repairs on the boat. By early 2003, Borror had already taken possession of the boat, paid for it and used it for three weeks. He did not return the boat or discontinue payment. When appellant refused to allow Borror to rescind, which was before the complaint was filed, Borror pursued recovery of his damages. At the time this matter went to trial, rescission was no longer an option or issue since Borror had sold the

10.

boat by then.   Further, in its Proposed Findings of Fact and Conclusions of Law, ¶ 1, appellant stated that Borror had "voluntarily dismissed with prejudice his claim for revocation of acceptance of the boat * * * as originally set forth in his Complaint." Appellant also acknowledged that "during the trial of this action, Plaintiff advised the Court of * * * the dismissal of his revocation of acceptance claim * * *."  It is clear from the record that the trial court did not "find rescission and award contract damages" as appellant claims.  This argument is without merit.

{¶ 32} Appellant also argues that the trial court's finding that MarineMax violated the CSPA is against the weight of the evidence.  In support, appellant asserts that the "overwhelming evidence" shows a "breakdown in communication" rather than deceit on the part of MarineMax or its agents.  Appellant stresses that Borror testified that he heard the salesman say that the boat had hit a can (buoy) by the reef, while the salesman testified he told Borror the boat had hit a reef by the green can.  In further support of this argument, appellant cites testimony of service manager Oreskovich, who stated he thoroughly inspected the boat before and after the second round of repairs, observed the repairs being made, and believed that the boat was fully repaired.

{¶ 33} Our standard of review on manifest weight of the evidence issues in a civil case is whether there is some competent, credible evidence in support of the trial court's decision. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, syllabus.

{¶ 34} An appellate court generally must presume that the findings of the trier of fact are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79-80. The

11.

trier of fact is in the best position to make factual findings, since it has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections which cannot be conveyed on appeal through the written record. Id.; *Miller v. Miller* (1988), 37 Ohio St.3d 71. "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co.*, supra, at 81. See, also, *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.

{¶ 35} R.C. 1345.02(A) provides that "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section when it occurs before, during or after the transaction." It is undisputed that, as defined by R.C. 1345.01, Borror was a consumer, appellant was a supplier, and the sale of the boat to Borror was a consumer transaction. Appellant disputes that it intended to deceive Borror as to the extent of damage to the boat and the nature of the repairs.

{¶ 36} In its September 2005 order, the trial court found that appellant held out the boat to have sustained only minor, non-structural damage. The court found that Borror took possession of the boat without discovery of the problems because discovery was difficult, since it was in the water from the time he first looked at it until he decided to purchase it. The trial court further found that the Disclosure Acknowledgement failed to set forth "critical facts" as to the damage and repairs, "all of which would have put Plaintiff on notice that additional investigation would be appropriate."

12.

{¶ 37} Proof of intent to deceive is not required to establish a violation of R.C. 1345.02. It is sufficient that the conduct complained of "has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts." *Funk v. Montgomery AMC/Jeep/Renault* (1990), 66 Ohio App.3d 815, 823. Citing a decision of the Twelfth District Court of Appeals, the trial court in this case noted that "[t]he place to look to determine the presence of deception is the state of mind of the consumer and not the intent of the supplier." *Thompson v. Jim Dixon Lincoln Mercury, Inc.*, (Apr. 27, 1983), 12th Dist. No. 82-11-0109.

{¶ 38} Borror testified that after he test drove the boat, he asked salesman Mark Walker why such a nice boat had not been sold already. He stated Walker told him it had hit a can by the reef and had been sent back to the factory for repairs. Borror testified that Walker told him that because of the damage, they would extend the warranty six months. Borror stated that Walker pointed to the starboard side of the boat and said it was hit along that side. He testified that the boat looked fine. Borror told Walker that since the boat had been damaged and sent back to Sea Ray, he wanted to talk to service manager Karl Oreskovich, whom he had known for several years and trusted. At no time did Walker tell Borror the boat had been grounded on the reef or mention anything that would suggest that the boat had suffered stringer damage or any other structural damage. Borror testified that he spoke to Oreskovich the following morning by phone and asked him what condition the boat was in at that time. Oreskovich told him that after the boat was returned from the factory he realized it needed additional repairs. Oreskovich said

13.

he had the boat worked on locally and that there was nothing to prevent Borror from
buying it.  He did not tell Borror the boat had been grounded, the transmission replaced,
propeller shafts repaired and stringer broken.  After speaking with Oreskovich, Borror
purchased the boat.

{¶ 39} Borror testified that the disclosure acknowledgment did not specify the
extent of the damage to the boat and that he thought it referred to the damage Walker told
him about the first time he saw the boat.  He further testified that he would not have
purchased the boat if he had been told the truth about the damage.  Borror explained that
he learned of possible problems with the boat when the person he hired to prepare it for
the coming season suggested he have someone take a look at damage he noticed on the
bottom and some other things wrong with it.  At that point, Borror hired Group, the
surveyor, to inspect the boat.  He further testified that when he was offered the extended
warranty he did not think it was intended to cover structural damage done to the stringer.

{¶ 40} Debbie Halsey, a friend of Borror's daughter Danielle, testified that she was
with Borror and his daughter when they first looked at the boat.  Halsey testified that she
heard the salesman say that the boat had hit a can and had been repaired.  She did not
hear Walker say that the boat had been run aground or hit a reef.

{¶ 41} Danielle Borror testified that she heard Walker tell her father that the boat
had hit a can and had been fixed.  She did not hear any mention of the boat being run
aground or other damage.

14.

{¶ 42} Steve Lenthe, an employee of MarineMax, testified that he was taking the boat for a test drive when it was damaged. Lenthe stated he hit a reef, not a can, at almost full speed. After he returned the boat to the harbor and it was pulled from the water, he could see that the props. rudders and gel coat were damaged.

