1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JASON ARCHINACO
State Bar ID Number: 284396
jarchinaco@archlawgroup.com
THE ARCHINACO FIRM LLC
The Pennsylvanian
1100 Liberty Avenue, Suite C6
Pittsburgh, PA 15222
Telephone: (412) 434-0555
Fax (888) 563-7549

*ATTORNEY FOR KNIGHT MOTORS, LP*

## IN THE UNITED STATES DISTRICT COURT
## OF THE CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation, No. 8:17-cv-00838-JLS-JDE and Flaherty v. Hyundai Motor Company, Inc. et al, No. 18-cv-02223 (C.D. Cal.)* | **KNIGHT MOTORS, LP AND DOMAN AUTO AND MARINE SALES INC.'S POINTS AND AUTHORITIES IN SUPPORT OF OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT**<br><br>*[Filed concurrently with Declarations of Jason A. Archinaco and Christopher Pantelis and Exhibits attached thereto]*<br><br>**JURY TRIAL DEMANDED** |

MEMO OF PTS. AUTH. OBJ. PROP. CLASS SETTLEMENT

1

# **TABLES OF CONTENTS**

OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT .......................... 1

I.    FACTUAL BACKGROUND ............................................................................ 1

   A.   Hyundai Defined the 2011-14 Hyundai Sonata Class correctly the first time
   in the Mendoza Settlement in contrast to this time. ............................................. 2

   B.   Hyundai's outside experts determine the root cause is a design /
   manufacturing defect that exists in every single 2011-14 Hyundai Sonata. ......... 3

   D.   Knight Motors and Doman Auto learn of the Settlement Agreement and act.
   7

   E.   Hyundai acts to frustrate the purposes of the Settlement Agreement............. 9

   F.   Hyundai engages in vexatious litigation conduct and attempts to conceal the
   documents that establish that all its 2011-14 Hyundai Sonatas are defective. ..... 11

   G.   Hyundai conceals the smoking gun documents; Hyundai attempts to deceive
   this Court while Class counsel looks away. ........................................................ 13

II.   ARGUMENT ................................................................................................. 17

   A.   The built-in off-ramps designed to subvert the class while discriminating
   against those most likely to cause the defective cars to be fixed and/or removed
   from the roads. .................................................................................................. 19

   B.   Hyundai built in clauses to shift million in harm to consumers designed to
   off-ramp a massive number of defective vehicles while blaming the consumers
   and leaving them holding the bag. ...................................................................... 21

   C.   Hyundai should be required to produce the documents it provided to
   NHTSA to the Court before any settlement is approved. .................................... 28

   D.   The Requirement that someone need to 'opt in' first when already a Class
   member before being able to object is itself objectionable and objected to. ... 29

III.   CONCLUSION............................................................................................... 30

MEMO OF PTS. AUTH. OBJ. PROP. CLASS SETTLEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLES OF AUTHORITIES

**Cases**

*Altamirano v. Shaw Indus., Inc.*, No. 13-CV-00939-HSG, 2015 WL 4512372 (N.D. Cal. July 24, 2015) ............................................................................................... 21

MEMO OF PTS. AUTH. OBJ. PROP. CLASS SETTLEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT

AND NOW COMES, Knight Motors, LP ("Knight Motors") by and through its counsel, The Archinaco Firm LLC and files the within Points and Authorities in Support of Objections to the Proposed Class Action Settlement, including by incorporating by reference the Objections contained in the letter provided to Class Counsel concurrently herewith.  [Archinaco Decl., ¶ 12, Exhibit 10]

## I.      FACTUAL BACKGROUND

In or about 2015, Hyundai was named as a defendant in two class action lawsuits – *Mendoza v. Hyundai Motor Company, Ltd. et al.*, No. 5:15-cv-1685 (N.D. Cal. April 2015) and *Graham v. Hyundai Motor America, Inc.*, No. 5:15-cv-2017 (N.D. Cal. May 2015).  In June 2015, the two cases were consolidated at *In re: Hyundai Sonata Engine Litigation*, No. 5:15-cv-1685 (N.D. Cal.).  Specifically, the class plaintiffs in the Class actions were owners or lessees of 2011-2014 Hyundai Sonatas, who alleged that Hyundai knowingly manufactured, marketed, sold and/or leased said vehicles with an engine defect that can cause sudden engine seizure. [Christopher Pantelis Decl., ¶ 3, Ex. 2], Second Amended Complaint ("SAC") (verified)].[1]

---

[1] Notably, although having established his own firm in the interim, one of the signatory attorneys involved with the Mendoza Settlement Agreement, Matthew D. Schelkopf is also one of the class attorneys in this case.  [Pantelis Decl., ¶ 4, Ex. 3, Mendoza Settlement Agreement].  Mr. Schelkopf is also Class counsel in the case of *Brown v. Hyundai Motor America* et. al., No. 2:18-cv-11249 (D.N.J) and a proponent of the Class settlement there.  [Id. at ¶¶ 22-23].

1

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

**A. Hyundai defined the 2011-14 Hyundai Sonata Class correctly the first time in the Mendoza Settlement in contrast to this time.**

In or about April 2016, almost one year after the *Mendoza* litigation commenced, the parties reached a settlement and a settlement agreement was filed on April 14, 2016.  Pursuant to the *Mendoza* Settlement Agreement, the 'Class' was defined as "All owners and lessees of a Class Vehicle who purchased or leased the Class Vehicle in the United States, excluding the territories, or abroad while on active military duty." [Pantelis Decl., ¶ 4, Ex. 3, p. 2].  Although Hyundai could have sought to exclude certain owners of 2011-14 Hyundai Sonatas from the Class, Hyundai did not do so.  Instead, anyone who owned a qualifying vehicle after the Agreement was in place, irrespective of when the vehicle was purchased, was a member of the Class and accordingly a beneficiary or party to the Agreement. [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶ 14].  Further, in the Settlement Agreement, the 'Class Vehicles' were defined as ". . . all 2011[-]2014 model year Hyundai Sonata vehicles equipped with a Theta II 2.0 liter or 2.4-liter gasoline direct injection engine, which were purchased or leased in the United States, excluding the territories, or abroad while a Class member was on active military duty." [Pantelis Decl., ¶ 4, Ex. 3, p. 3.  Importantly, neither Hyundai nor their attorneys included any terminology in the *Mendoza* Settlement Agreement that would cause the Agreement to apply only to 'original' owners or lessees of the Class Vehicles as opposed to subsequent purchasers/owners or lessees.  [Pantelis Decl., ¶ 3, Ex. 2 SAC ¶ 16].  Additionally, neither Hyundai nor their attorneys included any terminology in the Settlement

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

Agreement that would cause the Agreement to apply to owners of the vehicles, but only if they owned them as of the date of the Agreement. [Id. at ¶ 17].

