1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation* | 8:17-cv-00838-JLS-JDE<br><br>Related Cases:<br>8:17-cv-01365-JLS-JDE<br>8:17-cv-02208-JLS-JDE<br>2:18-cv-05255-JLS-JDE<br>8:18-cv-00622-JLS-JDE<br>8:18-cv-02223-JLS-JDE<br><br>**DECLARATION OF BONNER C. WALSH** |

I, Bonner C. Walsh, declare as follows:

1.     I am a member of the law firm of Walsh PLLC.

2.     My firm acted as one of Class Counsel in this matter.

3.     Attached hereto as Exhibit 1 are true and correct copies of the objection withdrawals received from Roberta Lawther, Richard Nilles, and Christopher A. Wright.

4.     Attached hereto as Exhibit 2 is a true and correct copy of the portions of the deposition of Daniel F. Thornton cited to in Plaintiffs' Response to Objections to the Proposed Class Action Settlement.

5.     I pulled the 162 VIN numbers identified by Knight Motors, LP in their objection to determine whether the KSDS update had been performed on those vehicles, and if there were any additional open recalls.  Attached hereto as Exhibit 3 is a true and correct copy of my report containing that information.  Only 19 of the 162 cars owned by Knight have had the KSDS update done and have zero outstanding recalls.  The remaining 143 vehicles collectively have 530 open recalls.

6.     In regards to whether a vehicle has an open recall (such as the KSDS recall) the National Highway and Traffic Safety Administration offers a free tool to quickly search a vehicle by VIN to determine if there are any outstanding recalls.  I went to that site, https://www.nhtsa.gov/recalls#vin, and entered Mr. Barber's VIN.  He has no outstanding recalls, meaning his KSDS update has been performed.  Any class member could perform a similar search.

7.     Additionally, when an objector provided a VIN number, I sought to confirm they had a Class Vehicle.  When I could not confirm whether a VIN was for a Class Vehicle, I contacted Kia and Hyundai to see if they could confirm whether or not a VIN belonged to a Class Vehicle.  I identified three vehicles that were owned by putative objectors that did not appear to be Class Vehicles.  I confirmed with Kia and Hyundai that those vehicles were not Class Vehicles.  Those three vehicles were

DECLARATION OF BONNER C. WALSH

those identified by the following objectors: Frank Bergkvist, Tennie Kruse, and John Caro.

8.    Some objectors did not provide any VIN information or included a partial VIN and could not be identified as a Class Vehicle.  Each of these objectors was treated as if they did have a Class Vehicle since it could not be determined whether or not they did.  Should any of these objectors appeal any decision in this case, Class Counsel will seek confirmation that they do indeed have a Class Vehicle to establish whether they actually have standing to appeal.  Objectors who did not provide a VIN were: Ashley Warring; Dale C. Huebener; and Joshua Hursa[1]. Objector John H. Metz only provided a partial VIN number that could not be identified one way or another as a Class Vehicle.

9.    Attached hereto as Exhibit 4 is a true and correct copy of the Second Amended Class Action Complaint (Dkt. 35) in *Brown v. Hyundai Motor America*, No.: 2:28-cv-11249 (D.N.J. Sept. 27, 2019).

10.    Attached hereto as Exhibit 5 is a true and correct copy of the objection filed by Arnold L. Levey in a previous class action lawsuit.

11.    Attached hereto as Exhibit 6 is a true and correct copy of the objection filed by Edward A. Maybury in a previous class action lawsuit.

12.    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 6th day of November 2020 in Grangeville, Idaho.

*/s/ Bonner C. Walsh*
Bonner C. Walsh

---

[1] Hursa only filed a self-notarized notice of intent to appear with no return address, no contact information, no objection, no statement he owns a class vehicle, no identification by make or model what car he may own, and no VIN.

-3-

DECLARATION OF BONNER C. WALSH

# EXHIBIT

# 1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation* | 8:17-cv-00838-JLS-JDE<br><br>Related Cases:<br>8:17-cv-01365-JLS-JDE<br>8:17-cv-02208-JLS-JDE<br>2:18-cv-05255-JLS-JDE<br>8:18-cv-00622-JLS-JDE<br>8:18-cv-02223-JLS-JDE<br><br>**WITHDRAWAL OF OBJECTION** |

On August 19, 2020, I submitted a letter stating my intention to object to the settlement. After contacting class counsel, it was explained to me that the settlement does not release any claims for personal injury or death.  In light of this information, I am satisfied with the terms of settlement and no longer intend to object to the settlement.  I have received no payment or other consideration under 23(e)(5) in conjunction with this withdrawal of my intent to object.

By: _Roberta Lowther_                          Date: 9/30/20
Roberta Lowther

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation* | 8:17-cv-00838-JLS-JDE<br><br>Related Cases:<br>8:17-cv-01365-JLS-JDE<br>8:17-cv-02208-JLS-JDE<br>2:18-cv-05255-JLS-JDE<br>8:18-cv-00622-JLS-JDE<br>8:18-cv-02223-JLS-JDE<br><br>**WITHDRAWAL OF OBJECTION** |

On July 28, 2020, I submitted a letter stating my intention to object to the settlement. After contacting class counsel, it was explained to me that there will be coverage under the settlement for vehicles that have already had an engine replacement.  In light of this information, I am satisfied with the terms of settlement and no longer intend to object to the settlement.  I have received no payment or other consideration under 23(e)(5) in conjunction with this withdrawal of my intent to object.

By: _____        Date: _9/14/20_
      Christopher A. Wright

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation* | 8:17-cv-00838-JLS-JDE |
| | Related Cases:<br>8:17-cv-01365-JLS-JDE<br>8:17-cv-02208-JLS-JDE<br>2:18-cv-05255-JLS-JDE<br>8:18-cv-00622-JLS-JDE<br>8:18-cv-02223-JLS-JDE |
| | **WITHDRAWAL OF OBJECTION** |

On August 20, 2020, I submitted a letter stating my intention to object to the settlement. After contacting class counsel, it was explained to me that the lifetime warranty extends to subsequent owners of class vehicles.  In light of this information, I am satisfied with the terms of settlement and no longer intend to object to the settlement.  I have received no payment or other consideration under 23(e)(5) in conjunction with this withdrawal of my intent to object.

By:   *Richard Nilles*
      Richard Nilles (Sep 14, 2020 16:33 CDT)
      Richard Nilles

Date: Sep 14, 2020

# Nilles objection withdrawal 9.10

Final Audit Report                                                                2020-09-14

| | |
|---|---|
| Created: | 2020-09-14 |
| By: | Bonner Walsh (walshpllc@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAuZTjAPlRViLyZDfi3OvzqomLtWvqEltA |

## "Nilles objection withdrawal 9.10" History

Document created by Bonner Walsh (walshpllc@gmail.com)
2020-09-14 - 9:28:36 PM GMT- IP address: 67.148.126.189

Document emailed to Richard Nilles (richn63@gmail.com) for signature
2020-09-14 - 9:29:03 PM GMT

Email viewed by Richard Nilles (richn63@gmail.com)
2020-09-14 - 9:33:00 PM GMT- IP address: 64.233.172.81

Document e-signed by Richard Nilles (richn63@gmail.com)
Signature Date: 2020-09-14 - 9:33:35 PM GMT - Time Source: server- IP address: 98.34.94.128

Signed document emailed to Richard Nilles (richn63@gmail.com) and Bonner Walsh (walshpllc@gmail.com)
2020-09-14 - 9:33:35 PM GMT

Adobe Sign

# EXHIBIT

# 2



Deposition of:

# Daniel Thornton

*September 24, 2020*

In the Matter of:

# Hyundai And Kia Engine Litigation / In Re:

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1          UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF CALIFORNIA

2

3
                              ) 8:17-cv-00838-JLS-JDE
4     IN RE: HYUNDAI AND KIA )
      ENGINE LITIGATION        )
5                              )
                              ) Related Cases:
6                              ) 8:17-cv-01365-JLS-JDE
                              ) 8:17-cv-02208-JLS-JDE
7                              ) 2:18-cv-05255-JLS-JDE
                              ) 8:18-cv-00622-JLS-JDE
8                              ) 8:18-cv-02223-JLS-JDE

      _____
9

10              VIRTUAL DEPOSITION OF

11               DANIEL F. THORNTON

12

13

14          TRANSCRIPT of the stenographic notes of

15     the proceedings in the above-entitled matter, as

16     taken by and before KATHLEEN SWENOR, a Registered

17     Professional Reporter and Certified Court Reporter

18     of the State of New Jersey, on September 24, 2020,

19     commencing at 1:00 in the afternoon.

20

21

22

23

24

25

David Thornton                      September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   WALSH, PLLC
     BY:  BONNER C. WALSH, ESQ.
 4   1561 Long Haul Road
     Grangeville, Idaho 83530
 5   541-359-2827
     Bonner@walshpllc.com
 6   Attorneys for Plaintiff

 7

 8
     SAUDER SCHELKOPF, LLC
 9   BY:  MATTHEW SCHELKOPF, ESQ.
     1109 Lancaster Avenue
10   Berwyn, Pennsylvania 19312
     610-200-0581
11   Mds@sstriallawyers.com
     Attorneys for Plaintiff

12

13

14   HAGENS BERMAN SOBOL SHAPIRO, LLC
     BY:  TINA LO, ESQ.
15   1301 Second Avenue, Suite 2000
     Seattle, Washington 98101
16   206-623-7292
     Steve@hbsslaw.com
17   Attorneys for Defendant

18

19

20

21

22

23

24

25
```

Case 8:17-cv-00838-JLS-JDE   Document 165-1   Filed 11/06/20   Page 13 of 109   Page ID
#:7625
Daniel Thornton                                    September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 37

1  reports in the news, honestly, shortly after I
2  purchased the vehicle.
3       Q.    Now, you mentioned connecting rod
4  failures.  What's a connecting rod, if you know?
5       A.    Part of the engine.
6       Q.    Okay.  Beyond part of the engine, can
7  you be more specific?
8       A.    I believe it connects the piston to
9  another part of the engine, Counsel.  But again,
10  you are at the edge of my knowledge.
11       Q.    All right.  I understand.  Let's back
12  up a minute for your understanding of the defect.
13  I want to make sure I have it correct.  Your
14  understanding was that there were metal shavings
15  in the engine, and it could lead to an engine
16  failure; is that a fair characterization?
17       A.    In general terms, yes.
18       Q.    Okay.  Let's run down a little bit more
19  specifically what your understanding of the defect
20  is then.  Tell me what you further understand the
21  defect to be.
22       A.    That this manufacturing process wherein
23  metal shavings were to be removed from the machine
24  engine parts by magnets rather than conventional
25  or prior methods was a defective manufacturing

Daniel Thornton                    September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 38

1    process that, in fact, left metal shavings.  And
2    all or substantially all of the engines that were
3    manufactured at this Alabama plant, including the
4    engine that was placed into my 2011 Sonata, and
5    the presence of these metal shavings increases the
6    wrist of various kinds of engine failure.
7           Q.    Okay.  All right.  I think we have got
8    your knowledge in this first work order out of the
9    way.  I don't think we need to go through all of
10   them unless you tell me differently.
11          I want to make sure your testimony was,
12   to your knowledge none of these work orders
13   mention anything about metal shavings being in
14   your engine; fair?
15          A.    No one has ever said to me or produced
16   a paper stating to me there are metal shavings in
17   your engine, no.  I just produced the maintenance
18   records I have in my file, Counsel, in the
19   interest of -- I believe that was my discovery
20   obligation with getting the notice.  So you have
21   something in here that's not relevant I'm sure.
22          Q.    Absolutely.  I'm just -- if it's
23   relevant I want to talk to you about it.  If it's
24   not I want to be mindful of your time and move
25   things forward.  And I think we are going to be

Page 42

