UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE: KIA ENGINE LITIGATION

CASE NO. 8:17-cv-00838-JLS-JDE

**PUBLIC REDACTED VERSION**

**ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT (Doc. 143) AND (2) GRANTING MOTION FOR ATTORNEYS' FEES (Doc. 139)**

Before the Court is a joint Motion for Final Approval of Class Action Settlement (Mot., Doc. 143) and Motion for Attorneys' Fees (Mot. Fees, Doc. 139.)  Having considered the parties' original and supplemental briefing and having held oral argument, the Court now GRANTS the parties' Motions for the reasons stated below.

## I.      BACKGROUND

### A.  Procedural History

This is a consumer class action alleging that certain Hyundai and Kia vehicles suffer from premature engine failure.  The instant action consolidates several nationwide class action lawsuits, filed in 2017 and 2018, stemming from the alleged defect.  (Order Consolidating Cases, Doc. 85.)  The parties mediated in late 2018 and "settled in principle" on December 21, 2018.  (Mot. at 5.)  The parties executed a Settlement Agreement on October 10, 2019, and—after another mediation session—reached an agreement on attorneys' fees and costs.  (*Id.* at 5–6.)

The Court granted preliminary approval of the settlement on May 7, 2020.  (Prelim. Approval Order, Doc. 132.)  Specifically, the Court (1) preliminarily approved the terms of the class action settlement; (2) conditionally certified the proposed class for settlement purposes; (3) appointed class representatives; (4) appointed Class Counsel; (5) authorized R.L. Polk & Company or a similar third party to compile and provide information on Class Members' identities to Defendants; (6) approved the form and manner of class notice, subject to certain modifications; and (7) scheduled a final fairness hearing.  (*Id.* at 29–30.) The Court then approved the modifications for the form and manner of class notice on June 1, 2020.  (Order, Doc. 137.)  The deadline for Class Members to object or opt out of the Settlement was October 30, 2020.  Class Members who do not opt out had until April 12, 2021 to submit most claims for reimbursements.

The parties filed a motion for approval of attorneys' fees on September 30, 2020 (Mot. Fees) and a motion for final approval of the class section settlement on October 16,

2020 (Mot.).  The parties filed a supplement to their motions on November 6, 2020, with an updated settlement valuation and updated fee calculation.  (Supp. Mot., Doc. 164.)

The Court held a Final Fairness Hearing on November 13, 2020.  On December 17, the parties filed supplemental papers addressing the Court's concerns regarding (1) the treatment of certain business entities in the Settlement Agreement, (2) timing provisions related to the KSDS update, and (3) the progress Hyundai and Kia have made processing settlement claims.  (Supp. Briefing, Doc. 192.)  In response to the Court's concerns, the parties also modified the Settlement Agreement to (1) "exclude from the Settlement Class all business entities that regularly engage in vehicle resales (*e.g.*, used car dealers, leasing companies, brokers" and (2) "indicate that class members must schedule an appointment to install the KDSD update, as opposed to completing installation of the KSDS update, within 60 days of the Notice Date or the mailing of the KSDS campaign notice, whichever is later."  (Ex. A to Supp. Briefing, Doc. 192-1.)

The parties also submitted supplemental declarations in December providing an update on the status of claims administration for Hyundai and Kia, respectively, for comparison purposes.  (Lee Decl., Supp. Briefing Ex. B, Doc. 192-2; Sternberg Decl., Supp. Briefing Ex. C, Doc. 192-3.)  The Court then requested additional supplemental briefing on the status of claims administration after the end of the claims period, including: total claims received; total face value of all claims; the number and face value of claims that have been approved (or tentatively approved); and the number and face value of claims that have been denied.[1]  (Order Requesting Supp. Briefing, Doc. 196).  In accordance with the Court's Order, the parties provided further updates on claims processing for Hyundai and Kia, respectively.  (Supp. Gonnelli Decl. re: April 16 Order,

---

[1] The Court also asked the parties to clarify a discrepancy the Court identified in their December estimate of Hyundai's total claim value.  (Order Requesting Supp. Briefing at 1.)  The parties explained that the discrepancy arose because Hyundai excluded as facially implausible any claims over $50,000 from its estimated total claim value, while Plaintiffs' counsel and their expert included the value for all claims (other than one claim with a face value of $1 billion.)  (Supp. Gonnelli Decl. re: April 16 Order.)

Doc. 197; Supp. Lee Decl., Doc. 198 (providing status of Hyundai's claims administration as of April 2, 2021); Supp. Olsen Decl., Doc. 199 (providing status of Kia's claims administration as of March 31, 2021).)

Additionally, in an effort to "preemptively address and resolve any outstanding issues raised by the Court" at the Final Fairness Hearing, the parties "continued to confer and agree on additional revisions to the Settlement Agreement. (Joint Notice, Doc. 194.) On April 5, 2021, the parties submitted a Joint Notice with a final Revised Settlement Agreement. (*Id.*; Revised Settlement Agreement ("RSA"), Ex. A to Joint Notice, Doc. 194-1.)

## B. Settlement Agreement

### 1. Class

The Class is defined as: All owners and lessees of a Class Vehicle who purchased or leased the Class Vehicle in the United States, including those that were purchased while the owner was abroad on active U.S. military duty, but excluding those purchased in the U.S. territories and/or abroad. (RSA at 4.)

There are 3,956,568 Class Vehicles. (Thompson Report Schedules 7 & 8, Doc. 146-1.) Class Vehicles include: all 2011-2018 and certain 2019 model year Hyundai Sonata vehicles; all 2013-2018 and certain 2019 Hyundai Santa Fe Sport vehicles; all 2014-2015, 2018, and certain 2019 Hyundai Tucson vehicles; all 2011-2018 and certain 2019 Kia Optima vehicles; all 2012-2018 and certain 2019 Kia Sorento vehicles; and all 2011-2018 and certain 2019 Kia Sportage vehicles, originally equipped with or replaced with a genuine Theta II 2.0 liter or 2.4 liter gasoline direct injection engine within OEM specifications. (*Id.* at 5.) For 2019 model year vehicles, the Class includes those vehicles that were manufactured before the Knock Sensor Detection System ("KSDS") technology was incorporated into their production. (RSA at 4.)

The Class excludes all claims for death, personal injury, property damage, and subrogation, as well as affiliates of Hyundai or Kia. (RSA at 4.) The Class also excludes:

(a) Hyundai Motor America ("HMA"), Hyundai Motor Company ("HMC"), Kia Motors Corporation ("KMC") and Kia Motors America ("KMA"); (b) any affiliate, parent, or subsidiary of HMA, HMC, KMC or KMA; any entity in which HMA, HMC, KMC or KMA has a controlling interest; any officer, director, or employee of HMA, HMC, KMC or KMA; any successor or assign of HMA, HMC, KMC or KMA; any judge to whom this Action is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; (c) individuals and/or entities who validly and timely opt-out of the settlement; (d) consumers or businesses that have purchased Class Vehicles previously deemed a total loss (*i.e.*, salvage or junkyard vehicles) (subject to verification through Carfax or other means); (e) vehicle owners or lessees who rent or previously rented the Class Vehicle for the use of third parties; (f) new and used motor vehicle dealerships engaged in the business of buying, selling or dealing in motor vehicles; (g) banks, credit unions or other lienholders; and (h) current or former owners of a Class Vehicles who previously released their claims in an individual settlement with HMA, HMC, KMC and KMA with respect to the issues raised the Action (for the purpose of clarity, individual owners of 2011-2014 Hyundai Sonatas who released claims against HMA and HMC in the settlement reached in *Mendoza v. Hyundai Motor Company Ltd., et. al.*, Case No. 15-cv- 01685-BLF (C.D. Cal.) are not excluded from the claims of the Class).

Exclusions (e), (f), and (g) were added to the Revised Settlement Agreement after the Court expressed its concern at the Final Fairness Hearing that certain business entities (*e.g.*, auto resellers) were included in the Class definition but excluded from certain benefits of the settlement, most notably the Lifetime Warranty Coverage.  (*See* Supp. Briefing at 1; RSA at 4; Original Settlement Agreement at 3–4, Doc. 128-1.)

## 2. **Knock Sensor Detection Software**

Knock Sensor Detection Software ("KSDS") refers to the engine monitoring technology developed by Defendants that continuously monitors engine performance for

symptoms that may precede engine failure.  (RSA at 6.)  The KSDS is being offered as a software update to Class Members free of charge.  (*Id.*)

If the KSDS detects bearing wear in the engine, it triggers multiple alerts to the driver: (1) the check engine light will turn on; and (2) the car will be placed in a "temporary engine protection mode."  (Mot. at 9.)  "This mode allows the driver to drive at a safe speed home or to a repair facility for inspection and diagnosis while limiting the risk of an accident."  (*Id.*)

### 3.  Lifetime Warranty Coverage

All Class Vehicles "owned by individual consumers that have completed the KSDS update" are eligible to receive a Lifetime Warranty.  (RSA at 6, 11.)  The Lifetime Warranty covers all costs associated with inspections and repairs including, without limitation, the costs associated with replacement parts, labor, diagnoses, and mechanical or cosmetic damage to the Class Vehicle caused by the engine malfunction (e.g., engine failure or fire).  (*Id.* at 11.)

The Lifetime Warranty coverage does not apply to cases of "Exceptional Neglect," which means: (a) when the vehicle clearly evidences a lack of maintenance or care for a significant period of time of not less than one (1) year, such that the vehicle appears dilapidated, abandoned, and/or beyond repair unless such lack of maintenance was due to a Loss Event; or (b) failure of a Settlement Class Member to have scheduled an appoint[ment] to have the KSDS ("Knock Sensor Detection Software") installed pursuant to the KSDS Product Improvement Campaign by a Hyundai or Kia dealer within 60 days of the Notice Date, or within 60 days of the mailing of the KSDS campaign notice, whichever is later.  (RSA at 5.)  This section of the agreement was revised to indicate that Class Members must *schedule an appointment* to install the KSDS update within 60 days, rather than *complete installation* of the update, to address the Court's concern that some Class Members may have difficulty completing the update within that time frame depending on appointment availability.  (*See* Supp. Briefing at 2.)  The revised section,

however, adds the following caveat: "It is expected that a class member that schedules such an appointment will act in good faith to have the KSDS installed on the scheduled date or shortly thereafter, even if the actual installation occurs more than 60 days following the Notice Date or the KSDS campaign notice." (RSA at 5–6.)

