UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Hyundai and Kia Engine Litigation* | 8:17-cv-00838-JLS-JDE <br><br> Related Cases: <br> 8:17-cv-01365-JLS-JDE <br> 8:17-cv-02208-JLS-JDE <br> 2:18-cv-05255-JLS-JDE <br> 8:18-cv-00622-JLS-JDE <br> 8:18-cv-02223-JLS-JDE <br><br> **DECLARATION OF BONNER C. WALSH CONCERNING REVIEW OF CLASS MEMBER CLAIMS** |

I, Bonner C. Walsh, declare as follows:

1. I am a member of the law firm of Walsh PLLC.

2. My firm serves as Class Counsel in this matter.

3. On May 10, 2021, the Court ordered Class Counsel to provide a supplemental declaration with the results of Class Counsel's audit of a statistically significant sample of Defendants' claim denials, including the basis for the denials, the nature of documentation Defendants are requiring for claim approval, and other information addressing the propriety of the denials. I personally served as the point person for reviewing a sample of claims submitted to the claims administrators and performing statistical analysis.

4. The results, conclusions, and recommendations of that audit follow.

### I. Methodology

5. To perform a statistically relevant analysis of the claims process, I obtained a list of all submitted through May 11, 2021 to both Epiq/Kia and HMA for Qualifying Repairs, which is a prerequisite for certain relief.

6. I performed a randomization of this list and took a sample sufficient to do an analysis with a 99% confidence level. Kia had received 8,674 claims for Qualifying Repairs, almost evenly split among Kia dealer repairs and third-party repairs.[1] By taking a sample of 327 claims, we were able to perform a survey with a 99% confidence level and a 7% margin of error.[2] A similar, statistically relevant, sample was taken for HMA that yielded a 99% confidence level with a 7% margin of error.

---

[1] There were 4,272 claims for third party claims and 4,402 claims for Kia repairs.

[2] This means that if 100 surveys were completed of randomized data that we would expect 99 of those surveys to be within 7% of the observed data.

-2-

DECLARATION OF BONNER C. WALSH

7.     In my review of rejected non-fire sample claims, I flagged a total of 75 claims for Epiq/Kia and 13 claims for HMA for which I had concerns. These included situations where I suspected a claim may have been improperly rejected because either (1) the Class Member had provided sufficient documentation or (2) any missing documents should be readily available to either Kia or HMA. Of these claims, 20 of the Epiq/Kia claims involved requests to Class Members to provide dealership information in order for Kia to retrieve the necessary documentation at the dealer level; however, those claimants did not provide the information necessary for Kia to retrieve the documents and process the claim.[3] Epiq/Kia provided me with additional information on an additional 13 claims that removed any concern of an improper denial. As a result, these 33 claims have been removed from the analysis leaving 42 claims where I believed Epiq/Kia should re-review or approve the claim.

8.     Following the review of the claims that were selected, it was determined that HMA's review of claims fairly tracked the Settlement Agreement and only a few possibly erroneous denials occurred. Statistically (with only 5.4% of claims needing re-review) HMA was within the margin of error of the survey. However, this survey concluded that about 13.5% of Kia Qualifying Repair claims required re-review.[4]

## II.     Results of Audit of Kia Claims

9.     In connection with Class Counsel's investigation into Kia's denial of fire claims, Class Counsel had previously reviewed a subset of fire claims and found a high rate of claims requiring further review. Class Counsel then requested that all fire claims be provided for review. These claims were received by Class Counsel on

---

[3] HMA did not have this issue as they were able to identify where repairs occurred for vehicles by VIN number and could confirm whether or not a repair had occurred. Epiq did not have a similar database.

[4] Given the margin of error we would expect the error rate to vary between 6.5% and 20.5% for the whole population of the Kia Qualifying Repair claims.

1  May 12, 2021.  As a result, more than 500 fire claims were reviewed, which yields a 99% confidence level with a less than 5% margin of error.  During this review, Class Counsel flagged 38.5% of these files that, in the opinion of Class Counsel, need to be re-reviewed or approved based on the information submitted by Class Members that seemed to meet the claimant burden under the settlement agreement.

10.  Following this review, Class Counsel identified three common reasons for improper denials of fire and Qualifying Repair claims among Kia Class Members who submitted additional supporting documentation after receipt of an initial denial.  These were (i) Epiq's misinterpretation of the settlement; (ii) confusing and misleading feedback from Epiq to Class Members; and (iii) errors and/or oversights in reviewing the claim.  Class Counsel is continuing to work through and further correct these issues with Epiq/Kia.

11.  First, after previously observing an elevated rate of fire claim denials, Class Counsel exchanged numerous letters with Epiq and Kia in early 2021 and obtained Epiq's internal process and a sample of fire claims.  After reviewing the sample, Class Counsel believed that an incorrect standard was being applied to claims seeking fire loss compensation and therefore requested all relevant files be produced for potential review, which were provided.  The parties are currently working through this issue.

12.  Second, Epiq's denial letters were often vague, confusing, or contradictory and did not clearly inform the Class Member why Epiq believed their claim was deficient.  Although the standard language for any particular deficiency was clear, there was often a disconnect between Epiq and the Class Member, because the letters listed the wrong reasons for rejection or did not identify a specific reason for rejection (such as the appropriate documentation needed for approval of the claim), Class Members were confused and unable to adequately cure their claims.

DECLARATION OF BONNER C. WALSH

13.     Third, Epiq committed a number of errors, even among claims that did not require close examination of diagnostic or repair documents.  In a number of situations, Epiq did not recognize proof of Qualifying Repairs.   Or seemed to be evaluating claims that were not associated with a claimant's file.  For example, Epiq sent letters that denied fire claims where a claimant had not asserted any claims for a vehicle fire.

14.     Class Counsel is continuing to work through the above issues with Epiq/Kia, but in the event that any of these issues cannot be resolved between the Parties, Class Counsel proposes that any outstanding administration issues be presented to this Court for review.

### III.     Results of Audit of Hyundai Claims

15.     Overall, HMA fairly followed the terms of the settlement agreement and seemed to err on the side of the Class Member.

16.     Class Counsel identified only minor issues.  For example, in the reviewed HMA files, a "T3G" code was overlooked as a Qualifying Repair on a few occasions.  Due to a separate contact from a Class Member requesting clarification of a denial, Class Counsel had recently confirmed that T3G is an ongoing Service Campaign that includes a bearing clearance test, which if failed, would constitute a Qualifying Repair.

17.     Generally, this code was found in conjunction with an engine replacement and noted that replacement was done under warranty.  That means that while the engine was replaced free of charge a claimant might have submitted a claim for towing or rentals that was improperly denied.  HMA is now aware of this issue and prepared to address it in the claims that remain to be reviewed and future contacts or appeals from class members.

DECLARATION OF BONNER C. WALSH

## IV. Claim Data Update

18. Previously we advised the court (Dkt. 197) that as of March 31, 2021 Kia had approved $5,938,959.24 of claims and that HMA had approved $4,974,635.67. As of the date of this declaration, the Kia claims have risen to $7,504,851.48 and HMA has approved $8,975,834.81 in claims.

## V. Conclusion

19. Since it is not necessary in this case to finalize every claim before distributing awards, it is my opinion, as well as that of Class Counsel, that final judgment should be entered so that any appeals may begin and be resolved. In this manner, approved claims can be paid as soon as judgment is final. In the meantime, the review of claims by Class Counsel can and will continue.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of June 2021 in Grangeville, Idaho.

   */s/ Bonner C. Walsh*
   Bonner C. Walsh