{¶ 43} Greg Group, the marine surveyor, testified that Borror hired him to inspect the boat. He testified in detail as to his findings after he inspected the boat on January 31, 2003. Group stated that after his inspection he concluded the boat was not seaworthy based on the existence of extensive repairs, unrepaired damage, and "vast areas" of the boat he was unable to inspect and that did not appear to have been inspected to determine whether or not there was additional damage. Group testified that he spoke with Oreskovich sometime after he inspected the boat and Oreskovich indicated that "the boat had hit a can." He later spoke in passing to Oreskovich, who then told Group that he did not intend to say that the boat hit a can but intended to say it hit "out by the can." Group also testified that after his inspection he determined the boat was worth approximately $300,000 based on its history of damage and repairs.

{¶ 44} Stephen Knox, a certified marine surveyor specializing in damage survey and accident investigation, offered his opinion that a properly repaired boat does not suffer any loss in fair market value for a fully informed buyer. Knox, who surveyed Borror's boat before he sold it, stated that he considered it seaworthy after the repairs. Knox testified that he disagreed with conclusions Group reached in his report with regard

15.

to the quality of the repairs and the extent of damage to the hull.  He also expressed his opinion that Group grossly undervalued the boat after the repairs were done.

{¶ 45} Mark Walker, a salesman at MarineMax at the time Borror purchased his boat, testified that when he worked for Marine Max he was instructed not to use Group for surveys of used boats because the company believed Group was prejudiced against Sea Ray boats.  Walker testified that after Borror first looked at the boat he told Borror the boat had hit a reef and had been through two rounds of repairs.  He then put Borror in touch with Oreskovich to further discuss the boat's history.

{¶ 46} Ken Oreskovich testified that he looked at the boat after the second round of repairs and saw no problems or anything left unrepaired.  He did not believe there were any structural deficiencies at that time.  Oreskovich testified as to his brief telephone conversation with Borror in August 2002, after Borror first saw the boat. Oreskovich stated he told Borror the boat was run aground in 2001, and said he told Borror there was "some pretty good damage to the bottom of it."  He testified that he told Borror the boat was returned to Sea Ray and repaired further after that because the Sea Ray repairs were not adequate.  He further testified that Borror's main concern was how the boat was repaired as opposed to the accident or the damage.  Oreskovich stated he did not try to deceive Borror and was not aware of any suggestion from MarineMax that he hide the details of the boat's history.   He had seen photographs of the damage to the boat but did not offer to let Borror see them because "[i]t wasn't asked of me."  He further testified that MarineMax had not been asked to provide warranty service on the problems

16.

Borror claimed existed with the boat. Oreskovich explained that after the initial repairs, delamination was discovered on the engine stringers which led to the second repair job. He stated that when that happens to the inboard and outboard stringers, the boat is not structurally sound. Oreskovich testified he was aware that when Tim Mills began to repair the boat in 2002, Mills found damage that had not been addressed by Sea Ray during the initial repairs.

{¶ 47} This court has thoroughly reviewed the record of proceedings in the trial court. Based thereon, we find that there was competent, credible evidence before the trial court to support its decision that appellant held out the boat to have sustained only minor, non-structural damage and thereby committed an unfair or deceptive act. The trial court's application of the Consumer Sales Practices Act to the facts of this case was proper. This court must presume that the findings of the trier of fact are correct; a difference of opinion as to the credibility of witnesses and evidence is not a legitimate ground for reversal. See *Seasons Coal Co.*, supra.[2]

{¶ 48} Based on the forgoing, appellant's first assignment of error is not well-taken.

{¶ 49} In its second assignment of error, appellant asserts the trial court erred by finding a knowing violation of the CSPA, which is required for an award of attorney fees,

---

[2]Appellant does not separately challenge the trial court's decision to award treble damages. Pursuant to R.C. 1345.09(B), actual damages proven, whether economic or noneconomic, are subject to trebling. *Whitaker v. M.T. Automotive, Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481.

17.

and abused its discretion by awarding enhanced attorney fees exceeding $420,000. Appellant argues that even if reasonable fees were justified, the court erred by enhancing them.

{¶ 50} This court has already affirmed the trial court's finding that appellant committed a deceptive act in violation of the CSPA.  The trial court found further that "one can knowingly do an act without knowing that the act is in violation of the law." [*Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.* (1985), 23 Ohio App.3d 85].   In *Einhorn v. Ford Motor Company et al.* (1990), 48 Ohio St.3d 27, the Supreme Court of Ohio found that the legislative purpose of R.C. 1345.09(F)(2) is best safeguarded "by finding that 'knowingly' committing an act or practice in violation of R.C. Chapter 1345 means that the supplier need only intentionally do the act that violates the Consumer Sales Practices Act." *Einhorn* at 30.  The court further found that "[t]he supplier does not have to know that his conduct violates the law for the court to grant attorney fees."  Id. The trial court in the case before us concluded that appellant knowingly violated the CSPA when it failed to disclose the structural damage to the boat and also when it refused to accept Borror's revocation of the sale.  The trial court's findings allowed it to award Borror reasonable attorney fees, including expenses.

{¶ 51} Appellant next argues that the trial court's award of enhanced attorney fees was an abuse of discretion.  To determine a "reasonable" fee as allowed by R.C. 1345.09(F), the trial court first calculates the number of hours reasonably expended on the case times an hourly fee.  The trial court then may modify that figure by applying

18.

factors listed in DR 2-106(B).  See *Bittner v. Tri-County Toyota, Inc.* (1991), 58 Ohio St.3d 143, syllabus.  Following the three-day bench trial, Borror submitted a fee request of $181,850.75.  MarineMax did not contest that figure, with the exception of $2,421 in fees generated by a paralegal and law clerk.  MarineMax objects to the trial court's decision to enhance the fee by $240,000 based on factors set forth in DR 2-106(B).

{¶ 52} The trial court made numerous findings related to the application of the factors set forth in DR 2-106(B).  In support of its decision to modify the attorney fees upward, the trial court considered the time and labor involved as well as the experience and professional skills of Borror's attorneys.  The trial court found that the issues in the case were novel and difficult; plaintiff's counsel performed "exemplary" legal services; the lodestar was inappropriate in light of the difficulty in ascertaining an appropriate fee for legal services of this type; and appellant's offer of $35,000 to settle in response to Borror's $900,000 settlement demand was so inadequate that Borror was left with no choice but to proceed to trial.