As part of consideration contained in the Settlement Agreement, Hyundai specifically agreed to issue a Recall Notice for 2011-2014 Hyundai Sonatas in connection with bearing wear and engine failure. [Id. at ¶ 21].  Under the terms of the Recall, Hyundai agreed to conduct safety inspections on effected Class Vehicles presented and, if necessary, replace the engine assembly if it were found to be damaged. [Id. at ¶ 22].  The Settlement Agreement includes no limitations as to how many Class Vehicles an individual or entity can submit to Hyundai pursuant to the Recall. [Id. at ¶ 23].  Ultimately, Knight Motors and its sister company Doman Auto became parties / third-party beneficiaries of the Settlement Agreement based on its plain conditions and terms as both purchased numerous qualifying Sonatas. [Id. at ¶ 24].[2] Currently, Knight Motors owns 162 eligible Class Sonatas. [Pantelis Decl., ¶ 6].

### B. Hyundai's outside experts determine the root cause is a design / manufacturing defect that exists in every single 2011-14 Hyundai Sonata.

In 2017 in connection with the recall efforts, Hyundai employed the engineering firm Exponent, to "investigate and assist with them identifying the root cause of the engine failures and help them relieve this matter.  So we inspected hundreds of engines and tore them down to understand how they failed, why they failed and the cause behind the failures."  [Archinaco Decl., ¶ 3, Ex. 1, Hearing

---

[2] Knight Motors and Doman Auto share common ownership in Christopher Pantelis who has been personally sued by Hyundai, in addition to his businesses.  This litigation is still pending.  [Pantelis Decl., ¶¶ 1-2].

3

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

Transcript, James Smith Testimony, p. 6:16-25]. Exponent disassembled approximately 200 engines, and also watched dozens of others disassembled. [Id. at p. 17:2-4]. Exponent determined the root cause of the problem and advised NHTSA that within the engine "are some components that are machines, perhaps a little – in a way that will allow a bearing to fail over time." [Id. at p. 17:13-16]. "The root cause is associated with the connecting rod bearing. And the bearing seems to be wearing over time allowing the crankshaft to seize." [Id. at p. 18:14-16]. As above, the same failure was noted in "several hundred" of the engines. [Id. at p. 19:11-12]. Exponent prepared a presentation for NHTSA and, thereafter, Hyundai provided written materials from that presentation to NHTSA regarding the systemic cause of the engine failures. [Archinaco Decl., ¶ 4 Ex. 2, Decl. of Jason R. Erb, ¶¶ 5-6].

### C. Hyundai attempts to avoid its obligations under the recalls and Mendoza Settlement Agreement.

After the settlement was reached and in the face of the evidence that the root problem was present in every single Class vehicle without exception, Hyundai intentionally made it difficult for individuals who owned a Class Vehicle to obtain a replacement engine pursuant to the terms of the Recall and/or Settlement Agreement. [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶ 31]. This strategy appears to have been directly implemented so that Hyundai could reduce the expected pay out / economic impact from such a settlement / recall. [Id. at ¶ 32]. Hyundai placed deliberate obstacles in the path of individuals seeking to take advantage of the Recall. [Id. at ¶ 33]. As an example of Hyundai's obstruction, Hyundai created two separate, but similar-looking

4

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

vehicle identification number (VIN) websites which were designed to add to consumer confusion and ward off a consumer who mistakenly used the incorrect website. [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶ 35; ¶ 5, Ex. 4 Confusing Websites].  A further example is that Hyundai caused other of its web pages to not properly link to the recall notices such that consumers obtain "false negatives" as to whether their cars are impacted by the recalls. [Id. at ¶ 36].

Hyundai's conduct has not been limited to its website, however.  By way of further example, an individual who sought to take advantage of the Recall and/or Settlement Agreement had to take their Class Vehicle directly to a Hyundai dealership.  [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶ 37].  Then once at the dealership, a Hyundai representative would convince the individual to trade in the Class Vehicle that they sought to be inspected under the terms of the Recall / Settlement Agreement for a brand-new Hyundai vehicle, thus avoiding having to perform and inspection and replace the defective engine.  [Id. at ¶ 38].  For individuals who persisted in having their Class Vehicles inspected and forewent purchasing a new Hyundai vehicle, Hyundai offered to repurchase their Class Vehicles at a value equal to or lower than the Kelley Blue Book value of the vehicles.  [Id. at ¶ 39].

Hyundai had several reasons for engaging in such conduct.  First, Hyundai disincentivized their own dealerships from actually performing the inspections pursuant to the Recall and/or Settlement Agreement by severely underpaying and underequipping the dealerships to perform the work and store the vehicles.  [Id. at ¶ 40].  Specifically, Hyundai only paid its dealerships a flat fee of only approximately

5

$150.00 total to perform the work and store the vehicle when in fact the cost of labor and storage for the dealerships was significantly greater. [Id. at ¶ 41].

Second, Hyundai did not possess the correct storage facilities and/or tools.  For example, Hyundai did not provide the required tools necessary to move vehicles that could not move on their own power, including causing dealers to manually push cars. [Id. at ¶ 42].  Moreover, Hyundai did not provide proper storage for vehicles stored under the Recall and/or Settlement at facilities and/or reimbursement for storage, something that provided a disincentive to dealers from accepting and/or taking in cars. [Id. at ¶ 43].

Third, Hyundai did not have enough replacement engines readily available to install into all of the qualifying Class Vehicles. [Id. at ¶ 44].  It is believed that Hyundai knew in advance of entering into the *Mendoza* Settlement Agreement or within a short period thereafter that it did not possess enough replacement engines. [Id. at ¶ 45].