```
 1        Q.    Okay.  Hold on.  Now you confused me.
 2   Not that that's hard to do.
 3              But what document do I need to look at
 4   that you produced that is your current
 5   understanding of the warranty?
 6        A.    I think it would be Exhibit-5.
 7        Q.    Okay.
 8        A.    Where there is a screenshot and it says
 9   that my VIN number qualifies for, yeah, the ten
10   year 120,000 mile warranty, whichever occurs
11   first.  I don't know if that's the same wording as
12   we looked at before, but that's -- you know, I
13   entered my VIN number on the website and that's
14   the warranty that comes up.  So that's my
15   understanding of what my warranty is today.  It is
16   expired recently based of the dates we are talking
17   about.
18        Q.    Right.  Right.  Now, I would agree with
19   you that previous warranty had expired.  But let's
20   go back to this vehicle history.  Do you see the
21   last entry here where it says power train.  It's
22   got a bunch of letters, but PWRTRN, WAR, EXT; do
23   you see where that starts?
24        A.    Yes.
25        Q.    And you see where it says "to lifetime
```

Daniel Thornton                                  September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 60

1    you were on the New Jersey Turnpike; correct?

2         A.    Yes.

3         Q.    But not concerned enough to have an

4    outside person inspect it for metal shavings?

5         A.    I don't think that's a fair

6    characterization, Counsel.  I don't have the time,

7    money, or inclination to get everything inspected.

8    And I don't think it's my obligation.  What I wish

9    is Hyundai would fix the problem.

10        Q.    I'm trying to ask what indication you

11   have that your particular engine actually has the

12   issue.

13        A.    It's a manufacturing defect.

14        Q.    So anytime there's a manufacturing

15   defect it just 100 percent proves the vehicle is

16   defective?

17        A.    Not necessarily, Counsel.  But my

18   understanding is that this particular defect left

19   shavings in some quantity in all or substantially

20   all the engines at issue.  But again, I don't know

21   that is part of what we are here for today.

22        Q.    Oh, sure, it's absolutely part of what

23   we are here for.  Let me read the bottom, "In

24   short, if I were to litigate the same issues here

25   in New Jersey my likely recovery would consist of,

Daniel Thornton                    September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 61

1    at a minimum, 300 percent of the cost of

2    installing a defect-free short block."

3            Did I read that correctly?

4       A.    Yes.

5       Q.    What's your basis for that statement?

6       A.    Well, we are getting into a

7    hypothetical again.  That whole section is kind of

8    phrased in the hypothetical.  If I was to withdraw

9    from this class and try to seek my own remedy,

10   this is one of the main statutes that would be an

11   avenue for potential relief.  In the course of

12   that I expect I would need to retain an expert,

13   disassemble the short block totally, and have them

14   comb or whatever they do to determine the amount,

15   quantity, presence of metal shavings.  All of that

16   would be very expensive and time consuming.  And I

17   really just would prefer not to have that done and

18   not to initiate an individual litigation.  I just

19   raised it as a counterfactual to say I really

20   don't know if consumers in the class who are New

21   Jersey based are getting a fair shake, because in

22   the alternative they would have very robust loads

23   of relief available to them.

24      Q.    Talk me through that.  You mentioned

25   this New Jersey statute that I guess is New Jersey

 1   again, it's beyond my layperson's knowledge of

 2   engines and inspections of engines.

 3        Q.   Let's move back to this claim of at a

 4   minimum you would be due 300 percent of the cost

 5   of them installing a defect short block.  You

 6   mentioned having to hire an expert and do some

 7   other things.  What would the average consumer

 8   have to do to get this 300 percent?

 9        A.   Well, they would have to demonstrate an

10   ascertainable loss.

11        Q.   Okay.  And what monetary loss have you

12   had due to this engine defect, if any?

13        A.   Well, there is a present unrealized

14   loss in the diminutive in value.

15        Q.   What's the diminutive in value on your

16   vehicle?

17        A.   That it has a lesser book value than

18   one that's free of the defect.  I don't think it's

19   easy to find a comparable because substantially

20   all these 2011s are all in the same plant, same

21   manufacturing, all in the class.  That might not

22   be the case but I don't think you can find a 2011

23   with a non-Alabama engine.  So it's a bit hard to

24   calculate.  And I wouldn't hazard a guess as to

25   the method that's appropriate to do that here.

Page 78

1    vehicle that does not have a defect but is a

2    Hyundai vehicle.

3         Q.    Can you think of any other things that

4    you didn't articulate in Exhibit-5 as to how the

5    settlement could be improved?

6         A.    I think we are going back to the theme

7    again of adequate relief.  And I think what that

8    looks like depends on the circumstances sometimes

9    and on the consumers' wishes.  For those, say,

10   like my friend with his Toyota who loved their

11   vehicle, despite whatever defects wanted to keep

12   driving it, an engine rebuild or replacement might

13   be appropriate.  For those who lost faith, another

14   vehicle might be appropriate.  I appreciate that

15   the settlement as proposed offers those different

16   options, but I think the credit is a -- the credit

17   option should be enhanced.  I don't think it comes

18   anywhere close to remedying the harm, especially

19   to owners of the very early model vehicles like

20   me.

21        Q.    Do you have any idea what the current

22   Blue Book value on your vehicle is?

23        A.    I did have it appraised in an online

24   service.  It was about $5,000, as best I recall.

25   But again, I would have to run it again, you know,

Daniel Thornton                                      September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 83

1    manufacturing process left some metal shavings in

2    every engine.  Does it manifest in every engine,

3    clearly not.  But again, it's a serious

4    manufacturing level defect that, you know, has a

5    potential to manifest in every single engine.

6         Q.    All right.

7         A.    That's my understanding.

8         Q.    Did you purchase the vehicle in New

9    Jersey?

10        A.    I did.  It was -- it's in Exhibit No. 3

11   near the beginning.  Toms River.  Yeah, Toms River

12   in Ocean County.

13        Q.    Just to stay on time, I didn't want to

14   look for it if you remembered.  I'm glad you did.

15             Let's go to Exhibit-6 for just a

16   minute, then we will move on to Exhibit-7

17   afterward.  Let's see, I want to look at the

18   bottom of Page 1 here on Exhibit-6.  "By way of

19   explanation, these documents consist of a

20   lien-satisfaction letter from USAA, (Hyundai

21   Thornton 29-30), followed by a letter and

22   documentation from my stepfather (Hyundai Thornton

23   31-39), whose experience with his 2011 Hyundai

24   Sonata is part of what motivated me to lodge the

25   instant objections."

Daniel Thornton                                September 24, 2020
Hyundai And Kia Engine Litigation / In Re:

Page 106

1              C E R T I F I C A T E

2

3

4              I, Kathleen Swenor, do hereby certify

5    that prior to the commencement of the examination,

6    DANIEL THORNTON, was duly sworn by me to tell the

7    truth, the whole truth, and nothing but the truth.

8              I do further certify that the foregoing

9    is a true and accurate transcript of the testimony

10   as taken stenographically by and before me at this

11   time, place and date hereinbefore set forth.

12             I do further certify that I am neither

13   a relative nor employee nor attorney nor counsel

14   of any of the parties to this action, and that I

15   am neither a relative nor employee of such

16   attorney or counsel, and that I am not financially

17   interested in the action.

18

19

20

21

22             Kathleen Swenor, RPR, CCR

23

24

25

Throughout:

a hundred percent >> 100%
Post and Schell >> Post & Schell
Petra bus >> Petrobas

Specific issues:

Page:Line >> Error >> Correction

2:14 >> Firm association for Attorney Tina Lo appears to be incorrect.
5:16-17 >> I don't -- >> (omit this)
8:11 >> settlement >> settled
9:17 >> University >> the University
10:18 >> years >> years ago
12:19 >> Talmad >> Tallmadge
12:24 >> sought >> brought
13:11-12 >> the New Jersey Transit -- the Transit Authority within the state >> New Jersey Transit
15:12 >> for the district >> for many of those school districts
15:15 >> or the >> for the
15:16 >> write an >> have a right of
15:25 >> is an 80 percent >> was a substantial
17:9 >> Affair >> Fair
17:10 >> equivalence >> equivalents
18:11 >> Yeah. >> Yes.
29:19 >> Oh, >> (omit this)
32:23 >> 60 >> 60,000
38:6 >> wrist >> risk
41:24 >> "that's --" >> (omit this)
45:8 >> would I say >> I would say
47:2 >> But also that repeatedly >> But I also testified repeatedly that
52:14 >> placed >> replaced
53:13 >> 100,000 >> 100,000-mile warranty
58:4 >> "I just --" >> (omit this)
58:25 >> 90 miles >> 80 miles per hour
60:9 >> is Hyundai >> is that Hyundai
60:21 >> that is >> that that's
61:22 >> loads >> roads
63:3 >> I don't -- doesn't >> it doesn't
64:14 >> diminutive >> diminution
64:15 >> diminutive >> diminution
64:19 >> comparable >> comparator
66:15 >> law >> the law
68:5 >> you know >> (omit this)
68:6 >> manufacturing >> manufacturer
69:12 >> of >> in
70:1 >> so not an expert >> (omit this)
72:3 >> good faith >> good-faith
73:13 >> honest and prohibitive here -- >> honesty and probity here.