The Lifetime Warranty "shall not apply or be available to commercial entities such as used car dealers, franchisees, or automobile auction houses." (*Id.* at 7.) As described above, these commercial entities are also now excluded from the Class definition. Any dispute concerning coverage under the Lifetime Warranty shall be resolved through a Better Business Bureau ("BBB") administered alternative dispute resolution process. (*Id.* at 12.) The cost of the BBB-administered alternative dispute resolution process will be paid by Defendants, unless the mediator finds that the Class Member's claims were brought in bad faith. (*Id.* at 13.)

### 4.  **Recall and Product Improvements**

Hyundai previously recalled certain model year 2011-2012 Hyundai Sonata vehicles in September 2015 through the National Highway Transportation Safety Administration (NHTSA) Campaign Number 15V-568 and recalled certain model year 013-2014 Hyundai Sonata and Santa Fe Sport vehicles in March 2017 through NHTSA Campaign 17V-226. (Mot. at 8–9.) In December 2018 and January 2019, Defendants issued a subsequent recall of those same vehicles to inspect and confirm proper reinstallation of the fuel tube to address car engines at risk of fire, through NHTSA Campaign numbers 18V93400 (as to HMA) and 18V907000 (as to KMA). (*Id.*) These voluntary safety recalls "represent part of the consideration to the Class[.]" (*Id.*)

### 5.  **Repair Reimbursements**

Class Members who paid out of pocket for repairs related to the defect are eligible to submit claims that, if approved, will reimburse them in full for these expenses, regardless of whether the Class Member was an original owner, lessee, or subsequent purchaser, or whether the repair was completed before or after the recall campaigns. (Mot.

at 10; RSA at 13–14.)  To receive reimbursement, Class Members must have submitted a completed Claim Form by April 12, 2021, "with proof of the repair expense that reflects that the work was conducted to address the repair."  (Mot. at 10.)  Defendants "shall take all reasonably available steps to acquire from the dealership the information reasonably necessary to approve the Claim—namely, the date, nature, and cost charged" for the repair.  (RSA at 14.)  Additionally, except in instances of Exceptional Neglect, reimbursements shall be provided to Class Members even if warranty coverage was initially denied for the repair on the grounds that it was necessitated by a failure to properly service or maintain the vehicle.  (*Id.* at 15.)  Customers who were initially denied coverage at a Hyundai or Kia dealership and then obtained their repair elsewhere are entitled to claim an additional $140 goodwill payment.  (*Id.*)

As of September 16, 2020, 5,503 Hyundai Class Members had submitted claims for approximately $9.9 million for reimbursement of past repairs (Mot. at 11; Thompson Report at 32, Schedule 4), and 4,900 Kia Class Members submitted claims for approximately $10.9 million (Thompson Report at 33, Schedule 5.)

### 6.  Other Repair-Related Reimbursements

Additionally, Class Members may submit claims for reimbursement for repair-related expenses incurred, such as for rental car or towing services, "or other out-of-pocket expenses reasonably related to obtaining a Qualifying Repair for a Class Vehicle."  (RSA at 15.)  As of September 16, 2020, there have been 3,108 claims from Hyundai Class Members totaling $2,205,775, and 2,964 claims from Kia Class Members totaling $2,566,661 under this reimbursement category.  (Mot. at 11.)

### 7.  Inconvenience Due to Repair Delays

If a Class Member was "inconvenienced by prolonged delays (exceeding 60 days) obtaining any Qualified Repair from an authorized Hyundai or Kia dealership," the Class Member is entitled to a goodwill payment of $50 for delays lasting between 61 and 90 days, and $25 for each additional 30-day period of delay.  (RSA at 16.)  Class Members

can also elect to receive their compensation in the form of a dealership service card valued at 150% of the amount that would otherwise be paid.  (*Id.* at 17.)

### 8.  Loss of Value

For Class Members who experienced an engine malfunction related to the alleged defect and then sold or traded in their Class Vehicle without first procuring the recommended repair, Defendants will reimburse the difference between the value the Class Member received in the transaction and the vehicles' baseline "Black Book" value, plus an additional $140 goodwill payment.  (*Id.*)  In contrast to the commonly-known "Blue Book" value, which is a "reference for consumers that provides prices the consumer might expect to pay for a car," the "Black Book" value is "used by car dealers to determine what to pay a consumer for a vehicle (or the wholesale value)."  (Mot. at 12 n.17.)

If a Class Member contends that the actual damages incurred exceed the reimbursement provided, the Class Member can provide written notice to Hyundai or Kia requesting alternative dispute resolution through the BBB.  (RSA at 18.)

### 9.  Loss of Vehicle by Engine Fire

Class Members whose vehicles were lost in an engine fire directly caused by the alleged defect that would have otherwise been addressed by a Qualifying Repair are eligible to receive the maximum Black Book value of the Class Vehicle at the time of loss, plus an additional $140 goodwill payment.  (*Id.* at 19.)  Again, the BBB alternative dispute resolution option is available, at Defendants' expense, should any dispute arise.  (*Id.*)

### 10. Rebate Program

If any Class Members lose faith in their Class Vehicle after receiving notice of this Settlement, they may submit a claim for a rebate at the baseline Black Book value after selling their Class Vehicle in an arm's length transaction.  (*Id*. at 20.)

### 11. Claims Administration

Within 60 days of receiving a Claim, Defendants shall provide written notice to the

Claimant informing them of the amount, if any, that Defendants propose to reimburse the Claimant; the basis for that decision; and the Claimant's right to cure any deficiency in their Claim that led to a denial or a reimbursement of less than the full amount claimed. (*Id.* at 22.)  In response to the written notice, within 35 days, Claimants may attempt to cure any deficiency in their claims or accept the result.  (*Id.*)  Within 60 days of receipt of Defendants' final determination of a Claim, any Claimant dissatisfied with the determination may seek arbitration through a BBB-administered alternative dispute resolution process by notifying HMA or KMA in writing that the Claimant requests arbitration.  (*Id.*)  The expense for each such arbitration review shall be borne by HMA or KMA unless the arbitrator finds that the Claimant's claims were brought in bad faith.  (*Id.* at 23.)

## C. Notice and Response

Notice to the Class was carried out by Hyundai and Epiq.  (Mot. at 14; Schelkopf Decl., Exs. 1–2.)  10,642,839 first-class mail notices were sent out, and email notice was sent to 6,309,594 email addresses.  (Mot. at 15.)  The Settlement-dedicated phone lines established by Hyundai and Epiq received 144,193 calls at the time of the motion, and Epiq's settlement website received 156,340 unique visitors.  (Mot. at 15.)

At the time of submitting their Motion, 22,842 Hyundai Class Members and 29,894 Kia Class Members had submitted claims.  (*Id.*)  At the Final Fairness Hearing, the Court asked the parties to submit an update on settlement claims processing, which the parties provided in December 2020.  (*See* Supp. Briefing at 3.)  The Court requested an additional update in April 2021.  (Order Requesting Supp. Briefing at 1.)  As of April 2, 2020, Hyundai has received 59,986 claims and Kia/Epiq has received 42, 269 claims.  (Supp. Lee Decl. ¶ 5; Supp. Olsen Decl. ¶ 3.)

## II. CONDITIONAL CERTIFICATION OF THE CLASS

The parties ask the Court to reaffirm its conditional certification of the Class for settlement purposes only.  (Mot. at 15.)  In its Preliminary Approval Order, the Court

discussed the propriety of conditional class certification for the purposes of settlement. (Prelim. Approval Order at 10–17.)  The Court also discussed the adequacy of the named Plaintiffs as Class Representatives and Plaintiffs' Counsel as Class Counsel.  (*Id.* at 13–17.)  The Court sees no reason to depart from its previous conclusion regarding the existence of a proper settlement class, its appointment of Plaintiffs as Class Representatives, or its appointment of Class Counsel.  Further, no objections have been received challenging the certification of the Settlement Class.  The Court therefore incorporates its class certification analysis from the Preliminary Approval Order into this Order and GRANTS Plaintiffs' request to reaffirm class certification for the purposes of settlement.

### III.  FINAL APPROVAL OF CLASS ACTION SETTLEMENT

#### A. Legal Standard

Before approving a class-action settlement, Rule 23 of the Federal Rules of Civil Procedure requires the Court to determine whether the proposed settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2).  "To determine whether a settlement agreement meets these standards, a district court must consider a number of factors, including:  [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (internal citation and quotation marks omitted).[2]

In addition to these factors, where "a settlement agreement is negotiated *prior* to formal class certification," the Court must also satisfy itself that "the settlement is not the

_____

[2] Factor [7], the presence of a governmental participant, does not apply to this case.

product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (quotation marks and citation omitted).

"[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is 'exposed to the litigants, and their strategies, positions and proof.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (citation omitted). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

## B. Adequacy of Notice

"Before the district court approves a class settlement under Rule 23(e), it is 'critical' that class members receive adequate notice." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019) (citing *Hanlon*, 150 F.3d at 1025.) "To satisfy Rule 23(e)(1), settlement notices must 'present information about a proposed settlement neutrally, simply, and understandably.'" *Id.* (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009).

The Court previously conditionally approved the parties' proposed notice procedures for the Class, subject to some modifications to the proposed notice and Claim Form. (*See* Prelim. Approval Order at 28–29.) The parties then submitted revised notice materials. (Doc. 135.) The Court, noting that all required modifications had been made, approved the revised notice forms for dissemination to the Class. (Order, Doc. 137.)

The parties have now carried out the notice plan approved by the Court. They sent out a total of 10,642,839 first-class mail notices and sent email notice to 6,309,594 email

addresses.  (Mot. at 14–15; Lee Decl. ¶ 6; Sternberg Decl. ¶ 15.)  The Settlement-dedicated phone lines established by Hyundai and Epiq have received 144,193 calls, and Epiq's settlement website has received 156,340 unique visitors.  (Mot. at 15; Lee Decl. ¶ 4; Sternberg Decl. ¶ 27.)  As of December 10, 2020, Hyundai has received 41,461 claims, while Kia has received 36,437 claims.  (Supp. Briefing, Doc. 192 at 4.)  Further, more than 80% of Class vehicles have had the KSDS update installed.  (*Id.* at 2.)

In light of the Court's prior orders granting approval of the notice method and the actions described above, the Court concludes that the parties have sufficiently provided notice of the Settlement to the Class.  *See Keegan v. Am. Honda Motor Co, Inc.*, No. CV 10-09508-MMM-AJWx, 2014 WL 12551213, at *7 (C.D. Cal. Jan. 21, 2014) (citing *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 319 (1950) (stating that "the mails today are recognized as an efficient and inexpensive means of communication" that is reasonably calculated to provide notice)).