{¶ 53} Another key factor the trial court considered pursuant to DR 2-106(B) was whether the fee was fixed or contingent.  In this case, when the lawsuit was initiated, Borror and his legal counsel agreed that fees would be paid on an hourly basis.  However, on March 1, 2005, Borror and his attorneys entered into a contingency fee agreement which provided that as of April 1, 2005, attorney fees would be 50 percent of "all money and things of value recovered on behalf of [Borror] that exceeds the amount of

19.

$486,404.47." This provided for Borror to be made whole for his actual damages before paying his attorney fee obligation.

{¶ 54} The trial court awarded fees and expenses of $484,727.43; this included the $181,850.75 lodestar, a $240,000 enhancement of the lodestar, and expenses of $62.877.43.

{¶ 55} The trial court explained how it arrived at the enhancement of $240,000. The trial court reasoned that because approximately $120,000 of the lodestar was earned *after* Borror and his attorneys changed to a contingency fee agreement, Borror's counsel "risked" that amount by entering into the second arrangement. The trial court then doubled the $120,000 amount and added it to the $181,850.75 lodestar along with expenses.

{¶ 56} A careful review of the trial court's separate decision and order as to attorney fees shows that the court's decision to enhance the fee award was heavily influenced by the fact that Borror and his attorneys entered into the contingency fee agreement. This court does not dispute that such an agreement may be used as a factor, among several others, to determine the reasonableness of attorney fees. See *Brookover v. Flexmag Indus.*, 4th Dist. No. 00CA49, 2002-Ohio-2404; DR 2-106(B)(8). Ohio courts have not always followed that reasoning, however. This court held in *Stacy v. Nationwide Mut. Ins. Co.* (1998), 125 Ohio App.3d 658, 672, that the trial court erred by using a contingent fee agreement to award attorney fees because it was unfair to hold a third party adversary to the terms of another's bargain. Additionally, the Supreme Court

20.

of Ohio has held that to award attorney fees to the prevailing party based on that party's contingent fee agreement with counsel constitutes an abuse of discretion. *Landis v. Grange Mut. Ins. Co.* (1998), 82 Ohio St.3d 339, 342-343.

{¶ 57} In spite of Ohio cases rejecting the existence of a contingency fee agreement as a determining factor in the award of attorney fees, the trial court found that the fee agreement entered into by Borror and his counsel did not adequately reflect the merits of the claim and the difficulty of establishing those merits.

{¶ 58} In further support of its decision, the trial court reasoned that, if this case had involved a commonly used contingency fee arrangement of one-third the amount recovered, that amount would be $646,121.67. The court further noted that the fee awarded of $421,850 represents only 21.9 percent of the amount recovered. The court stated that "It is this fact that warrants an enhancement of the 'lodestar' by counsel's assumption of the risk times a factor of two, or $240,000.00."

{¶ 59} A trial court's determination as to the amount of attorney fees awarded for a knowing violation of the CSPA should not be reversed absent a showing that the court abused its discretion. *Bittner*, supra. An abuse of discretion is more than an error of judgment or law; it implies the trial court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1985), 5 Ohio St.3d 217, "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Bittner*, supra, at 146, quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.* (1985), 23 Ohio App.3d 85, 91.

21.

{¶ 60} In this case, Borror's attorneys were paid their hourly rate until just a few weeks before trial, when they negotiated the contingency fee agreement.  A careful review of the record does not support either the trial court's finding that Borror's counsel "risked" $120,000 by entering into the contingency fee agreement or its decision to double that amount in calculating the total attorney fee award.  As noted above, enhancement of attorney fees is within a trial court's discretion.  We find, however, that an enhancement of the magnitude ordered by the trial court was not justified.  We are troubled by what appears to be great weight given by the trial court to its conclusion that Borror's counsel took a "risk" by entering into the contingency fee agreement.  Granted, if Borror had not prevailed on any of his claims, counsel would have collected only the fees earned before the new agreement was made.  Such is the nature of a contingency fee agreement.  We also acknowledge that the trial judge, after participating in the trial and numerous preliminary proceedings, was in a position to determine the value of services rendered by the lawyers who tried to case.  Ohio case law tells us that where a court is empowered by statute to award attorney fees, the amount of such fees is within the court's sound discretion. *Bittner*, supra, at 146; *Brooks*, supra, at 91.  The record does reflect that approximately $120,000 in legal services was rendered after entering into the contingency fee agreement.  However, to simply take that number and double it appears to this court to have been arbitrary and without adequate justification.  For the foregoing reasons, this court finds that the trial court's decision to enhance the award of attorney

22.

fees by $240,000 was an abuse of discretion.  Accordingly, appellant's second assignment of error is well-taken.

{¶ 61} In its third assignment of error, appellant challenges the trial court's finding that MarineMax committed an act of egregious fraud and its decision to award punitive damages, arguing that the decision was against the weight of the evidence.

{¶ 62} To establish fraud, a plaintiff must prove:

{¶ 63} "(a) a representation or, where there is a duty to disclose, concealment of a fact.

{¶ 64} "(b) which is material to the transaction at hand,

{¶ 65} "(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

{¶ 66} "(d) with the intent of misleading another into relying upon it,

{¶ 67} "(e) justifiable reliance upon the representation or concealment, and

{¶ 68} "(f) a resulting injury proximately caused by the reliance."

*Burr v. Stark County Board of Commissioners* (1986), 23 Ohio St.3d 69, paragraph two of the syllabus.

{¶ 69} Appellant argues that there was insufficient evidence to support a finding of fraud, much less egregious fraud.  Alternatively, appellant argues that the trial court's findings are against the manifest weight of the evidence.  While we agree the finding of egregious fraud was not supported by the evidence, we affirm the trial court's finding that appellant committed fraud.

23.