Finally, Hyundai attempted to shirk its obligations under the Recall / Settlement Agreement by scheming to make inadequate adjustments to Class Vehicles brought to its dealerships, such as replacing dipsticks in a manner that would hide increased oil consumption or inadequate original oil levels and specifications (as evidenced by the fact that the replacement dipsticks Hyundai is installing in the Class Vehicles contain different 'marks' or indicators than the original dipsticks in an attempt to illustrate that the original oil level is insufficient, when it in fact is not) and installing monitors in the vehicles to reduce the power of

6

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

engines, known as "Recall 953 Knock Sensor Detection Software Upgrade," in an effort to avoid fulfilling its obligations under the Settlement Agreement. [Id. at ¶ 46].

### D. Knight Motors and Doman Auto learn of the Settlement Agreement and act.

In or about early 2018, the joint-owner of Knight Motors and Doman Auto, Christopher Pantelis, learned that Hyundai was engaging in the practice of repurchasing Class Vehicles that qualified for inspection and repair pursuant to the terms of the Recall instead of replacing the engines. [Id. at ¶ 49]. As a result, Mr. Pantelis began purchasing 2011-14 qualifying Hyundai Sonatas *en masse* from multiple sources, including auction houses and Hyundai dealerships themselves along with Hyundai Motor Finance and Hyundai Capital America. [Id. at ¶¶ 50-55]. After acquiring *Mendoza* Class Vehicles, the defective vehicles were delivered to Hyundai dealers throughout the country for purpose of having them inspected and repaired pursuant to the terms of the Recall and/or Settlement Agreement and other federal safety recalls. [Id. at ¶ 58]. Upon presentment, Hyundai and its dealerships would conduct their own, unfettered, reviews, valuations and inspections on each vehicle to ensure that the Class Vehicles were qualifying pursuant to the Recall and/or Settlement Agreement and other federal safety recalls and, thus, were in a condition entitling Knight Motors to a new engine replacement and the repair of other various mechanical defects under additional federal safety recalls, including seatbelt and airbag replacements. [Id. at ¶ 59-60]. Knight Motors ultimately submitted 719 qualifying Class Vehicles to Hyundai dealers between the dates of February 13, 2018

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

and April 30, 2019. [Id. at ¶¶ 61-3]. However, because Hyundai simply did not have an available supply of new engines, or because it wanted to limit its liability for defective vehicles in service, it opted instead to repurchase approximately 630 of the Class Vehicles that Knight through Pantelis submitted to Hyundai through its various dealerships. [Id. at ¶ 64].

Indeed, Mr. Pantelis and his companies were incentivized by the Hyundai's *Mendoza* Settlement Agreement not only for financial gain, but also to assist in cleaning up Hyundai's massive engine problems, such actions benefitting the U.S. public generally by removing Hyundai's defective vehicles from the roads, ones that could catch fire and injure and/or kill people.  [Id. at ¶¶ 52-3].  Essentially, Mr. Pantelis and his companies served as a clearinghouse for eligible vehicles by presenting vehicles to Hyundai in an orderly and uniform manner. Additionally, Pantelis even processed Hyundai internal documents as a Repurchase Facilitator directly for Hyundai.  [Pantelis Decl., ¶ 6].

On or about April 1, 2019, NHTSA publicly announced that it was opening an investigation petition into various vehicles, specifically including the Class Vehicles after it granted an earlier June 2018 consumer advocacy petition.  [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶ 65].  Among other things, NHTSA is investigating numerous engine fires associated with the Class Vehicles and issues related to recall of the vehicles. [Id. at ¶ 65-6.]  According to Hyundai's own associate general counsel, they are now currently under investigation by New York's state attorney general, in addition to the

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

federal government, specifically the National Highway Traffic Safety Administration (NHTSA).  [Archinaco Decl., ¶ 4, Ex. 2, Decl. of Jason R. Erb, ¶¶ 3-4].

### E.  Hyundai acts to frustrate the purposes of the Settlement Agreement.

However, as Hyundai's Recall problem continued to publicly intensify with regard to the Class Vehicles, Hyundai decided to shift strategy and attempt to blame others, including by specifically retaliating against those working pursuant to the Recall / Settlement Agreement to clean up Hyundai's defective engine problem by acquiring the defective Class Vehicles and presenting them for inspection and repair. [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶ 67].  Indeed, upon seeing Knight Motor's success in submitting qualifying Class Vehicles, Hyundai retaliated in multiple ways in an effort to prevent the federal safety recalls / *Mendoza* Settlement Agreement from being implemented, and in so doing directly harming Knight Motors.  [Id. at ¶ 68].  Thereafter, Knight Motors was made to jump through artificial hoops – despite Hyundai knowing that every single vehicle suffered from the same defects and were qualifying.[3]

First, in or about February 2019, Hyundai began to "place on hold" any and all Class Vehicles presented to them by Knight Motors even though every single vehicle submitted was a fully qualifying Class Vehicle under the terms of the Recall and/or Settlement Agreement. [Id. at ¶ 69.  In providing its hold, Hyundai first placed "holds" on all Class Vehicles presented to it by Knight Motors for the purpose of

---

[3] These are similar to the complaints made by the Class representatives in their filings, about being misled and re-directed by Hyundai.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

having a valuation inspection completed by a company called Bosch Appraisal Service. [Id. at ¶ 71]. According to Hyundai, it did this to ensure that the vehicles being presented by Knight Motors were roadworthy cars and not junkyard cars. [Id. at ¶ 72]. Once the Class Vehicles were all deemed roadworthy, Hyundai then began requesting bills of sale and registration for each and every vehicle – items that are not needed under the terms of the Recall /Settlement Agreement, another hoop Knight Motors jumped through. [Id. at ¶ 73-4]. Hyundai even had its own attorneys and engineering technicians inspect the vehicles. [Id. at ¶¶ 95-6].

Then later in May 2019, Mr. Pantelis received an email from a manager of one of Hyundai's dealerships indicating that Hyundai was refusing to accept all Class Vehicles presented by Knight Motors and requested that all of the Class Vehicles it presented to Hyundai dealers be removed within 48 hours. [Id. at ¶ 75]. These actions intentionally obstructed the *Mendoza* settlement and other federal recalls, leaving Knight Motors with many Class Vehicles in its possession that were in essence "stuck" on its lot because they could not be resold by Knight Motors given their defects. [Id. at ¶ 76-77]. Resultantly, Knight Motors was forced to litigation to try to enforce the *Mendoza* Settlement Agreement.