```
73:19-20 >> I think in New Jersey >> (omit this)
74:17 >> No. New Jersey has -- >> (omit this)
74:17 >> that's >> That's
76:23 >> is -- >> depends.
78:9 >> consumers' >> consumer's
78:19 >> very early model >> very-early-model
79:20 >> travel >> treble
80:4 >> treble damages, consumer fraud laws >> treble-damages consumer-fraud laws
(hyphenate and omit the comma)
80:11 >> and/or >> or
83:11 >> Yeah, >> Yes,
84:5 >> personal >> percentage
84:11 >> legality >> legalese
84:24 >> epitasis >> covfefe (but seriously, this should read "emphasis")
87:1 >> Jersey. >> Jersey's.
87:13 >> me. >> mine.
87:14 >> long-term >> long term
87:16 >> that included and/or -- >> (omit this)
88:11 >> OT >> O2
88:17 >> replacement, the >> replacement at the
89:18 >> USAA >> USA
91:9-10 >> continuing violation >> continuing-violation
91:10 >> discovery rule >> discovery-rule
94:17 >> was >> in
94:23 >> writing >> affording
96:2 >> practice -- pattern of practice >> pattern or practice
99:18 >> in the, kind of, >> (omit this)
101:12 >> of >> that as
101:13 >> and >> I
103:7-8 >> me, Man, this >> me that this
```

# EXHIBIT

# 3

| Stock | VIN | Year | Make | Model | KSDS Done | Date Campaign | Date Completed | Outstanding recalls |
|-------|-----|------|------|-------|-----------|---------------|----------------|---------------------|
| 18528 | 5NPEB4AC0DH793891 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19085 | 5NPEC4AC8CH463234 | 2012 | HYUNDAI | SONATA | Y | | 4-Jan-19 | |
| 19179 | 5NPEB4AC9CH485746 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19207 | 5NPEB4AC0CH313490 | 2012 | HYUNDAI | SONATA | Y | | 7-May-19 | |
| 19231 | 5NPEB4AC6EH947411 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Oct 2017 |
| 19338 | 5NPEB4AC6CH331494 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19339 | 5NPEB4AC2DH570154 | 2013 | HYUNDAI | SONATA | Y | | 19-Feb-19 | |
| 19340 | 5NPEB4AC1BH165089 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19341 | 5NPEB4AC0CH348114 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19342 | 5NPEB4AC9BH271063 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19386 | 5NPEB4AC2BH213621 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct. 2017 |
| 19401 | 5NPEC4AC3BH061149 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to Sept 2015 |
| 19410 | 5NPEB4AC1DH580884 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to May 2017 |
| 19424 | 5NPEB4AC3EH926323 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19443 | 5NPEB4AC9BH213745 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov. 2016 |
| 19474 | 5NPEC4AC6BH138368 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Oct. 2017 |
| 19481 | 5NPEB4AC8EH887065 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19484 | 5NPEB4AC6DH719035 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19490 | 5NPEB4AC2DH632961 | 2013 | HYUNDAI | SONATA | Y | | 31-Jan-19 | |
| 19497 | 5NPEB4AC0DH791915 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19503 | 5NPEB4AC7BH181486 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Oct 2017 |
| 19504 | 5NPEB4AC6CH352572 | 2012 | HYUNDAI | SONATA | Y | | 19-Aug-19 | |
| 19506 | 5NPEB4ACXCH443473 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19511 | 5NPEC4AC8DH779458 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19512 | 5NPEB4AC6CH400183 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb. 2018 |
| 19513 | 5NPEB4AC1DH789932 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19516 | 5NPEB4AC9DH731003 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to Jul. 2014 |
| 19526 | 5NPEB4AC0BH101156 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to Sept 2015 |
| 19537 | 5NPEB4AC5EH888075 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19540 | 5NPEC4AC0BH075753 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to March 2016 |
| 19541 | 5NPEC4AC1CH443570 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb. 2018 |
| 19542 | 5NPEB4AC0DH628178 | 2013 | HYUNDAI | SONATA | Y | | 22-Mar-19 | |
| 19543 | 5NPEC4AC8CH353798 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19544 | 5NPEC4AB9CH473259 | 2012 | HYUNDIA | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb. 2018 |
| 19546 | 5NPEB4AC0CH321849 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb. 2018 |
| 19548 | 5NPEB4AC7EH840755 | 2014 | HYUNDAI | SONATA | Y | | 22-Mar-19 | |

| Stock | VIN | Year | Make | Model | KSDS Done | Date Campaign | Date Completed | Outstanding recalls |
|---|---|---|---|---|---|---|---|---|
| 19551 | 5NPEB4AC1CH442308 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Oct.2017 |
| 19553 | 5NPEB4AC8CH477945 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19556 | 5NPEB4AC6BH062444 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov. 2016 |
| 19560 | 5NPEB4AC8DH786445 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19563 | 5NPEB4AC0CH369321 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb. 2018 |
| 19565 | 5NPEB4AC8DH704939 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Aug 2018 |
| 19573 | 5NPEB4AC4BH103752 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to Sept 2015 |
| 19574 | 5NPEB4AC6CH482416 | 2012 | HYUNDAI | SONATA | Y | | 29-Apr-19 | |
| 19576 | 5NPEC4ABXCH406850 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19578 | 5NPEB4AC5BH021710 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2016 |
| 19584 | 5NPEC4AB4CH479759 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Aug 2018 |
| 19585 | 5NPEC4AC7CH387120 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19586 | 5NPEB4AC0DH746828 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Aug 2018 |
| 19587 | 5NPEB4AC1CH374270 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19589 | 5NPEC4AC0BH152573 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2016 |
| 19592 | 5NPEB4AC1BH160751 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2016 |
| 19593 | 5NPEC4AC5BH305819 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19595 | 5NPEB4AC8DH539197 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19596 | 5NPEB4AC8EH929542 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19597 | 5NPEB4AC5CH503174 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19598 | 5NPEC4AC2BH287203 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19599 | 5NPEB4AC0BH136554 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19600 | 5NPEB4AC3CH493339 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19601 | 5NPEB4ACXDH671720 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19602 | 5NPEB4AC2DH722949 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19603 | 5NPEB4ACXEH925198 | 2014 | HYUNDAI | SONATA | Y | | 14-May-19 | |
| 19604 | 5NPEC4AC4BH229610 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19606 | 5NPEB4ACXCH472780 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19607 | 5NPEC4AC9CH485033 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19608 | 5NPEB4AC6CH497238 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Sept 2015 |
| 19609 | 5NPEB4AC3DH633603 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Aug 2018 |
| 19610 | 5NPEB4AC0EH945296 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19611 | 5NPEB4AC9BH101737 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19613 | 5NPEC4AC0BH081410 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to March 2016 |
| 19614 | 5NPEC4AC5BH083749 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19615 | 5NPEC4AC9BH196880 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Sept 2015 |

| Stock | VIN | Year | Make | Model | KSDS Done | Date Campaign | Date Completed | Outstanding recalls |
|---|---|---|---|---|---|---|---|---|
| 19617 | 5NPEB4AC5CH334063 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19619 | 5NPEB4AC0EH842153 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19622 | 5NPEB4AC9BH263657 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19623 | 5NPEB4AC6CH313528 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19624 | 5NPEC4AC5BH100291 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19625 | 5NPEB4AC6DH575308 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Aug 2018 |
| 19626 | 5NPEB4AC2BH087390 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Aug 2018 |
| 19627 | 5NPEC4AB7BH200562 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19628 | 5NPEB4AC7BH062727 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 10 incomplete recalls back to Mar. 2013 |
| 19629 | 5NPEB4AC9DH653208 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to March 2015 |
| 19630 | 5NPEB4AC3BH095014 | 2011 | HYUNDAI | SONATA | Y | | 2-Jul-19 | |
| 19631 | 5NPEB4AC4EH877519 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Aug 2018 |
| 19632 | 5NPEB4AC0CH339106 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19633 | 5NPEC4AC2BH304028 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19634 | 5NPEB4AC0CH327540 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19635 | 5NPEC4AB7BH232041 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19636 | 5NPEC4AC0BH274270 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19637 | 5NPEB4AC1CH376584 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19638 | 5NPEC4AC3CH420971 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Oct 2017 |
| 19639 | 5NPEC4AB6CH401919 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to March 2015 |
| 19640 | 5NPEB4AC6CH429683 | 2012 | HYUNDAI | SONATA | Y | | 11-Feb-19 | |
| 19642 | 5NPEB4AC8CH490159 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19643 | 5NPEC4AB1DH572580 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19644 | 5NPEB4ACXDH652536 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to March 2015 |
| 19645 | 5NPEB4AC9DH699296 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19647 | 5NPEB4AC4CH329467 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19648 | 5NPEC4AC4DH598468 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19649 | 5NPEC4AC4DH598468 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19650 | 5NPEB4AC9DH558339 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19652 | 5NPEB4AC1CH322265 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19653 | 5NPEB4AC1DH698787 | 2013 | HYUNDAI | SONATA | Y | | 1-May-19 | |
| 19654 | 5NPEC4AC7CH373458 | 2012 | HYUNDIA | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19655 | 5NPEC4AB2CH442418 | 2012 | HYUNDAI | SONATA | Y | | 23-Apr-19 | |
| 19656 | 5NPEB4AC1DH569626 | 2013 | HYUNDIA | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19657 | 5NPEB4AC1DH559677 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Feb 2018 |
| 19658 | 5NPEB4AC7CH336946 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to July 2014 |

| Stock | VIN | Year | Make | Model | KSDS Done | Date Campaign | Date Completed | Outstanding recalls |
|-------|-----|------|------|-------|-----------|---------------|----------------|---------------------|
| 19659 | 5NPEB4AC6EH830136 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19660 | 5NPEC4AC3DH686850 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19661 | 5NPEC4AC8DH565506 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19662 | 5NPEB4AC4BH014828 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19663 | 5NPEB4AC7CH488967 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19664 | 5NPEB4AC4DH721950 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19665 | 5NPEC4AC3BH291242 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19666 | 5NPEB4AC0DH713070 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19667 | 5NPEC4AC4DH518747 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to March 2015 |
| 19668 | 5NPEB4AC7BH096067 | 2011 | HYUNDAI | SONATA | Y | | 17-Dec-18 | |
| 19669 | 5NPEC4AC9DH696511 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19670 | 5NPEB4AC9BH287912 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19671 | 5NPEC4AB6BH315783 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19672 | 5NPEB4AC7DH773976 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Aug 2018 |
| 19673 | 5NPEB4AC7DH551485 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19678 | 5NPEB4AC1EH874948 | 2014 | HYUNDAI | SONATA | Y | | 29-Jun-19 | |
| 19679 | 5NPEC4AB8CH466271 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19680 | 5NPEC4AC4CH473309 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19681 | 5NPEB4AC9DH777785 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19682 | 5NPEB4AC7EH905460 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19683 | 5NPEC4AB1BH299265 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Sept 2015 |
| 19684 | 5NPEC4AC0BH305243 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to Sept 2015 |
| 19685 | 5NPEB4AC4BH015591 | 2011 | HYUNDAI | SONATA | Y | | 13-May-19 | |
| 19686 | 5NPEB4AC8CH444265 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to March 2017 |
| 19687 | 5NPEC4AC3CH444784 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Sept 2015 |
| 19688 | 5NPEB4AC4CH500668 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19689 | 5NPEB4ACXDH785121 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19690 | 5NPEC4AC5BH139403 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19691 | 5NPEB4ACXBH002408 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19692 | 5NPEB4AC6BH063156 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19693 | 5NPEB4AC2DH541687 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19694 | 5NPEC4AC8DH602361 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Aug 2018 |
| 19695 | 5NPEB4AC5DH687310 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19696 | 5NPEB4AC1EH830688 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19697 | 5NPEB4AC1BH073528 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to March 2016 |
| 19698 | 5NPEC4AC7BH038098 | 2011 | HYUNDAI | SONATA | Y | | 1-May-19 | |

| Stock | VIN | Year | Make | Model | KSDS Done | Date Campaign | Date Completed | Outstanding recalls |
|---|---|---|---|---|---|---|---|---|
| 19699 | 5NPEC4AC3BH279575 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 7 incomplete recalls back to July 2014 |
| 19700 | 5NPEB4AC9CH406611 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Nov 2016 |
| 19701 | 5NPEB4AC1CH496501 | 2012 | HYUNDAI | SONATA | Y | | 6-Feb-19 | |
| 19702 | 5NPEC4AB5DH532728 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19703 | 5NPEB4AC3DH567831 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19704 | 5NPEC4AC3DH646123 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | only recall outstanding |
| 19705 | 5NPEB4AC3DH749917 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Aug 2018 |
| 19706 | 5NPEB4AC7EH819033 | 2014 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19707 | 5NPEB4AC9BH223577 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 2 incomplete recalls back to Feb 2018 |
| 19708 | 5NPEB4AC0CH493203 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Oct 2017 |
| 19709 | 5NPEB4AC2CH368560 | 2012 | HYUNDAI | SONATA | Y | | 20-Jul-20 | |
| 19710 | 5NPEB4AC8DH593633 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19711 | 5NPEB4AC7DH577603 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 5 incomplete recalls back to Nov 2016 |
| 19712 | 5NPEC4AC6CH417787 | 2012 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to Oct 2017 |
| 19713 | 5NPEB4AC5BH015292 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 4 incomplete recalls back to March 2017 |
| 19714 | 5NPEB4AC7DH740346 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 6 incomplete recalls back to July 2014 |
| 19718 | 5NPEC4AC4BH046644 | 2011 | HYUNDAI | SONATA | N | 9-Aug-18 | | 10 incomplete recalls back to Mar. 2013 |
| 19720 | 5NPEB4AC6DH757154 | 2013 | HYUNDAI | SONATA | N | 9-Aug-18 | | 3 incomplete recalls back to Aug 2018 |

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# NEWARK DIVISION

| | |
|---|---|
| ELIZABETH BROWN, THOMAS PEARSON, JANESHIA MARTIN, and NICHOLAS MOORE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA, and HYUNDAI MOTOR COMPANY, LTD,<br><br>Defendants. | Case No.: 2:18-cv-11249-JLL-JAD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Elizabeth Brown, Thomas Pearson, Janeshia Martin, and Nicholas Moore (collectively, "Plaintiffs") bring this action against Defendant Hyundai Motor America ("HMA") and Hyundai Motor Company ("HMC"), (collectively, "Defendants"), by and through their attorneys, individually and behalf of all others similarly situated, and allege as follows:

## <u>INTRODUCTION</u>

1. This consumer class action arises from a latent defect found in model year ("MY") 2011 through 2016 Hyundai Elantra cars with "Nu" 1.8-liter engines (the "Class Vehicles").

2.     First unveiled with MY 2011 Hyundai Elantras, defects in the piston assemblies of the Nu 1.8L engines within the Class Vehicles cause total and irreparable engine failures, the symptoms of which include a knocking noise from the engine while the car is warming up after being started and/or while driving (the "Piston Defect"). Once the fateful engine knock sound begins, the Class Vehicle's engine will inevitably fail completely, causing a loss of engine power, power steering and brake assistance which can lead to stalling while the Class Vehicle is in motion and place the operator of the Class Vehicle, and those that share the road with them, at risk of accident, injury, or death. Once the Piston Defect has manifested, the engine block has been damaged beyond repair. Therefore, the only fix is replacement of the engine, which can cost upwards of $10,000.

3.     Defendants' knowledge of the Piston Defect dates back to no later than 2011, when it began to make changes to its piston manufacturing processes.  Hyundai made additional changes related to the Piston Defect in 2013. And in March 2014, Hyundai Auto Canada Corp., a subsidiary of Hyundai Motor Corporation, issued a Technical Service Bulletin arising from engine knock in Elantras. Covering model year 2011 through 2013 Hyundai Elantras, the bulletin attributed engine knock to manufacturing defects in the pistons and connecting rods of Nu 1.8L engines. Canadian Hyundai dealers were instructed to replace Nu 1.8L engines affected by engine knock. No such relief was offered in the United States, though the Class Vehicles' engines were

built on the same assembly lines, using the same defective parts and manufacturing practices.

4. Consumers who report engine knock in the Class Vehicles routinely have their concerns dismissed by Hyundai dealers, who describe the sound as "normal." When a knocking engine inevitably fails due to the Piston Defect, Hyundai routinely denies knowledge of the engine knock issue and denies warranty claims, instead blaming the consumer for inadequate maintenance. Even where a replacement engine is provided under the warranty, the replacement is just as likely to fail as the original engine due to it containing the same latent defect.

5. Many other owners and lessees of the Class Vehicles have communicated with Defendants and/or their agents to request that they remedy and/or address the defect and/or resultant damage at no expense. Defendants have routinely failed to do so, even within the warranty period.