### C. Whether the Settlement is Fair, Adequate, and Reasonable

In its Preliminary Approval Order, the Court evaluated each of the fairness factors identified above to determine whether the Settlement Agreement is fair, reasonable, and adequate under Rule 23.  (*See* Prelim. Approval Order at 17–25.)  The Court incorporates its analysis from the Preliminary Approval Order into the instant Order as to the following factors, which remains unchanged: strength of the Plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the extent of discovery completed, and the stage of the proceedings; and the experience and views of counsel.  (*Id.*)  The Court concludes that these factors continue to weigh in favor of approval, for the same reasons provided in its Preliminary Approval Order.

At the time of preliminary approval, however, Plaintiffs had not yet quantified either the proposed settlement's value or the Class Members' potential recovery; provided evidence of the Class Members' reactions to the proposed settlement; or negotiated

attorneys' fees.  (*Id.* at 20–24.)  Based on the updated information provided by the parties, the Court will analyze the following factors to determine whether they weigh in favor of approval: (1) amount offered in settlement; (2) reaction of class members to the proposed settlement; and (3) signs of collusion.

### 1.  **Amount Offered in Settlement**

The parties represent that the amount offered in the settlement is "estimated to have a minimum value to consumers of $889,570,109," which "may rise to $1.3 billion."[3]  (Mot. at 19; Thompson Report (Redacted) ¶ 10, Doc. 145-2.)  After submitting their motion, on November 6, 2020, the parties provided a supplement to their motion including updated calculations with the most recent claim information provided by HMA and KMA, which valued the settlement at $1,305,396,814.  (Supp. to Mot., Doc. 164; Supp. Thompson Report, Doc. 164-1.)  The parties further state that the benefits offered in the settlement— described in detail above, including the KSDS software update; Lifetime Warranty; reimbursement for past repair expenses; a rebate program; additional goodwill payments; and a mechanism for review of warranty denials through BBB-administered alternative dispute resolution—"offers the class virtually everything Plaintiffs hoped to recover through the litigation."  (Mot. at 19.)  The settlement also provides for a "robust direct notice plan, which has been executed," and has "proven effective at distributing benefits to the Class."  (*Id.*)  As of September 18, 2020, the KSDS had already been installed on almost 3 million vehicles, or 74% of the Class Vehicles still on the road.  (*Id.*)  As of December 17, 2020, more than 80% of the class had the KSDS update installed.  (Supp. Briefing at 2.)

According to the expert report, the approximately $1.3 billion settlement is broken down as follows:

- The value of the Lifetime Warranty Coverage is $932,939,474.

---

[3]  The lower estimate was based on actual claims current through September 20, 2021, while the higher estimate was based on projected claims through April 21, 2020.

- The value of the free Diagnostic Inspection for Class Vehicles is $64,597,623.

- The value of the KSDS update installation in the Class Vehicles is $146,247,716.

- The value of the Repair Reimbursements and related goodwill payments is $126,626,151.

- The value of Other Repair-Related Reimbursements is $30,310,280.

- The value of the payments for Inconvenience Due to Repair Delays is $863,650.

- The value of the Loss of Value for Sold or Trade-In vehicles cannot be calculated at this time since it relies, in part, on the Black Book value of the vehicles, so the value was calculated based only on the $140 goodwill payments, which is $2,722,300.

- The value of the Loss of Vehicle by Engine Fire was similarly calculated based only on the $140 goodwill payments, which is $1,089,620.

- The value of the Rebate Program cannot be calculated at this time as it relies, in part, on the Black Book value, so no value was given.

- The Cost of Administration and Notice was not calculated.

(Supp. Thompson Report at 4.)  These values are based on actual claims through October 2020 ($946,433,135), and projected claims through April 21, 2021 (for a total of $1,305,396,814.)  (*Id.* at 4 (Summary Table).)

The bulk of the Settlement's value—almost $1 billion—thus comes from the estimated value of the Lifetime Warranty Coverage.  Because the warranty coverage is a non-monetary benefit, it is crucial to assess the assumptions underlying this valuation.  The Lifetime Warranty refers to the "extension of the existing Powertrain Warranty to cover the short block assembly, which consists of the engine block, crankshaft and bearings, connecting rods and bearings, and pistons[.]"  (Thompson Report (Redacted) at 7.)  To determine the value of a short block engine assembly warranty, Hyundai and Kia first provided the MSRP value of a Powertrain Warranty that would be sold to a consumer, assuming the vehicle had 60,000 miles at the time the extended warranty was purchased.



(*Id.* at 14.)

Thompson Report (Unredacted) at 14.)

(*Id.*)

(*Id.*)  To state this assumption another way, the valuation assumes that the average consumer would walk into a dealership and pay about $ ▇ for a lifetime warranty on their engine's short block.  The valuation thus focuses on the estimated value of the warranty *to the consumer*, rather than the estimated cost to Defendants to administer the warranty.

As detailed above, the Lifetime Warranty is available for all Class Vehicles owned by individuals who have had the KSDS update installed.  (RSA at 5.)  Multiplying the number of Class Vehicles that currently have the KSDS software update installed—as of October 30, 2020—by the estimated value of the Lifetime Warranty yields a value to the Class of $710,088,465.  (Supp. Thompson Report at 8–10 (Schedule 2).)  Assuming *all* Class Vehicles receive the KSDS software update and are thus eligible for the Lifetime Warranty, the value to the Class would be $932,939,474.  The latter figure was used in calculating the total estimated value of the settlement.  (*Id.* at 3.)

At the Final Fairness Hearing, the Court raised its concerns with the reliability of expert valuations of non-monetary benefits, which are necessarily based on numerous assumptions that often go unchallenged—given the parties' joint incentive to present a court with a high settlement valuation.  In response to the Court's questions, the parties explained that the experts performed a cross-check of Hyundai's and Kia's estimated value of the short block engine assembly as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  The experts based their cross-check on the average costs to replace the various components of the powertrain, which is made up of the engine, the transmission, and the drive axel.

(Thompson Report (Redacted) at 15.)  It costs, on average, $3,500 to replace an engine, $2,600 to replace a transmission, and $484 to replace a drive axle.  (*Id.*)  The average cost of a short block assembly replacement is $800.  (*Id.*)  Based on these figures, the experts estimated that a short block assembly is ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████  (Thompson Report (Redacted) at 16.)  Counsel nonetheless used the lower estimate provided by Hyundai and Kia to calculate the value of the Lifetime Warranty.[4] Based on the expert reports and representations by counsel during the hearing, the Court is satisfied that the estimate is a reasonable one.

As noted above, the $932,939,474 total value of the Lifetime Warranty assumes that *all* Class Vehicles will be eligible for the warranty.  (Supp. Thompson Report at 8–10 (Schedule 2).)  At the time the supplemental expert report was prepared, 76% of Class Vehicles had received the KSDS update, so the actual value of the Lifetime Warranty was estimated at $710,088,465.  (*Id.*)  As of counsel's most recent update, on December 17, 2020, more than 80% of the class has now had the KSDS update installed.  (Supp. Briefing at 2.)  This number will likely continue to increase since any Class Vehicle with the KSDS installed is eligible for the Lifetime Warranty, regardless of when the KSDS was installed. (*See* Joint Notice at 2.)  Having reviewed the expert report in depth as well as Class Counsel's argument and briefing, the Court concludes that the expert's valuation of the warranty is a helpful indication of its value.  The Lifetime Warranty thus represents a substantial benefit to the Class.

The Court's review of the remaining benefits offered to the Class likewise appear to provide significant value to the Class.  The KSDS update represents the second-highest portion of the settlement with a projected value of $146,247,716.  (Supp. Thompson Report at 16.)  The update is estimated to be worth $35–36 per vehicle (based on labor

---

[4]  Using the higher percentage estimate provided by the experts would increase the total value of the Lifetime Warranty to $1,133,583,808.  (Thompson Report (Redacted) at 16.)

rates of $115–120 and hour rates of 0.3–0.5).  (*Id.* at 16.)  As of October 30, 2021, the total value of the Class Vehicles with the KSDS update already installed was $111,370,845; this number was based on a 76% update completion rate.  Although, as stated above, it is unlikely that every single vehicle will have the KSDS installed, the update has now already been performed on more than 80% of Class Vehicles.

The parties have also continued to update the Court with actual claims received for repair-related reimbursements, inconvenience, loss of value, and rebates.  These claims involve actual cash benefits paid to Class Members, and so are based on the face value of the claimed dollar amount.  At the Final Fairness Hearing, the Court requested that the parties provide a supplemental analysis of the ongoing claims process, with Hyundai's and Kia's data separated, so the Court could analyze the rate of denials and how that rate differs between Hyundai and Kia.  The parties provided the requested update.  As of December 10, 2020, Hyundai had received 41,460 claims with a total face value of $47,499,912.93[5] and Epiq, the claims administrator for Kia, had received 36,437 claims with a total face value of $35,136,038.82.  (Supp. Briefing at 3–4; Lee Decl. ¶¶ 3–4, 8–10, Doc. 192-2; Sternberg Decl. ¶¶ 4–5, 11–12.)  At that point, however, most of the claims were still in the process of review.  (*Id.*)  The Court therefore requested an additional update on April 16, 2021, after the claims period had closed.  (Order Requesting Supp. Briefing.)  The parties reported that as of April 2, 2021, Hyundai had received 59,986 claims totaling $80,093,196.72 in total claimed value; approved 3,648 claims in the amount of $4,974,635.67; and denied 25,098 claims.  (Supp. Gonnelli Decl. re: April 16 Order at 2.)  Over 29,000 Hyundai claims are still pending.  (*Id.*)  As of March 31, 2021, Kia/Epiq had received 42,269 claims for a total claimed value of $43,914,702.50; approved 3,583 claims in the amount of $5,938,959.24; and denied 35,208 claims.  (*Id.* at 3.)  About 2,000 Kia claims are still pending.  (*Id.*)

---

[5] As explained in subsequent briefing, this figure includes the total amount *claimed* by claimants except for one facially implausible claim for $1 billion, which was excluded to avoid skewing results.  (*See* Supp. Lee Decl. ¶ 3.)