{¶ 70} The trial court found that Borror's fraud claim shared a common core of facts with the CSPA claim.  We agree.  The trial court's findings included the following: Oreskovich knew his representations were false in that they understated the degree of damage and were made with intent to deceive; the Disclosure Acknowledgement was made with intent to deceive, as evidenced by the omission of critical information; and Walker and Oreskovich intended for Borror to believe their statements and rely upon them when making his decision to purchase the boat.  The trial court then found that punitive damages under the fraud claim were "altogether appropriate," despite Borror's statement that he would be satisfied with the damages from a CSPA violation, if trebled. The amount of punitive damages awarded was $484,591.27, which was equal to the actual damages.  Further, having determined that Borror was entitled to punitive damages, the trial court found that he also was entitled to attorney fees under the fraud claim.  However, there appears to have been no additional sum awarded over and above the $484,727.43 awarded under the CSPA claim.  In its order, the trial court awarded Borror "attorneys fees pursuant to R.C. 1345.09(F)(2)."

{¶ 71} In considering appellant's claims under this assignment of error, we are guided by the following standard of review: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St. 2d 279.

24.

{¶ 72} For the following reasons, we find that the record supports the lower court's decision that fraud was demonstrated.  Representations concerning how the boat was damaged, the extent of the damage, and its repair history were material to Borror's decision to purchase the boat.  The most significant misrepresentation, in the opinion of this court, occurred through the bare-bones "Disclosure Acknowledgement" presented to Borror for him to sign at the time of the purchase.   The "disclosure" stated that the boat had been returned to the manufacturer for repairs but, importantly, said nothing about the additional repairs required after it was discovered that all of the damage had not in fact been remedied by the manufacturer.  The representations made by MarineMax were made falsely, clearly with knowledge of their falsity, with the intent of misleading Borror into relying upon them.  Lastly, Borror justifiably relied upon those representations, which resulted in his economic injury.

{¶ 73} Borror testified that had he known of the extent of the damage to the boat and its repair history, he would not have bought it.  Therefore, had he not relied on appellant's representations, his subsequent damages would never have resulted.  In summary, appellant knew it was concealing information about the boat, intended reliance, and in fact misled Borror to his detriment.

{¶ 74} Based on the foregoing, this court finds that MarineMax committed fraud upon Borror.   The trial court's finding is not against the manifest weight of the evidence.  Having made that determination, we now consider appellant's assertion that the trial court

25.

erred by finding that MarineMax committed egregious fraud and ordering punitive damages.

{¶ 75} The Ohio Supreme Court held in the third paragraph of the syllabus of *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241:

{¶ 76} "In each case of alleged fraud the plaintiff, in order to be awarded punitive damages, must establish not only the elements of the tort itself but, in addition, must either show that the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious."

{¶ 77} Further, in weighing this issue, the United States Supreme Court has stated that it should be presumed a plaintiff has been made whole by compensatory damages, and punitive damages should be awarded only if the defendant's culpability is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence. *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408.

{¶ 78} The infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, can warrant a substantial penalty. But all acts that cause economic harm do not constitute torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages. *BMW of North America, Inc. v. Gore* (1996), 517 U.S. 559.

{¶ 79} We find that Borror did not present any evidence which would elevate the fraud committed against him to the level we believe was contemplated by the court in *Combs Trucking*, supra. There was no evidence presented in addition to that needed to

26.

establish a basic case of fraud.  Borror did not establish that the fraud was aggravated by malice or ill will on the part of MarineMax, nor did he demonstrate that the fraudulent inducement was "particularly gross or egregious."  Accordingly, we find that the trial court erred by finding that appellant committed egregious fraud and by awarding punitive damages on the claim.

{¶ 80} As appellant notes, this court in *Brenner Marine, Inc. v. Goudreau* (Jan. 13, 1995), 6th Dist. No. L-93-077, held that "an award of punitive damages in addition to the treble damages provided for under the Consumer Sales Practices Act" constitutes error as a matter of law.  Ohio courts have held that a plaintiff may not obtain multiple recoveries for actual damages under different legal theories for the same conduct of a defendant. See *Brenner Marine*, supra; *Hamlin Steel Products, Inc. v. Bur. of Employment Serv.* (1977), 54 Ohio App.2d 173.  This court relied on *Hamlin* in *Brenner Marine*, wherein we concluded that the trial court erred by awarding punitive damages for fraud in addition to treble damages under the CSPA where the same facts supported both claims. A decision on this issue in this case would require a determination of whether the trial court awarded Borror damages for his actual loss on his CSPA claim and actual damages again via the punitive damages award on the fraud claim.  However, we need not make such a finding here in light of our reversal of the trial court's award of punitive damages.

{¶ 81} As to the trial court's decision that an award of attorney fees was justified on this claim, since there appears to have been no additional award actually ordered over

27.

and above the $484,727.43 awarded under the CSPA claim, this claimed error is without merit.

{¶ 82} Based on the foregoing, appellant's third assignment of error is well-taken.

{¶ 83} In its fourth assignment of error, appellant argues alternatively that the trial court erred when it awarded punitive damages in additional to the trebled damages and in its calculation of attorney fees. First, we note that while appellant's statement of its assignment of error refers to an error in calculation of attorney fees, its argument in support of its fourth assignment of error does not address that issue. Therefore, this court will not consider it. Next, we find that in light of our determination above that the trial court erred in awarding punitive damages, this assignment of error is moot.

{¶ 84} In its fifth assignment of error, appellant asserts that the trial court abused its discretion when it awarded prejudgment interest. Appellant argues that the award of prejudgment interest punishes MarineMax for exercising its right to trial. Appellant claims it "vigorously" defended itself because it believed that its representatives were honest with Borror regarding the boat's history. MarineMax further asserts it did make a good faith settlement offer.