On or about May 30, 2019, Knight Motors began filing a series of complaints in magisterial district court in Pennsylvania for each recalled Class Vehicle that Hyundai refused to repair, despite its obligations to do so. [Id. at ¶¶ 78-80]. Due to Hyundai's tactics, Knight Motors was caused to file twenty (20) complaints. [Id. at ¶ 82]. During each hearing, Hyundai asserted several frivolous defenses, all of which

10

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

were rejected by the judge.  Such defenses shifted and morphed over time, and as

each defense was refuted, Hyundai through its counsel simply fabricated a new

one.[Id. at ¶ 83][4].  Of the twenty hearings that occurred Knight Motors prevailed in

seventeen (17) cases totaling over $150,000 in damages, and only lost three cases

because a traffic jam prevented timely presentation of those three cases by Mr.

Pantelis (who was proceeding *pro se* in every case). [Id. at ¶¶ 85-86].[5]  Although

Hyundai knew that it was responsible for what was occurred (including having been

advised by its own expert's Exponent), it continued to advance and proceed against

Knight Motors, while simultaneously engaging in filings before this Court designed

to obtain a class action resolution, including of the same defects mentioned above.

[Id. at ¶ 87].

### F. Hyundai engages in vexatious litigation conduct and attempts to conceal the documents that establish that all its 2011-14 Hyundai Sonatas are defective.

Hyundai destroyed / spoliated all the vehicles purchased by it from Knight

Motors.  [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶¶ 93, 97]. Hyundai also appealed all the

rulings made against it in magisterial district court. [Id. at ¶ 91].  Thereafter, from

June through August 2019, Hyundai schemed to stop Knight Motors from submitting

---

[4] The false defenses included but were not limited to that Knight Motors: (1) did not
have the proper VINs, which did not make their vehicles qualified for inspection and
repair; (2) was not the "owner" of the vehicles; and (3) had not "opted in" to the
Settlement Agreement – something that was not required of them under the
Settlement Agreement. [Id. at ¶ 84].

[5] Although Hyundai was represented by attorneys in every single case, it has falsely
asserted elsewhere that it was not and that is why it lost.

11

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

further vehicles. [Id. at ¶ 92].  This conduct culminated in a lawsuit being filed on

September 24, 2019 <u>by Hyundai against</u> Knight Motors.  [Pantelis Decl., ¶ 2, Ex. 1,

Hyundai Complaint].  Despite knowing it had no evidence to support its lawsuit and

in the face of its own experts Exponent advising of a design / manufacturing defect

present in every vehicle engine, Hyundai instead falsely alleged that Knight Motors

(as well as Doman Auto and Mr. Pantelis) were responsible for the engine failures

and they were breaking the engines through "fraudulent conduct" that could only be

"ascertained by discovery" in the lawsuit after-the-fact.  [Pantelis Decl., ¶ 2, Ex. 1 at

¶¶ 94, 103; Id. at ¶ 2, Hyundai Complaint, ¶ 30].  Thus, without any affirmative

evidence and while itself possessing voluminous evidence that directly contradicted

Hyundai's claims, Hyundai claimed Knight Motors, et. al. had altered, tampered with

or damaged the engines of the Class Vehicles that they presented to Hyundai – even

alleging that Knight Motors engaged in "criminal conduct."  [Id. at ¶¶ 98-99].

Shortly thereafter, on October 11, 2019, Hyundai announced that it had

earmarked $760 million to settle the within cases now pending before this Court,

which includes the 2011-14 Hyundai Sonatas previously submitted by Knight Motors

to Hyundai.  [Id. at ¶¶ 109-12].  As above, discussions to resolve the above case were

occurring between Hyundai's counsel and current Class counsel.   Despite those

discussions, Hyundai continued in its publicly false façade that Mr. Pantelis and his

companies were responsible for Hyundai's Sonata engine problems. [Id. at ¶ 113].

As a result of Hyundai's improper conduct, Mr. Pantelis was named in an industry

publication, *Today AutoDealer* as the #4 fraud story of 2019 along with a photograph

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

of a U.S. penitentiary.  [Pantelis Decl., ¶ 7 Ex. 5]. Due to Hyundai's falsehoods, Mr. Pantelis was accused of "damaging [2011-14 Hyundai Sonatas] beyond repair, then reselling them to the factory for a total of about $5 million through a program intended only for private owners." [Id.].  Prior to being defamed on a national basis because of Hyundai's own improper actions, Mr. Pantelis was known as a hard-working, successful Pittsburgh businessman and an exemplary member of the community.  [Pantelis Decl., ¶ 8].

### G. Hyundai conceals the smoking gun documents; Hyundai attempts to deceive this Court while Class counsel looks away.

On June 12, 2020, Knight Motors, Doman Auto and Mr. Pantelis' counsel sent a letter to Class counsel, advising of numerous issues with the settlement as well as loopholes that appeared to be built in by Hyundai to "off ramp" numerous qualifying vehicles.  [Archinaco Decl., ¶ 5, Ex. 3.].  Therein, Mr. Pantelis (through counsel) advised Class counsel that the *Mendoza* settlement agreement had been revised unfavorably, pointing out that the *Mendoza* Settlement extended to any owner of a Class vehicle "**regardless of any transfer of ownership of a Class Vehicle**." [Archinaco Decl., ¶ 5, Ex. 3, ¶ 2 (citing *Mendoza* Settlement, Section II(A)(3)).  However, as Mr. Pantelis' counsel pointed out:

> under the terms of your proposed settlement, "The Lifetime Warranty **shall not apply or be available to commercial entities such as used car dealers, franchisees, or automobile auction houses."**  (Id.) (emphasis added).  Thus, despite being considered class members, our clients are not being protected – but instead, intentionally "off ramped." Additionally, this provision causes most vehicles not to be eligible

13

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

(despite being eligible) solely because they changed hands, as most do, through used sales.

[Archinaco Decl., ¶ 5, Ex. 3, ¶¶ 4-5 (emphasis added).]  It was further pointed out that such language defeated the purposes of the Settlement, which is to fix the broken cars or get them off the road so that no one is unnecessarily injured or killed.  [Archinaco Decl., ¶ 5, Ex. 3, ¶ 5].