6. Defendants have also refused to take any action to correct this concealed defect when it manifests in the Class Vehicles outside of the warranty period. Because the defect can manifest shortly outside of the warranty period for the Class Vehicles— and given Defendants' knowledge of this concealed, safety-related defect—Defendants' attempt to limit the warranty with respect to the engine defect is unconscionable and unenforceable here.

7.      Despite notice and knowledge of the defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including pre-sale durability testing, Defendants have not recalled and/or offered an adequate engine repair to the Class Vehicles, offered their customers suitable repairs or replacements free of charge, or offered to reimburse their customers who have incurred out-of-pocket expenses to repair the defect.

8.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

9.      Had Plaintiffs and other Class Members known of the defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

10.     Plaintiffs are also informed and believe, and on that basis allege, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

11.     As a result of the defect and the monetary costs associated with attempting to repair the defect, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

12.     This case seeks protection and relief for owners and lessees of Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' breaches of express and implied warranties and Defendants' unfair, unlawful, and deceptive trade practices.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district.  Additionally, Defendants have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

15.    This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

## THE PARTIES

### A.    Plaintiff Liz Brown

16.    Plaintiff Liz Brown is a citizen of the State of New Jersey and resides in Avenel, New Jersey.

17.    In August 2013, Plaintiff Liz Brown purchased a new 2013 Hyundai Elantra Limited, containing a "Nu" 1.8 liter engine, from Avenel Sansone Auto Group ("Sansone"), an authorized Hyundai dealer and repair center located in Avenel, New Jersey.

18.    Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Her vehicle bears Vehicle Identification Number: KMHDH4AE6DU715726.

19.    In deciding to purchase an Elantra, Plaintiff Brown relied on Hyundai's representations about the various features of her vehicle, none of which disclosed the Piston Defect described herein.

20.    In late October 2017, Plaintiff Brown began to notice a ticking noise emanating from her Elantra's engine at startup. Approximately one week later, the engine

of Plaintiff Brown's Elantra catastrophically failed with about 64,000 miles on the odometer. At the time, her son was driving and heard a loud popping sound before the engine failed.

21.     Plaintiff Brown had her car towed to Sansone Auto Group for inspection and repairs during the week of November 6, 2017. At Sansone, she was informed that her warranty claim and that a loaner vehicle would take a day or two to authorize.  Several days later she was informed that oil sludge was found in her engine and that Hyundai would be denying her warranty claim due to inadequate maintenance.

22.     Hyundai corporate told Plaintiff Brown to file a complaint to the Better Business Bureau and that they would honor the BBB's decision. When she submitted a claim to BBB, she was informed that they would not consider her claim because her vehicle had more than 60,000 miles on the odometer.

23.     Though the engine of Plaintiff Brown's Elantra was still covered by Hyundai's 10-year/100,000 mile powertrain warranty, Hyundai blamed the engine failure on her alleged inadequate maintenance and denied warranty coverage. Specifically, Hyundai informed Plaintiff Brown that her engine was full of oil sludge, which was caused by her failure to timely change the oil in her vehicle. Sansome informed her that the least expensive option to repair her vehicle would be to install a used engine, which would cost approximately $3,500.

24.     Contrary to Sansome Hyundai's representation that Plaintiff failed to timely change her oil, Plaintiff maintained her Class Vehicle in accordance with the terms of Hyundai's warranty at all times. Plaintiff Brown had her oil changed pursuant to the warranty agreement. Defendant Hyundai Motor America routinely informs its dealerships to deny warranty coverage for engine failures under the pretextual reason that the vehicle was insufficiently maintained.

25.     Since approximately November 2017, Plaintiff Brown has been without a usable mode of transportation. She has been forced to ask for rides to and from work and/or borrow her children's vehicles. Plaintiff' Brown cannot drive her vehicle. Her vehicle will not operate.

26.     Plaintiff Brown's Elantra now sits in her driveway. She continues to pay approximately $470 per month for her auto loan as well as approximately $3,000 per year for auto insurance.

27.     Plaintiff Brown has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Piston Defect, including, but not limited to, out of pocket loss associated with the Piston Defect and future attempted repairs and diminished value of her vehicle.

28.     None of the Defendants, nor any of their agents, dealers or other representatives informed Plaintiff of the existence of the Piston Defect and/or defective vehicle design prior to purchase.

**B. Plaintiff Thomas Pearson**

29.  Plaintiff Thomas Pearson is a citizen of the State of Washington and currently resides in Tenino, Washington.

30.  In December 2014, Plaintiff purchased a 2015 Hyundai Elantra from Korum Hyundai located in Puyallup, Washington.

31.  Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. His vehicle bears Vehicle Identification Number: 5NPDH4AE3FH589133.

32.  In deciding to purchase an Elantra, Plaintiff Pearson relied on Hyundai's representations about the various features of his vehicle, none of which disclosed the Piston Defect described herein.

33.  In late July of 2018, with approximately 76,000 miles on the odometer, Plaintiff was driving on the highway when the engine in his Elantra catastrophically failed. Plaintiff quickly pulled over the shoulder of the highway and, fortunately, avoided getting into an accident in the rush hour traffic.

34.  Plaintiff Pearson had his car towed to a nearby friend's mechanic shop, who informed him that the engine had seized and advised him to contact Hyundai corporate about warranty coverage. Plaintiff then contacted Hyundai corporate to recount his experience and requested warranty reimbursement. Hyundai towed his Elantra to Car Pros Hyundai Renton, located in Renton, Washington.

35.     Hyundai corporate then informed Plaintiff that it would cover the engine replacement under warranty but that Plaintiff would need to pay out-of-pocket for his own rental car while he waited for the engine replacement, which Hyundai corporate informed Plaintiff could take months.

36.     Plaintiff inquired if the rental car fees would be reimbursed at a later date, to which Hyundai corporate stated that there was no guarantee the fees would be reimbursed.

37.     To date, Plaintiff Pearson has incurred approximately $800 in rental car fees waiting for an engine that has still not been replaced.  Plaintiff, Pearson has not been reimbursed by Defendant despite his request.

38.     Plaintiff Pearson has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Piston Defect, including, but not limited to, $500 rental fees associated with the Piston Defect and future attempted repairs and diminished value of his vehicle.  Plaintiff's vehicle would have sold for less money if Plaintiff and the public were fully aware of the Piston Defect.  Plaintiff would not have purchased the Elantra if made fully aware of the Piston Defect.

39.     None of the Defendants, nor any of their agents, dealers or other representatives informed Plaintiff of the existence of the Piston Defect and/or defective vehicle design prior to purchase.

## C. Plaintiff Janeshia Martin

40.     Plaintiff Janeshia Martin is a citizen of the State of Georgia and resides in Lithonia, Georgia.

41.     In May 2015, Plaintiff Ms. Martin purchased a used 2015 Hyundai Elantra, containing a "Nu" 1.8 liter engine, from Superior Chevrolet in Decatur, Georgia ("Superior").

42.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Her vehicle bears Vehicle Identification Number: 5NPDH4AE3FH581887.

43.     In deciding to purchase an Elantra, Plaintiff Martin relied on Hyundai's representations about the various features of her vehicle, none of which disclosed the Piston Defect described herein.

44.     Plaintiff Martin did not negotiate the warranty provided on her vehicle. The warranty was drafted by Defendant. Plaintiff was provided the warranty on a "take it or leave it" basis. Plaintiff and Defendant did not negotiate the terms of the warranty. The warranty was drafted by Defendant and provided to Plaintiff after the sale of the vehicle.

45.     On two occasions in early 2018, the engine in Plaintiff Martin's Elantra catastrophically failed with about 74,000 miles on the odometer.

46.     Ms. Martin had her car towed to Nally Hyundai in Lithonia, Georgia, in early February 2018.

47.   Ms. Martin was informed that there were metal shavings in the oil and that her engine would need to be replaced.

48.   She was also informed that she was out of the warranty period because her vehicle had more than 60,000 miles on the odometer but would not have been covered in any case because of the presence of the metal shavings.

49.   The Hyundai dealer replaced the engine with a used engine for approximately $3,000.

50.   Plaintiff Martin has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Piston Defect, including, but not limited to, out of pocket loss associated with the Piston Defect and future attempted repairs and diminished value of her vehicle.

51.   None of the Defendants, nor any of their agents, dealers or other representatives informed Plaintiff of the existence of the Piston Defect and/or defective vehicle design prior to purchase.

**D.   Plaintiff Nicholas Moore**

52.    Plaintiff Nicholas Moore is a citizen of the State of Illinois and resides in Washington, Illinois.

53.   On December 20, 2014, Plaintiff, Moore purchased a used 2013 Hyundai Elantra, from Green Chevrolet in Peoria, Illinois.

54.     Plaintiff, Moore purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. His vehicle bears Vehicle Identification Number: 5NPDH4AE3DH350100.

55.     Plaintiff Martin did not negotiate the warranty provided on her vehicle. The warranty was drafted by Defendant. Plaintiff was provided the warranty on a "take it or leave it" basis. Plaintiff and Defendant did not negotiate the terms of the warranty. The warranty was drafted by Defendant and provided to Plaintiff after the sale of the vehicle.

56.     In deciding to purchase an Elantra, Plaintiff Moore relied on Hyundai's representations about the various features of his vehicle, none of which disclosed the Piston Defect described herein.

57.     In June, 2017, Plaintiff Moore began to notice a ticking noise emanating from his Elantra's engine. Approximately one week later, the engine of Plaintiff Moore's Elantra catastrophically failed with about 72,000 miles on the odometer.

58.     Plaintiff Moore had his car towed to Green Chevrolet where he was informed the engine had to be replaced. Hyundai denied his warranty claim.

59.     Plaintiff Moore replaced the engine at an out of pocket cost of $3,500.00.

60.     Plaintiff Moore has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Piston Defect, including, but not limited to, out of pocket loss associated with the Piston Defect and future attempted repairs and diminished value of his vehicle. None of the Defendants, or any of their

agents, dealers or other representatives informed Plaintiff of the existence of the Piston Defect and/or defective vehicle design prior to purchase.

## E.   The Defendants

61.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

62.     Defendant Hyundai Motor Company, Ltd. ("HMC") is a South Korean corporation.  HMC is the parent corporation of Hyundai Motor America, Inc.  HMC, through its various entities, designs, manufactures, markets, distributes and sells Hyundai automobiles in California and multiple other locations in the United States.

63.     Defendant Hyundai Motor America, Inc. ("HMA") is incorporated and headquartered in the State of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.  HMA is HMC's U.S. sales and marketing division, which oversees sales and other operations across the United States. HMA distributes Hyundai vehicles and sells these vehicles through its network of dealers.  Money received from the purchase of a Hyundai vehicle from a dealership flows from the dealer to HMA.

64.     HMA and HMC sell Hyundai vehicles through a network of dealerships that are the agents of HMA and HMC.

65.    There exists, and at all times herein existed, a unity of ownership between HMC, HMA and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

66.    Upon information and belief, Defendant HMC communicates with Defendant HMA concerning virtually all aspects of the Hyundai products it distributes within the United States.

67.    Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Nu Engine as it relates to the engine defect within the Class Vehicles were performed exclusively by Defendants HMA and HMC.

68.    Upon information and belief, Defendants HMA and HMC developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

69.    HMA and HMC are collectively referred to in this complaint as "Hyundai" or "Defendants" unless identified separately.

70.    Hyundai engages in continuous and substantial business in New Jersey.

71.    Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and

consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## **TOLLING OF STATUTES OF LIMITATION**

72.     Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the true, latent defective nature of the Piston Defect until shortly before this class action litigation was commenced.

73.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles and that it will require costly repairs, and diminishes the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## **COMMON FACTUAL ALLEGATIONS**

**A.     Background on Hyundai**

74.     Hyundai Motor America, headquartered in Fountain Valley, California, is a subsidiary of Hyundai Motor Corporation, a South Korean corporation. Hyundai Motor Corporation, a multinational corporation with nearly 80,000 employees, is the fourth-largest automobile manufacturer in the world.

75.     More than 50% of Hyundai vehicles sold worldwide are sold in the United States, where Hyundai Motor America manages domestic sales, marketing and distribution of Hyundai vehicles and employs approximately 32,000 people at Hyundai dealerships throughout the United States.

76.     Hyundai maintains testing facilities and equipment in California City, California, where it conducts pre-sale durability testing, among other things.

**B.      The Class Vehicles' Nu 1.8-liter multiport injection engines**

77.     First released in MY 2011 Hyundai Elantras, the Nu 1.8L MPI engines are four-cylinder gasoline engines developed by Hyundai in conjunction with Kia.

78.     Hyundai manufactured the Class Vehicles' Nu 1.8L engines in at least two locations including the Hyundai Motor Manufacturing Alabama facility in Montgomery, Alabama and in Hyundai's manufacturing facility in Ulsan, South Korea.

79.     On information and belief, the engines in the Class Vehicles were built with the same parts, on the same assembly lines, and using the same manufacturing processes, as Elantra cars sold in Canada by Hyundai Auto Canada Corporation.

**C.      The Piston Defect in the Class Vehicles' Nu 1.8L engines**

80.     The Piston Defect affects critical components in the Class Vehicle's engines, a brief overview of which is provided below.

81.     Like most gasoline-powered internal combustion engines, the Nu 1.8L MPI engine powers a vehicle's wheels by igniting fuel inside combustion chambers.

82.     The combustion cycle begins when oxygen and fuel enter the combustion chamber through the opening of an intake valve ("I" in the diagram below).



83.     The pressure created by combustion moves the piston ("P") down. The piston is attached to the connecting rod ("R"), which converts the vertical movement of the piston into the rotational force that turns the crankshaft ("C") powering the wheels. Each of the engine's pistons are connected to the crankshaft in a reciprocal arrangement, such that the downward movement of one piston leads to the upward movement of another piston.

84.     During operation, the piston and connecting rods are in constant rapid motion. A failure of any of these components can cause the engine to catastrophically fail.

**D.    Hyundai Canada's 2014 Technical Service Bulletin about the Piston Defect**

85.    On March 3, 2014, Hyundai Auto Canada Corp. ("HACC") issued Technical Service Bulletin ("Bulletin") 14-20-002, attached hereto as Exhibit A.

86.    Covering all MY 2011—2013 Hyundai Elantra cars in Canada with Nu 1.8L engines, the TSB addressed engines exhibiting a knocking noise. After "extensive quality research with Hyundai Motor Manufacturing Alabama (HMMA) to determine the root cause," HACC attributed the engine knocking to "defects in the piston skirt coating as well as improper finishing of the connecting rods."

87.    According to HACC's TSB, these defects were more likely to manifest in the presence of cold temperatures, poor fuel quality, or fuel delivery issues. HACC described the symptoms of the defects as "the engine exhibits a loud knock during start up but the noise reduces as the engine reaches operating temperature."

88.    HACC instructed dealers to replace engines exhibiting the knocking noise without any further diagnosis or teardown of the engine. HACC also instructed dealers to reject warranty claims if a perfect oil change record could not be produced by the owner or lessee.

89.    HACC also provided a timeline of various attempts to resolve the defects:

    i.    September 2011 - added piston surface alkali washing;

    ii.    June 2013 – improved quality control of connecting rod manufacturing process; and

iii.     September 2013 – improved piston surface finish.

90.     Though the vehicles subject to HACC's Bulletin were built on the same assembly line with the same parts as the Class Vehicles, Hyundai has not issued a technical service bulletin for American vehicles.