This results in a total of $10,913,595 in claims actually approved by Hyundai and Kia thus far.  This figure falls significantly short of the parties' estimated value for this portion of the settlement; Plaintiffs' expert's estimate of $126,626,151 for Repair Reimbursements assumed a 100% claims approval rate, while the actual approval rate hovers around 15%.  While the Court has some concern about the denial rate, it concludes that the high rate of claim denials does not render the entire settlement unfair, inadequate, or unreasonable.  The parties' declarations explain that many of the denied claims either did not claim a Class Vehicle or, more commonly, were missing the required documentation (and claimants often failed to provide the requested documentation even after receiving a written request.)  (Supp. Lee Decl.; Olsen Decl.)  Further, as described in Section I.B.11, *supra*, Class Members may seek review of claims denials through BBB-administered alternative dispute resolution, which is paid for by Defendants unless brought in bad faith.  The Court will, however, seek a further update from counsel regarding claims processing to ensure that Hyundai and Kia are not denying claims unreasonably or in bad faith.  Moreover, in light of the high denial rate, the Court requires additional assurances that Claimants are adequately apprised of their right to arbitrate the denial of a claim.  The Court's further Order in this regard is set forth in Section V., below.

Finally, the amount of the settlement also appears fair, adequate, and reasonable in light of the claims released by Plaintiffs and settlement Class Members.  Explicitly excluded from the settlement are any claims for death, personal injury, damage to property other than a Class Vehicle, or subrogation.  (RSA at 29.)

The Court therefore concludes that this factor weighs in favor of settlement approval.

### 2.  Reaction of the Class

#### a.  Class Declarations

In its Preliminary Approval Order, the Court ordered Class Counsel to "submit a sufficient number of declarations from Class members discussing their reactions to the

proposed settlement." (Prelim. Approval Order at 23.) To meet this requirement, Class Counsel surveyed a random sample of 2,000 Hyundai Class Members and 2,000 Kia Class Members. (Berman Decl. ¶ 4, Doc. 143-3.) As of October 13, 2020, Class Counsel obtained declarations from 546 Class Members. (*Id.* ¶ 7; Mot. at 22.) Of the 546 Class Members who provided declarations, 525 supported the Settlement, with 395 Class Members finding it fully satisfactory and 130 Class Members supporting the Settlement but wanting greater relief. (Berman Decl. ¶ 7.) 21 Class Members who provided declarations did not support the Settlement, although some of the declarations "indicate the Class Member may be confused or incorrect about the Settlement benefits"; Class Counsel have therefore reached out to them to obtain additional information and feedback. (*Id.* ¶ 8.) Counsel provided all 21 unsupportive declarations, and a sample of 100 supportive declarations. (*Id.* ¶ 8; Berman Decl. Ex. 1.) Overall, 96.15% of declarants supported the Settlement and its approval. (*Id.* ¶ 7.)

The Court, having reviewed the declarations submitted, finds that the vast majority of declarants support the Settlement agreement—particularly the reimbursement aspect, with many citing "financial compensation" and "monetary reimbursement" as the most important aspect of the Settlement. (*Id.*; Mot. at 22.) The positive response from declarants thus weighs in favor of approval.

b. Exclusions

Defendants' most recent amendment regarding settlement exclusion requests, filed on December 4, 2020, identifies the following exclusions: Of the 6.5 million notices sent to current and former owners and lessees of 2.23 million Hyundai Class Vehicles, Hyundai received exclusion requests from 546 Class Members. (Supp. Notice re: Settlement Exclusions, Doc. 176.) Of the 4.10 million notices sent to current and former owners and lessees of 1.73 million Kia Class Vehicles, Kia received exclusion requests from 1,119 Class Members. (*Id.*) Defendants submitted a final list of the names of Class Members who seek to exclude themselves; the list does not include any requests that were found to

be untimely or invalid.  (Ex. A to Am. Supp. Notice re: Settlement Exclusions, Doc. 191-1.)[6]

### c.  Objections

The deadline for objecting to the Settlement was October 30, 2020.  On October 31, 2020, Class Counsel submitted the 37 objections that had been received by that point, noting that they may still receive some timely objections sent by mail.  (Notice of Objections, Doc. 150.)  On November 6, 2020, Class Counsel submitted an additional 12 objections.[7]  (Add'l Objections, Doc. 161.)  On November 8, 2020, Class Counsel submitted an additional 2 objections.  (Second Notice of Add'l Objections, Doc. 166.)  Knight Motors, LP ("Knight Motors") also filed an objection directly with the Court through its counsel, The Archinaco Firm LLC.  (Knight Objection, Doc. 158.)  The parties responded to the objections.  (Response to Objections, Doc. 150; Response to Knight Objection, Doc. 169.)  In total, Class Counsel received 52 objections out of the more than 3.9 million Class Vehicles covered in the Settlement.

During the Final Fairness Hearing, the Court heard from five objectors: Daniel Thornton; Edward Maybury; Arnold L. Levey; Maryia M. Kabuya;[8] and Jason Archinaco on behalf of Knight Motors.

### i.  *Knight Motors Objection*

Knight Motors makes four primary objections to the Settlement.[9]

---

[6] Exhibit A includes certain individuals identified in Attorney Tionna Dolin's filings requesting confirmation of certain exclusion requests (Docs. 179, 183), "if they were determined to have submitted valid exclusion requests" (Am. Supp. Notice re: Settlement Exclusions, Doc. 191 at 1.)

[7] Three of the additional objectors did not put forth a formal objection, but instead included a notice of intention to appear at the Final Fairness Hearing.  (Add'l Objections at 2 n.2.)

[8]  Ms. Kabuya did not submit a written objection but at the hearing explained that, after her 2014 Santa Fe required a total engine replacement, she opted to trade the vehicle in but received less than the Blue Book value due to its condition.  When counsel asked whether she had submitted a claim to recover the difference in the value she received for the trade, she confirmed that she had, but that the claim was still pending.

[9]  To the extent Knight Motors' objection raises issues concerning the separate *Mendoza* settlement, those objections are not relevant to the Settlement Agreement at issue here.

First, Knight Motors objects to the provision in the original proposed Settlement Agreement stating, "The Lifetime Warranty shall not apply or be available to commercial entities such as used car dealers, franchisees, or automobile auction houses." (Knight Objection at 9.) At the Final Fairness Hearing, the Court expressed its concern with the parties' decision to *include* business entities such as Knight Motors in the Settlement Class but *exclude* them from the main benefit offered by the settlement, the Lifetime Warranty. The parties were amenable to revising the Class Definition to exclude these business entities, and as detailed in Section I.B *supra*, submitted a revised Settlement Agreement that excluded from the Class all business entities that regularly engage in vehicle resales (*e.g.*, used car dealers, leasing companies, brokers.) (Joint Notice, Doc. 192; RSA.)

Second, Knight Motors objects to the provision in the original proposed Settlement Agreement defining "Exceptional Neglect" as the "failure of a Settlement Class member to have the [KSDS] installed . . . within 60 days of the Notice Date, or within 60 days of the mailing of the KSDS campaign notice, whichever is later." (Knight Objection at 19.) Again, the Court agreed with Knight Motors at the Final Fairness Hearing that Class Members should not be penalized in a situation where, for example, a Class Member schedules an appointment to have the KSDS installed within 60 days but, for whatever reason, the KSDS is not actually installed within that timeframe. The parties again agreed to revisit this provision in the Settlement Agreement. Following the Final Fairness Hearing, the parties submitted a Notice Regarding Proposed Revisions to the Settlement Agreement in which they clarified that "the provision requiring Class Members to obtain the KSDS update within 60 days of the Notice Date does *not* apply to the Lifetime Warranty benefit." (Joint Notice, Doc. 192 at 1.) Nonetheless, the parties revised the Settlement Agreement to "indicate that class members must schedule an appointment to install the KSDS update, as opposed to completing installation of the KSDS update, within 60 days" of the Notice Date. (*Id.*; RSA, Doc. 194-1.)

Third, Knight Motors objects to the fact that it would not be able to opt-out of the Class if its objections were overruled, because the opt-out deadline would have since passed.  (Knight Objection at 24.)  Because Knight Motors is now excluded from the Class, this objection is moot.

Finally, Knight Motors contends that Hyundai "should be required to produce the documents it provided to NHTSA [National Highway Traffic Safety Administration] to the Court before any settlement is approved." (*Id.* at 23.)  Following the Final Fairness Hearing, Knight Motors also submitted an additional Notice Regarding Final Approval and Request to Take Judicial Notice." (Doc. 187.)  The subject of Knight Motor's request is a November 23, 2020 Consent Order entered into between Hyundai and NHTSA stemming from NHTSA's allegations of administrative process deficiencies related to certain recalls of Class Vehicles in 2015 and 2017.  (*Id.*)  The Court agrees with Defendants that the Consent Order does not have any impact on the approval of the settlement, and Knight Motors "does not offer any argument in this regard."  (*See* Def. Response, Doc. 189.)

In sum, the Court concludes that the parties have adequately addressed Knight Motors's objections in the Revised Settlement Agreement.[10]  Knight Motors's objection is therefore OVERRULED.

ii.     *Objectors who misunderstood the Settlement*

The parties contend that 15 Class Members "objected because they mistakenly believed that they were not entitled to benefits."[11]  (Response at 1.)  Class Counsel have

---

[10] Knight Motors also raised issues with the prospect of Hyundai self-administering the settlement. (Knight Objection at 13.)  As recounted above, the Court already raised this concern in its Preliminary Approval Order and has since required claims processing information separated by Kia (through its third-party administrator, Epiq) and Hyundai so the Court could determine whether there were any significant differences in Hyundai's administration of the settlement.
[11] D. Kahane (Doc. 150-1 at 87); J. Langford (Doc. 150-1 at 186); G. Frank (Doc. 150-1 at 58–59); C. Takamatsu (Doc. 150-1 at 222–223); Jennifer Canelos (Doc. 150-1 at 40); Dale C. Huebener, (Doc. 150-1 at 75); Eric Evan Greene, (Doc. 150-1 at 71); Tamera Colcord (Doc. 150-1 at 45); Zhaleh Khosravi and Ehsan Naderi (Doc. 150-1 at 88); Wilfredo Rosa, (Doc. 150-1 at 212); and Douglas A. Banich (Doc. 150-1 at 4); Lordis V. Lynn Cotton and Calvin Cotton (Doc.161-1 at 163-165.)

contacted these objectors and "are working to inform them of their rights under the Settlement and resolve their concerns." (*Id.* at 2.)  So far, three have withdrawn their objections.[12]

                      iii.     *Objectors Whose Issues are Outside the Scope of the Settlement*

Some objectors raised issues that are unrelated to the Settlement.  Three do not have Class Vehicles, and one did not provide contact information or VIN information.[13]  Some complained about individual mechanical issues with their vehicles,[14] but "[c]laims not related to the short engine block are not released under the Settlement."  (Response at 3.)  Other objections expressed general dissatisfaction with Hyundai/Kia vehicles and dealerships.[15]

Objectors who complained about oil consumption issues raise problems that "may be related to the engine defect."  (Response at 3.)  The parties contend, however, that "[t]hese issues should be addressed in the first instance with a diagnostic inspection (free under the Lifetime Warranty, and free regardless of symptom or warranty for 90 days after final approval.)"  (*Id.*)  If the issue is diagnosed as related to the engine defect, "repairs will be free under the Lifetime Warranty."  (*Id.*)

The Court finds that these objections are not grounds to reject the Settlement.  They are therefore OVERRULED.