{¶ 85} Whether to grant an award of prejudgment interest rests with the trial court's sound discretion. *Scioto Mem. Hosp. Assn., Inc. v. Price Waterhouse* (1996), 74 Ohio St. 3d 474, 479. Absent a clear abuse of discretion, a trial court's decision on the matter should not be reversed. *Mobberly v. Hendricks* (1994), 98 Ohio App. 3d 839, 845.

28.

Again, an abuse of discretion occurs where a court's decision is unreasonable, arbitrary,

or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St. 3d 217.

{¶ 86} In the instant action, prejudgment interest was awarded pursuant to R.C.

1343.03(C) which provides:

{¶ 87} "Interest on a judgment, decree, or order for the payment of money

rendered in a civil action based upon tortious conduct and not settled by agreement of the

parties, shall be computed from the date the cause of action accrued to the date on which

the money is paid, if, upon motion of any party to the action, the court determines at a

hearing held subsequent to the verdict or decision in the action that *the party required to

pay the money failed to make a good faith effort to settle the case and that the party to

whom the money is to be paid did not fail to make a good faith effort to settle the case*."

(Emphasis added.)

{¶ 88} Whether a party has made a good faith effort to settle under R.C.

1343.03(C) is determined by whether he or she has:  1) fully cooperated in discovery

proceedings, 2) rationally evaluated the risks and potential liability, 3) not attempted to

unnecessarily delay any of the proceedings, and 4) made a good faith monetary

settlement offer or responded in good faith to an offer from the other party. *Kalain v.

Smith* (1986), 25 Ohio St. 3d 157, syllabus.  All four criteria must be met.  We stress that

"whether a party's settlement efforts indicate good faith is generally within the sound

discretion of the trial court" and will not be overturned absent an abuse of discretion.  Id.

at 159.  If, however, a party has a good faith, objectively reasonable belief that it has no

29.

liability, it is not required to make a settlement offer to avoid payment of prejudgment interest. Id. at syllabus; *Edgerson v. Cleveland Elec. Illum. Co.* (1985), 28 Ohio App.3d 24, 27-28. *Egleston v. Fell* (Feb. 9, 1996), 6th Dist. No. L-95-127.

{¶ 89} Borror filed a motion for prejudgment interest on September 23, 2005. Borror asserted he was entitled to prejudgment interest of $141,148.40, based on the boat having been purchased three years and 34 days before the trial court's decision and order. This was followed by a memorandum in opposition, reply and surreply. The trial court held a hearing on the matter on December 22, 2005, when the testimony of the parties' counsel was taken. Testimony regarding settlement negotiations revealed that Borror made one settlement demand of $900,000 during mediation on February 1, 2005. Appellant made a counter-offer of $35,000 on March 16, 2005. Borror did not counter that offer. Appellant's attorney testified that in mid-April he contacted Borror's attorney by telephone in an attempt to restart negotiations. He asked Borror's attorney if he would respond to the offer of $35,000 that had been made in March and said he had authority to negotiate. Borror's attorney indicated he did not consider appellant's offer "serious."

{¶ 90} The trial court found that Borror was not obligated to make any additional monetary settlement offers. The court further found that appellant's offer was "so inadequate as to justify the termination of settlement discussions" and concluded that as such, appellant could not claim that it made a good faith effort to settle the case. In its order, the trial court did not calculate the amount of interest to be awarded or specify the applicable interest rates.

30.

{¶ 91} There is no shortage of case law in Ohio dealing with the issue of prejudgment interest.  There have been many decisions, including some from the Supreme Court of Ohio, reversing a trial court's order when one of the parties failed to make a settlement offer.  See, e.g., *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638.   Such was not the case herein, as Borror made the initial offer and appellant responded with a counteroffer.  The issues in this case  then become whether the trial court abused its discretion in determining that appellant's counteroffer was so inadequate as to justify the conclusion that it failed to respond in good faith, and whether the trial court was punishing appellant for exercising its right to trial.  This court has held that it is "an injustice to penalize a party for exercising her right to trial." (Citations omitted.) *Steele v. Diab* (Dec. 3, 1999), 6th Dist. No. E-98-035.   In *Steele*, the appellant had admitted she was negligent at the time of the automobile accident that gave rise to the case, but disputed that her negligence was the proximate cause of appellee's injuries, and the matter proceeded to trial.

{¶ 92} We are mindful, however, of the holding of the Ohio Supreme Court in *Moskovitz*, supra, that the "ultimate decision whether to award prejudgment interest rests with the trial judge."

{¶ 93} The trial court concluded that appellant failed to put forth evidence suggesting it made any offers that would constitute a reasonable basis for settlement discussions.  It also found that Borror's demand was not unreasonable.  The court thus rejected appellant's claim that it made a good faith effort to settle the case.  Upon our

31.

review of the record, we are unable to find that the trial court was attempting to penalize appellant for exercising its right to a trial.

{¶ 94} Based on the foregoing, guided by the clear message from the Ohio Supreme Court that the "ultimate decision" on this issue rests in the trial court's discretion, we are unable to find that the decision of the trial court in this case was an abuse of discretion. Accordingly, appellant's fifth assignment of error is not well-taken.

{¶ 95} On consideration whereof, the judgment of the Ottawa County Court of Common Pleas is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with this decision and judgment entry. The parties are ordered to pay equal shares of the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.

JUDGMENT AFFIRMED IN PART
AND REVERSED IN PART.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

Borror v. MarineMax of Ohio, Inc.
C.A. No. OT-06-010

Arlene Singer, J. _____

_____
                                    JUDGE

William J. Skow, J. _____

George M. Glasser, J. _____
CONCUR.

_____
                                    JUDGE

_____
                                    JUDGE

Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.

33.