In addition to other problems with the Settlement Agreement including pointing out the repair period is too short, counsel pointed out that Hyundai had made affirmative misrepresentations to the Court in an effort to self-administer, including: "[i]n none of these cases [including Mendoza] does it appear a single class member has ever raised a concern with the overseeing court about any aspect of Hyundai's execution of the settlement administration." [Archinaco Decl., ¶ 5, Ex. 3,  ¶ 7 (citing Docket, #127, p. 7)].  Moreover, "instead of disclosing the litigation that Hyundai filed against [Knight Motors, et, al.], Hyundai misleadingly suggests to the Court that few, if any, disputes have arisen, when that is not the case given the multi-million-dollar litigation they are engaged in with our clients."  [Id. at ¶ 8].  As a result, Mr. Pantelis pointed out that self-administration was a very serious problem, absent penalties against Hyundai that deter or prevent future conduct like that he was being subjected to.  [Id. at ¶¶ 9-10]  Further, in addition to issues with he and his companies, Mr. Pantelis pointed out how Hyundai was systematically impeding consumers through its self-administered website that caused "false negatives" (i.e.

14

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

the vehicle was eligible but the website reported the opposite) through two look-alike websites that cause consumer confusion.  [Id. at ¶ 10 (a)-(c)].

Approximately ten days later on June 22, Class counsel, Bonner Walsh responded and requested further information from Mr. Pantelis, including evidence about his need to file magistrate complaints, as well as the confusing website matter.  [Archinaco Decl., ¶ 6, Ex. 4].  On June 24, Mr. Pantelis provided additional information to Class counsel, including examples of Hyundai discriminating against consumers based upon location, including that California owners appeared to be paid $2,000-$3,000 less for qualifying Sonatas. [Archinaco Decl., ¶ 7, Ex. 5].  Further, Class Counsel was provided with website printouts disclosing the issues where Hyundai was mis-directing, and causing false negatives. [Id.].  Six days later, Mr. Pantelis was advised by Mr. Walsh in relevant part that "[w]e are evaluating the information you have provided." [Archinaco Decl., ¶ 8, Ex. 6].  When no response was received, a follow up letter was sent to all Class counsel on August 14. [Archinaco Decl., ¶ 9, Ex. 7].  Rather than respond substantively (including to the confusing website that affects every consumer), Mr. Walsh provided no meaningful response.  [Archinaco Decl., ¶ 10, Ex. 8].  Instead, without addressing why the language had been added to exclude user car dealers and auction houses (who re-buy and re-sell the bulk of all used automobiles in the country and serve as vital class action clearinghouses), Mr. Walsh instead claimed that "[c]onsumers who obtain vehicles (even through used car dealers) are entitled to the lifetime warranty so long as the KSDS was previously performed."  [Id.]  And then, further added: "the other

15

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

issues that you raise seem limited to your litigation . . . ." without addressing any of the issues substantively.  [Id.].

While Class action counsel were preparing their fee requests seeking $6.9 million in unopposed fees (including a *Lodestar* enhancer of approximately $3.36 million), Knight Motors, et. al. remained occupied defending themselves against the frivolous claims asserted by Hyundai in Pennsylvania.  Indeed, therein Hyundai has attempted to prevent the production of the smoking gun evidence, i.e., a power point presentation (and surrounding materials) created by its engineering experts Exponent in which Hyundai is believed to have admitted that every single class engine suffers from the same exact defect, as detailed above in the testimony of Exponent's James Smith.  Although the document has not been produced yet and Hyundai uses every means at their disposal to prevent its production, at a September 24, 2020 discovery hearing, the Honorable Philip A. Ignelzi, of the Court of Common Pleas observed:

> THE COURT: And he is saying that you are full of hokey pokey.  We didn't do that [break the engines].  There was an underlying condition and if that underlying condition exists in the engines that NHTSA reviewed, how is that not relevant?  Does that not defeat totally and fully your allegation that they committed fraud if another 2,000 engines did the same thing?  No?  [sic]

[Archinaco Decl., ¶ 11, Ex. 9, p. 39:11-18].  As above, despite multiple letters to Class counsel, they refused to correct issues with the settlement agreement, compelling the filing of these objections.

---

16

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

## II.  ARGUMENT

A review of a proposed settlement typically proceeds in two stages, with preliminary approval followed by a final fairness hearing. [Dkt. 132, May 7, 2020, Preliminary Approval Order (Staton, J.), p. 17 (citing Federal Judicial 11 Center, Manual for Complex Litigation, § 21.632 (4th ed. 2004)).  Here, the Court preliminarily approved the settlement, while presciently noting areas of concern – ones that were legitimate, as documented herein.  As the facts disclose, Hyundai continued (and continues) to refuse to accept responsibility for its own actions and continues to fail to adhere to the terms of the existing Recall and/or Settlement Agreement and other federal safety recalls unnecessarily risking the lives and safety of numerous U.S. citizens. [Pantelis Decl., ¶ 3, Ex. 2, SAC ¶¶ 117-19].  This poses numerous problems with the Settlement, beginning with the inherent problem of Hyundai, at this point, self-administering anything.  Hyundai is engaged in an attempt to perpetrate a misrepresentation and perhaps even fraud not only on the Class but also on this Court, altering the terms of the *Mendoza* Settlement Agreement to insert loopholes so that Hyundai can cause tens if not hundreds of thousands of otherwise eligible vehicles, to become ineligible – yet remain on the road with a known defect that can cause engine fires resulting in injury and/or death.  Indeed, the loopholes are so significant that much of the purported $760 million of value is at risk.[6]

---

[6] Importantly, Hyundai recently publicly announced in a written securities disclosure that it has now earmarked nearly $3 billion with regard to the engines at issue here, raising very serious questions about what assumptions were used with regard to the

17

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

While building in such loopholes, Hyundai has agreed not to contest $6.9 million in Class counsel fees, including a *Lodestar* enhancer of approximately $3.36 million.  None of Class counsel seeking the enhancer purportedly noticed the loopholes built into the agreement, yet are willing to accept a conspicuously lower than 20% fee for a settlement of the magnitude of $760 million – one that likely justifies a collective fee of $15 million – or more – if that amount was real. However, what is particularly disturbing is that at least one of the attorneys in this matter, Matthew Schelkopf who seeks $907,045 in fees for he and his firm was also Class counsel and a signatory to the *Mendoza* Settlement Agreement.  Mr. Schelkopf is properly charged with knowledge of the differences between the *Mendoza* agreement he signed, and the agreement here – including the loopholes that appear intentionally built in.  Further, as above, what is also shocking is that despite $6.9 million being set aside for multiple attorneys / law firms here with the impressive credentials presented, is that none of the Class counsel claim to have noticed any of the massive problems with the agreement that could strip the class of nearly all of the $760 million purportedly set aside, raising serious questions about collusion or external pressures since counsel are more than competent.  This is even more so the

$760 million settlement presented to this court. See, [Pantelis Decl., ¶¶ 9-10, Exs. 6 and 7].  Further, as Hyundai's recent earnings call disclosed, the replacement rate for engines is higher than anticipated, essentially proving Mr. Pantelis' assertions that Hyundai was indeed attempting to evade the settlement for the exact reason that is now being disclosed despite using measures like they continue to use against Mr. Pantelis and his companies.  See, [Id].