## E.     The impact of the Piston Defect on the Class Vehicles

91.     The knocking sound described in HACC's Bulletin is consistent with a phenomenon called "piston slap," which occurs when there is an excessive gap between the piston and the cylinder enclosing it. Under such circumstances, the piston head is not secured in the cylinder, allowing the piston to rotate and causing the piston's edges to collide with the cylinder wall. The knocking noise created by piston slap typically fades once the engine reaches operating temperature and the piston expands to sit securely in the cylinder.



92.     On information and belief, piston slap in the Class Vehicles irreparably damages the pistons, coatings applied to the piston and cylinder walls, the cylinder walls,

and stresses the entire piston assembly. The impact caused by piston slap removes metal and coatings from the cylinder and piston, and some of this dislodged material is then pulled into the crankcase, where it enters the engine's oil supply.

93.     In addition, the material that is removed from the piston or cylinder by piston slap leaves small grooves or divots in the cylinder or piston. Unburned fuel, contaminants, and combustion byproducts such as soot, oil an unburned fuel escape the combustion chamber through these grooves or divots and enter the engine's oil supply in the crankcase.

94.     Over time, the accumulation of contaminants in the oil supply from piston slap creates an oil sludge that clogs oil ports in the engine. Clogged oil ports lead to metal-on-metal contact between moving components that are ordinarily separated by a layer of oil in the engine. This metal-on-metal contact creates metal shavings that also enter the oil supply, worsening the oil clogs. Metal shavings in the oil supply can also get lodged between moving parts, causing the engine to seize.

**F.     Hyundai's knowledge of the Piston Defect**

95.     Upon information and belief, Defendants, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration (NHTSA), (4) warranty and post-warranty claims, (5) internal pre-sale durability testing and TSBs, and (5) other various sources,

were well aware of the Piston Defect but failed to notify customers of the nature and extent of the problems with Class Vehicle engines or to provide any adequate remedy.

96. HACC's 2014 Bulletin states that it conducted its investigation of the Piston Defect in conjunction with Hyundai Motor Manufacturing Alabama, beginning no later than 2011 and continuing through at least 2013.

97. A mechanical failure involving the piston assembly can cause total engine failure, leading to a loss of engine power and power steering. Hyundai acknowledged that unexpected engine failures "at higher speeds can increase the risk of a crash." NHTSA Recall No. 17V-226 (Mar. 31, 2017).

98. Consumer complaints to NHTSA suggest that Hyundai recognizes the safety risk posed: "Engine ticking. Brought it in and they informed me I need an engine replacement. They also informed me if I do not get the engine fixed and continue to drive it, it could stall and or potentially blow up." NHTSA Id. No. 10984687.

99. Other reports suggest that Hyundai is well aware of a widespread issue, as detailed in this post concerning a 2015 Elantra with a Nu 1.8L engine. "As I sat down with the service advisor to resume what would be done on my Elantra, I casually brought up the subject that my engine was knocking. He grabbed my keys, followed me outside and started my car. The knocking was apparent as soon as the engine turned over. The advisor told me that I would need a new short block. Just like that. He continued to say that this problem is well known throughout Hyundai. He did not go into details as to what

the problem actually is, only that the short block is on back-order for 6 weeks and to drive the car like I normally do until then." http://www.hyundai-forums.com/md-2011-2016-elantra-sedan-coupe/612233-canadians-engine-block-replacement-advice-6.html#post5611122 (Last visited Apr. 2, 2018).

100.  The Office of Defects Investigation within NHTSA conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the Nation's highways.[1] All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns (which is backed by criminal penalties), thus Defendants have knowledge of any and all NHTSA complaints. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

101.  The following sampling of complaints to NHTSA concerning the Class Vehicles demonstrates the manifestation of the defect, the safety risk the defect and engine failures pose, and engine failures occurring throughout the warranty period.

**Complaint Date:** November 15, 2010     **NHTSA ID Number:**  10365753
**Model**: 2010 Hyundai Elantra
**Summary:**
TL* The contact owns 2010 Hyundai Elantra. While traveling 40 MPH, the contact heard a knock from the engine and the vehicle then stalled. The contact shifted into

---

[1] *See* https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm. Indeed, vehicle manufacturers are required by law to report any potential safety defects to the United States government.

neutral at first and was unable to remove the key from the ignition. After allowing the vehicle to sit idle for several minutes, the contact was able to shift into park ad restart the vehicle. The vehicle resumed normal operation. The vehicle was neither inspected nor repaired. The failure and current mileage was 1,000. Updated 01/24/11 *CN

**Complaint Date:** May 31, 2012
**Model**: 2013 Hyundai Elantra
**Summary:**
When driving the vehicle on the high way I 29 n at about 68-72 mph the brand new vehicle engine stalled abruptly and the steering wheel froze and we were stuck in the direction the steering was previously turned it and it made impossible for us to steer it on to the shoulder and the vehicle behind us almost crashed into us. We were just a whisker away from getting killed. We had a near death experience and my fiance is still having nightmares about it. *tr

**Complaint Date:** June 20, 2012        **NHTSA ID Number:** 10462448
**Model**: 2011 Hyundai Elantra
**Summary:**
I was turning from gas station onto road, crossing 3 lanes of traffic when vehicle stalled in the middle of the road and I was nearly broad-sided. All dash lights came on, and AC and radio were on, but engine had stalled. After calling Hyundai USA I took vehicle to dealership, reported as stalling at low speed and rough idle. Hyundai USA representative said no problems like this reported. Also service adviser reported never hearing of the problem when took into dealership, despite numerous reports I had printed off the internet. In fact said "we don't acknowledge internet reports as being valid". *JS

**Complaint Date:** August 3, 2012        **NHTSA ID Number:** 10469073
**Model**: 2011 Hyundai Elantra
**Summary:**
When turning left at a busy intersection, the car stalled. I could not accelerate at all. The airconditioning was still running and the car was otherwise on but it completely stalled. I had to turn the engine off and turn it back on in order for the car to accelerate. I was able to drive it approximately 20 feet and the car stalled again with all the same characteristics as before. No check engine light came on. *TR

**Complaint Date:** August 9, 2012        **NHTSA ID Number:** 10470002
**Model**: 2012 Hyundai Elantra

**Summary:**
Car lurched, engine shut off. Car became uncontrollable and all the warning lights on the dash lit up. Eventually managed to get to side of road where the transmission locked into place. Electrical system was still functional but car was completely unresponsive. Occurred again 800 miles later after "repair" both incidents nearly caused accidents. *TR

| **Complaint Date:** July 13, 2013 | **NHTSA ID Number:** 10524640 |
|---|---|

**Model**: 2013 Hyundai Elantra
**Summary:**
Vehicle was stopped at a traffic light and started idling roughly and engine shut off. Doral had a Hyundai motor "Field engineer" ([xxx]) look at it on july 11 and I was informed through the service adviser that this was typical of these models and that she, personally, had chosen to ignore it; she works for a Hyundai dealership. Furthermore, nothing can be done. Please refer to previous complaint. Thank you. Information redacted pursuant to the freedom of information act (foia), 5 u.S.C. 552(b)(6).

**Complaint Date:** March 25, 2014          **NHTSA ID Number:** 10574780
**Model**: 2010 Kia Forte
**Summary:**
TL* The contact owns a 2010 Kia Forte. The contact stated that there was a load knocking in the engine. The vehicle was taken to the dealer, who diagnosed that the vehicle exhibited a rod knock and recommended having the engine replaced. The vehicle was not repaired. The manufacturer was notified of the problem. The approximate failure mileage was 47,000

| **Complaint Date:** Apr. 29, 2014 | **NHTSA ID Number:** 10585564 |
|---|---|

**Model**: 2013 Hyundai Elantra
**Summary:**
While driving my vehicle at highway speed, the vehicle suddenly stalled without any apparent reason. I was in the middle lane of a three-lane highway. I had to coast over to the side of the highway with no steering or brakes due to the engine failure. Once at the side of the highway, the vehicle re-started immediately and ran normally again for about a week when the same thing happened again, this time on a side street at approximately 15 mph. The vehicle once again started back up with no problem. It has run normally again as of this posting.

**Complaint Date:** January 9, 2015         **NHTSA ID Number:** 10671362

**Model**: 2012 Hyundai Elantra

**Summary:**

TL* The contact owns a 2012 Hyundai Elantra. The contact stated that while driving approximately 25 MPH, there was a loud grinding noise as the vehicle stalled. In addition, the electronic stability control warning light illuminated. The vehicle could be restarted. The failure recurred on several occasions. The vehicle was not diagnosed or repaired. The manufacturer was made aware of the failure. The failure mileage was 33,000. MA 10/8 Updated 6/12/12*CN

**Complaint Date:** Mar. 7, 2015         **NHTSA ID Number:** 10692742

2013 Hyundai Elantra

**Summary:**

I bought a used 2013 Hyundai Elantra with 29,802 miles on it on October 6, 2014. By february 2015 I started hearing a tapping noise from under the hood and a noise when I pressed the gas pedal which stopped when I took my foot off the gas pedal. I took it to a Hyundai dealership in February 2015 and it was determined I needed my engine replaced. Hyundai agreed to replace it under factory warranty. I had 32,500 I believe miles on it. The dealership had multiple cars sitting on their lot which needed their engines replaced. While I was waiting for a rental car business to come pick me up at the Hyundai dealership to get me a rental car to drive while my car was waiting to be fixed, I spoke to a couple who came in to drop off their rental car. Their 2012 Hyundai Elantra needed an engine replacement as well--at 23,000 miles. The dealership told me that these cars had engine problems more often in the northeast due to the more severe weather in the winter. I so regret ever buying my first ever Hyundai vehicle!

**Complaint Date:** Mar. 7, 2015         **NHTSA ID Number:** 10692742

2013 Hyundai Elantra

**Summary:**

I bought a used 2013 Hyundai Elantra with 29,802 miles on it on October 6, 2014. By february 2015 I started hearing a tapping noise from under the hood and a noise when I pressed the gas pedal which stopped when I took my foot off the gas pedal. I took it to a Hyundai dealership in February 2015 and it was determined I needed my engine replaced. Hyundai agreed to replace it under factory warranty. I had 32,500 I believe miles on it. The dealership had multiple cars sitting on their lot which needed their engines replaced. While I was waiting for a rental car business to come pick me up at the Hyundai dealership to get me a rental car to drive while my car was waiting to be fixed, I spoke to a couple who came in to drop off their rental car. Their 2012 Hyundai Elantra needed an

26

engine replacement as well--at 23,000 miles. The dealership told me that these cars had engine problems more often in the northeast due to the more severe weather in the winter. I so regret ever buying my first ever Hyundai vehicle!

**Complaint Date:** April 12, 2015          **NHTSA ID Number:** 10705195
**Model**: 2011 Hyundai Elantra
**Summary:**
When I start the engine it makes a very loud rattling noise and when I drive and I push on gas it is rattles. It sounds more like grinding loud noise too. Motor knocks when you start it up and now for the last week when I start it the car will sputter and then shot off. Sometimes will take many times for it to even start. It will RPM very high even when I am not moving. I have had a lot of problems with this car now bc of the issues I am using more gas. I have a little under 80 thousand miles on it and it will leave me set. Wondering if anyone knows of any recalls on this stuff or know what could be wrong with it and if Hyundai still does life time warranty… Thanks *TR

**Complaint Date**: April 12, 2015          **NHTSA ID Number**: 10705195
**Model**: 2011 Hyundai Elantra
**Summary**:
When I start the engine it makes a very loud rattling noise and when I drive and I push on gas it is rattles. It sounds more like grinding loud noise too. Motor knocks when you start it up and now for the last week when I start it the car will sputter and then shot off. Sometimes will take many times for it to even start. It will RPM very high even when I am not moving. I have had a lot of problems with this car now bc of the issues I am using more gas. I have a little under 80 thousand miles on it and it will leave me set. Wondering if anyone knows of any recalls on this stuff or know what could be wrong with it and if Hyundai still does life time warranty… Thanks *TR

**Complaint Date:** May 4, 2015          **NHTSA ID Number:** 10714372
**Model**: 2013 Hyundai Elantra
**Summary:**
My 2013 Elantra started making a tapping noise so I took it to the service department. It seems my 3 year old vehicle needs a new engine. That was almost three weeks ago and I am still waiting. Neither my dealer nor Hyundai can give me and eta as to when the car will be repaired. Unacceptable and from what I gather from the service manager and the posts on this site, I am not alone. My respect for Hyundai has cratered and will never buy another Hyundai.

**Complaint Date:** October 28, 2015          **NHTSA ID Number:** 10786802
**Model**: 2011 Kia Forte
**Summary:**

Took my 2011 Kia Forte into the Kia dealership today because the engine is making a ticking sound. I have had two other mechanics in recent weeks tell me it is a serious problem with the lifters and/or the pistons inside the engine. The Kia mechanic refuses to acknowledge there is a ticking sound, but in formed me the air bag sensor is malfunctioning and I will have to pay $1100 to have the air bag sensor repaired before I can sell the car. Also, my brakes will occasionally make a very loud 'thump' when I apply them, but the Kia dealer can find nothing wrong with them

**Complaint Date:** October 28, 2015          **NHTSA ID Number:** 10786802
**Model**: 2011 Kia Forte
**Summary:**

Took my 2011 Kia Forte into the Kia dealership today because the engine is making a ticking sound. I have had two other mechanics in recent weeks tell me it is a serious problem with the lifters and/or the pistons inside the engine. The Kia mechanic refuses to acknowledge there is a ticking sound, but in formed me the air bag sensor is malfunctioning and I will have to pay $1100 to have the air bag sensor repaired before I can sell the car. Also, my brakes will occasionally make a very loud 'thump' when I apply them, but the Kia dealer can find nothing wrong with them.

**Complaint Date:** Dec. 3, 2015
**Model**: 2013 Hyundai Elantra
**Summary:**

My 2013 Elantra's engine recently stalled and now needs to be replaced, and the underlying problem as explained to me by the Hyundai service dept. Sounds extremely similar to the problems that led to the recent sonata recall. Here's what happened: I was sitting at a stoplight when I heard a strange clicking/knocking noise from the engine. The vehicle began to have a very rough idle, shaking noticeably. The engine then stalled. After about 30 seconds of trying, I was able to start the engine again but still experienced a very rough idle and the check engine light had turned on. I took it to the Hyundai dealership. After the service department had looked at my car, they told me the engine needed to be replaced and that they were going to file a warranty claim. I was told that the engine bearings had failed, and that when they don't work properly to reduce friction in the engine, metal shards can get into the engine and cause problems. As I understand it from reading about the recent class-action against Hyundai, this

sounds virtually identical to the problems with the sonata engines that ultimately led to the recall. I am still waiting to hear about the warranty (I'm still under the full 5 year/60k miles cpo warranty), but wanted to report this issue since what I've been told is so similar to the issues with the sonata engines. If the warranty claim is denied, I plan to request documentation of the problems with the vehicle and will be happy to provide them to nhtsa.

**Complaint Date:** Aug. 4, 2016
**Model**: 2013 Hyundai Elantra

**Summary:**
On numerous occasions, my car would stall out during left turns (middle of intersections) and while accelerating on an entrance ramp. There were no warning lights prior to stalling. I took it in for service/ diagnostics. I was told it is possible for the Elantra to suck up to 1qt of oil per 1000 miles! Due to the mechanics of the car, it could stall out while turning if low on oil. I was due for my regular oil change and it was completed during this service at which time they stated I was 2 qts low !! It was suggested that I come in every 2000 miles to have it checked. My concern is -without warning lights, do I have to stall in the middle of an intersection to let me know my oil is low ????

**Complaint Date:** Aug. 29, 2016          **NHTSA ID Number:** 10899374
**Model**: 2013 Hyundai Elantra

**Summary:**
Auto stalled while driving on a clear day, light traffic, 25 mph, no warning lights, engine was running smooth, engine stalled and could not be re-started, road way was level with no turn involved. Auto had to be towed.

**Complaint Date:** Oct. 18, 2016
**Model**: 2013 Hyundai Elantra

**Summary:**
Engine failure. Zero compression cylinder #1. Second time this has happened since purchase on 10/18/2016. . . . Bought vehicle, cash, from enterprise car sales in montclair, ca. It was a "Certified" used car, supposedly. Immediately I noticed that the engine sounded "Tinny". Sounded like a sewing machine, it was knocking. Also, when I lifted the oil stick, smoke came out of engine. This was within 2 weeks after purchase. The car completely lost compression on interstate 10 in april, 2015. I told both Hyundai and enterprise who ignored my complaints. Finally, after several complaints and threats, enterprise took the car in and sent it to Hyundai dealership who claimed there was no problem. The car began losing