---

[12] Roberta Lawther, Richard Nilles, and Christopher A. Wright have withdrawn their objections. (Response at 2 n.5; Walsh Decl. Ex. 1.)  The objection of Megan Jones was addressed in a separate court-approved settlement.  (Doc. 184.)

[13] The VINs provided by Frank Bergkvist, Tennie Kruse (Doc. 150-1 at 180–181) and John Caro, (Doc. 161-1 at 177–179) are not Class Vehicles.  (Response at 2 n.6; Walsh Decl. ¶ 7.)  Joshua S. Hursa (Doc. 150-1 at 77) failed to provide information that would allow counsel to determine if he is a Class Member.  (*Id.*; Walsh Decl. ¶ 8.)

[14] Mike Brennan (Doc. 150-1 at 38); William Joseph Dill (Doc. 150-1 at 53).

[15] Dale C. Huebener (Doc. 150-1 at 75); Ronald A. Wallace (Doc. 150-1 at 249); Zhong Liu (Doc. 150-1 at 193.)  Some malfunctions described by Mr. Liu "might be related to the engine defect," but the parties argue that this merely "demonstrates the value of the free diagnostic, lifetime warranty, and the KSDS."  (Response at 3 n.12.)

iv.   *Objectors Dissatisfied with the Offered Relief*

Some Class Members objected because they want additional or different relief under the Settlement, such as engine replacements, full refund value, double Blue Book value, and a lifetime warranty for the entire engine, not just the short block.[16]  (Response to Objections at 3–4, citing objections.)  Others were concerned that the Settlement offered no protection for the future resale value of their vehicles.[17]

In a class comprising several million people, it is expected that not everybody will be completely satisfied with the offered relief.  "Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better.  But this possibility does not mean the settlement presented was not fair, reasonable or adequate."  *Hanlon*, 150 F.3d at 1027; *see also Officers for Justice*, 688 F.2d at 625 ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").  Here, Class Members receive a free Lifetime Warranty to address future defects as well as a full refund for past repairs, repair-related expenses, and lost value for past sales and trade-ins.  Having reviewed the limited objections to the relief offered, the Court concludes that they provide no basis to reject the Settlement.  Accordingly, they are OVERRULED.  *See Hendricks v. Starkist Co.*, No. 13-cv-00729, 2016 WL 5462423, at *6 (N.D. Cal. Sept. 29, 2016) ("That a more favorable result for

---

[16]  Ginny N. Graham and Michael A. Graham (Doc. 150-1 at 66); Jean G. F. Card (Doc. 161-1 at 35-36); Clayton N. Saettel and Diane M. Saettel (Doc.150-1 at 215); Maria Theresa and Laura Flores (Doc. 150-1 at 56); Darlene Bennet (Doc. 150-1 at 29); Kelvin Bennet (Doc. 150-1 at 34); Leticia R. Ramon (Doc. 161-1 at 92-93); Michael Wilson II (Doc. 150-1 at 257; Daniel Thornton, (Doc. 150-1 at 239 (Mr. Thornton's other objections are further addressed *infra*); James E. Langford (Doc. 150-1 at 186); Cecil Tuley and Judy Tuley (Doc. 150-1 at 245); Naibori Shaw (Doc. 150-1 at 217.)

[17]  Naomi S. Warren (Doc. 150-1 at 252); Ashley Warring (Doc. 150-1 at 255); William Joseph Dill (Doc. 150-1 at 53); Gordon Deats (Doc. 161-1 at 18).  For these objectors, the Court agrees with Plaintiffs that "the fact that the Lifetime Warranty and KSDS stay with the vehicle permanently, and the presence of the trade-in option with the rebate mitigate these concerns." (Response at 5.)

some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement.").

> v.   *Objection of Thomas Barber*

One objector, Thomas Barber, believes that "[o]wners should be permitted to submit their request for exclusion up to 30 days *after* the date of the Final Approval," so they have an opportunity to "read and study the final wording of the settlement before making their decisions." (Doc. 150 at 27.) Class Members, however, have had notice of the terms of the proposed settlement since August 2020; the Court is unconvinced that there was insubstantial time to review it prior to the opt-out deadline. Although some changes were made following the Final Fairness Hearing, they mainly concern now-excluded business entities. Even if those business entities had not opted out prior to the Final Fairness Hearing, they are now excluded from the Class.[18] The parties also revised the Settlement to require Class Members to schedule an appointment to have the KSDS installed, rather than actually have the KSDS installed, by the Notice Date—but this change was made simply to ensure that Class Members who made a good-faith attempt to have the KSDS installed would be eligible for all benefits under the Settlement. As the vast majority of Class Vehicles already had the KSDS installed at the time this change was made, the Court is doubtful that this change was significant enough to alter a Class Member's decision to exclude or not exclude herself from the Settlement.

Mr. Barber also requests that Kia be required to post on its website whether a specific vehicle has had the KSDS installed. (*Id.* at 27.) This request stems from Mr. Barber's difficulty in determining whether the KSDS update had already been installed on his 2019 vehicle. (*Id.*) The parties respond that Class Members need only go to the

---

[18] With respect to notice issues concerning the now-excluded entities, the parties propose the following. For excluded entities that have made timely claims under the settlement, a notice will be sent explaining that they are now excluded, "but that defendants will, as a goodwill gesture, offer benefits similar to those available under the settlement on a voluntary basis outside the context of the settlement if they provide a release of their claims." (Supp. Briefing at 1.) For excluded entities that have not made claims, no additional notice is warranted. (*Id.*)

National Highway and Traffic Safety Administration website and enter their VIN to determine if any outstanding recalls (including the KSDS) have been performed. (Response at 5.)  It therefore appears that Mr. Barber's request would "do little to improve the information available to Class members."  (*Id.*)

Finally, Mr. Barber raises the concern that the KSDS software update may "negatively affect the everyday performance of the vehicle."  (*Id.* at 26.)  He requests that "the Settlement should clearly state that the only circumstance in which the software update is permitted to change the engine management or alter the performance of the engine is when a diagnostic code is initiated and the 'check engine' light comes on."  (*Id.* at 27.)  The parties challenge the premise of Mr. Barber's objection that the KSDS will have a negative impact on day-to-day performance, contending that "the knock sensor also has an auditory component that deals with many of the concerns raised by Mr. Barber." (Response at 9.)  Further, as explained, the purpose of the KSDS is to monitor for bearing wear in the engine; upon detection, the check engine light will turn on, and the car will be placed in a temporary "limp mode" allowing for a maximum speed of 65 miles per hour to allow the driver to drive at a safe speed home or to a repair facility for inspection and diagnosis while limiting the risk of an accident.  The Court thus fails to see the utility of including the language proposed by Mr. Barber in the Settlement.

Accordingly, Mr. Barber's objection is OVERRULED.

vi.    *Objection of Daniel F. Thornton*

Attorney Daniel F. Thornton presents four objections to the settlement: (1) the Settlement fails to make Class Members whole; (2) the Settlement's remedies are inadequate for Class Members whose Hyundai purchases are governed by the laws of New Jersey; (3) the proposed Settlement is largely duplicative of remedies already received by 2011–2014 Sonata owners; and (4) Hyundai should not be permitted to self-administer the Settlement.  (Doc. 150-1 at 237–244.)

27

First, Mr. Thornton argues that his 2011 Sonata has a defective engine filled with metal shavings, and that "only a metal-shaving-free engine" could make him whole. (*Id.* at 233.)  As Plaintiffs point out, however, the purpose of the KSDS and the Lifetime Warranty is to detect early manifestations of the engine defect so that the vehicle may be serviced (for free) before catastrophic engine failure.

Second, Mr. Thornton argues that New Jersey Class Members can receive more favorable results under the New Jersey Consumer Fraud Act. (*Id.* at 233.)  Plaintiffs respond that recovery under the New Jersey statute is "expensive and risky." (Response at 7.)  Regardless, Class Members are free to opt out of the Settlement to pursue recovery under their respective states' consumer protection statutes.

Third, Mr. Thornton argues that the Lifetime Warranty is "largely duplicative" of the warranty already offered under the settlement in *In re Hyundai Sonata Engine Litigation*, No. 5:15-cv-1685 (N.D. Cal.) ("Mendoza Settlement"). (Doc. 150-1 at 234.)  The Mendoza settlement provided 10-year/120,000-mile warranties for approximately 885,000 2011–14 Hyundai Sonatas. (Response at 7.)  Although there is overlap between the 10-year *Mendoza* warranties and the Lifetime Warranty offered here, this Settlement "extends those vehicle warranties for life and gives those Class members another opportunity for reimbursement for repairs and other monetary compensation for events occurring after the expiration of the *Mendoza* claims period." (*Id.*)  In Mr. Thornton's case, "his *Mendoza* warranty expired earlier this year," so the Lifetime Warranty offers him additional, not duplicative, benefits. (*Id.*; Walsh Decl. Ex. 2 at 42.)

Finally, Mr. Thornton argues that Hyundai should not be permitted to self-administer the Settlement. (Doc. 150-1 at 242.)  Plaintiffs take issue with the underlying "anecdotal evidence" Mr. Thornton relies upon in making this assertion. (*See* Response at 8–10.)  The Court, however, raised its own concerns with Hyundai's self-administration during the preliminary approval stage, and has continued to require supplemental information from the parties regarding Hyundai's claim processing to ensure that its results

28

do not differ significantly from Kia/Epiq.  The Court, having reviewed the supplemental data, is satisfied that Hyundai has been satisfactorily administering the settlement.