# EXHIBIT Q

FILED

NOVEMBER 5, 1979

COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

HAMILTON COUNTY COMMON
PLEAS CLERK OHIO

WILLIAM J. BROWN, et al.              )
Attorney General of Ohio
                                      )        CASE NO. A-742156
                Plaintiffs,
                                      )        JUDGE JOHN W. KEEFE
        v.
                                      )
HAROLD KENNETH LYONS, et al.
                                      )        FINDINGS OF FACT AND
                .Defendants.                   CONCLUSIONS OF LAW
                                      )

        This cause having come on for trial and the Court, having heard
the evidence presented by the plaintiffs and defendants, and having
ruled in favor of plaintiffs, and the plaintiffs having filed a re-
quest for separate findings of fact and conclusions of law, therefore
the Court finds the facts and states the conclusions of law as fol-
lows:

                FINDINGS OF FACT FOR ATTORNEY GENERAL

        1.    Harold Kenneth Lyons and his employees engaged in consumer
transactions in the State of Ohio beginning a date unknown but at
least from March 1973, at the following locations:

                (a)    2935 Jessamine, Cincinnati, Ohio;

                (b)    1725 Vine Street, Cincinnati, Ohio;

                (c)    5259 Colerain, Cincinnati, Ohio;

                (d)    4152 Hamilton Avenue, Cincinnati, Ohio;

                (e)    2916 Colerain, Cincinnati, Ohio.

2. Harold Kenneth Lyons and his employees, in the course of engaging in consumer transactions, used the phone numbers 542-7515 and 542-7442.

3. Harold Kenneth Lyons, in connection with engaging in consumer transactions, identified himself by the following names:

(a) Harold Lawrence;

(b) Ken Lawrence;

(c) Harold Davis;

(d) William Lawrence;

(e) Mr. Harold,

4. Harold Kenneth Lyons and his employees engaged in consumer transactions using the following business names:

(a) Emergency Refrigeration Service;

(b) ABC Appliances;

(c) Harold's Appliances, Sales and Service;

(d) ACCO & Co.

5. Harold Kenneth Lyons employed sales persons and repairmen to engage in the business of the sale of used appliances and the repair of used appliances.

6. Harold Kenneth Lyons personally represented, and authorized his sales persons to represent the characteristics of the goods and services or warranties of the goods and services sold to consumers.

7. Harold Kenneth Lyons and his employees, in the course of engaging in consumer transactions, represented, expressly or impliedly, that goods sold by him were of merchantable quality, and would perform in the manner for which such goods were used.

8. Harold Kenneth Lyons represented, or authorized representations by his sales persons, that goods and services sold by him were warranted or guaranteed for a certain specific period of time, usually for a period of ninety (90) days.

10.   Harold Kenneth Lyons failed to repair goods or replace goods, or refund consumers' money when those goods were not of a merchantable quality, and did not perform in a manner for which such goods were used.

11.   Harold Kenneth Lyons represented, or authorized representations by his sales persons, that appliances were in working condition at the time of sale.

12.   Harold Kenneth Lyons or his employees sold certain appliances that were not in working condition, despite the representations that said appliances were in working condition.

13.   After failing to provide goods and services, Harold Kenneth Lyons also failed to refund consumers' payments for said goods and services.

14.   Harold Kenneth Lyons or his employees represented that his good and services had performance characteristics, uses, and benefits which, in fact, they did not have.

15.   Harold Kenneth Lyons failed to provide in advance to the consumer, when anticipated repairs exceed $25.00, a written estimate of the cost to the consumer of the anticipated repairs, the basis upon which the charge to the consumer would be made, and the reasonably expected completion date of such repairs, including any charge for reassembly of any parts disassembled for inspection, or any service charge to be imposed.

16.   Harold Kenneth Lyons represented, or authorized representations by his repairmen, that defects in appliances had been repaired when, in fact, the repairs had not been properly performed.

17.   Due to the complex electrical and mechanical nature of household appliances, many consumers are unable to personally determine whether appliances are working properly or repaired properly.  Furthermore, consumers are unable to comprehend the internal mechanical operation of appliances as well as the identification of parts, terms and mechanical functions.  Therefore, those consumers must rely on the expertise of suppliers who hold themselves out to be appliance dealers and appliance repairmen.  Harold Kenneth Lyons and his employees:

(a)   Intentionally and knowingly made misleading statements

      of opinion upon which consumers relied regarding the

      quality and operation of used appliances which consu-

      mers purchased;

(b)   Intentionally and knowingly made misleading statements

      of opinion upon which consumers relied regarding the

      work necessary to repair consumers' defective appliances

      and repair work already performed;

(c)   Knowingly took advantage of the inability of the consu-

      mer to protect his interests because of his inability

      to understand technical terms by intentionally making

      deceptive and false statements in the sale or repair of

      used appliances, and by performing useless and unneces-

      sary repairs.

18.   Harold Kenneth Lyons and his employees knew at the time of

the consumer transactions of the inability of the consumer to receive

a substantial benefit because the used appliances did not work, guaran-

tees and warranties would not be honored, or that useless and unneces-

sary repairs were made.

19.   Harold Kenneth Lyons, in connection with consumer transactions,

avoided his legal obligations to consumers in each of the following re-

spects:

(a)   Concealing his real identity from consumers with whom

      he dealt by using several fictitious names or aliases as

      his name;

(b)   Frequently changing the names under which he did busi-

      ness;

(c)   Frequently changing the geographic location from which

      he did business;

(d)   Failing to answer his business phones for unreasonable

      lengths of time;

(e)   Failing to return calls to consumers;

(f)   Selling defective merchandise and thereafter failing

      to honor warranties.

- 4 -

20.     Harold Kenneth Lyons, in connection with consumer transactions,
consistently maintained a pattern of inefficiency, incompetency, stall-
ing and evasion.

## ADDITIONAL FINDINGS OF FACT FOR INTERVENORS

21.     The following consumer-plaintiffs purchased used appliances
from Harold Kenneth Lyons and his employees which did not perform ac-
cording to the representations made by Harold Kenneth Lyons and his em-
ployees, and which were not repaired or replaced pursuant to express and
implied warranties (as set forth in Findings of Fact numbers 6 through
14 herein):

            (a)  Rebecca Green;

            (b)  Virginia Ferrarelli;

            (c)  Earl Owens;

            (d)  Lucille Cody;

            (e)  Ruth Blackburn.