18

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

case given that Mr. Schelkopf is also the proponent of another settlement against Hyundai, one that does not contain similar infirmities as the Settlement Agreement before this Court. [Pantelis Decl., ¶¶ 22-23].

> **A. The built-in off-ramps designed to subvert the class while discriminating against those most likely to cause the defective cars to be fixed and/or removed from the roads.**

First, Hyundai, <u>while including them as Class members</u>, off ramped any used car dealer and/or auction house or finance company without providing any valid basis for doing so. Moreover, not only has it done so, but it has done so for an obvious reason, i.e., that used car dealers and auction houses or finance companies serve as essential clearinghouses for recall implementations in the U.S. and are the most likely to submit cars in accord with the settlement agreement. [Pantelis Decl., ¶ 11, Ex. 8, Settlement Agreement, p. 4 (vehicles are included in the class); p. 6 (used car dealers, franchisees, or automobile auction houses owners are excluded); Thus, by excluding such entities, Hyundai has intentionally sought to prevent the vehicles being fixed through their most likely means – the used car dealers that must then offer them to the public for sale. Hyundai cannot offer any explanation as to why either group of owners should be excluded or discriminated against because there is no explanation that makes any sense – but for the fact that used car dealers and/or auction houses are the *most likely* to take advantage of the settlement and turn in the defective cars, either having them fixed for the benefit of consumers and/or removed from the road. [Id. at ¶ 12]. Further, used car dealers and other commercial entities are the most likely to assist consumers with navigating the procedural requirements such that

19

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

consumers can gain the benefits of the agreement, while also protecting such consumers from the dangers inherent in these engines. [Id.]

Skirting these issues when responding to Mr. Pantelis' counsel's correspondence, Mr. Walsh for Class counsel claimed that the settlement does not exclude a consumer simply because they purchased a vehicle from a used car dealer or auction house, presumably suggesting that used car dealers and auction houses can or should sell knowingly defective vehicles to the public.  Yet, as the *Mendoza* court held in approving the class settlement, it did so because "the recall and free-inspection program addresses any potential safety issues by taking defective engines off the road before they can fail."  [Archinaco Decl., ¶ 13, Ex. 11, *Mendoza Final Class Action Settlement Approval Opinion*, p. 9.]  Here, the settlement does not do that, as it obviously excludes numerous owners of vehicles – and as noted – thwarts efforts by those most likely remove the cars from the road from doing so.  Not only does the agreement improperly discriminate between segments of the class, but it was intentionally designed so that Hyundai could stop what Mr. Pantelis (and others like him) are attempting to do – i.e., fulfilling the very purpose of the *Mendoza* settlement agreement by removing Hyundai's dangerous, defective vehicles from the roadway.  Moreover, the exclusion is obviously strategic, as the same commercial entities are not excluded from the *Brown* Settlement Agreement where similar defects are alleged.  [Pantelis Decl., ¶¶ 22-23].

Whether the settlement agreement provides preferential treatment to any settlement class member turns on whether there is any disparity among what class

20

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

members are poised to receive and, if so, whether the settlement "compensates class members in a manner generally proportionate to the harm they suffered on account of [the] alleged misconduct." Compare, *Altamirano v. Shaw Indus., Inc.*, No. 13-CV-00939-HSG, 2015 WL 4512372, at *8 (N.D. Cal. July 24, 2015) (finding no preferential treatment).  Here, used car dealers, auction houses and other commercial entities like finance companies are improperly discriminated against for no justifiable purpose and not properly compensated.  As such, the agreement should not be finally approved.

**B. Hyundai built in clauses to shift million in harm to consumers designed to off-ramp a massive number of defective vehicles while blaming the consumers and leaving them holding the bag.**

In addition to the above, Hyundai has also built in other provisions that did not appear in *Mendoza*, and when examined closely, they reveal further intent to avoid the settlement here itself while pretending to provide benefit to the class.  First, the Court should note in retrospect that the *Mendoza* settlement contains unnecessary provisions given that every engine is defective, and the inspections do nothing to change or alter the outcome of anything.  [Pantelis Decl., ¶ 13].  These provisions are shams and have been properly revealed as such from the facts documented above, made to appear like benefits, but actually stripping them away.  [Id.].  However, given that the *Mendoza* shams did not prevent the vehicles from being turned in for repair by entities like Knight Motors, new sham provisions were designed and inserted in the current agreement to ensure <u>more</u> consumers lose benefits.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

Notably, neither Hyundai nor Class counsel pointed out the built-in loophole found with the "Knock Sensor Detection Software" ("KSDS") provision. [Pantelis Decl., ¶ 11, Ex. 8, Settlement Agreement, p. 6, Section L]. As the settlement agreement asserts, the KSDS does nothing whatsoever to fix the problem with the engines. [Id.] Instead, the KSDS is "engine monitoring technology . . . software . . . to continuously monitor engine performance **for symptoms that may precede engine failure** and that is being offered as a software update . . . free of charge . . . ." [Id.] (emphasis added). According to the plain language of the Settlement Agreement, all the software does is give a warning of *symptoms* that precede an engine failing, yet the engine will fail anyway, engines that Hyundai has represented usually fail before 100,000 miles. [Id.; See also, Archinaco Decl., ¶ 13 Ex. 11, *Mendoza* Final Approval Opinion, p. 9]. Ironically, the representation about the KSDS system is also a deception as well, yet one that the proponents of the settlement are bound by.[7]