power again in september, 2016 and finally stopped in the middle of the street in arcadia, ca. No compression. It had to be towed to my house. I took it to private shop who said "Zero compression in cylinder #1, possible burned out valve '. See attached. Called hyindai and enterprise again. Both denied responsibility, and refused to do anything. I have to now pay over $1,000 to get engine rebuilt. This car is a lemon and I am enttied to refund or a new car.

**Complaint Date:** Jan. 19, 2017       **NHTSA ID Number:** 10946559
**Model**: 2013 Hyundai Elantra

**Summary:**
After 50k miles the car started to idle rough. Changed spark plugs, air filter, etc. Still ran rough. Car now stalls out when stopped in traffic, and lately will not accelerate up to speed from a stopped position too well. Started to hear a 'clicking' noise that is synced when I press the gas. The vehicle is now stalling when I put it in reverse as well.

**Complaint Date:** Jan. 23, 2017       **NHTSA ID Number:** 10947067
**Model**: 2013 Hyundai Elantra

**Summary:**
Tl* the contact owns a 2013 Hyundai Elantra. While driving 55 mph, the contact observed an abnormal sound from the engine and the check engine indicator illuminated. The dealer diagnosed that the engine assembly needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure. The failure mileage was 84,000.

**Complaint Date:** Jan. 28, 2017       **NHTSA ID Number:** 10948158
**Model**: 2013 Hyundai Elantra

**Summary:**
At 60k miles, a knocking sound came from the engine after rough idling. The engine oil now has metal shavings. Dealership denied that there have ever been problems. Never missed an oil change. Trying to get dealer to cover under warranty.

**Complaint Date:** May 09, 2017       **NHTSA ID Number:** 10984539
**Model**: 2013 Hyundai Elantra

**Summary:**

I bought a 2013 Hyundai Elantra limited new. 3 years later the car stalls out when stopped and it difficult to start. Have taken the car to the dealership so many times (10) within a 2 month period, I use the loaner more than my own car. The last time I picked it up they had changed out the timing cover with oil pump, cam shaft and timing chain. Called me to come pick my vehicle up as it was ready. When exiting the dealership, I came to the stop light and the car stalled once again with it being difficult to start. Turned around and the vehicle would not drive faster than 20 mph. The service manager came out and asked what was wrong. I asked him to get in the vehicle that they had just fixed. He drove it and they now have my car once again and I'm driving the loaner. They can't seem to find out what the problem is and say they keep calling the manufacturer for input. Apparently no one knows what is wrong and I will not buy another Hyundai as it seems they can't repair their vehicles with these similar problems.

**Complaint Date:** May 18, 2017          **NHTSA ID Number:** 10986405
**Model**: 2013 Hyundai Elantra

**Summary:**

My 2013 Elantra (appx. 54k miles) began making noises when turning while driving and when stalling. Twice the vehicle lost acceleration and shut off while driving on local streets. I took the vehicle to the dealer service department in February 2017 and they indicated there was no oil in the car and the engine needed to be replaced. It had been less than 5k miles since the last oil change. The repairs and rental are both covered under warranty. After replacing the engine and a few other parts, I was told my vehicle was ready for pickup in March 2017. I got in the car and noticed a noise. The advisor and tech said its because of a new pump and will go away after driving a few miles. Immediately after driving off and entering the highway I heard a dragging noise and the engine light came on. I turned around and went back to the service department. They kept the vehicle and placed me in another rental. It is now may 2017 and the car is still in the service department. The engine has been replace twice and other parts have been replace multiple times as well. I was told by the service manager that Hyundai has sent out an engineer to look at the vehicle. At this point it appears they do not know the problem and/or cannot fix the problem. I am no longer confident in the safety of my car and Hyundai vehicles over all.

**Complaint Date:** June 7, 2017          **NHTSA ID Number:** 10993695
**Model**: 2013 Hyundai Elantra

**Summary:**
Tl* the contact owns a 2013 Hyundai Elantra. While exiting the highway and decelerating from approximately 60-35 mph, the vehicle suddenly decelerated to 15 mph on its own. The vehicle was towed to Shaffer Hyundai where it was diagnosed that the throttle bar failed and the engine needed to be replaced. The vehicle was repaired. The contact stated that the vehicle was emitting an odor of burning oil. While driving approximately 55 mph, the vehicle suddenly stalled and the oil and battery indicators illuminated. The contact had the vehicle towed to the Webb Hyundai dealer where it was diagnosed that the engine needed to be replaced. The contact was informed that the vehicle would be repaired shortly. The manufacturer was not made aware of the failures. The vin was unknown. The approximate failure mileage was 67,000.

**Complaint Date:** July 18, 2017          **NHTSA ID Number:** 11006253
**Model**: 2013 Hyundai Elantra

**Summary:**
Pin came out from bottom of engine

**Complaint Date:** July 19, 2017          **NHTSA ID Number:** 11006387
**Model**: 2013 Hyundai Elantra

**Summary:**
Car stutters, rpms drop, and car stalls when it comes to a complete stop at stop sign or traffic light. This happens when driving without warning in all conditions-- hot/cold, morning/evening, etc. Following this, car will be difficult to restart and slow to accelerate; then rpms raise to 5 and car goes into gear. This has been happening since april 2017 and has been to the dealer 3 times. (4th time tomorrow)

**Complaint Date:** Dec. 14, 2017          **NHTSA ID Number:** 11054826
**Model**: 2013 Hyundai Elantra

**Summary:**
I took my car to the shop today because it had this horrible ticking sound in the engine. I found out a need a new engine

**Complaint Date:** Jan. 22, 2018          **NHTSA ID Number:** 11064067
**Model**: 2013 Hyundai Elantra

**Summary:**
The engine seized while driving on the highway and the car stalled out.

**Complaint Date:** Feb. 1, 2018          **NHTSA ID Number:** 11066498

**Model**: 2013 Hyundai Elantra

**Summary:**

Tl* the contact owns a 2013 Hyundai Elantra. The contact noticed a knocking noise coming from the engine. There were no warning indicators illuminated. The vehicle was taken to Prestige Hyundai . . . where it was diagnosed that the lower bearing in the engine needed to be replaced. The vehicle was not repaired. The manufacturer was not notified of the failure. The approximate failure mileage was 121,000.

**Complaint Date:** Feb. 28, 2018     **NHTSA ID Number:** 11075514

**Model**: 2013 Hyundai Elantra

**Summary:**

Tl* the contact owns a 2013 Hyundai Elantra. While driving various speeds with the accelerator pedal depressed, there was an abnormal noise from the front of the vehicle. The failure recurred several times. The vehicle was taken to patriot GMC Hyundai (2001 se Washington Blvd, Bartlesville, OK 74006) where it was diagnosed that the engine needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure and did not assist. The vin was not available. The approximate failure mileage was 87,200.

**Complaint Date:** Mar. 6, 2018     **NHTSA ID Number:** 11076482

**Model**: 2013 Hyundai Elantra

**Summary:**

2/23/2018 at highway speed near 70 mph, in spring valley, ca. Making sweeping right turn, engine suddenly stops, coast to road shoulder, engine fails start attempts, tow truck called. At tow impound yard 3 days of engine attempt failed. End of 3rd day impound, tow manager started car, ran okay, but car was towed to dealer to assure engine okay. The dealer found no fault with the vehicle. A consumer reporter publication, had 18 same year same model Hyundais with high speed right turn engine failures, but no fix of the problem by dealer or private mechanics for the 18 Hyundai owners. It appears Hyundai is hiding this right turn fault from nhsa, and the public. 18 had repeat incidents after the initial failure.

**Complaint Date:** Mar. 13, 2018     **NHTSA ID Number:** 11078960

**Model**: 2013 Hyundai Elantra

**Summary:**

Tl* the contact owns a 2013 Hyundai Elantra. While driving at an undisclosed speed, there was an abnormal knocking sound in the engine. The vehicle was taken to Wilkins Hyundai . . . where it was diagnosed that the engine needed to

33

be replaced. The vehicle was not repaired due to the engines being on backorder. The manufacturer was not notified of the failure. The approximate failure mileage was 64,999. The vin was not available.

**Complaint Date:** Mar. 22, 2018          **NHTSA ID Number:** 11080987
**Model**: 2013 Hyundai Elantra

**Summary:**
Car had been making an awful sound, ticking almost for a while... Took it to the garage and it was diagnosed as the engine completely shot. They said there were 12 other Elantras at their garage alone waiting to be repaired for the exact same issue. They said certain years they've noticed are being affected, but it doesn't matter the mileage, they're getting cars with even just 20k miles coming in need of a new engine. Estimated the part at $2400, don't have that to spare.

102.   In addition to complaints made directly to Hyundai by customers who tendered their vehicles to Hyundai's authorized dealers for repair, Hyundai routinely monitors the Internet, including vehicle-defect and Hyundai-specific forums, for complaints similar in substance to those quoted below. Upon information and belief, Hyundai's customer service division carries out this function and regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, Hyundai was made aware of the Piston Defect. The complaints from hyundai-forums.com, some of which are included below, also indicate Hyundai's awareness of the defect and its potential danger, and many evidence Class members' efforts to contact Hyundai directly concerning the Piston Defect.

**Complaint Date:** May 4, 2011
**Complaint**: Has anyone noticed their engine making a loose, clackity, diesel like sound at cold start up. It seems to last only about 1 second and quiets down. I think it may be

characteristic of the engine and caused by the delay in building up oil pressure. I have NO driveability issues so there is probably no cause for concern. Just wanted to see if anyone else noticed this . . . The sound I am trying to describe goes away literally after about 1-2 seconds. It is the same sound an engine makes when really low on oil. This is what leads me to the delay in oil pressure scenareo.

**Complaint Date:** July 25, 2011
**Complaint**: Hi I am new to Hyundai. I just purchased a new 2012 elantra Limited (a week ago) and am experiencing the issues below: 1. Steering wheel not straight – a little bit to the right. Need to be adjusted a little to the left. 2. In the morning, first start up, the engine whines for about 5 seconds (kind of like screaming) 3. When idle (at a stop light), the AC is on, the brake is applied, the car is shaking. It has happened once though. 4. I always hear notice a "clocking" sound when idle I will bring my car to the dealer to have it inspected. I have read this forum and people are experiencing the same. Are they normal then?.Please advise

**Complaint Date:** August 22, 2011
**Complaint**: Hello all: My '11 Elantra Limited runs well, but one thing concerns me: Most (but not every) time I start the car, the engine makes a sort of clanking/rattling noise, as though the valve train is dry. It lasts 1-2 seconds, then goes away. There is plenty of oil in the crankcase, and the temps are between 70-90 degrees Farenheit (20-33 Celsius). The oil is the factory fill, by the way. I haven't changed it yet, as there are only 2000 miles/3200 km on it. Is this initial start-up "racket" commonplace with this car, or do I need to see the dealer? Anyone with any insight, or a similar situation, should advise me. Thanks

## G. Hyundai's performance under its written warranties

103.   Hyundai issued two relevant warranties covering each Class Vehicle and each Class Vehicle's powertrain.

104.   Under the New Vehicle Limited Warranty, Hyundai promised to repair defects reported within the earlier of 5 years or 60,000 miles.

105.   Under the Powertrain Warranty, Hyundai promised to repair defects affecting various powertrain components through 10 years and 100,000 miles, including, in relevant part, the following engine components: cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger. The powertrain warranty also covered components in the Class Vehicle's transaxle and transmission.

106.   Hyundai routinely evades its warranty obligations in response to complaints about the Piston Defect by failing to tell consumers that their vehicles are defective and by representing that: (1) the engine knock symptom of the Piston Defect is normal and does not merit diagnosis or repairs; and (2) the cause of engine failures from the Piston Defect is the owner's neglect to properly maintain the engine oil and/or engine oil level or their use of aftermarket filters.

107.   Hyundai also routinely denies warranty repairs for Class Vehicle owners or lessees who reported Piston Defect symptoms during the warranty period but had their Nu 1.8L engines fail from the piston defect outside of the warranty period.

108.   In addition, Defendant has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including requiring that all oil changes be completed at a Hyundai dealership, before determining whether to make the necessary repairs under warranty. Hyundai is well

aware that the Piston Defect in the Class Vehicles' engines manifests even if the owner or lessee has followed the Defendants' oil change guidelines.

109.   Hyundai is further aware that the Piston Defect creates oil sludge in the engine.  Upon the detection of oil sludge in an engine affected by the Piston Defect, Hyundai routinely blames the oil sludge—and engine failure—on inadequate maintenance by the consumer.  Even proof of adequate maintenance is no guarantee that Hyundai will take responsibility for an engine impacted by the Piston Defect.

110.   In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the Piston Defect (despite such defect having been contained in the Class Vehicles when manufactured by Defendants), repair and replacement of the Nu 1.8L engine, and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components. A replacement engine in a Class Vehicle can cost upwards of $10,000 including installation costs.

111.   Despite its extensive knowledge of the Piston Defect, Hyundai has continued to conceal the Defect. Because consumers would find the Piston Defect material to their purchase decisions. This deceptive practice has occurred in spite of the materiality of the Piston Defect to consumers' purchase decisions and in spite of the safety risks posed by the Piston Defect and the duties imposed on the Defendant to inform vehicle owners and prospective purchasers of the Piston Defect. Defendant

knowingly and intentionally concealed material information about the Defect with the

intent that Plaintiffs and the Class members would purchase the Class Vehicles.

## CLASS ALLEGATIONS

112.   Plaintiffs bring this action on behalf of themselves, and on behalf of the

following nationwide class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3).

Specifically, the nationwide class consists of the following:

**Nationwide Class:**
All persons or entities in United States who are current or former owners and/or
lessees of a Class Vehicle (the "Nationwide Class").

81.   In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P.

23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the

Court declines to certify the Nationwide Class above:

**New Jersey Subclass:**
All persons or entities in New Jersey who are current or former owners and/or
lessees of a Class Vehicle (the "New Jersey Class").

**Washington Subclass:**
All persons or entities in Washington who are current or former owners and/or
lessees of a Class Vehicle (the "Washington Class").

**Georgia Subclass:**
All persons or entities in Georgia who are current or former owners and/or lessees
of a Class Vehicle (the "Georgia Class").

**Illinois Subclass:**
All persons or entities in Illinois who are current or former owners and/or lessees
of a Class Vehicle (the "Illinois Class").

113.   The Nationwide Class, the New Jersey Subclass, the Washington Subclass, the Georgia Subclass, and the Illinois Subclass are referred to herein as the "Class". The New Jersey Subclass, Washington Subclass, Georgia Subclass, and the Illinois Subclass are referred to herein as the "State Subclasses." The Class excludes the following: Defendants, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case. Also excluded are any current or former owners or lessees of Class Vehicles with personal injury claims related to the Piston Defect. Plaintiffs reserve the right to modify, change, or expand the definitions of the Class and Subclass based upon discovery and further investigation.

114.   *Numerosity*: The Class is so numerous that joinder of all members is impracticable. At least hundreds of thousands of Class members have been subjected to Defendants' conduct. The class is ascertainable by reference to records in the possession of HMA and HMC.

115.   *Predominance*: Common questions of law and fact exist as to all members of the Class and Subclass. These questions predominate over questions affecting individual members of the Class and Subclass and include:

       a.      Whether the Class Vehicles were sold with a Piston Defect;

       b.      Whether Defendants knew of the Piston Defect at the time of sale;

       c.      Whether Defendants failed to disclose the Piston Defect;

       d.      Whether Defendants actively concealed the Piston Defect;

e.  Whether a reasonable consumer would consider the Piston Defect or its manifestation to be material;

f.  Whether Defendants breached express and/or implied warranties;

g.  Whether Defendants must disclose the Piston Defect; and

h.  Whether Defendants violated consumer protection statutes and the other claims asserted herein.

116.  *Typicality*: Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting, and selling the Class Vehicles. All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all Class members were injured in the same manner by Defendants' uniform course of conduct described herein. Plaintiffs and all Class members have the same claims against Defendants relating to the conduct alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class members.  Plaintiffs and all Class members sustained economic injuries including, but not limited to, ascertainable losses arising out of Defendants' course of conduct as described herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class and/or Subclass members.