Accordingly, Mr. Thornton's objection is OVERRULED.

vii.   *Objection of Arnold L. Levey*

Attorney Arnold L. Levey objects that the Lifetime Warranty provided by the Settlement is overvalued, particularly in light of the *Mendoza* settlement.  (Doc. 161-1 at 87–90.)[19]  As discussed above, however, this Settlement provides additional benefits beyond those offered in the *Mendoza* settlement: the current Settlement applies to an additional 3.1 million class vehicles; the Lifetime Warranty extends beyond the limited *Mendoza* warranty; and *Mendoza* class members receive an additional opportunity to submit repair reimbursements.  (*See Response* at 10.)  Mr. Levey does not provide any other basis for his argument that the "value of the settlement has been greatly overstated." (Doc. 161-1 at 88.) Mr. Levey further raises the concern that the parties colluded to inflate the settlement value in order to award excessive attorneys' fees to Class Counsel.  (*Id.*) The Court, however, has a separate obligation to look for indications of collusion, and has found none here.  (*See* Section III.D *infra*.)  Further, the Court will be awarding attorneys' fees based on the lodestar method, not a percentage-of-fund method, which largely mitigates Mr. Levey's concern.  The Court will also closely scrutinize the attorneys' fee award for reasonableness.

Accordingly, Mr. Levey's objection is OVERRULED.

viii.   *Objection of Edward A. Maybury*

Mr. Maybury objects to the "12 [million] cap on fees and expenses," arguing that a

---

[19] Mr. Levey also raises his dissatisfaction with the offered relief and lack of "substantial cash payments."  Class Members, however, are eligible for cash compensation for past repair bills, sales, or trade-ins.   Further, as the Court has already discussed, that some Class Members are dissatisfied with the offered relief is not grounds to reject the Settlement.

cap of $1.2 million "would be more appropriate[.]" (Doc. 150-1 at 197–99.) He characterizes the "intellectual work" performed by Class Counsel as "whiting out the name of the last corporation tagged with a law[.]" (*Id.*) He then states, "I'm not saying they actually whited out the name of a prior corporation or they have a pattern of litigation against companies with similar flimsy underpinnings or that I have evidence that their motivation is simply money." (*Id.*) He nonetheless concludes that $1.2 million in fees would be more reasonable "for the intellectual and administrative work involved in this case." (*Id.*)

First, as discussed in more detail in Section IV, *infra*, Class Counsel seek $6.9 million in attorneys' fees, or 57.5% of the $12 million cap on fees. (Fees Mot.) Second, the Court will analyze the reasonableness of the fee award using the lodestar method, which is calculated by multiplying the number of hours reasonably expended on the litigation (supported by adequate documentation) by a reasonable hourly rate. The Court will therefore scrutinize detailed billing records prior to making any award of fees. Finally, the Court agrees with the parties' assessment that "Mr. Maybury's real objection is to class action legal practice in general and class action lawyers in particular, and not to the specifics of this case." (Response at 12.)

Mr. Maybury's objection is OVERRULED.

ix.    *Objection of John H. Metz*

Mr. Metz objects to the safety of the "limp mode" associated with the KSDS update. (Doc. 150-1 at 201–202.) Mr. Metz explains that in early 2020, he was driving from Cincinnati to Atlanta on the interstate at around 70 miles per hour when his check engine light came on; his "car then stuttered and lurched," and "even with the gas pedal to the floor constantly the car would hardly do 50 [miles per hour.]" (*Id.* at 201.) Mr. Metz said that this created a "very frightening and . . . very dangerous situation." (*Id.*) Mr. Metz wants compensation for the "fear, danger, emotional distress and inconvenience" suffered as a result of his defective vehicle.

30

As explained, the purpose of the KSDS is to prevent a catastrophic engine failure by detecting warnings of an impending failure, alerting the driver through the check engine light, and triggering "limp mode" so the driver can safely drive home or to a dealership for repairs.  Mr. Metz, however, continued his 11-hour road trip with his car in limp mode before taking it to a dealership.  (*Id.*)  In a subsequent road trip, the check engine light and limp mode were once again triggered, and Mr. Metz once again drove another 11 hours of travel.  (*Id.* at 202.)  He then took his vehicle to a dealership the next morning and received a reconditioned engine.  Although Mr. Metz raises a legitimate concern about the safety of driving in "limp mode" on the highway, its purpose is to allow the driver to either return home or drive to a nearby dealership.  Mr. Metz's decision to continue driving in "limp mode" for such an extended period likely contributed to the dangerous situation he described in his objection.

Mr. Metz also raises objections demonstrating misunderstanding of the Settlement, such as his mistaken assertion that the Settlement forecloses suits for personal injury or death (*id.* at 203); these claims are *not* released by the Settlement and may be pursued individually by Class Members.  Mr. Metz also expresses concerns about how attorneys' fees will be calculated and speculates that the Court may determine legal fees based on the "common fund" (*id.* at 204); as explained above, the Court will calculate attorneys' fees based on the lodestar method, not the percentage-of-fund method.

Mr. Metz's objection is OVERRULED.

### d.  Conclusion as to Reaction of the Class

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted).  Of the nearly 4 million Class Vehicles covered by the Settlement, the parties received exclusion requests from just 1,665 Class Members, representing just 0.0004% of the Class.  Further, only 52 Class Members

filed objections to the Settlement.  "The relatively low number of opt-outs and objections
indicates that the class generally approves of the settlement."  *Keegan v. Am. Honda Motor
Co, Inc.*, No. CV-10-09508-MMM-AJWx, 2014 WL 12551213, at *13 (C.D. Cal. Jan. 21,
2014); *see also Churchill Vill., LLC v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004)
(affirming the approval of a class action settlement where 90,000 members received notice
and 45 objections were received).  The Court thus concludes that, given the relatively low
number of objections to the Settlement, combined with the supportive declarations
submitted by Class Members, this factor favors settlement approval.

### D. Whether the Settlement is the Product of Collusion

As described above, where "a settlement agreement is negotiated prior to formal
class certification," the Court must also satisfy itself that "the settlement is not the product
of collusion among the negotiating parties."  *In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935, 946-47 (9th Cir. 2011) (quotation marks and citation omitted).  Accordingly,
the Court must look for explicit collusion and "more subtle signs that class counsel have
allowed pursuit of their own self-interests and that of certain class members to infect the
negotiations." *Id*. at 947.  Such signs include (1) "when counsel receive a disproportionate
distribution of the settlement," (2) "when the parties negotiate a 'clear sailing' arrangement
providing for the payment of attorneys' fees separate and apart from class funds," and (3)
"when the parties arrange for fees not awarded to revert to defendants rather than be added
to the class fund."  *Id*. (quotation marks and citations omitted).

As to the first factor, Class Counsel are not receiving any distribution from the
Settlement.  As detailed in the separate motion for attorneys' fees, Class Counsel have
sought $6,900,000 in attorneys' fees and $175,000 in costs, which Defendants have agreed
to pay this amount.  (RSA at 27.)  Because the Settlement is not structured as a common
fund, the payment of attorneys' fees does not reduce the consideration Class Members are
entitled to under the Settlement.  (Mot. at 25.)  Nonetheless, "[t]hat the defendant in form
agrees to pay the fees independently of any monetary award or injunctive relief provided to

the class in the agreement does not detract from the need carefully to scrutinize the fee award." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). "Ordinarily, a defendant is interested only in disposing of the total claim asserted against it, and the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Id.* (internal citations omitted.) Although the Court will fully scrutinize the reasonableness of the attorneys' fee award in the context of Class Counsel's Motion for Fees, the Court notes here that, even when viewing the class recovery and the agreement on attorneys' fees as a "package deal," *In re Bluetooth*, 654 F.3d at 949, the Court finds no indication of collusion; the attorneys' fee award is only a small fraction of the total value of the settlement.

The second factor, however, is present here to some extent. After reaching agreement on the relief to be provided to the Class, the parties negotiated attorneys' fees before a neutral mediator over two mediation sessions. (*Id.*) Hyundai and Kia agreed to pay Class Counsel's $6,900,000 in attorneys' fees and $175,000 in litigation expenses and has not contested Class Counsel's Motion for Fees. Plaintiffs argue that, even though Defendants have agreed to pay Class Counsel's fees and expenses, "this does not evidence collusion" because "the fee negotiations were protracted and adversarial," and the fees agreement was not finalized until nearly a year after the Settlement Agreement was signed. (*Id.* at 25.) "[W]hen confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *In re Bluetooth*, 654 F.3d at 948 (citing *Staton*, 327 F.3d at 954). Here, despite the presence of an agreement to pay fees, the Class stands to receive substantial benefits from the Settlement.

Finally, because this is not a common fund case, reversion to Defendants is not directly relevant here. Nonetheless, the Court will fully analyze the Motion for Attorneys' Fees to ensure that the agreement does not result in the award of "unreasonably high" fees.

### E.  Balancing the Factors

"Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (internal citation omitted).  "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation[.]"  *Id.*  The Court, having considered the relevant factors and found them to weigh in favor of settlement approval, approves the settlement as fair, adequate, and reasonable.

### IV.   MOTION FOR ATTORNEYS' FEES AND COSTS

Class Counsel also seek an order requiring Defendants to pay (1) $6,900,000 in attorneys' fees to Class Counsel; (2) actual costs up to $175,000 to Class Counsel for reimbursement of litigation expenses; and (3) $3,500 to each Plaintiff as service awards.

The Settlement Agreement provides that the "total amount of attorneys' fees requested will be negotiated by the parties at a later date."  (RSA at 27.)  Thus, after the parties entered into the Settlement Agreement, they mediated the issue of attorneys' fees during two mediation sessions, reaching agreement on September 1, 2020.  (Fees Mot. at 5; Schelkopf Decl. ¶ 21; Berman Decl. ¶ 28.)  Further, Hyundai and Kia agreed "to pay the attorneys' fees, costs, and service payments separate and apart from, and in addition to, the relief provided to the Class."  (RSA at 27.)  The Notice disseminated to Class Members stated that Class Counsel would not seek more than $12,000,000 in fees and expenses, and service awards of no more than $3,500 per Plaintiff.  (Fees Mot. at 1.)

### A.  Legal Standard

Rule 23 permits a court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 941 (9th Cir.2011).  The parties contend that

Defendants' agreement to pay Class Counsel's fees is reasonable under two California fee-shifting statutes: the California Consumers Legal Remedies Act (CLRA), Cal. Civ. Code § 1780(e), which provides for an award of attorneys' fees to a prevailing plaintiff in an action brought under the CLRA (as this case was); and Cal. Code of Civ. Proc. § 1021.5, which provides attorneys' fees to the prevailing party who confers a significant benefit on the general public.  (Fees Mot. at 6.)