22.     The following consumer-plaintiffs paid money for the repair
of used appliances to Harold Kenneth Lyons or his employees, which re-
pair was improperly performed (as set forth in Findings of Fact numbers
15 and 16 herein):

            (a)  Beatrice McWilliams;

            (b)  Saundra Cheek;

            (c)  Linnie Caldwell;

            (d)  Olivia Thompson;

            (e)  Josephine Dickhaus;

            (f)  Raymond Colson;

            (g)  Luther Walker;

            (h)  Zita Crooker.

23.     Harold Kenneth Lyons and his employees engaged in the acts
and practices (as set forth in Findings of Fact numbers 17 through 21)
with respect to each of the consumer-plaintiffs herein.

24.     Harold Kenneth Lyons and his employees failed to return con-
sumers appliances which were taken from their homes for repair.

CONCLUSIONS OF LAW FOR ATTORNEY GENERAL

From the foregoing facts, the Court makes the following conclusions of law:

1.     Harold Kenneth Lyons is a "supplier" as defined by Section 1345.01(C), Ohio Revised Code and is a merchant as defined by Section 1302.01(A)(5), Ohio Revised Code.

2.     Sales persons, repairmen, and employees of Harold Kenneth Lyons who effected or solicited consumer transactions, are agents of Harold Kenneth Lyons and therefore, Harold Kenneth Lyons is legally responsible for the acts and practices of his agents.

3.     Harold Kenneth Lyons and his agents have engaged in numerous "consumer transactions" as defined by Section 1345.01(A), Ohio Revised Code.

4.     Harold Kenneth Lyons and his agents, in the sale of appliances, have created express warranties as defined in Section 1302.26, Ohio Revised Code.

5.     Failure by a supplier in connection with a consumer transaction to honor express warranties, constitute deceptive acts and practices in violation of the Ohio Consumer Sales Practices Act, Section 1345.02(A), Ohio Revised Code.  This failure also constitutes a violation of Section 1345.02(B)(10), Ohio Revised Code.

6.     Harold Kenneth Lyons and his agents, in the sale of appliances, have created implied warranties of merchantability as defined in Section 1302.27, Ohio Revised Code.

7.     Failure by a supplier in connection with a consumer transaction to honor implied warranties of merchantability constitutes a deceptive act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.02(A), Ohio Revised Code.  This failure to honor implied warranties also constitutes a violation of Section 1345.02(B)(10), Ohio Revised Code.

8.     Representations by a supplier in connection with a consumer transaction that goods and services have performance characteristics,

uses, and benefits which, in fact, they do not have constitute deceptive acts and practices in violation of Section 1345.02(A), Ohio Revised Code. These representations also specifically violate Section 1345.02(B)(1), Ohio Revised Code.

9.   Failure by a supplier in connection with a consumer transaction to provide goods and services while also failing to refund consumers' money after consumers have paid for said goods and services consitute deceptive acts and practices in violation of Section 1345.02(A), Ohio Revised Code.  This also specifically violates Section 1345.02(B)(6), Ohio Revised Code.

10.   A supplier who in connection with a consumer transaction accepts monies from consumers for goods or services and then allows an unreasonable length of time to elapse without:

(a)   making shipment or delivery of the goods ordered;

(b)   making full refund;

(c)   advising the consumer of the duration of an extended delay and offering to send him a refund within a reasonable length of time if so requested; or

(d)   furnishing similar goods of equal or greater value as a good faith substitute,

commits a deceptive act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.02(A), Ohio Revised Code.

11.   A supplier who in connection with a consumer transaction fails to provide in advance to the consumer, when anticipated repairs exceed $25.00, a written estimate of the cost to the consumer of the anticipated repairs, the basis upon which the charge to the consumer will be made, and the reasonably expected completion date of such repairs, including any charge for reassembly of any parts disassembled for inspection or any service charge to be imposed commits a deceptive act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.02(A), Ohio Revised Code.  This also specifically violates the Ohio Director of Commerce's Substantive Rule COcp-3-01.05(A)(1).

12.    Where a supplier has legal obligations to consumers, and where there are no valid legal defenses for not performing those obligations, a supplier who avoids or attempts to avoid those obligations commits a deceptive act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.02(A), Ohio Revised Code.

13.    A supplier in connection with a consumer transaction who consistently maintains a pattern of inefficiency, incompetency, or continually stalls and evades his legal obligations to consumers, commits an unconscionable act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.03(A), Ohio Revised Code, providing an adequate legal basis for the award to the consumer of punitive damages in an action where such damages have been requested from the Court.

14.    Where a supplier in connection with a consumer transaction knowingly takes advantage of the inability of the consumer reasonably to protect his interests because of his physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement, the supplier commits an unconscionable act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.03(A), Ohio Revised Code.

15.    Where a supplier in connection with a consumer transaction knows at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction, the supplier commits an unconscionable act and practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.03(A), Ohio Revised Code,

16.    Where a supplier in connection with a consumer transaction knowingly makes a misleading statement of opinion on which the consumer is likely to rely to his detriment, the supplier commits an unconscionable act or practice in violation of the Ohio Consumer Sales Practices Act, Section 1345.03(A), Ohio Revised Code.

ADDITIONAL CONCLUSIONS OF LAW FOR INTERVENORS

17.   Harold Kenneth Lyons committed deceptive and unconscionable acts and practices in connection with consumer transactions in violation of the Ohio Consumer Sales Practices Act, Section 1345.01, et seq., Ohio Revised Code, entitling each of the named plaintiffs herein to their actual damages as a result of these deceptive and unconscionable acts under Ohio Revised Code, Section 1345.09.

18.   Harold Kenneth Lyons consistently maintained a pattern of inefficiency, incompentency, and continually stalled and evaded his legal obligations to plaintiffs-intervenors, in violation of the Ohio Consumer Sales Practices Act, Section 1345.03(A), Ohio Revised Code, entitling each of the plaintiffs-intervenors herein to punitive damages in the amount of Two Hundred Fifty Dollars ($250.00) each.