---

[7] Every engine will fail, as Hyundai knows given their own expert Exponent's analysis. No software system can fix the inherent defect / problem. What a software system conceivably can do if it regulates the engine while it is running (i.e. reducing RPM when the software detects a pending major failure), is potentially slow the onset of the problems with the Hyundai engines. [Pantelis Decl., ¶ 14]. However, even if the onset was slowed, it would only serve as a temporary band aid given that Hyundai knows that every single Class engine needs to be fixed or replaced as they will all ultimately fail. [Id.]. Further, although the KSDS system conceivably provides benefit in some situations (i.e. a car is travelling at a slow rate of speed, less than 30 mph), as Mr. Pantelis attests, the KSDS system presents a serious risk of harm when a vehicle is driving at highway speeds, as the KSDS system involuntarily changes the engine RPM (despite the proponents of the settlement not disclosing such to the court), and the system is *most likely* to be engaged when a vehicle is

---

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

However, assuming the Court concludes that on its face the KSDS provision in the settlement agreement provides some benefit to consumers and that it has not been placed in the agreement in a bad faith effort to deceive the Court as well as the class,[8] the KSDS provision is used in the agreement to force otherwise eligible vehicles to become ineligible by labeling owners as being exceptionally neglectful if they fail to install the KSDS within a very short period of time, while simultaneously permitting the self-administering Hyundai to serve as a bottleneck for its own economic benefit and gain by not actually timely installing the software.  Indeed, as the agreement is written, Hyundai controls who does and does not obtain the KSDS installation within the 60-day time period. An attempt or a request by a consumer to install is not

---

traveling at high rates of speed, cutting the RPM dramatically and in a manner dangerous to the driver and even hastening engine failure.  [Id.]  Such leads to the driver of the vehicle being placed at serious risk of accident and injury, given that the engine essentially "cuts out" – and the vehicle loses the ability to maintain speed and/or accelerate to pass.  [Id.]  Given the above, it is no wonder that the settlement proponents appear to have intentionally not disclosed this to the Court, because the Court might hold that the entire KSDS software upgrade is a farce simply designed to off-ramp or place at risk the majority of the $760 million purported settlement "value".  [Id. at 13-18].  Finally, Hyundai's recent earnings call appears to support Mr. Pantelis' contention, as Hyundai has acknowledged that since installing the KSDS systems, the rate of engine failures has increased despite using confusing language designed to intentionally mask further what is occurring.  [Pantelis Decl., ¶ 13; ¶¶ 10, Ex. 7, p. 3]. ("Installation of KSDS has increased pre-failure detection leading to higher cost forecasts.").

[8] The KSDS provisions are not included in the *Brown* settlement. [Pantelis Decl., ¶¶ 22-3].

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

enough, as the KSDS has to actually be installed during that period creating a conflict in self-administration.  This is not an unintended conflict, but an intended one. Indeed, in the section in the Settlement Agreement entitled "Exceptional Neglect", p. 5 Section (J), Hyundai and Class counsel have included [Pantelis Decl., 11, Ex. 8].

> "Exceptional Neglect" means (a) when the vehicle clearly evidences a lack of maintenance or care for a significant period of time of not less than one (1) year, such that the vehicle appears dilapidated, abandoned, and/or beyond repair unless such lack of maintenance was due to a Loss Event; or (b) **failure of a Settlement Class member to have the KSDS ("Knock Sensor Detection Software") installed pursuant to the KSDS Product Improvement Campaign by a Hyundai or Kia dealer within 60 days of the Notice Date, or within 60 days of the mailing of the KSDS campaign notice, whichever is later.** Diagnostic costs associated with establishing Exceptional Neglect will be borne by Defendants.

[Id.] (emphasis added).

The language is drafted, not to have a consumer *apply* to have the KSDS installed "within 60 days of the Notice Date, or within 60 days of the mailing of the KSDS campaign notice, whichever is later" (software that does nothing to fix the engine or the inevitable engine failure), but instead the consumer must have the system *installed* within such time periods.  This Court already presciently questioned the integrity of the short time periods provided in the agreement when it observed that in a recently approved automotive class settlement, the "current owners and lessees were afforded with **twenty-one months** after the date of the court's final approval order to submit their claim forms, while former owners and lessees were required to submit claims within ninety days after the date of that order."  [Dkt. 126,

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

Order Directing Parties to Meet and Confer Regarding Settlement and Claims Administration, dated February 19, 2020, p. 2 (emphasis in the original).

As the facts above illustrate from Mr. Pantelis' first-hand experience with Hyundai's gross inability (let alone its refusal) to properly service vehicles in accord with the *Mendoza* settlement, it is impossible for Hyundai to achieve installation of the KSDS system in all the class vehicles during the 60 days period.  [Pantelis Decl., ¶¶ 15-16]. Further, even if only a small percentage of the owners of 2011-14 Hyundai Sonatas, let alone an equal small percentage across all affected vehicle classes were to attempt to install such systems, and even if every Hyundai dealership acted with 100% good faith (extremely doubtful), it would be impossible for all such vehicles to have the KSDS system installed in the 60-day time period as Hyundai would be overwhelmed with requests that could not be fulfilled. [Id.].  Mr. Pantelis' counsel already pointed this out to Class counsel but was simply ignored.  [Archinaco Decl., ¶ 5 Ex. 3].

The Court should also note how the agreement here uses the word *install* versus words such as *apply to be installed* – because Hyundai knows that it cannot install all such systems within the time period specified and the intent is to off-ramp otherwise eligible class vehicles.  [Pantelis Decl., ¶¶ 14-18].  So why would Hyundai and Class counsel build such a bottleneck into the purported $760 million Settlement Agreement?  Why build that in over a piece of software that does nothing to change the outcome of the engine failure, usually within 100,000 miles and might actually cause the engines to fail even faster?  The misleading answer is found in Subsection

25

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

M – "Lifetime Warranty" – defining the lifetime warranty that is the primary consideration in the Settlement Agreement.  First, it is true that with each Class vehicle the Lifetime Warranty is an unequivocally necessary component given that every single car engine in the Class will, despite proper maintenance by their owners, ultimately fail due to the same common defect.  However, Hyundai and Class counsel inserted language that if the KSDS is not *installed* within the very limited time period provided, then each owner that failed to do so has maintained their vehicle with "exceptional neglect" such that the vehicle is no longer eligible for the much-needed, lifetime warranty.[9]  This not only keeps the dangerous and defective cars on the roadways, but shifts loss properly incurred by Hyundai onto the already injured class.