117.  *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the Class. Plaintiffs

have retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breaches of warranties, product liability, product design defects, and state consumer fraud statutes.

118. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable, and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

119. *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

120. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

# CAUSES OF ACTION

## COUNT I
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class and State Subclasses)

121.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

122.   Plaintiffs brings this claim on behalf of themselves and on behalf of the Class and the State Subclasses.

123.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

124.   The engine parts affected by the Piston Defect were distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided to all purchasers and lessors of Class Vehicles.

125.   Defendants breached these warranties by selling and leasing Class Vehicles with the Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

126.   Plaintiffs notified Defendants of the breach within a reasonable time though they were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants also knew of the

Defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

127.   As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the Piston Defect.

128.   Defendants' attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

129.   Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

130.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and that their engines would fail well before their useful lives.

131. Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT II
## BREACH OF IMPLIED WARRANTY
### (On Behalf of the Nationwide Class and State Subclasses)

132. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

133. Plaintiffs bring this claim on behalf of themselves and on behalf of the Class and the State Subclasses.

134. Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

135. Defendants provided Plaintiffs and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, inter alia, the Class Vehicles and their engines suffered from the Piston Defect, which causes the Class Vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not merchantable and are not fit for their particular purpose of providing safe and reliable transportation.

136.  Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

137.  Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

138.  Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## COUNT III
### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. § 2301, *et seq.*)
**(On Behalf of the Nationwide Class and the State Subclasses)**

139.  Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

140.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Class and State Subclasses.

141.    Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

142.    Each Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

143.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

144.    Defendants' warranties for the Class Vehicles are "written warranties" within the meaning of 15 U.S.C. §2301(6).

145.    Defendants breached their express warranties by:

    i. Providing a 10 year/100,000 mile Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    ii. Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

       iii.   Refusing or failing to honor its express warranties by repairing or

replacing, free of charge, the engine or any of its component parts in

order to remedy the Defect.

146.   Plaintiffs and the other Class Members relied on the existence and length of

the express warranties in deciding whether to purchase or lease the Class Vehicles.

147.   Defendants' breach of the express warranties has deprived Plaintiffs and the

other Class Members of the benefit of their bargain.

148.   The amount in controversy of Plaintiffs' individual claims meets or exceeds

the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the

sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all

claims to be determined in this suit.

149.   Defendants have been afforded reasonable opportunities to cure its breaches

of the written warranties and/or Plaintiffs and the other Class Members were not required

to do so because affording Defendants a reasonable opportunity to cure its breach of

written warranties would have been futile. Defendants were also on notice of the alleged

defect from the complaints and service requests it received from Plaintiff, Class

Members, as well as from its own warranty claims, customer complaint data, and/or parts

sales data.

150.   As a direct and proximate cause of Defendants' breach of the written

warranties, Plaintiffs and the other Class Members sustained damages and other losses in

an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory fees and/or other relief as deemed appropriate.

**COUNT IV**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. Stat. Ann. §§ 56:8-1, *et seq*.)**
**(On Behalf of the New Jersey Subclass)**

151.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

152.    Plaintiff Brown brings this claim on behalf of herself and the New Jersey Class.

153.    Plaintiff, the New Jersey Class members and Defendant are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

154.    Hyundai engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e). Hyundai's actions as set forth herein occurred in the conduct of trade or commerce.

155.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or

48

advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. § 56:8-2.

156.    In the course of Hyundai's business, Hyundai intentionally or negligently concealed and suppressed material facts concerning the Piston Defect affecting the Nu 1.8L engines. Defendants accomplished this by failing to disclose the known safety risk of engine failure from the piston defect, denying warranty claims arising from the defect, and denying the existence of the defect.

157.    Defendants thus violated the provisions of the New Jersey CFA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

158.    Hyundai intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Jersey Class.

159.    Hyundai knew or should have known that its conduct violated the New Jersey CPA.

160.   Defendants owed Plaintiff and New Jersey Class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it:

     a.    Possessed exclusive knowledge of the piston defect;

     b.    Intentionally concealed the piston defect from consumers; and

     c.    Made incomplete or negligent representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the New Jersey Class.

161.   Plaintiff and New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Hyundai's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the New Jersey Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of her vehicle, as well as lost or diminished use.

162.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

163.   As a result of the foregoing wrongful conduct of Defendant, Plaintiff and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just

and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

### COUNT V
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code. 19.86,** *et seq.***)**
**(On Behalf of the Washington Subclass)**

164.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

165.  Plaintiff Pearson brings this claim on behalf of himself and the Washington Class.

166.  Defendants are "persons" within the meaning of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010(1), and conduct "trade" and "commerce" within the meaning of the WCPA, WRC § 19.86.010(2).

167.  Plaintiff Pearson and members of the Washington Class are "persons" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(1).

168.  In the course of Hyundai's business, Hyundai intentionally or negligently concealed and suppressed material facts concerning the Piston Defect affecting the Nu 1.8L engines. Defendants accomplished this by failing to disclose the known safety risk of engine failure from the piston defect, denying warranty claims arising from the defect, and denying the existence of the defect.

169.   Defendants thus violated the WCPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles; and (5) otherwise engaging in conduct likely to deceive.

170.   Hyundai intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the New Jersey Class.

171.   Hyundai knew or should have known that its conduct violated the WCPA.

172.   Defendants owed Plaintiff and Washington class members a duty to disclose, truthfully, all the facts concerning the reliability of the Class Vehicles because it:

> d.   Possessed exclusive knowledge of the piston defect;
>
> e.   Intentionally concealed the piston defect from consumers; and
>
> f.   Made incomplete or negligent representations about the Class Vehicles generally, while purposefully withholding material facts from Plaintiff and the Washington Class.

173.   Plaintiff and Washington Class members suffered ascertainable loss and actual damages as a direct and proximate result of Hyundai's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Washington

Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of his vehicle, as well as lost or diminished use.

174.   Defendants' violations present a continuing risk to Plaintiff and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest and are likely to be repeated.

175.   As a direct and proximate result of Hyundai's actions described above, Plaintiff and the Washington Class members have been injured in fact and suffered damages, and seek relief in the form of actual damages, treble damages, and reasonable attorneys' fees, pursuant to Wash. Rev. Code § 19.86.090.

## COUNT VI
## VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### (Ga. Code Ann. § 10-1-390, *et seq.*)
### (On Behalf of the Georgia Subclass)

176.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

177.   Plaintiff Martin brings this claim on behalf of herself and the Georgia Class.

178.   Defendants are "persons" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA"). Ga. Code Ann. § 10-1-392(a)(24).

179.   Plaintiff and Class Members are "consumers" within the meaning of the Georgia FBPA. Ga. Code Ann. § 10-1-392(a)(6).

180.   The purchase or lease of Class Vehicles by Plaintiff and Class Members constituted "consumer transactions" as defined by the Georgia FBPA. Ga. Code Ann. § 10-1-392(a)(10).

181.   The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," *id.* §§ 10-1-393(b)(5), (7) & (9).

182.   By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Class Members, Hyundai violated the Georgia FBPA, because Hyundai represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another. *See* Ga. Code Ann. §§ 10-1-393(b)(5) & (7).

183.   In the course of Hyundai's business, Hyundai intentionally or negligently concealed and suppressed material facts concerning the Piston Defect affecting the Nu 1.8L engines. Defendants accomplished this by failing to disclose the known safety risk of engine failure from the piston defect, denying warranty claims arising from the defect, and denying the existence of the defect.

184.   Plaintiff and Georgia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Hyundai's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Georgia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed—would have paid significantly less for them. Plaintiff also suffered diminished value of her vehicle, as well as lost or diminished use.

185.   Hyundai's violations present a continuing risk to Plaintiff and to the general public. Hyundai's unlawful acts and practices complained of herein affect the public interest.

186.   Plaintiff and Class Members are entitled to equitable relief.

187.   Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule 23's prerequisites are met. The prohibition of class actions in Ga. Code Ann. § 10-1-399(a) is procedural, not substantive, and so directly conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the Rules Enabling Act, 28 U.S.C. § 2072; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938

188.    Thus, pursuant to Ga. Code Ann. § 10-1-399, Plaintiff Martin seeks, in addition to equitable relief, actual and statutory damages, attorneys' fees and expenses, treble damages, and punitive damages as permitted under the Georgia FBPA and applicable law.

<u>**COUNT VII**</u>
**VIOLATIONS OF THE GEORGIA UNIFORM DECEPTIVE TRADE
PRACTICES ACT
(Ga. Code Ann. § 10-1-370, *et seq.*)
(On Behalf of the Georgia Subclass)**

189.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

190.    Plaintiff Martin brings this claim on behalf of herself and the Georgia Class.

191.    Hyundai, Plaintiff, and Class Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). Ga. Code Ann. § 10-1-371(5).

192.    The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-372.

193. By failing to disclose the defective nature of the Class Vehicles to Plaintiff and the Georgia Class Members, Hyundai engaged in deceptive trade practices in violation of the Georgia UDTPA, because Hyundai represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another. *See* Ga. Code Ann. §§ 10-1- 372(5), (7), (9).

194. Hyundai advertised the Class Vehicles with the intent not to sell them as advertised, in violation of Ga. Code Ann. § 10-1-372(12).

195. Hyundai's unfair and deceptive acts or practices occurred repeatedly in Hyundai's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm on owners and purchasers of the Class Vehicles.

196. Hyundai knew before the sale or lease of the Class Vehicles, that the Class Vehicles suffered from an inherent design defect, would repeatedly fail, and were not suitable for their intended use.

197. Hyundai had exclusive knowledge of material facts concerning the existence of the defect in the Class Vehicles. Furthermore, Hyundai actively concealed these defects from consumers by denying the existence of the defects to Class Members who contacted Hyundai about the defect, and failing to offer Class Members an effective remedy or solution to the defect.

198.   Hyundai was under a duty to Plaintiff and the Georgia Class Members to disclose the defective nature of the Class Vehicles, as well as the associated costs that would have to be repeatedly expended in order to repair the Class Vehicles due to the defect, because, inter alia: (a) Hyundai was in a superior position to know the true state of facts about the defect in the Class Vehicles; Plaintiff and the Georgia Class Members could not reasonably have been expected to learn or discover that the Class Vehicles were defective; and (c) Hyundai knew that Plaintiff and the Georgia Class Members could not reasonably have been expected to learn or discover defect prior to its manifestation.

199.   Despite possessing information to the contrary, Hyundai failed to disclose and actively concealed the defect. The deception made reasonable consumers believe that Class Vehicles were of high quality and designed and made by a company that stood behind its vehicles once they were on the road.

200.   Hyundai knew or should have known that its conduct violated the Georgia UDTPA.

201.   In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause and remedy of the defect, Hyundai knowingly and intentionally concealed material facts and breached its duty not to do so.

202.   The facts concealed or not disclosed by Defendants to Plaintiff Moore and the Illinois Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class

Vehicles or pay a lesser price. Had Plaintiff Moore and the Illinois Class Members known about the defect, they would not have purchased the Class Vehicles or would have paid less for them.

203. Plaintiff and the Georgia Class Members, like all objectively reasonable consumers, did not expect their Class Vehicles to contain an undisclosed, dangerous safety defect.

204. As a result of Hyundai's misconduct, Plaintiff Martin and the Georgia Class Members have been harmed and suffered actual damages in that the Class Vehicles repeatedly fail due to the defect, causing inconvenience, creating an unsafe environment for vehicle occupants, and causing Class Members to spend money to repeatedly repair or temporarily fix the Class Vehicles.

205. As a direct and proximate result of Hyundai's unfair or deceptive acts or practices, Plaintiff Martin and the Georgia Class Members have suffered and will continue to suffer actual damages.

206. Hyundai's violations present a continuing risk to Plaintiff and to the general public. Hyundai's unlawful acts and practices complained of herein affect the public interest.

207. As a direct and proximate result of Hyundai's violations of the Georgia UDTPA, Plaintiff and Class Members have suffered injury-in-fact and/or actual damage.

208.   Plaintiff Martin seeks an order enjoining Hyundai's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

**COUNT VIII**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT**
**(815 Ill. Comp. Stat. § 505, *et seq.*)**
**(On Behalf of the Illinois Subclass)**

209.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

210.   Plaintiff Moore brings this claim on behalf of himself and the Illinois Class.

211.   Illinois's Consumer Fraud and Deceptive Business Practices Act prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce, including among others, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, … whether any person has in fact been misled, deceived, or damaged thereby."  815 Ill. Comp. Stat. § 505/2. The Act also prohibits suppliers from representing that their goods are of a particular quality or grade that they are not.

212.   The Class Vehicles are "merchandise" as defined in 815 Ill. Comp. Stat. § 505/1(b). Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c). Plaintiff Moore and the other Illinois Class members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

213.    Defendants has engaged in deception, fraud, unfair practices, and concealment by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Moore and the Illinois Class Members the existence of the defect (and the costs and diminished value of the Class Vehicles as a result of Defendants' conduct). Accordingly, Defendants engaged in unfair or deceptive acts or practices as defined in 815 Ill. Comp. Stat. § 505/2, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

214.    The facts concealed or not disclosed by Defendants to Plaintiff Moore and the Illinois Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff Moore and the Illinois Class Members known about the defect, they would not have purchased the Class Vehicles or would have paid less for them.

215.    Plaintiff Moore and the other Illinois Class members were injured as a result of Defendants' conduct in that Plaintiff Moore and the other Illinois Class members purchased Class Vehicles that would become unusable as automobiles, overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles

have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' omissions.

216. The injuries suffered by Plaintiff Moore and the Illinois Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Moore and the Illinois Class Members should have reasonably avoided.

217. Plaintiff Moore's and the other Illinois Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

218. Defendants' conduct in this regard was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff Moore and the other Illinois Class members and, as such, warrants the imposition of punitive damages.

## COUNT IX
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT
### (815 Ill. Comp. Stat. § 510, *et seq.*)
### (On Behalf of the Illinois Subclass)

219. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

220. Plaintiff Moore brings this claim on behalf of himself and the Illinois Class.

221. Illinois's Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2, prohibits deceptive trade practices, including among others, "(2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or

certification of goods or services; . . . (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . .; (7) represent[ing] that goods or services are of a particular standard, quality, or grade . . . if they are of another; . . . (9) advertis[ing] goods or services with intent not to sell them as advertised; . . . [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

222.    Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 510/1(5).

223.    Defendants has engaged in deception, fraud, unfair practices, and concealment by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from the existence of the defect (and the costs and diminished value of the Class Vehicles as a result of Defendants' conduct). Accordingly, Defendants engaged in unfair or deceptive acts or practices as defined in 815 Ill. Comp. Stat. § 510/2, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

224.    The facts concealed or not disclosed by Defendants to Plaintiff Moore and the Illinois Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class

Vehicles or pay a lesser price. Had Plaintiff Moore and the Illinois Class Members known about the defect, they would not have purchased the Class Vehicles or would have paid less for them.

225. Plaintiff Moore and the other Illinois Class Members were injured as a result of Defendants' conduct in that they purchased Class Vehicles that would become unusable as automobiles, overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions

226. The injuries suffered by Plaintiff Moore and the Illinois Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Moore and the Illinois Class Members should have reasonably avoided.

227. Plaintiff Moore's and the other Illinois Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

### COUNT X
### COMMON LAW FRAUD
### (On Behalf of the Nationwide Class and the State Subclasses)

228. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

229.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class and the State Subclasses.

230.   Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the Class Vehicles' engines, which was not readily discoverable until after the Vehicles were purchased. As a result, Plaintiffs and the other Class members were fraudulently induced to lease and/or purchase the Class Vehicles with the said Piston Defect and all of the resultant problems.

231.   These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs and Class members rely upon them.

232.   Plaintiff and Class members reasonably relied on these omissions, and suffered damages as a result.

### COUNT XI
### UNJUST ENRICHMENT
**(On Behalf of the Nationwide Class and the State Subclasses)**

233.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

234.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class and the State Subclasses.

235.   This claim is pled in the alternative to Plaintiffs' contract-based claims.

236.   Defendant knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

237.   Plaintiffs and the Class conferred substantial benefits on Defendant by purchasing the defective Class Vehicles. Defendant knowingly and willingly accepted and enjoyed those benefits.

238.   Defendants' retention of these benefits is inequitable.

239.   As a direct and proximate cause of Defendants' unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.   determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class(es) as defined above;

B.   appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.   award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.   award pre-judgment and post-judgment interest on such monetary relief;

E.    grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants' to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the design defect;

F.    award reasonable attorney's fees and costs; and

G.    grant such further relief that this Court deems appropriate.

DATED: September 27, 2019

*/s/ Matthew D. Schelkopf*
Matthew D. Schelkopf
Joseph B. Kenney
**Sauder Schelkopf LLC**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0581
mds@sstriallawyers.com
jbk@sstriallawyers.com

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio*
Jason Rathod*
Esfand Y. Nafisi*
412 H Street Northeast, Suite 302
Washington, D.C. 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
enafisi@classlawdc.com

Daniel C. Levin, Esquire *
**LEVIN SEDRAN &
BERMAN**
510 Walnut Street
Suite 500
Philadelphia, PA 19102
Telephone: 215-592-1500
Facsimile: 215-592-4663

*pro hac vice* application forthcoming

Attorneys for Plaintiff and the
Putative Class

# EXHIBIT

# 5

# LAW OFFICES

# ARNOLD L. LEVEY

Telephone ████████████     ████████████████     Facsimile ████████████

### November 7, 2016

Shon Morgan
QUINN EMANUEL URQUHART &           **DEFENSE COUNSEL**
SULLIVAN, LLP
865 S. Figueroa St. 10th Floor
Los Angeles, California 90017

Eric Gibbs
GIBBS LAW GROUP, LLP                **CLASS COUNSEL**
50514TH Street, Suite 1110
Oakland, California 94612

**RE: OBJECTION TO SETTLEMENT in** *In Re: Hyundai Sonata Engine Litigation, No. 5:15-cv-1685-BLF* and intention to appear at Fairness Hearing

## OBJECTION

### Introductory Information

1. **Arnold L. Levey**
2. ████████████████████████
   ████████████████████████████
3. ████████████████████████
   **Vehicle year model 2011, VIN #**
   ████████████████████████

4. **I have never objected, myself or through counsel,**

4.  **I have never objected, myself or through counsel, to any class action settlements submitted in any court in the United States.**

## Statement of Objection and Argument

I, as both a Hyundai owner and an attorney, strongly object to the Settlement because I believe that its approval would be neither in my best interest nor in the best interest of the other members of the class. It is probably advantageous for the Defendant and, certainly, is good for the Plaintiff's counsel who brought this case and the Class counsel who both stand to recover substantial and, in my opinion, clearly excessive and unwarranted attorney's fees.

This proposed settlement is not only not very good, but almost useless to the members of the class and will compromise my rights and those of the other vehicle owners. I realize I could exclude myself from the class but as I will later explain, this option would place me in a worse position than if the case had never been brought.

The lawsuit makes serious allegations, particularly in detailing mechanical deficiencies that could lead to catastrophic engine failure which is likely to manifest itself towards the end of the warranty period or shortly thereafter. It also claims that these deficiencies will lead to a great decrease in the value of the vehicle on resale. I was even told off the record that my insurance carrier had increased my premiums due to the vehicle's safety ratings. This case should, after the settlement is rejected, proceed to either a trial or a more reasonable settlement that is in the best interest of the class members. New counsel should probably be brought in so that justice may be done.

The proposed settlement provides very little to the

class members. Hyundai has already informed us through a Recall Letter that it is prepared to make necessary repairs and modifications and even replace the engine, if warranted. The new engine would have a warranty attached to it so the extended warranty given in the settlement is really meaningless. I have had the opportunity to read the objection filed in a similar case (2:12-cv-08238-AWT-PJW)pending in the District Court for the Central District of California by Ninth Circuit Court Judge Alex Kozinski and his wife involving their Nissan, where they pointed out that the proposed settlement should not be based upon action that the Defendant had already taken; that this was nothing but past consideration. He said that even if the settlement had brought about the action already taken there was no new consideration and nothing to be gained by the settlement. In this case, we already have the engine recall available to the vehicle owners.

Extending the warranty for five years is basically of little value. I presume that the warranty will not be extended until some time after the settlement would be approved by the court (including any appeals which likely would be brought) so there will be a gap in warranty coverage during an extended period—the time frame when problems would be likely to arise. This makes it even less valuable. (My warranty coverage has recently expired because it has now been more than 5 years from the purchase date.

The other provisions in the proposed settlement are basically trivial and of little value to the vehicle owner. This includes paying for rental cars for the times when the vehicle is in for repairs.

**It is significant that the settlement gives the members of the class no monetary payment whatsoever, except for paltry amounts to be paid the named Plaintiffs, who almost certainly were recruited to bring this case which I claim is nothing more than a means to generate huge attorney's fees.**

I would have made my objections known before now if I had knowledge of this lawsuit at an earlier time, specifically before the preliminary approval process had been before the Court.

The Notice that was received by class members was defective and did not provide sufficient information for enough of the class members to realize how little they would receive as a result of the settlement. See *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985). Further access to the settlement agreement itself was made very difficult due to technical problems in accessing the website on which the agreement was allegedly posted. Was this perhaps intentional?

I came very close to opting out of the class and then possibly pursuing my own case against Hyundai or at least maintaining the right to do so in the future (subject to statute of limitations issues of course). However considering the expenses inherent in bringing this type of case and the fact that the extent of my damages have not yet become apparent, I decided not to do this. Rather, as a member of the class, I expect the attorneys representing the class do their job and earn their fee rather than just negotiate a settlement that is in their financial interest and which totally ignores their fiduciary responsibility to me and the other members of the class.

While I believe these attorneys' fee requests are excessive considering primarily the results obtained in the settlement, focusing on this begs the main issue which is the fact that serious allegations were made—particularly the possibility of catastrophic failure of the vehicles; great loss of value; and substantial inconvenience. I do not want to see the discovery which has been done, as well as the time expended, wasted and not benefit the class members.

Although I have not yet exhaustively researched the legal issues in determining the fairness of a class action settlement, I have looked at the case of *Churchill Village, LLC v. General Elec. Co.* 169 F. Supp. 2d 1119 (N.D. Cal. 2000) for guidance on the factors to be considered in approving a settlement in this district. Based on these factors the settlement is not good for the class, particularly on what is achieved compared to what is alleged. The only possible question I have is the chances of success which I would attribute to attorneys who don't really care about pursuing the case and are only seeking their personal enrichment.

## Conclusion

I would like an opportunity to be heard at the Fairness Hearing and then I ask that the Court reject the Settlement and appoint new or additional class counsel to protect the interests of myself and the other members of the class. While I do have thoughts about what terms a fair settlement would contain, I realize that at this time the only issue is whether the settlement should be approved or rejected. It is clear to me that the proposed settlement must be rejected.


Thank you for your consideration.

Yours truly,

Arnold L. Levey

# EXHIBIT

# 6

Gmail - subway money grab
Case 0:16-cv-61198-CMA-JEB Document 161 Entered on FLSD Docket 01/08/2019 Page 1 of 4
#:7118

# M Gmail

**Ed Maybury <eamaybury@gmail.com>**

FILED BY _____ D.C.

JAN 0 8 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## subway money grab
1 message

Fri, Dec 28, 2018 at 11:23 PM

Re: Flaum v. Doctor's Associates, Inc. n/k/a Doctor's Associates LLC, Case No. 0:16-cv-61198-CMA (S.D. Fla.).

To: The Honorable Cecilia M. Altona

28 Dec 2018

1. Your Honor: I am a citizen who buys food at Subway and would like to do anything I can to prevent this money grab by plaintiff's attorneys from proceeding.

2. The proposed settlement of $50-$75 for each class member with estimated counsel fees of 10.3 million dollars plus expenses for the heinous crime of two months at selected stores of providing receipts with the expiration date of the card used in the transaction is so outlandish that it is hard to believe it is real. Do the lawyers believe they can make this request in front of a jury with a straight face?

3. The website for the class action suit sets up an extensive list of actions with specific dates that I must take to make my voice heard, including providing the dates and my credit card numbers to them. I am reluctant to share any personal information with these sharks. The bar is set very high with multiple opportunities for the plaintiff to make a technical objection to my voice objecting to this class action on "my" behalf by them. I object to the proposed settlement and I object to these lawyers pretending to represent my interest or any interest other than their own pockets. If it means I must remain a member of the settlement class in order to object to the plaintiff's attorneys from pretending to represent me, then so be it.

4. Below I have attempted to comply as best I can with the detailed requirements of the plaintiff attorneys. I am simply a citizen trying to have my voice heard and to do my part in stopping this insanity. Please, your Honor, help me accomplish that goal. Thank you, your Honor.

From the Plaintiff attorney website in my attempt to satisfy their requirements:

- (a) the case name and number;

Case No. 0:16-cv-61198-CMA (S.D. Fla.).

- (b) the name, address, and telephone number of the objecting Settlement Class Member and, if represented by counsel, of his or her counsel;

Edward A. Maybury

7938 Quimby Court

Viera, Florida  32940   (904) 703-9268

- (c) a description of the specific basis for each objection raised;
- 

  1. I object to the excessive Plaintiff attorney fees requested.
  2. I object to the basis for the class action.
  3. I object to the validity of the claims made by the Plaintiff attorney representing me as a class member
  4. I object to the claim of actual or potential damages to myself or my fellow class members as purported by "my" attorneys
  5. 
- (d) a statement of whether he or she intends to appear at the Final Approval Hearing, either with or without counsel;
- 
- I would be happy to appear if the judge in charge  requests me to appear, not the lawyers pretending to say what the court wants.
- 
- (e) any documentation in support of such objection;
- 
- The documentation of the objections raised above in (c)  is in the collective sense of what is right and wrong, what is reasonable and what is clearly excessive.
- 
- and
- (f) the date and location of the purchase for which the Settlement Class Member received a receipt with the card expiration date.
- 

  1. I am reluctant to provide any information to "my" attorneys regarding specific credit card information because I don't trust them to maintain the integrity of the data.
  2. If the Judge requests the information, I will be happy to provide the information to the court directly.
  3. I remind "my" attorney that they initiated the contact with  me by mail regarding this class action, and a prudent person would assume that "my" attorney exercised due diligence prior to contacting me soliciting my joining of the class action suit.

Below from "My" Attorneys website:

"In addition, a Settlement Class Member who does not complete and submit a Claim Form or a Publication Claim Form must provide, to the Claims Administrator, the first six and last four digits of the credit or debit card used to make the purchase.

Any Settlement Class Member who fails to object to the Settlement in the manner described above shall be deemed to have waived any such objection, shall not be permitted to object to any terms or approval of the Settlement at the Final Approval Hearing, and shall be foreclosed from seeking any review of the Settlement or the terms of the Settlement Agreement by appeal or other means. "

I'm not sure of the authority of the website to exclude me from having my voice heard in this manner, but your Honor I am trying to comply with all of the requirements to allow my voice, as a member of the class "aggravated"  by Subway, to be heard.

Thank you, your Honor.


Very Respectfully,

Edward A. Maybury


Cc:



<u>For Plaintiff:</u>              <u>For Defendant:</u>
Keith J. Keogh                Peter Breslauer
Michael S. Hilicki             Montgomery McCracken Walker & Rhoads LLP
Keogh Law, Ltd.              1735 Market St., 21st Fl.
55 West Monroe St., Ste. 3390   Philadelphia, PA 19103
Chicago, IL 60603


The Honorable Judge Cecilia M. Altona

Court for the Southern District of Florida, Wilkie D. Ferguson, Jr. United States Courthouse, 400 North
Miami Avenue, Miami, Florida 33128.

Case 9:17-cv-00938-JLS-JDE   Document 165-1   Filed 11/06/20   Page 109 of 109   Page ID
Case 0:16-cv-61198-CMA   Document 101   Entered on FLSD Docket 01/08/2019   Page 4 of 4
#:7121



USMS
INSPECTED

RECEIVED

ORLANDO FL 326

JAN 08 2019
12:38 PM

The Honorable Judge Cecilia M. Altonaga
Case 0:16-CV-61198-CMA (S.D. Fla.)
Court for the Southern District of Florida
Wilkie D. Ferguson Jr. United States Courthouse
400 North Miami Ave.
Miami, FL. 33128

33128861801   C075



EDWARD A MAYBURY MD
VIERA FL 32940
7938 QUIMBY COURT