"Courts in this circuit determine attorney's fees in class actions using either the lodestar method or the percentage-of-recovery method." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 570 (9th Cir. 2019) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)).  Because this settlement does not involve a conventional common fund, the Court calculates the award of attorneys' fees using the lodestar method.  *Kearney v. Hyundai Motor Am.*, No. SACV 09-1298-JST, 2013 WL 3287996, at *7 (C.D. Cal. June 28, 2013) (citing *Hanlon*, 150 F.3d at 1029); *see also In re Bluetooth*, 654 F.3d at 941 ("The 'lodestar method' is appropriate in class actions brought under fee-shifting statutes (such as federal civil rights, securities, antitrust, copyright, and patent acts), where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized.")  "It may be appropriate in some cases, assuming the class benefit can be monetized with a reasonable degree of certainty, to 'cross-check' or adjust the lodestar in comparison to a percentage of the common fund to ensure that the fee awarded is reasonable[.]" *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 557 (2009).  "While the court has discretion to do so where appropriate, it is not required." *Id.*

## B.  Lodestar Calculation

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941.

At the time of submitting their motion, Class Counsel estimated that they spent over

Case 8:17-cv-00838-JLS-JDE   Document 202   Filed 05/10/21   Page 36 of 47   Page ID
#:8056

6,200 hours litigating this case for a total lodestar of $3,539,804.87. (Fees Mot. at 1.)
Class Counsel have since supplemented their motion to reflect additional time and
expenses incurred since filing the motion. (*See* Supp. Mot. at 1, Doc. 164; Joint Notice at
2, Doc. 194.) As of the most recent filing, Class Counsel stated that they have now spent
an additional 681.9 hours on the case, increasing the total lodestar to $4,224,932.87. (Joint
Notice at 2.) The supplemental time "is largely attributable to assisting Class members
and overseeing the claims administrative process." (*Id.*) Based on the most recent lodestar
estimate, Class Counsel's request for $6,900,000 in fees yields a multiplier of
approximately 1.63.

 Nearly 50 attorneys from nine law firms represented the Class. Their hours and
rates are as follows:

### Sauder Schelkopft LLC

*Hours and rates at the time of filing the motion:*

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| J. Sauder | Partner | 750.00 | 145.90 | 109,425.00 |
| M. Schelkopf | Partner | 700.00 | 881.60 | 617,120.00 |
| L. Kier | Of Counsel | 500.00 | 121.60 | 60,800.00 |
| J. Kenney | Associate | 475.00 | 252.00 | 119,700.00 |
| **Total** | | | **1401.10** | **907,045.00** |

(Fees Mot. at 12.) Between September 26, 2020 to November 5, 2020, the firm spent an
additional 161.40 hours working on this case, for an additional lodestar of $92,692.50.
(Supp. Schelkopft Decl. ¶ 2, Doc. 164-3.) Between November 6, 2020 and March 20,
2021, the firm spent an additional 291 hours on the case, for an additional lodestar of
$158,077.50. (Second Supp. Schelkopft Decl. ¶ 2, Doc. 194-2.) A new paralegal, P.
Lyons, worked 82.9 of these supplemental hours at a rate of $300 per hour. (*Id.*)

36

Otherwise, the supplemental hours were performed by the same attorneys at the same rates listed in the chart above.

When combined, the firm spent a total of 1,854.3 hours working on this case, for a total lodestar amount of **$1,157,815.** (*Id.* ¶ 5.)  The firm also expended **$55,991.95** in total costs.  (*Id.*)

## Walsh PLLC

*Hours and rates at the time of filing the motion:*

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| B. Walsh | Partner | 650.00 | 674.10 | 438,165.00 |
| C. Walsh | Partner | 500.00 | 33.20 | 16,600.00 |
| **Total** | | | **707.30** | **454,765.00** |

(Fees Mot. at 12.)  Between September 26, 2020 to November 5, 2020, the firm spent an additional 132.4 hours working on this case, for an additional lodestar of $81,590.00. (Supp. Walsh Decl. ¶ 2, Doc. 164-4.)  Between November 6, 2020 and March 20, 2021, the firm spent an additional 179.5 hours on the case, for an additional lodestar of $114,440. (Second Supp. Walsh Decl. ¶ 2, Doc. 194-2.)

When combined, the firm spent a total of 1,020.1 hours working on this case, for a total lodestar amount of **$651,260.00.** (*Id.* ¶ 5.)  The firm also expended **$19,911.49** in total costs.  (*Id.*)

## Law Office of Adam R. Gonnelli, LLC

*Hours and rates at the time of filing the motion:*

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| A. Gonnelli | Partner | 795.00 | 115.40 | 91,743.00 |
| **Total** | | | **115.40** | **91,743.00** |

(Fees Mot. at 13.)  Between October 9, 2020 to November 5, 2020, Mr. Gonnelli spent an additional 51.4 hours working on this case, for an additional lodestar of $40,863.00.

(Supp. Gonelli Decl. ¶ 2, Doc. 164-5.)  Between November 6, 2020 and March 20, 2021,
Mr. Gonnelli spent an additional 103.1 hours on the case, for an additional lodestar of
$81,946.50.  (Second Supp. Gonnelli Decl. ¶ 2, Doc. 194-2.)

When combined, Mr. Gonnelli spent a total of 1,854.3 hours working on this case,
for a total lodestar amount of **$1,157,815.**  (*Id.* ¶ 5.)  The firm also expended **$55,991.95** in
total costs.  (*Id.*)

### The Sulzer Law Group, P.C.

| Name | Role | Rate | Hours | Lodestar |
|---|---|---|---|---|
| J. Sultzer | Partner | 795.00 | 5.20 | 4,134.00 |
| A. Gonnelli | Partner | 795.00 | 601.50 | 478,192.50 |
| M. Liskow | Partner | 700.00 | 0.30 | 210.00 |
| J. Francis | Associate | 450.00 | 35.90 | 16,155.00 |
| R. Todorov | Paralegal | 195.00 | 75.50 | 14,722.50 |
| **Total** | | | **718.40** | **513,414.00** |

(Fees Mot. at 13.)[20]

### Hagens Berman Sobol Shapiro LLP

*Hours and rates at the time of filing the motion:*

| Name | Role | Rate | Hours | Lodestar |
|---|---|---|---|---|
| L. Aragon | Partner | 650.00 | 2.30 | 1,495.00 |
| S. Berman | Partner | 1,075.00 | 62.50 | 67,187.50 |
| E. Byszewski | Partner | 700.00 | 11.50 | 8,050.00 |
| R. Carey | Partner | 800.00 | 114.50 | 91,600.00 |
| J. DeStefano | Associate | 550.00 | 0.60 | 330.00 |

---

[20] The chart in the Motion erroneously lists the total lodestar for this firm as $525,871.37.

| | | | | |
|---|---|---|---|---|
| R. Fitzpatrick | Associate | 475.00 | 1095.20 | 520,220.00 |
| S. Matt | Partner | 800.00 | 4.00 | 3,200.00 |
| J. Conte | Paralegal | 300.00 | 2.30 | 690.00 |
| C. Flexer | Paralegal | 300.00 | 1.00 | 300.00 |
| A. Garcia | Legal Ass't | 175.00 | 37.70 | 6,597.50 |
| B. Gibson | Paralegal | 290.00 | 167.10 | 48,459.00 |
| N. Grueneich | Paralegal | 250.00 | 15.40 | 3,850.00 |
| R. Haegele | Paralegal | 250.00 | 26.80 | 6,700.00 |
| L. Henson | Paralegal | 250.00 | 71.20 | 17,800.00 |
| C. Johnson | Paralegal | 290.00 | 12.00 | 3,480.00 |
| C. Lovell | Legal Ass't | 175.00 | 0.80 | 140.00 |
| S. Pearce | Paralegal | 290.00 | 102.10 | 29,609.00 |
| C. Shaaf | Legal Ass't | 175.00 | 0.60 | 105.00 |
| K. Skoda | Paralegal | 230.00 | 1.90 | 437.00 |
| S. Taylor | Paralegal | 250.00 | 1.00 | 250.00 |
| **Total** | | | **1730.50** | **810,500.00** |

(Fees Mot. at 13–14.)  Between September 26, 2020 to November 5, 2020, the firm spent an additional 163.60 hours working on this case, for an additional lodestar of $65,453.50. (Supp. Berman Decl. ¶ 4, Doc. 164-6.)  Between November 6, 2020 and March 20, 2021, the firm spent an additional 107.50 hours on the case, for an additional lodestar of $50,065.00.  (Second Supp. Berman Decl. ¶ 4, Doc. 194-2.)

When combined, the firm spent a total of 2001.60 hours working on this case, for a total lodestar amount of **$926,018.50.**  (*Id.* ¶ 5.)  The firm also expended **$75,187.56** in total costs.  (*Id.*)

### Levin Sedran & Berman LLP

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| H. Sedran | Partner | 795.00 | 4.95 | 3,935.25 |
| D. Levin | Partner | 975.00 | 108.50 | 105,787.50 |
| C. Shaffer | Partner | 975.00 | 9.75 | 9,506.25 |
| A. Cohen | Partner | 975.00 | 282.00 | 274,950.00 |
| C. Hesson | Paralegal | 450.00 | 2.00 | 900.00 |
| J. Rapone | Paralegal | 450.00 | 343.20 | 154,440.00 |
| K. Sentyz | Paralegal | 450.00 | 29.50 | 13,275.00 |
| **Total** | | | **779.90** | **562,794.00** |

(Fees Mot. at 14.)

### Migliaccio & Rathod LLP

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| N. Migliaccio | Partner | 759.00 | 17.60 | 13,358.40 |
| J. Rathod | Partner | 759.00 | 19.30 | 14,648.70 |
| E. Nafisi | Of Counsel | 759.00 | 115.10 | 87,360.90 |
| E. Quezada | Associate | 378.00 | 1.75 | 661.50 |
| K. Kearns | Paralegal | 206.00 | 0.80 | 164.80 |
| B. Ortega | Law Clerk | 206.00 | 21.90 | 4,511.40 |
| **Total** | | | **176.45** | **120,705.70** |

(Fees Mot. at 14.)[21]

### Bardo Law PC (Local Counsel to Migliaccio & Rathod LLP)

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| S. Bardo | Partner | 525.00 | 14.30 | 7,507.50 |
| **Total** | | | **14.30** | **7,507.50** |

(Fees Mot. at 14.)