19.   Harold Kenneth Lyons failed to honor the express and implied warranties made in connection with the sale of goods to plaintiff-intervenors.  As a result of this failure, these plaintiffs are entitled their actual damages under Ohio Revised Code, Section 1302.88.

_____
Date

_____
JUDGE JOHN W. KEEFE

# EXHIBIT R

PIF Number:     10001586

Case Name:      CRANFORD V. JOSEPH AIRPORT TOYOTA, INC.

Case Number:    15408

FILED
COURT OF APPEALS
96 MAY 17 AM 9:58
CRAIG ROGERS
CLERK OF COURTS
MONTGOMERY CO., OHIO



RECEIVED
MAY 2 3 1996
ATTORNEY GENERAL OF OHIO
CONSUMER FRAUDS & CRIMES
PUBLIC INSPECTION FILE

IN THE COURT OF APPEALS OF MONTGOMERY COUNTY, OHIO

MARK J. CRANFORD and
JEANINE F. CRANFORD                        :

      Plaintiffs-Appellants/      :      C.A. Case No. 15408
      Cross-Appellees

v.                                          :      T.C. CASE NO. 94-2431

JOSEPH AIRPORT TOYOTA, INC.    :

      Defendant-Appellee/         :
      Cross-Appellant

. . . . . . . .

O P I N I O N

Rendered on the 17th day of May , 1996.

. . . . . . . .

Carol J. Holm, Price Brothers Building, Suite 110, 367 West
Second Street, Dayton, Ohio  45402 (513) 461-0009
      Attorney for Plaintiffs-Appellants/Cross-Appellees

Jay R. Langenbahn and Peter J. Stautberg, 312 Walnut Street,
Suite 2300, Cincinnati, Ohio  45201 (513) 421-6630
      Attorneys for Defendant-Appellee/Cross Appellant

. . . . . . . .

BOOK 187 PAGE 394

COURT OF APPEALS
SECOND APPELLATE DISTRICT

2

PER CURIAM:

   This is an appeal and a cross-appeal from a judgment rescinding a contract to purchase an automobile upon a finding that the seller had violated the Consumer Sales Practices Act, R.C.Chp.1345.

   On February 17, 1994, Mark Cranford and his daughter, Jeanine Cranford, visited the used car sales lot of Joseph Airport Toyota, Inc. ("Joseph") to shop for a car for Jeanine.  They were shown several cars by one of Joseph's salesmen, Eddie Bressler.

   After the Cranfords showed interest in a 1989 ISUZU Trooper, Bressler persuaded them to sign a sales contract, loan application, and associated documents to purchase the vehicle.  The Cranfords drove the car off the lot.

   The Cranfords returned the following morning.  They complained that one of the car's doors would not close properly, a defect which Joseph promised to fix.  The Cranfords also complained that the monthly payment on the loan Joseph had arranged through Huntington Bank was more than Jeanine Cranford could afford.  Whether for that reason, or because Huntington Bank had since declined to make the loan, Joseph proposed to seek new financing.

   Joseph prepared an application for a loan with lower monthly payments from Union Federal Savings Bank.  Joseph reduced the sale price of the car but arranged for a longer finance term to make up the difference.  The price change

BOOK 187 PAGE 395

3

apparently required a new written sales contract. Joseph
prepared a contract, but dated it for the prior day,
February 17, 1994. The Cranfords signed the new contract,
and the loan application. They left the car with Joseph for
repairs on the door.

The following day, February 19, 1994, the ISUZU Trooper
was advertised for sale by Joseph in a local newspaper for
less than the Cranfords had paid for it. Several days
later, an attorney representing the Cranfords sent Joseph a
written notice of rescission. Joseph did not treat the sale
as rescinded, however, and subsequently accepted payment
from Union Federal Savings Bank of the proceeds of the
Cranfords' loan.

The Cranfords never returned for the vehicle. They
were repeatedly dunned for payment by Union Federal Savings
Bank. Ultimately, the Cranfords filed this action seeking
to rescind the sale and cancel their debt. Their obligation
to Union Federal Savings Bank was apparently settled as a
result.

The Cranfords brought this action for violations of the
Consumer Sales Practices Act, claiming that in its dealings
with them Joseph had committed several unfair or deceptive
acts or practices prohibited by the Act. Joseph denied the
claims. After a trial, the court found that Joseph
violated the act by (1) back-dating the sales contract
signed on February 18, 1994 to February 17, 1994, (2) by

4

using the term "M.S.R.P." in the sales contract though the
ISUZU Trooper was a used vehicle, and (3) by failing to sell
the ISUZU to the Cranfords at the price advertised on
February 19, 1994.  The court ordered the sale rescinded,
but it denied the Cranford's request for attorney fees.

     The Cranfords appealed from the order.  Joseph filed a
cross-appeal.  For purposes of clarity, Joseph's assignments
of error are discussed first.

                              I.

                   JOSEPH AIRPORT TOYOTA, INC'S
                     ASSIGNMENT OF ERROR

          THE TRIAL COURT ERRED IN FINDING THAT
          JOSEPH VIOLATED THE CONSUMER SALES
          PRACTICES ACT. O.R.C. § 1345.01 ET SEQ.,
          AND THAT THE CRANFORDS WERE ENTITLED TO
          RECISION OF THE PURCHASE CONTRACT.

     Joseph presents three specific issues for review
concerning the violations which the trial court found.  They
are discussed below.

     R.C. 1345.02 (A) states:

          No supplier shall commit an unfair or
          deceptive act or practice in connection
          with a consumer transaction.  Such an
          unfair or deceptive act or practice by a
          supplier violates this section whether
          it occurs before, during, or after the
          transaction.

At part (B), the statute sets out ten events typical and
illustrative of acts or practices that are unfair or
deceptive.  None of those specific acts were found here.

     A sales practice is deceptive within the meaning of
R.C. 1345.02(A) if it has the tendency or capacity to

BOOK 187 PAGE 397

                   COURT OF APPEALS
                 SECOND APPELLATE DISTRICT