Of additional note, although the proponents of the settlement seek such a short period of time for installing the KSDS, what they have not done is advised the Court of how many of the Class vehicles had the KSDS software update installed over the last twenty (20) months Hyundai has been purportedly been campaigning to have it installed in class vehicles.  [Pantelis Decl., ¶ 11; Ex. 8, Settlement Agreement, p. 13, ¶ 3 (HMA and KMA acknowledge that by January 2019, they each had initiated product improvement campaigns in which [KSDS] could be added through a free software update to the Class Vehicles.")].  Again, there appears to be an obvious

---

[9] Ironically, it is again pointed out that if Hyundai could even comply with such a short time period, the only manner that such could occur would be if used car dealers like Mr. Pantelis' companies were incentivized to be clearinghouses for such vehicles, so that they are presented in an orderly manner.  However, as illustrated above, Hyundai has already headed the Class off at the pass here – in a clear effort to thwart the benefits of the settlement.

26

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

reason for this, in that Mr. Pantelis estimates (based upon the sample of cars he has been able to review nationally at auction houses and in the Pittsburgh area) that fewer than 20% of the Class vehicles have had the KSDS installed during that twenty-month period.  [Pantelis Decl., ¶ 17].  This feeble response demonstrates that the supposedly helpful KSDS is actually a harmful weapon designed to limit Hyundai's actual exposure to disbursing a major portion of the $760 million settlement "value." [Id. at ¶ 18].

Obviously, Mr. Pantelis will defer to any forensically audited statistics provided to the Court that contradict his 20% or less estimate, but if his observation is correct, then Hyundai and Class counsel have entered into a settlement where the actual benefit is only about $152 million (20% KSDS automobiles), versus the advertised $760 million – let alone the $3 billion actual exposure recently disclosed. Although certainly some Class members would have their KSDS installed within 60 days, the vast majority of the Class would be stripped of the much-needed lifetime warranty, placing at direct risk over $600 million of the purported settlement, while Hyundai single-handedly decides through its self-administered bottleneck, how much is actually provided.  Thus, the settlement is wholly inadequate financially, and will shift and force hundreds of millions in harm onto the consumers that need relief, not more harm.  Moreover, that is not even assessing the harm that will occur from the numerous future personal injury suits that will arise.  Frankly, this is not a settlement for the class, but instead an attempt to perpetrate a deception on the class – and on

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

this Court, while paying Class counsel a bonus of over $3.3+ million while Hyundai does so. The settlement should not be approved.

### C. Hyundai should be required to produce the documents it provided to NHTSA to the Court before any settlement is approved.

Hyundai has publicly asserted in its securities filings that the actual liability here is $3 billion, if not more. However, Class counsel has asserted that there is a very significant risk of litigation. See, [Dkt. 69, Unopposed Motion for Class Counsel Fee, p. 9 (noting very significant risk of litigation). This appears to have dramatically impacted the settlement value, along with the uncontested fees. However, this litigation risk can and should be eliminated or reduced significantly with the production of the Exponent power point and other materials provided by Hyundai to NHTSA once they are provided to the Court for its review. Indeed, the Settlement Agreement should not be approved absent Hyundai turning over the materials to the Court for its review. Absent the production of such documents, there is no way for Class counsel to assert or the Court to determine what the actual litigation risks are. Moreover, once the Exponent power point / NHTSA materials are produced to the Court for review, it is believed that they will establish 100% liability on the part of Hyundai, as it is believed Exponent advised NHTSA the problem exists in all the Class engines without exception. Resultantly, production of such materials will position the Court to assess the Settlement fully and without being misled by Hyundai.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

**D. The Requirement that someone need to 'opt in' first when already a Class member before being able to object is itself objectionable and objected to.**

Knight Motors, LP owns 162 Class vehicles. By definition, it is a Class member and, thus, included automatically in the Class, absent opting out.  However, despite that fact, as stated above, as a used car dealer, Knight Motors cannot receive the consideration central to the settlement even remaining in and not opting out. Instead, to object, Knight Motors must remain in the class – and risk that the objections are overruled by the Court.  If these objections are overruled, then Knight Motors is out of luck.  How can this be proper?  A Class member should be permitted to object before having to choose relief, not after – and not even knowing for certain what the relief will be.  Thus, the provision requiring Knight Motors to not be able to opt-out if its objections are somehow overruled is improper, as it is for every Class member. How can anyone judge whether to opt in or out until after the objections are heard because the consideration is not known yet? This seems like a basic procedural issue – and is foundational to the simplest notions of consideration in a contract and therefore, is objected to.

Further to this point, and worse, is that the Release defines Releasees so broad that it seeks to include non-parties such as Mr. Pantelis and Knight Motors' sister company, Doman Auto, both locked in litigation in Pittsburgh against Hyundai, purportedly within its terms.  [Pantelis Decl., ¶ 11, Ex. 8, p. 9, Section Z (Releasors)]. For example, would Mr. Pantelis' personal defamation claims be included here, if for

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PROPOSED CLASS SETTLEMENT

no other reason than to attempt to cram down such claims?  This is not proper and, resultantly the releases should also be revised.

## III. CONCLUSION.

For the foregoing reasons and such that will be placed on the record on November 13, 2020, the Court should DENY final approval of the Class Settlement Agreement.

RESPECTFULLY SUBMITTED

By: */s/Jason A. Archinaco*
Jason A. Archinaco
THE ARCHINACO FIRM LLC
1100 Liberty Ave., Suite C-6
Pittsburgh PA 15222
Counsel for Objector Knight Motors, LP

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PROPOSED CLASS SETTLEMENT

1

## CERTIFICATE OF SERVICE

2

3    I, Jason A. Archinaco, Esquire, hereby certify that a true and correct copy of the

4    foregoing Knight Motors, LP And Doman Auto And Marine Sales Inc.'s Points and

5    Authorities in Support of Objections to Proposed Class Action Settlement was served

6    to and upon the following this 30th day of October 2020, U.S. First Class Mail,

7    postage prepaid and email:

8
          Bonner Walsh
9           Walsh PLC
         1561 Long Haul Road
10        Grangeville, ID 83530

11
         Matthew D. Schelkopf
12         Sauder Schelkopf
         1109 Lancaster Avenue
13         Berwyn, PA 19312

14
           Steve Berman
15    Hagens Berman Sobol Shapiro LLP
      1301 Second Avenue, Suite 2000
16        Seattle, WA 98101

17

18

19                          By: /s/ Jason A. Archinaco
                                 Jason A. Archinaco
20

21

22

23

24

25

26

27                                31

28    MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
                  PROPOSED CLASS SETTLEMENT