### Nye, Stirling, Hale & Miller

| Name | Role | Rate | Hours | Lodestar |
|------|------|------|-------|----------|
| J. Miller | Partner | 700.00 | 38.70 | 27,090.00 |
| A. Bernal | Partner | 700.00 | 45.50 | 31,850.00 |
| **Total** | | | **84.20** | **58,940.00** |

(Fees Mot. at 14.)

1.   **Reasonableness of Counsel's Hours and Rates**

In assessing a reasonable hourly rate for the lodestar figure, courts look to the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Fin. Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (internal quotations omitted). "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). "Affidavits of the plaintiff[s'] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff[s'] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

---

[21] The motion contains a minor discrepancy of $120,640.00 as the total lodestar for this firm.

Class Counsel aver that the firms representing the Class are "respected and accomplished plaintiffs' firms responsible for numerous class action settlements." (Fees Mot. at 15; Schelkopft Decl. ¶ 9; Berman Decl. ¶¶ 4–5; Walsh Decl. ¶ 10.) Based on the Court's experience and the declarations submitted by counsel detailing their firms' extensive track records litigating complex class actions, the Court finds that most of the rates listed above—which yield a weighted average of approximately $610 per hour—are reasonable. *See, e.g.*, *Meghan Schmitt, et al v. Younique, LLC*, 8:17-cv-01397-JVS-JDE, Doc. 271 at 21 (approving as reasonable hourly rates ranging from $450 for associates and $700–$795 for partners, with an average per hour rate of approximately $670; *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 8:15-cv-01614-JLS-JCG, 2018 WL 8334858, at *6 (C.D. Cal. July 30, 2018) (approving billing rates between $600 and $825 per hour for attorneys with more than ten years of experience; $325 to $575 per hour for attorneys with 10 or fewer years of experience; and $250 per hour for paralegals and clerks). The Court notes, however, that the hourly rate for paralegals at Levin Sedran & Berman LLP is significantly higher than the paralegal rates charged by their co-counsel and the paralegal rates this Court has previously approved. Specifically, paralegals at that firm billed approximately 375 hours at a rate of $450 per hour. (Fees Mot. at 14.) The firm's declaration does not explain why the paralegals bill at a rate closer to that of a mid-level associate, nor are their experience levels provided. Accordingly, the Court reduces the paralegal rate at LSB to $250 per hour, which is the approximate average of the lowest paralegal rate charged by their co-counsel ($195 per hour) and the highest ($300 per hour.)

The district court should award attorneys' fees only for the hours that it concludes Were "reasonably expended." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary[.]" *Id.* As of their most recent filing, Class Counsel have spent approximately 6,918 hours litigating this case. The Court

has reviewed the detailed time records Class Counsel have provided in support of their motion and concludes that the hours expended were reasonable.

After adjusting the paralegal rate at Levin Sedran & Berman LLP as described above, the hours and rates approved by the Court yield a total lodestar of $4,137,715.20.

## 2. **Lodestar Multiplier**

Class Counsel request a fee award of $6,900,000, which—after the adjustments made to the lodestar calculation detailed above—reflects a lodestar multiplier of approximately 1.67.

Although the lodestar is "'presumptively reasonable,' a court may "the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors, 'including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment[.]'" *Id.* (citing *Hanlon*, 150 F.3d at 1029); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975).  "Foremost among these considerations, however, is the benefit obtained for the class."  *Id.*

Here, the Settlement covers nearly 4 million vehicles.  As detailed above, Class Members will receive a lifetime warranties on their engines; expense reimbursements for repair and repair-related expenses such as towing and rentals; cash payments for inconvenience due to repair delays, loss of value for sold or traded-in vehicles, loss of vehicle by engine vehicle, and a rebate program.  Although the exact value of the settlement cannot be quantified with precision, as the processing of claims is still ongoing and part of the relief obtained is not easily monetized, Defendants earmarked $760,000,000 to implement the terms of the Settlement.[22]  (Fees Mot. at 8.)  Plaintiffs'

---

[22] *Hyundai, Kia earmark $760 million to settle U.S. lawsuits over engine fires*, REUTERS (Oct. 10, 2019), *available at* https://www.reuters.com/article/us-hyundai-motor-settlement-usa/hyundai-kia-earmark-760-million-to-settle-us-lawsuits-over-engine-fires-idUSKBN1WQ0MN.

expert, meanwhile, has valued the settlement at approximately $1.3 billion.[23]  (*Id.*)
Plaintiffs contend that the expert valuation "is a more precise analysis of the benefits and
the actual value to Class Members, as opposed to the Settlement costs to Defendants."
(*Id.*)  While that is not necessarily true, Class Counsel nonetheless achieved an exceptional
result on behalf of the Class.  The quality of representation further supports a multiplier.
The firms representing the Class have extensive experience litigating complex class
actions, including automotive class actions.  (Schelkopft Decl. ¶ 9; Berman Decl. ¶¶4–5.)
This experience likely "paved the way for successful resolution."  (Fees Mot. at 17.)

       The Court is unpersuaded, however, that "the novelty and the complexity of the
issues also support a lodestar multiplier."  (*Id.*)  Class Counsel have litigated, and this
Court has presided over, many automotive defect class actions, and Class Counsel have not
pointed to anything that makes this one particularly novel or complex compared to other
automotive defect class actions.  Rather, Class Counsel seem to conflate this factor with
the risk of continued litigation, contending that automotive defect class actions often take
several years to resolve and are "fraught with risk."  (*See id.*)  While this may be true, risk
multipliers are inappropriate in statutory fee cases.  *See In re Washington Pub. Power
Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("In *Dague*, the [Ninth Circuit]
held that the private market's model of paying premiums for the risk of non-payment was
inapplicable in statutory fee-shifting cases.  For a variety of reasons, the [*Dague*] Court
concluded that the private market practice of rewarding attorneys for taking cases on a
contingency basis would unduly burden losing parties who are required by statute to pay
no more than a 'reasonable' fee for the services rendered by the winning party's attorneys
in that particular case."); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002)
("The bar against risk multipliers in statutory fee cases does not apply to common fund
cases.")  Because this is not a common fund case, the Court will not take the risk of

---

[23] As detailed above, the expert's valuation inflates the value derived from repair-related
reimbursements because it is based on 100% of claimed value, even though the value of claims
actually approved is much lower.  *See* Section III.C.1, *supra*.

litigation or the contingent nature of the fee into consideration when considering the appropriateness of a lodestar multiplier.

Considering the results obtained for the Class and the quality of representation, the Court determines that a multiplier of 1.67 is reasonable. *See, e.g.*, *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation."). Accordingly, Class Counsel's Motion for $6,900,000 in attorneys' fees is GRANTED.

### C. Costs

Class Counsel also seek reimbursement of $175,000 in litigation expenses.  To date, Class Counsel have incurred $196,668.51 in total expenses.  (Joint Notice, Doc. 194 at 2.) Though the expenses incurred have now exceeded the agreed-upon amount, Class Counsel continue to seek reimbursement of only $175,000.  (*Id.* n.2).

Class Counsel have provided itemized lists of the costs and expenses incurred. (Schelkopft Decl. ¶ 40; Berman Decl. ¶¶ 20–22; 27–29.)  Class Counsel have also submitted supplemental declarations for costs incurred since submitting their Fees Motion. Most of the expenses resulted from expert fees for the Settlement valuation report, objector depositions, and evidence storage fees.  *Id.*  Upon review, the Court concludes that these expenses are reasonable. Accordingly, Class Counsel's motion for $175,000 in costs is GRANTED.

### D. ENHANCEMENT TO THE CLASS REPRESENTATIVE

Class Counsel also move for a $3,500 service award for each of the twenty-one class representatives. (Fees Mot. at 20.)  District courts have the discretion to award incentive payments to named plaintiffs as compensation for their actions taken on behalf of the class.  *Stanton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir.2000).  The Ninth Circuit has emphasized that district courts must "scrutinize[e] all incentive awards to determine whether they destroy the adequacy of class

representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir.
2013).

      The Court concludes that Plaintiffs are entitled to the $3,500 incentive award.  Class
counsel aver that the class representatives "communicated and worked with Class Counsel,
presented their individual experiences with Class Vehicles to demonstrate common claims,
searched for and provided documentation to support their claims, reviewed pleadings,
consulted with Class Counsel regarding potential settlement remedies, and carefully
reviewed the Settlement Agreement on behalf of the Class."  (Fees Mot. at 21; Schelkopf
Decl. ¶ 42; Berman Decl. ¶¶ 34-36.)  Moreover, although the case settled before discovery,
the Class Representatives were committed to producing personal documents, sitting for
depositions, and appearing at trial if needed.  (*Id.*)  Accordingly, Counsel's request for a
$3,500 service award to the twenty-one class representatives is GRANTED.  *See Ebarle v.
Lifelock, Inc.*, No. 15-CV-00258-HSG, 2016 WL 5076203, at *12 (N.D. Cal. Sept. 20,
2016) ("Many courts in the Ninth Circuit have held that a $5,000 incentive award is
'presumptively reasonable.'") (collecting cases).

## V.    CONCLUSION

      For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Final
Settlement Approval.  However, in light of (1) the high denial rate for submitted claims,
(2) the fact that the parties touted the availability of BBB-administered arbitration as an
assurance of fairness, and (3) the limited time period in which Claimants have to seek BBB
arbitration, the parties are ORDERED to confirm to the Court that any written notice of
final claim determination other than one granting full payment specifically reminds the
Claimant of the right to BBB-administered arbitration, that it will be paid for by
Defendants except upon a determination of Claimant's bad faith by the arbitrator, and that
the Claimant has 60 days in which to notify Hyundai or Kia in writing of Claimant's
election to arbitrate.  Such confirmation shall be provided within **five (5) days** of the
issuance of this Order.  If the final claim determination notice does not provide such

information to Claimants, the parties shall take immediate steps to remedy that.  Further, Class Counsel are ordered to provide to the Court within **twenty-one (21) days**, a supplemental declaration with the results of Class Counsel's audit of a statistically significant sample of Defendants' claim denials, including the basis for the denials, the nature of documentation Defendants are requiring for claim approval, and any other information addressing the propriety of the denials.

The Court further GRANTS Plaintiffs' Motion for Attorneys' Fees.  The Court awards Class Counsel $6,900,000 in attorneys' fees and $175,000 in costs.  The Court awards each of the twenty-one class representatives $3,500 as an incentive award.  The parties shall submit a proposed judgment in accordance with this Order **within twenty one (21) days of the date of this Order.**

DATED:  May 10, 2021

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE